COPY

2

**FILED UNDER SEAL**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **PLAINTIFFS UNDER SEAL,** | ) | **Civil Action No.** 10-95 |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| **DEFENDANTS UNDER SEAL,** | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

David A. Dorey (DE I.D. No. 5283)
Steven L. Caponi (DE I.D. No. 3484)
BLANK ROME LLP
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: 302-425-6400
Facsimile: 302-425-6464

and

W. Scott Simmer
Alan M. Freeman
BLANK ROME LLP
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202-772-5800
Facsimile: 202-572-8412

*Counsel for Plaintiff/Relator*

Dated: February 5, 2010

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA *ex rel.* LAYNE FOOTE, and on behalf of the STATES of CALIFORNIA, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, LOUISIANA, MASSACHUSETTS, MICHIGAN, MONTANA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NEVADA, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN and the DISTRICT OF COLUMBIA,** | ) | |
| ***Plaintiffs,*** | ) | **Civil Action No.** |
| **v.** | ) | |
| **ASTRAZENECA LP and ASTRAZENECA PHARMACEUTICALS LP,** | ) | **FILED UNDER SEAL** |
| ***Defendants.*** | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America by Layne Foote, by and through his attorneys against Defendants pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*; the California False Claims Act, CAL. GOV'T CODE § 12650 (Deering 2000), *et seq.*; the Connecticut False Claims Act, 2009 Conn. Pub. Acts No. 09-5 (Sept. Spec. Sess.), *et seq.*; the Delaware False Claims and Reporting Act, DEL. CODE ANN. Tit. 6, § 1201 (2000), *et seq.*; the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.13 (2000), *et seq.;* the Florida False Claims Act, FLA STAT. 68-081 (2000), *et*

# TABLE OF CONTENTS

Page

I. SUMMARY ..... 2

II. JURISDICTION AND VENUE ..... 4

III. PARTIES ..... 5

A. Plaintiff/Relator Layne Foote ..... 5

B. Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP ..... 6

IV. SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT ..... 8

A. The Purpose of the Fraudulent Marketing Scheme ..... 8

B. The Manner and Means of Executing the Scheme ..... 8

V. BACKGROUND OF THE REGULATORY FRAMEWORK ..... 10

A. The Food and Drug Administration ("FDA") Regulatory System ..... 10

a. The FDA regulates what drugs may be marketed, and the uses for which they may be marketed. ..... 10

b. FDA regulations prohibit off-label marketing and false and misleading statements about a drug's use. ..... 15

c. DDMAC has limited ability to regulate drug maker marketing and promotion. ..... 20

B. Prescription Drug Payment Under Federal Healthcare Programs ..... 22

a. The Medicaid Program ..... 22

b. The Medicare Program ..... 23

c. Reimbursement Under Other Federal Healthcare Programs ..... 24

d. Direct Purchases By Federal Agencies ..... 24

1. Programs administered by the Department of Veterans Affairs ..... 24

2. Programs administered by the Department of Defense ..... 25

VI. FDA APPROVAL OF CRESTOR® ..... 25

A. FDA Approval of Crestor® Only For Limited Indications and Dosages ..... 27

B. Compendium Approval of Crestor® Only for Limited Indications ..... 30

C. More Safety Concerns Arise After Crestor® is Approved by the FDA ..... 34



133569.00601/35980358v.5

VII. ASTRAZENECA'S FRAUDULENT MARKETING SCHEME .......... 35

A. AstraZeneca Taps into the Lucrative Market for Statin Drugs, and Wages an Improper Public Campaign to Succeed. .......... 36

B. AstraZeneca Also Waged an Aggressive and Illegal Private Campaign of Misleading and Illegal Off-Label Claims in Order to Exalt Crestor® above Lipitor® and Zocor® and Undermine Public Confidence in Generic Statins. .......... 40

**a.** AstraZeneca Illegally Promoted Crestor® for Off-Label Uses .......... 40

**1.** AstraZeneca Disguises its Unlawful Promotion of Crestor® for Off-Label Uses Through its Engagement of Paid Speakers. .......... 42

**2.** AstraZeneca Ilegally Promotes Off-Label Through its Promotion of the ASTEROID Study As Showing Crestor®'s Ability to Reverse the Progression Atherosclerosis. .......... 44

**3.** AstraZeneca Used the METEOR Trial to Illegally Promote Crestor®'s Ability to Slow the Progression of Atherosclerosis Before Crestor® Was Approved for that Indication. .......... 49

**4.** AstraZeneca Ilegally Promotes Off-Label Through its Promotion of the JUPITER Study As Showing Crestor®'s Ability to Prevent Heart Attacks and Strokes. .......... 51

**5.** AstraZeneca Ilegally Uses Medical Liaisons to Promote Off-Label Uses of Crestor®. .......... 53

**6.** AstraZeneca Illegally Promotes Crestor® for Off-Label Use By Seeking to Override the Judgment of Doctors .......... 54

**b.** AstraZeneca Used Illegal Comparative Marketing Techniques, Including Unsubstantiated Superiority Claims, to Promote Crestor® Over Lipitor® and Generic Simvastatin in Violation of 21 C.F.R. § 202.1 .......... 55

**1.** AstraZeneca Illegally Promotes Crestor® Through Unsubstantiated Comparisons With Lipitor®. .......... 56

**2.** AstraZeneca Illegally Promotes Crestor® Through Unsubstantiated Comparisons With Generic Simvastatin .......... 59

**3.** AstraZeneca Illegally Promotes Crestor® Through Verbatim Dialogues that Repeat Unsubstantiated Comparative Claims. .......... 61

c. AstraZeneca Illegally Provided Kickbacks to Physicians in Order to Influence Them to Prescribe Crestor® for Their Patients. .......... 64

1. AstraZeneca's Illegal Use of Tutorials and Journal Club Dinners .... 65

VIII. ASTRAZeneca KNEW THE LEGAL RISKS RELATED TO OFF-LABEL AND OTHER ILLEGAL PROMOTION OF CRESTOR®. .......... 68

IX. ASTRAZeneca'S PROMOTION OF CRESTOR® CAUSED THE ILLEGAL SUBMISSION OF OFF-LABEL CLAIMS TO FEDERAL PROGRAMS AND THE QUI TAM STATES. .......... 68

**COUNT I** (Violation of False Claims Act, 31 U.S.C. § 3729, *et seq.*) .......... 69

**COUNT II** (Violation of False Claims Act, 31 U.S.C. § 3730) .......... 70

**COUNT III** (Violation of California False Claims Act) .......... 71

**COUNT IV** (Violation of Connecticut False Claims Act) .......... 72

**COUNT V** (Violation of Delaware False Claims and Report Act) .......... 74

**COUNT VI** (Violation of District of Columbia False Claims Act) .......... 75

**COUNT VII** (Violation of Florida False Claims Act) .......... 76

**COUNT VIII** (Violation of Georgia Medicaid False Claims Act) .......... 78

**COUNT IX** (Violation of Hawaii False Claims Act) .......... 79

**COUNT X** (Violation of Indiana False Claims and Whistleblower Protection Act) .......... 80

**COUNT XI** (Violation of Illinois Whistleblower Reward and Protection Act) .......... 82

**COUNT XII** (Violation of Louisiana Medical Assistance Programs Integrity Law) .......... 83

**COUNT XIII** (Violation of Massachusetts False Claims Act) .......... 84

**COUNT XIV** (Violation of Michigan Medicaid False Claims Act) .......... 86

**COUNT XV** (Violation of Montana False Claims Act) .......... 87

**COUNT XVI** (Violation of New Hampshire Medicaid False Claims Act) .......... 88

**COUNT XVII** (Violation of New Jersey False Claims Act) .......... 90

**COUNT XVIII** (Violation of New Mexico Medicaid False Claims Act) .......... 91

**COUNT XIX** (Violation of New York False Claims Act) ........ 93

**COUNT XX** (Violation of Nevada Submission of False Claims to State or Local Government Act) ........ 94

**COUNT XXI** (Violation of Nevada North Carolina False Claims Act) ........ 95

**COUNT XXII** (Violation of Oklahoma Medicaid False Claims Act) ........ 96

**COUNT XXIII** (Violation of Rhode Island False Claims Act) ........ 98

**COUNT XXIV** (Violation of Tennessee Medicaid False Claims Act) ........ 99

**COUNT XXV** (Violation of Texas Human Resources Code, Medicaid Fraud Prevention Chapter) ........ 101

**COUNT XXVI** (Violation of Virginia Fraud Against Taxpayers Act) ........ 102

**COUNT XXVII** (Violation of Wisconsin False Claims for Medical Assistance Act) ........ 103

*seq.*; the Georgia False Medicaid Claims Act, GA. CODE ANN.§ 49-4-168 (2007), *et seq.*; the Hawaii False Claims Act. HAW. REV. STAT. § 661-22, (2006) *et seq.*; the Illinois Whistleblower Reward and Protection Act, 740 ILL. COMP. STAT. ANN. § 175/1 (2000), *et seq.*; the Indiana False Claims and Whistleblower Protection Act, INDIANA CODE § 5-11-5.5, (2007) *et seq.*, the Louisiana Medical Assistance Programs Integrity, LA. REV. STAT. ANN. § 46.439.1 (2006), *et seq.;* the Massachusetts False Claims Act, MASS. ANN. LAWS ch. 12, § 5(A), (2007) *et seq.*; the Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.601, (2007) *et seq.* (2007); the Montana False Claims Act, MONT. CODE ANN. § 17-8-401 (2005), *et seq.*; the New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-b (2005), *et seq.*; the New Jersey False Claims Act, N.J. STAT. ANN. § 265 (2007); the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 (2007), *et seq.*; the New York False Claims Act, N.Y. CLS ST. FIN. § 190.6. (2007), *et seq.*; the Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. § 357.010 (1999), *et seq.*; the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605, *et. seq.*; the Oklahoma Medicaid False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*; the Rhode Island False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*; the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-181(c) (2006), *et seq.*; the TEX. HUM. RES. CODE § 36.001 (2006), *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 (2006), *et seq.*, and the Wisconsin False Claims for Medical Assistance Act, WIS. STAT. § 20.931 (2007), *et seq.*, ("State *qui tam* statutes" or "*Qui Tam* States").

## I. SUMMARY

1. This is an action to recover damages and civil penalties on behalf of the United States and the States arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants, AstraZeneca LP and AstraZeneca

Pharmaceuticals LP (collectively, "Defendants" or "AstraZeneca") and/or their agents, employees or co-conspirators under the False Claims Act and the State *qui tam* statutes.

2. As alleged herein, Defendants engaged in a scheme since at least 2007 to submit and cause to be submitted hundreds of thousands of false claims to federal and state healthcare programs by systematically and illegally promoting Crestor® for unapproved, off-label uses throughout the United States. These false claims cheated the federal and state Governments out of hundreds of millions of dollars that should not have been paid, thereby enriching the Defendants, and they subjected patients to non-approved, ineffective and unsafe uses of Crestor®.

3. The off-label indications that Defendants illegally promoted for Crestor® included (i) slowing the progression of atherosclerosis (before Crestor® received an approved indication for that use), and (ii) regression of atherosclerosis.

4. Defendants, *inter alia*, knowingly (i) violated federal laws and Food and Drug Administration ("FDA") regulations relating to off-label promotion; (ii) misrepresented the evidence concerning the efficacy and safety of the off-label use of Crestor®; (iii) promoted Crestor® for uses that were neither effective nor safe; (iv) utilized fraudulent comparative marketing tactics, including unsubstantiated superiority claims; and (v) provided kickbacks to healthcare professionals to induce them to use and prescribe Crestor® in lieu of cheaper (and even safer) generic equivalents. In so doing, Defendants have endeavored to undermine an important patient protection regulatory scheme developed over the course of almost fifty years.

5. Moreover, at the time the AstraZeneca Defendants were engaged in this illegal, they were operating under a Corporate Integrity Agreement ("CIA") with regard to the drug Zoladex®, making their conduct here even more egregious.

## II. JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345. The Court has original jurisdiction of the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the *Qui Tam* States, and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730.

7. This Court has personal jurisdiction over the Defendants because, among other things, Defendants transact business in this District, and engaged in wrongdoing in this District.

8. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District. According to Defendants' website, their U.S. corporate headquarters, as well as their research and development facilities, are located in this District at 1800 Concord Pike, Wilmington, DE 19897. According to Defendants' website, their cardiovascular supply and manufacturing division also is located in this District, at 587 Old Baltimore Pike, Newark, DE 19702. Further, Defendants employ a substantial number of sales representatives who call on healthcare professionals throughout Delaware in order to sell Crestor®.

9. The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## III. PARTIES

### A. PLAINTIFF/RELATOR LAYNE FOOTE

10. Plaintiff/Relator Layne Foote ("Relator Foote") is a resident of Indiana. Relator Foote received a Bachelor of Science degree from the University of Southern Indiana at Evansville in 1995. Relator Foote was employed by defendant AstraZeneca for approximately six years, from July 2003 to October 2009, as a Pharmaceutical Sales Specialist ("PSS") in the "Great Lakes Region." He had no prior experience in the pharmaceutical industry.

11. Initially, Relator Foote was assigned by AstraZeneca to work in the Louisville (KY) District, which was a part of AstraZeneca's Great Lakes Region. In 2007, Relator Foote requested and was transferred to AstraZeneca's Evansville, Indiana District, which also was a part of the Great Lakes Region.

12. AstraZeneca hired Relator Foote to promote three of its drugs, Crestor®, Toprol XL® and Atacand®, within the Louisville District. When AstraZeneca lost its exclusive right to sell Toprol XL® and stopped detailing Atacand® in 2007 and 2009, respectively, Relator Foote was assigned to promote Nexium® and Trilipix® in their places. He was assigned to promote, and he did promote, Crestor® during his entire time as an employee of AstraZeneca.

13. Relator Foote held the title of Pharmaceutical Sales Specialist throughout his tenure with AstraZeneca. As such, his primary assigned role was to call on physicians, including primary care doctors, cardiologists, nephrologists, endocrinologists and others, within his assigned district, and to encourage them to prescribe his assigned drugs, including Crestor®, for their patients. His secondary responsibility was to call on pharmacies within his assigned district to discourage them from recommending that physicians substitute generic drugs for his assigned, AstraZeneca branded drugs. Relator Foote's compensation package was calculated as base compensation plus a bonus calculated based on progress toward reaching a predetermined goal

for monthly sales growth. For example, if Relator Foote reached his goal for monthly sales growth (which usually was in the order of 25-35 percent), he would be paid 100 percent of the bonus for which he was eligible; and if he reached only 75 percent of his goal he would be paid only 75 percent of the bonus for which he was eligible. In addition, AstraZeneca from time to time would run "Special Incentive Plans" or "SIPs" that would pay an additional amount to the PSS responsible for the greatest sales growth in a sales District during a specified period that usually lasted from two to three months. In these ways, AstraZeneca tied PSS compensation to sales growth, and it incentivized each PSS to increase sales growth irrespective of the regulations prohibiting off-label marketing.

14. Shortly after Relator Foote voiced objection to his District Sales Manager's directive that he promote off-label uses of Crestor® to healthcare professionals, his employment with AstraZeneca was involuntarily terminated. When Relator Foote told his supervisor that he intended to convey his objections to the Human Resources department, his supervisor told him: "I don't know what you think it will accomplish. All you would be doing is talking your way out of a very good severance."

15. Relator Foote is an original source of the Fraudulent Marketing Scheme allegations in this Complaint, and the allegations in the Fraudulent Marketing Scheme are not based upon publicly disclosed information. He has provided the government with material information prior to the filing of this Complaint in accordance with 31 U.S.C. § 3730(b)(2). Prior to filing this complaint, Relator Foote brought the wrongdoing described in this Complaint to the attention of AstraZeneca.

### B. DEFENDANTS ASTRAZENECA LP AND ASTRAZENECA PHARMACEUTICALS LP

16. Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP (together herein referred to as "AstraZeneca") are Delaware limited partnerships with their principal places

of business in Wilmington, Delaware. AstraZeneca is engaged in the development, manufacture, distribution, and sale of pharmaceutical and healthcare products throughout the United States. Throughout the relevant period, AstraZeneca developed, marketed and sold substantial quantities of its drugs products, including Crestor® (rosuvastatin calcium), in Delaware and across the United States.

17. AstraZeneca LP and AstraZeneca Pharmaceuticals LP are U.S. subsidiaries of AstraZeneca PLC, an English public limited company with its principal place of business in London, England, United Kingdom. According to AstraZeneca PLC's most recent Annual Report and Form 20-F, the company had overall sales of more than $31 billion in 2008, and a core operating profit of $11 billion. Sales of Crestor® during 2008 amounted to $3.6 billion – more than 10 percent of the company's total sales, and an increase of 26 percent over the prior year.

18. AstraZeneca markets and sells brand-name prescription drug products, including Crestor®, paid or reimbursed by various governmental programs, including health benefit carriers offering benefits under the Federal Employees Health Benefits ("FEHB") program under a prime contract with the Blue Cross Blue Association ("BCBSA"), the Health Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq*. via Medicare Part C, also known as Medicare+Choice, patients covered by Medicare Part D, the Indian Health Service, Medicaid, the Mail Handler's Health Benefit Plan ("MHHBP"), the U.S. Secret Service Employees Health Association ("SSEH") Health Benefit Plan, the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE") and the Veteran's Health Administration ("VHA") (collectively, the "Federal Programs").

19. As a result of AstraZeneca's actions, the *Qui Tam* States and Federal Programs have suffered financial harm.

20. At all times material hereto, AstraZeneca employed as many as 15,000 sales representatives/sales managers located across the United States whose function it was to promote, market or otherwise sell AstraZeneca drugs, including Crestor®.

## IV. SUMMARY OF DEFENDANTS' ILLEGAL CONDUCT

### A. THE PURPOSE OF THE FRAUDULENT MARKETING SCHEME

21. It was the plan and purpose of AstraZeneca's scheme to illegally market Crestor®, beginning at least as early as 2007 and continuing to the present, in order to fraudulently obtain governmental reimbursement by causing false and fraudulent statements to be made, and by causing false and fraudulent claims to be submitted for payment, in order to maximize AstraZeneca's profits.

22. The underlying purpose of the scheme was to expand AstraZeneca's share of the lucrative market for statin drug, and thereby maximize profits.

### B. THE MANNER AND MEANS OF EXECUTING THE SCHEME

23. It was part of the scheme that AstraZeneca illegally promoted the off-label sales and use of Crestor® in order to obtain reimbursement for non-medically accepted indications and other off-label treatments by making false and fraudulent statements to the public, healthcare providers and the U.S. Food and Drug Administration ("FDA").

24. It further was part of the scheme that AstraZeneca disguised its role in its promotional activities for Crestor® and made false and misleading statements to the public and healthcare professionals. For example, AstraZeneca routinely and intentionally initiated discussions with and among healthcare professionals about off-label uses of Crestor®, sometimes by "planting" questions about off-label uses at AstraZeneca-sponsored presentations.

25. It further was part of the scheme that AstraZeneca utilized illegal and misleading comparative marketing tactics, including unsubstantiated and deceptive superiority claims, touting Crestor®'s alleged superiority for atherosclerotic regression. For example, at least since 2007, without substantial evidence supporting such claims and in contravention of its FDA-approved product labeling, AstraZeneca routinely, intentionally, and inaccurately told healthcare professionals that Crestor® was superior to generic alternatives and competing branded statins because it could *regress* atherosclerosis in patients. This aspect of the scheme was intended to undermine confidence in alternative therapies – particularly generic alternatives that soon would be available for competitor statins such as Lipitor® and Zocor® – and thereby mislead healthcare professionals into writing off-label prescriptions for Crestor®.

26. It further was part of the scheme that AstraZeneca provided illegal kickbacks to healthcare professionals, such as paying for – but then not utilizing – full-day "tutorials" with healthcare professionals, and by entertaining healthcare professionals with lavish dinners. These tactics were intended to induce healthcare professionals to prescribe Crestor®, rather than less expensive alternatives, for non-medically accepted indications, and to encourage government reimbursement for such uses.

27. It further was a part of the scheme that AstraZeneca attempted to conceal and cover up the off-label marketing and false and misleading promotion of Crestor® by making false statements to the FDA and directing employees to conceal evidence.

28. Each Defendant's unlawful promotion of Crestor® involved the unlawful making of a false record or statement and/or causing a false claim to be submitted for the purpose of getting the false record or statement to bring about the federal and state governments' payment of a false or fraudulent claim.

29. Each Defendant's individual conduct had a material effect on the government's decision to pay for Crestor®. Had the federal and state governments known that reimbursements were being made for Crestor® caused by each Defendant's unlawful promotion, they would not have made such reimbursements.

30. The above-described scheme, described in paragraphs 21-29 and below, is referred to herein as the "Fraudulent Marketing Scheme."

## V. BACKGROUND OF THE REGULATORY FRAMEWORK

### A. THE FOOD AND DRUG ADMINISTRATION ("FDA") REGULATORY SYSTEM

#### a. The FDA regulates what drugs may be marketed, and the uses for which they may be marketed.

31. Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d). Approval of the drug by the FDA is the final step in a multi-year process of study and testing.

32. To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

33. Under the nation's food and drug laws, a drug may not be introduced into interstate commerce unless its sponsor has shown that the drug is safe and effective for the intended conditions of use. *See* 21 U.S.C. § 321. The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness. *See* 21

U.S.C. § 355(d)(7). The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use. *See* 21 U.S.C. § 355(d)(5). The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA. *See* 21 U.S.C. § 355(d)(1) & (2). Indications for use that are not listed in a drug's labeling have not been approved by the FDA. *See* 37 Fed. Reg. 16,503 (1972).

34. The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices and guidance documents. The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with (1) clear objectives; (2) adequate design to permit a valid comparison with a control group; (3) adequate selection of study subjects; (4) adequate measures to minimize bias; and (5) well defined and reliable methods of assessing subjects' responses to treatment. *See* 21 C.F.R. § 314.26.

35. The FDA has set forth general principles for the conduct and performance of clinical trials. These principles have been adopted not only by the agency, but also by the International Conference on Harmonisation, which includes the world's leading medicine control agencies. *See* International Conference on Harmonisation: Guidance on General Considerations for Clinical Trials, 62 Fed. Reg. 66113 (Dec. 17, 1997).

36. Those principles include the following standards for the conduct of clinical trials to support an agency decision that a drug is safe and effective for its intended conditions for use:

(i) The need for trials to be controlled: "Trials should have an adequate control group. Comparisons may be made with placebo, no treatment, active controls, or of different doses of the drug under investigation. The

choice of the comparator depends on, among other things, the objective of the trial. . . . . Historical (external) controls can be justified in some cases, but particular care is important to minimize the likelihood of erroneous inference."

(ii) The need for trials to be randomized: "In conducting a controlled trial, randomized allocation is the preferred means of assuring comparability of test groups and minimizing the possibility of selection bias."

(iii) The need for trials to be blinded: "Blinding is an important means of reducing or minimizing the risk of biased study outcomes. A trial where the treatment assignment is not known by the study participant because of the use of placebo or other methods of masking the intervention is referred to as a single blind study. When the investigator and sponsor staff who are involved in the treatment or clinical evaluation of the subjects and analysis of data are also unaware of the treatment assignments, the study is double blind."

(iv) The need for objective and prospectively determined trial endpoints: A drug's effectiveness is determined if the drug has an effect on an "endpoint." That endpoint can be a clinical benefit, such as survival or a reduction of pain as measured on a validated pain scale; a clinical measurement, such as blood pressure; and, in some cases, a laboratory measurement, such as the amount of virus in the blood stream. All endpoints need to reflect clinical benefit. An endpoint that indirectly reflects a clinical benefit, such as a laboratory measurement, is known as a

"surrogate endpoint." Endpoints should be defined prospectively (*i.e.*, before the trial begins), giving descriptions of methods of observation and quantification. Objective methods of observation should be used where possible and when appropriate. A primary endpoint should reflect clinically relevant effects and is typically selected based on the principal objective of the study. Secondary endpoints assess other drug effects that may or may not be related to the primary endpoint. Endpoints and the plan for their analysis should be prospectively specified in the protocol. The method used to make the measurements of the endpoints, both subjective and objective, should be validated and meet appropriate standards for accuracy, precision, reproducibility, reliability and responsiveness (sensitivity to change over time).

37. The FDA has addressed the need for reproducibility and reliability of clinical data in the trials that support a drug's approval. The FDA generally requires two pivotal, adequate and well-controlled trials to support approval, except in certain circumstances. As stated by the FDA in its 1998 *Guidance to the Industry*, "it has been FDA's position that Congress generally intended to require at least two adequate and well controlled studies, each convincing on its own, to establish effectiveness." *See* U.S. Department of Health and Human Services, Food and Drug Administration, Center for Drug Evaluation and Research (CDER), Center for Biologics Evaluation and Research (CBER), *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drugs and Biological Products*, May 1998. *See*, *e.g.* Final Decision on Benylin, 44 FR 51512, 518 (Aug. 31, 1979); *Warner-Lambert Co. v. Hecker*, 787 F.2d 147 (3d Cir. 1986). FDA's position is based on the language in the statute and the legislative history of

the 1962 amendments. Language in a Senate report suggested that the phrase "adequate and well-controlled investigations" was designed not only to describe the quality of the required data but also the "quantum" of required evidence. *See* S. Rep. No. 1744, Part 2, 87th Cong. 2d Sess. 6 (1962). Nevertheless, FDA has been flexible within the limits imposed by the Congressional scheme, broadly interpreting the statutory requirements to the extent possible where the data on a particular drug was convincing. In some cases, FDA has relied on pertinent information from other adequate and well-controlled studies of a drug, such as studies of other doses and regimens, of other dosage forms, in other stages of disease, in other populations, and of different endpoints, to support a single adequate and well-controlled study demonstrating effectiveness of a new use. In these cases, although there is only one study of the exact new use, there are, in fact, multiple studies supporting the new use, and expert judgment could conclude that the studies together represent substantial evidence of effectiveness.

38. In other cases, FDA has relied on only a single, adequate and well-controlled efficacy study to support approval – generally only in cases in which a single multicenter study of excellent design provided highly reliable and statistically strong evidence of an important clinical benefit, such as an effect on survival, and a confirmatory study would have been difficult to conduct on ethical grounds. In section 115(a) of the Modernization Act, Congress amended section 505(d) of the Act to make it clear that the Agency may consider "data from one adequate and well-controlled clinical investigation and confirmatory evidence" to constitute substantial evidence if FDA determines that such data and evidence are sufficient to establish effectiveness. In making this clarification, Congress confirmed FDA's interpretation of the statutory requirements for approval and acknowledged the Agency's position that there has been

substantial progress in the science of drug development resulting in higher quality clinical trial data.

39. Cases where the FDA has approved a drug on the basis of one clinical trial plus confirmatory evidence are rare. They include instances of large, independently conducted multicenter trials with strong empirical results, with internal consistency across multiple outcomes, such that "sponsors faced ethical boundaries" in conducting a second placebo-based trial. Clinical trials that are not controlled, blinded, randomized and whose endpoints are not prospectively and objectively determined and measured may be used in early stage drug development phases, but are exceptionally unlikely to qualify as "adequate and well-controlled" clinical trials needed to support FDA approval.

40. After a drug is approved, the FDA continues to exercise control over the product labeling. To protect patients from safety concerns, the FDA may require a label change to reflect the increased risk of various side effects or interactions, restrict a drug's indications, or, in extreme cases, force a withdrawal from the market. *See* 21 C.F.R. § 201.57(3).

**b. FDA regulations prohibit off-label marketing and false and misleading statements about a drug's use.**

41. FDA regulations restrict how drug companies may market and promote approved drugs. *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. Drug labels – including all marketing and promotional materials relating to the drug – may not describe intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Illegal "misbranding" can result in criminal penalties. *See* 21 U.S.C. § 333.

42. The same general requirements about the promotion of prescription drugs apply to both professional and consumer-oriented marketing. In particular, promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict

scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional claims and materials. Federal regulations require that the risks as well as the benefits be clearly identified and given appropriate prominence. Promotional materials must be consistent with the FDA-approved product labeling. This restriction pertains to the clinical indications for which the drug has been approved as well as the dosing regimen that is supported by the clinical trials that were undertaken to establish safety and efficacy.

43. A manufacturer wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label, must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b), (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq.* A supplemental NDA must be filed. Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

44. "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population, *e.g.*, treating a child when the drug is approved to treat adults.

45. Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA. When considering off-label prescribing, physicians depend on the patient-specific evidence they have available to them.

This includes the particular patient, the severity of his or her problems, the successfulness of prior treatment, and the risks of not treating. Whether contemplating on- or off-label use, physicians also rely on personal experience, recommendations from colleagues and academics, educational seminars, and clinical trials evidence. Much of what physicians rely on is information (or, as the case may be, misinformation) provided by sales representatives from drug makers, drug company sponsored continuing medical education ("CME") courses and speaker programs, and drug company sponsored clinical trials.

46. Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved, or for a patient group that is unapproved. Specifically, a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. The statute, 21 U.S.C. § 331(d), and its implementing regulations, and 21 C.F.R. 202.1(e)(4)(i)(a) prohibit any advertising that recommends or suggests an off-label use for an approved drug, and the FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising. *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997). The FDA "interprets the term 'advertisement' to include information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product."

47. Any manufacturer speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing in 21 C.F.R. 202.1, as well as the FDA's "fair balance" requirement, described below.

48. 21 C.F.R. 202.1(e)(6)(xi) provides that an advertisement may not use "literature, quotations, or references for the purpose of recommending or suggesting conditions of drug use that are not approved or permitted in the drug package labeling." *See also* 21 U.S.C. § 331(d) (prohibiting distribution of a drug for non-approved uses); *id.* § 331(a) (prohibiting distribution of a misbranded drug); *id.* § 360aaa (permitting dissemination of material on off-label uses only if the manufacturer meets certain stringent requirements).

49. The FDA regulations that fall under the general rubric of 21 C.F.R. 202.1(e)(6) *et seq*. ban advertisements that are false, lacking in fair balance, or otherwise misleading. Thus, the use of unsubstantiated comparative claims also is prohibited by law. *See* 21 U.S.C. § 352; 21 C.F.R. § 202.1(e)(6). Thus, companies such as AstraZeneca may not promote their approved drugs through unsubstantiated comparative claims that exalt their drugs as safer or more efficacious than competitor drugs. Such promotion renders a drug "misbranded" and no longer eligible for reimbursement by Federal Programs, including Medicaid.

50. The regulations prohibit an advertisement that "contains a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience, by selective presentation of information from published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated." *See* 21 C.F.R. 202.1(e)(6)(iv).

51. The regulations require drug companies to present a "true statement" of information relating to the side effects, contraindications and effectiveness of the drug use. *See* 21 C.F.R. 202.1(e)(5) *et seq.* A company violates this regulation if it presents "false or misleading" information about a drug's side effects or does not "fair[ly] balance" information

relating to the safety and efficacy of the drug use against information about its side effects and contraindications. *Id.*

52. 21 C.F.R. 202.1(1)(2) broadly describes "labeling" of a drug as including any material accompanying a drug product that is supplied and disseminated by the manufacturer, packer or distributor of the drug.

53. 21 C.F.R. 201.56 requires labeling to be "informative and accurate and neither promotional in tone nor false and misleading in any particular," to "contain a summary of the essential scientific information needed for the safe and effective use of the drug," and prohibits "implied claims or suggestions of drug use if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness."

54. The FDA has interpreted oral communications as falling under the umbrella of "labeling."

55. 21 C.F.R. 99.101 *et seq*. lays out the stringent requirements that must be met by the manufacturer before it may disseminate any materials on unapproved or new uses of marketed drugs. This material must be in the form of an unabridged reprint or copy of a published, peer-reviewed article that is considered "scientifically sound" by experts qualified to evaluate the safety or effectiveness of the drug involved. *See* 21 C.F.R. 99.101(a)(2). The FDA does not consider abstracts of publications to be "scientifically sound." 21 C.F.R. 99.101(b). Unabridged reprints or copies of articles shall not be disseminated with any information that is promotional in nature. 21 C.F.R. 99.101(b)(2).

56. Furthermore, the manufacturer must not disseminate materials that are "false and misleading," such as those that only present favorable information when unfavorable publications exist, exclude mandatory information about the safety and efficacy of the drug use,

or present conclusions that "clearly cannot be supported by the results of the study." 21 C.F.R. 99.101(a)(4).

57. And off-label information may be disseminated only in response to an "unsolicited request from a healthcare practitioner." 21 U.S.C. § 360aaa-6. In any other circumstance, a manufacturer may disseminate information concerning off-label use only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use, has provided the materials to the FDA prior to dissemination; and the materials themselves are submitted in unabridged form and are neither false or misleading. 21 U.S.C. §§ 360aaa(b) & (c); 360aaa-1.

58. In sum, the off-label regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body – the FDA. And the prohibition on unsubstantiated comparative claims protects patients and consumers by ensuring that the prescription and use of approved drugs is not based on misleading marketing tactics.

**c. DDMAC has limited ability to regulate drug maker marketing and promotion.**

59. The FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") is charged with overseeing the marketing and promotion of approved drugs to ensure that advertisements are not false or misleading, provide a fair balance between the benefits and risks of the drug, and do not include off-label uses. *See* Statement by Janet Woodcock, M.D. (Director Center for Drug Evaluation and Research, FDA) Before the Senate Special Committee on Aging (July 22, 2003).

60. DDMAC's effectiveness in regulating off-label promotion is limited. In 2003, the entire staff consisted of forty members, with twenty-five reviewers responsible for reviewing all

drug advertisements and promotional materials. Moreover, drug materials do not have to be pre-approved. FDA review of promotional materials occurs, if at all, only after the materials already have appeared in public. *See* Woodcock Statement, *supra*. Upon finding a violation, DDMAC generally requests, but does not require, the company to stop using the promotional materials. *Id.* Sponsors occasionally are required to publicly correct product misimpressions created by false, misleading, or unbalanced materials. *Id.*

61. Once a drug has been approved, the FDA's statutory authority is limited to requesting label changes, negotiating restrictions on distribution with the manufacturer, and petitioning for the withdrawal of the drug from the marketplace. Title 21 of the Code of Federal Regulations requires that "as soon as there is reasonable evidence of a serious hazard with a drug," the "Warnings" section of the label should be revised to reflect this hazard.

62. The FDA's ineffectiveness in policing off-label promotion was confirmed in a July 28, 2008 U.S. General Accountability Office Report, which found that the FDA took an average of seven (7) months to issue letters in response to off-label promotions. *See Drugs: FDA's Oversight of the Promotion of Drugs for Off-Label Uses* (GAO 08-835), **http://www.gao.gov/new.items/d08835.pdf**. Among the Report's findings: (1) FDA does not have separate oversight activities to specifically capture off-label promotion; (2) FDA is unable to review all promotional submissions because of the volume of materials it receives and prioritizes its reviews in order to examine those with the greatest potential impact on human health; (3) FDA is hampered by the lack of a system that consistently tracks the receipt and review of submitted materials; (4) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material—for instance, discussions between doctors and sales representatives; (5) during calendar years 2003 through

2007, FDA issued 42 regulatory letters in response to off-label promotions requesting drug companies to stop dissemination of violative promotions.

### B. PRESCRIPTION DRUG PAYMENT UNDER FEDERAL HEALTHCARE PROGRAMS

#### 1. The Medicaid Program

63. Whether an FDA-approved drug is approved for a particular indication (*i.e.*, use) determines whether a prescription for that use may be reimbursed under Medicaid and other federal healthcare programs.

64. Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients. Funding for Medicaid is shared between the federal government and state governments. The Medicaid program subsidizes the purchase of more prescription drugs than any other program in the United States.

65. Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the federal government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §§ 1396b(I)(10), 1396r-8(k)(2)-(3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." *Id.* § 1396r-8(k)(3).

66. A medically-accepted indication, in turn, is a use that is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute. *Id.* § 1396r-8(k)(6). During the time period relevant to this Complaint, AstraZeneca promoted off-label uses of Crestor® that were not eligible for reimbursement from Medicaid because the off-label uses were neither listed in the FDA-approved labeling nor included in any of the drug compendia specified by the Medicaid statute.

67. Between the third quarter of 2003 and the second quarter of 2008, Medicaid reimbursements for Crestor® totaled more than $950 million, covering more than 13 million prescriptions.

**2. The Medicare Program**

68. The Medicare Prescription Drug Improvement and Modernization Act of 2003 added prescription drug benefits to the Medicare program. Medicare serves approximately 43 million elderly and disabled Americans.

69. The Medicare Prescription Drug benefit covers all drugs that are considered "covered outpatient drugs" under 42 U.S.C. § 1396r-8(k), as described above.

70. The first stage of the Medicare program, from May 2004 through December 2005, permitted Medicare beneficiaries to enroll in a Medicare-approved drug discount card program.

71. In addition, low-income beneficiaries, defined as those whose incomes are not more than 135 percent of the poverty line (those with incomes of no more than $12,569 for a single person or $16,862 for a married couple in 2004) qualified for a $600 credit (funded by Medicare) on their drug discount card for 2004, and again for 2005.

72. Starting in January 2006, Part D of the Medicare Program provided subsidized drug coverage for all beneficiaries, with low-income individuals receiving the greatest subsidies. AstraZeneca has targeted Medicare Part D beneficiaries for sales of Crestor®, including for off-label uses, by, among other things, distributing marketing materials that highlight formulary coverage of Crestor® by Medicare Part D plans.

73. During the time period relevant to this Complaint, AstraZeneca promoted off-label uses of Crestor® that were not eligible for reimbursement from Medicare because the off-label uses were neither listed in the FDA-approved labeling nor included in any of the drug compendia specified by the statute.

### 3. Reimbursement Under Other Federal Healthcare Programs

74. In addition to Medicaid and Medicare, the federal government reimburses a portion of the cost of prescription drugs under several other federal healthcare programs, including but not limited to CHAMPUS/TRICARE/CHAMPVA and the Federal Employees Health Benefit Program.

75. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependants affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for families of veterans with 100 percent service-connected disabilities. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees and survivors. Coverage of off-label drug use under these programs is similar to coverage under the Medicaid program. *See, e.g.,* TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

76. During the time period relevant to this Complaint, AtraZeneca promoted off-label uses of Crestor® that were not eligible for reimbursement under any of the various federal healthcare programs.

### 4. Direct Purchases By Federal Agencies

77. In addition to reimbursing drug purchases through Medicaid, Medicare and other federal healthcare programs, the United States is a significant direct purchaser of prescription drugs through various federal programs. AstraZeneca's illegal and misleading off-label promotion of Crestor® has resulted in greatly increased purchases of Crestor® and other statin drugs by these programs, including but not limited to the following:

#### a. Programs administered by the Department of Veterans Affairs

78. The Department of Veterans Affairs ("VA") maintains a system of medical facilities from which all pharmaceutical supplies, including prescription drugs, are dispensed to beneficiaries. It also supports a mail service prescription program as part of the outpatient drug benefit. The system serves approximately four million veterans. The VA directly purchases prescription drugs, including Crestor®, that are dispensed through these facilities and programs.

### b. Programs administered by the Department of Defense

79. The Department of Defense ("DOD") provides prescription drug coverage to approximately eight million active duty personnel, retirees and their families through three points of service: military treatment facility outpatient pharmacies, TRICARE managed care contractor retail pharmacies, and the National Mail Order Pharmacy Program. DOD negotiates independent contracts to purchase the majority of the prescription drugs, including Crestor®, provided through these programs.

## VI. FDA APPROVAL OF CRESTOR®

80. Crestor® (rosuvastatin calcium) is a member of the class of medications known as "statins," which generally are prescribed to lower cholesterol levels by blocking enzymes that are essential to cholesterol production. The best-selling statin drug is Lipitor® (atorvastatin), which is manufactured, marketed and sold by Pfizer, Inc., a competitor of AstraZeneca. Lipitor® was approved by the FDA on December 18, 1996, and it is scheduled to become available in generic form in late 2011. At the time Crestor® initially was approved by the FDA, the second-best-selling statin drug was Zocor® (simvastatin), which was manufactured, marketed and sold by Merck, Inc., another competitor of AstraZeneca. Zocor® had been approved by the FDA on December 23, 1991, but its patent protection expired in 2006, at which time the FDA approved an Abbreviated New Drug Application ("ANDA") for generic simvastatin.

81. Although statins have been hailed as "wonder drugs," they are not without their side effects, the most prominent being kidney problems and muscle damage. The FDA withdrew approval for Baycol® (Bayer) – then the most potent statin available – following the deaths of thirty-one patients. AstraZeneca developed Crestor® with the intention that it would assume the mantle of "most potent" statin available.

82. The success of Crestor® was critical to AstraZeneca's long-term strategy. Between 2000 and 2003, AstraZeneca faced a serious financial crisis precipitated by several factors, including new competition for its blockbuster drug, Prilosec®. Indeed, AstraZeneca reported a 17 percent drop in pre-tax profits in the second quarter of 2003 (which was the quarter immediately preceding Crestor®'s approval by the FDA). AstraZeneca considered the approval and introduction of Crestor® to the U.S. market to be the growth vehicle that could change the company's financial fortunes.

83. At the same time, AstraZeneca recognized that Crestor®'s economic success would depend in large part on its ability to capture market share from its chief rivals – Lipitor® and Zocor® – and, more importantly, on its ability to retain that market share after Lipitor® and Zocor® became available in generic form. AstraZeneca's concern was well-founded – when Zocor® became available in generic form in 2006, its daily cost dropped to pennies per day, while the daily cost of banded Lipitor® remained a multiple of that amount. Not surprisingly, simvastatin gained favor with patients and insurers alike, and sales of Lipitor® plummeted twenty percent between Q1 2005 and Q2 2008.

84. But AstraZeneca's concern was not only that Crestor® revenues would be depressed by generic versions of Zocor® and eventually Lipitor®. AstraZeneca also was acutely concerned, at least as early as 2007, that its revenues might be further eroded by the early

introduction of generic versions of Crestor® itself. That is because in 2007 AstraZeneca filed suit against nine generic drug manufacturers who had submitted ANDAs to market generic versions of Crestor®. *See In re: Rosuvastatin Calcium Patent Litigation*, Civ. No. 08-md-1949 (D. Del.). AstraZeneca contended that such sales would infringe its patent that covers the active ingredient in Crestor®, but the defendants countered that the patent (and the original patent from which it reissued) was procured through inequitable conduct, thereby rendering the patent unenforceable. The possibility that the patent might be unenforceable, and that Crestor® might soon be approved for sale in generic form, posed (and continues to pose) a significant threat to AstraZeneca's projected revenues from Crestor®. On December 11, 2009, United States Magistrate Judge Leonard P. Stark issued a Report and Recommendation that AstraZeneca's motion for a summary judgment of no inequitable conduct be *denied* because there was an adequate evidentiary record for the fact-finder to conclude that there was inequitable conduct.

85. Against this backdrop, AstraZeneca developed the Fraudulent Marketing Scheme in order to more effectively – albeit illegally – compete against rival statins, their generic equivalents and the possibility that it might soon have to compete against generic versions of Crestor® as well.

## A. FDA APPROVAL OF CRESTOR® ONLY FOR LIMITED INDICATIONS AND DOSAGES

86. Analysts initially had projected that Crestor® could claim up to a quarter of the cholesterol lowering market, with sales potentially reaching $6 Billion by 2006. However, Crestor® faced several regulatory hurdles that delayed its release, limited its market impact and hindered AstraZeneca's efforts to boost profits. Most particularly, concerns over rhabdomyolysis and renal impairment in higher doses delayed approval of Crestor® for the U.S. market until August 12, 2003, more than a year after the FDA had issued an "approvable" letter on May 31, 2002.

87. Concerns about Crestor®'s toxicity led the FDA to limit the manner in which it could be prescribed. The FDA limited the approved starting dose to 10 mg, and it limited Crestor®'s availability in 40 mg doses. These actions tended to reinforce public concern about super-statins (since the fallout from Baycol® was still fresh in the public mindset), and they significantly reduced Crestor®'s competitiveness with Lipitor®, a drug that was more familiar to doctors and that could be used more safely at higher doses.

88. Crestor® initially was approved only for the following indications, in accordance with FDA-approved labeling:

(i) as an adjunct to diet to reduce elevated total-C, LDL-C, ApoB, non-HDL-C, and TG levels and to increase HDL-C in patients with hypercholesterolemia (heterozygous familial and nonfamilial) and mixed dyslipidemia (Fredrickson Type IIa and IIb);

(ii) as an adjunct to diet for the treatment of patients with elevated serum TG levels (Fredrickson Type IV); and

(iii) to reduce LDL-C, total-C, and ApoB in patients with homozygous familial hypercholesterolemia as an adjunct to other lipid-lowering treatments (*e.g.*, LDL apheresis) or if such treatments are unavailable.

89. The following chart includes the various package sizes, strengths and drug codes approved by the FDA for Crestor® in 2003:

| Package Configuration | Capsule Strength | NDC Code | Imprint |
|---|---|---|---|
| Bottles of 90 | 5 mg | NDC 0310-0755-90 | ZD4522 & 5 |
| Bottles of 90 | 10 mg | NDC 0310-0751-90 | ZD4522 & 10 |
| Bottles of 90 | 20 mg | NDC 0310-0752-90 | ZD4522 & 20 |
| Bottles of 30 | 40 mg | NDC 0310-0754-30 | ZD4522 & 40 |
| Unit dose/100 | 10 mg | NDC 0310-0751-39 | ZD4522 & 10 |
| Unit dose/100 | 20 mg | NDC 0310-0752-39 | ZD4522 & 20 |

| | | | |
|---|---|---|---|
| Unit dose/100 | 40 mg | NDC 0310-0754-39 | ZD4522 & 40 |

90. Due to safety concerns, the FDA refused to approve an 80 mg dose of Crestor® and, as indicated, it restricted availability of a 40 mg dose.

91. In November 2007, the FDA approved an additional indication for Crestor® for slowing the progression of atherosclerosis as part of a treatment strategy to lower total-C and LDL-C as an adjunct to diet. Not only was Crestor® not approved for this indication prior to November 2007, all the other statins already had this same indication (*i.e.*, slowing progression of atherosclerosis) at the time.

92. In October 2008, the FDA approved an additional indication for Crestor® for patients with primary dysbetalipoproteinemia (Type III hyperlipoprotenemia) as an adjunct to diet. Crestor® was not approved for this indication prior to October 2008.

93. In October 2009, the FDA approved an additional indication for Crestor® for pediatric patients 10 to 17 years of age with heterozygous familial hypercholesterolemia. Crestor® was not approved for this indication in this patient population prior to October 2009.

94. Thus, Crestor® currently is approved by the FDA only for the following seven indications:

(i) August 12, 2003: as an adjunct to diet to reduce elevated total-C, LDL-C, ApoB, non-HDL-C, and TG levels and increase HDL-C in patients with primary hypercholesterolemia (heterozygous familial and nonfamilial) and mixed dyslipidemia (Fredrickson Type IIa and IIb);

(ii) August 12 ,2003: as an adjunct to diet for the treatment of patients with elevated serum TG Levels (Fredrickson Type IV);

(iii) August 12, 2003: patients with homozygous familial hypercholesterolemia to reduce LDL-C, total-C and ApoB as an adjunct to other lipid-lowering treatments;

(iv) August 12, 2003: patients with hypertriglyceridemia as an adjunct to diet;

(v) November 8, 2007: slowing the progression of atherosclerosis as part of a treatment strategy to lower total-C and LDL-C as an adjunct to diet;

(vi) November 6, 2008: patients with primary dysbetalipoproteinemia as an adjunct to diet; and

(vii) October 15, 2009: pediatric patients 10 to 17 years of age with heterozygous familial hypercholesterolemia to reduce elevated total-C, LDL-C and ApoB after failing an adequate trial of diet therapy.

95. Because Crestor® is not a risk-free drug, its label includes a wide range of precautions and adverse reactions. According to Crestor®'s FDA-approved label, patients on Crestor® may suffer potentially fatal complications of the liver and skeletal muscle (myopathy) dysfunction. Drug interactions with a variety of common medications, such as cyclosporine, gemfibrozil, coumarin anti-coagulants and lipid lowering doses of niacin, can increase the risk of myopathy, and Crestor® should be used with caution by patients with a history of liver disease, or by women who are pregnant or may become pregnant. The approved label also reflects that Crestor® may pose heightened or additional risks for persons of Asian descent.

### B. Compendium Approval of Crestor® Only for Limited Indications

96. Congress has adopted a compendia-based system for determining appropriate Medicaid reimbursements for off-label uses of a "covered outpatient drug." *See* Social Security Act §§ 1927(g)(1)(B)(i) and (k)(6). The statute permits reimbursements for drug uses that "(i) are appropriate, (ii) are medically necessary, and (iii) are not likely to result in adverse medical results."

97. Thus, the only way a prescription for an off-label use could be reimbursed under Medicaid, Medicare or the other federal reimbursement programs is if the particular off-label use was approved by one of the compendia identified in the Social Security Act, such approval qualifying the use as a "medically accepted indication."

98. The leading and most commonly available statutorily approved compendium is called DRUGDEX, and it supports only the following off-label uses for Crestor®:

| INDICATION | FDA APPROVED | DRUGDEX APPROVED |
|---|---|---|
| Acute Coronary Syndrome | No | Adult, Class IIa |
| Atrial Fibrillation; Prophylaxis – Operation on heart | No | Adults, Class IIb |
| Disorder of Cardiovascular System, Primary; Prophylaxis | No | Adults, Class IIb |
| Disorder of Cardiovascular System; Prophylaxis – Heart failure, chronic | No | Adults, Class IIb |
| Familiar Hypercholesterolemia – Homozygous | Adults | Adults, Class IIa |
| Familial Hypercholesterolemia – Heterozygous | Pediatric (10/2009) | |
| Familial Type 3 Hyperlipoproteinemia | Adults (10/2008) | Adults, Class IIb |
| Generalized Atherosclerosis | Adults | Adults, Class IIb |
| Hyperlipidemia, Primary | Adults | Adults, Class IIa |
| Hypertriglyceridemia | Adults | Adults, Class IIa |
| Metabolic Syndrome | No | Adults, Class IIb |
| Mixed Hyperlipidemia | Adults | Adults, Class IIa |
| Venous Thromboembolism; Prophylaxis | No | Adults, Class IIb |

99. Significantly, Lipitor® is approved, either by the FDA or one of the statutory compendia, for a number of therapeutic uses for which Crestor® is not approved, including:

| INDICATION | FDA APPROVAL | COMPENDIUM APPROVAL |
|---|---|---|
| Antiviral drug adverse reaction, Antiretroviral – Hyperlipidemia | No | Adult, Class IIa (DRUGDEX) |
| Atrial Fibrillation; Prophylaxis | No | Adults, Class IIb |

| INDICATION | FDA APPROVAL | COMPENDIUM APPROVAL (DRUGDEX) |
|---|---|---|
| Atrial Fibrillation; Prophylaxis – Direct current cardioversion | No | Adults, Class IIb (DRUGDEX) |
| Diabetes mellitus type 2 – Disorder of cardiovascular system, in patients with multiple risk factors for coronary heart disease; Prophylaxis | Adults | Adults, Class IIa (DRUGDEX) |
| Diabetic retinopathy; Adjunct | No | Adults, Class IIa (DRUGDEX) |
| Disorder of cardiovascular system, in patients with multiple risk factors for coronary heart disease; Prophylaxis | Adults | Adults, Class IIa (DRUGDEX) |
| Reducing total and LDL-cholesterol concentrations in patients with renal transplantation | No | AHFS-DI |
| Reducing total and LDL-cholesterol concentrations in hypercholesterolemic patients on peritoneal dialysis | No | AHFS-DI |
| Reduction of cholesterol and triglyceride concentrations in patients with hypercholesterolemia associated with the use of protease inhibitors | No | AHFS-DI |

100. Similarly, Zocor®/simvastatin is approved, either by the FDA or one of the statutory compendia, for therapeutic uses for which Crestor® is not approved, including:

| INDICATION | FDA APPROVAL | COMPENDIUM APPROVAL |
|---|---|---|
| Cardiovascular Event Risk, Primary; Prophylaxis | No | Adult, Class IIb (DRUGDEX) |
| Cerebrovascular accident; Prophylaxis | Adults | Adult, Class IIa (DRUGDEX) |
| Coronary Arteriosclerosis; Prophylaxis | Adults | Adult, Class IIa (DRUGDEX, AHFS-DI) |
| Diabetes Mellitus – Vascular Disorder; Prophylaxis | Adults | Adults, Class IIa |

| INDICATION | FDA APPROVAL | COMPENDIUM APPROVAL (DRUGDEX) |
|---|---|---|
| Dyslipidemia – Transplantation | No | Adult, Class IIb (DRUGDEX) |
| Heart Failure, Chronic | No | Adult, Class IIb (DRUGDEX) |
| High Density Lipoid Deficiency | No | Adult, Class IIb (DRUGDEX) |
| Hypercholesterolemia | Adults | Adult, Class IIa (DRUGDEX) |
| Hypercholesterolemia, Postmenopausal | No | Adult, Class IIa (DRUGDEX) |
| Hyperlipidemia – Kidney Disease | No | Adult and Pediatric, Class IIb (DRUGDEX) |
| Improving ejection fraction in cardiac transplant recipients | No | AHFS-DI |
| Percutaneous Coronary Intervention | No | Adult, Class IIb (DRUGDEX) |
| Reducing the risk of postoperative thrombocytosis and thrombotic complications following coronary artery bypass grafting | No | Adult, Class IIb (DRUGDEX, AHFS-DI) |
| Reducing total and LDL-cholesterol concentrations in patients with hypercholesterolemia associated with or exacerbated by diabetes mellitus, cardiac or renal transplantation, or nephritic syndrome | No | AHFS-DI |
| Restenotic Lesion of Coronary Artery; Prophylaxis | No | Adult, Class IIb (DRUGDEX) |

101. Thus, Lipitor® and Zocor®/simvastatin are approved for reimbursement by Medicaid, Medicare and the other federal reimbursement programs for indications and off-label uses for which Crestor® is not approved for reimbursement.

### C. More Safety Concerns Arise After Crestor® is Approved by the FDA

102. Not long after Crestor® was introduced to the U.S. market in August 2003, the same safety concerns that had delayed FDA approval resurfaced.

103. In March 2004, the public interest group Public Citizen petitioned the FDA to order that Crestor® be withdrawn from the U.S. market due to safety concerns. Public Citizen presented an analysis that there had been 29 reports of kidney failure or insufficiency among patients given Crestor® during the first year after its approval which, according to Public Citizen, was 75 times the rate of kidney failure or insufficiency for all other similar drugs combined. Public Citizen's petition was denied, but in June 2004 – less than a year after approval – the FDA issued a Public Health Advisory that asked doctors to exercise greater caution in prescribing Crestor® due to safety concerns. Highlighting the safety concern, AstraZeneca still does not make 40 mg samples of Crestor® available to physicians.

104. Later in 2004, on November 18, Dr. David J. Graham, the FDA's Associate Director for Science and Medicine in the FDA's Office of Drug Safety testified before a committee of Congress that Crestor® was one of five then-currently marketed drugs that should be withdrawn from the market due to safety concerns. The same day, Dr. Steven Galson, Director of the FDA's Center for Drug Evaluation and Research was quoted in the Washington Post as saying that the FDA "has been very concerned about Crestor® since the day it was approved, and we've been watching it very carefully." According to J.P. Morgan, in the week following the hearing, Crestor®'s share of new prescriptions among cholesterol lowering drugs dropped 22 percent.

105. In March 2005, the FDA issued another Public Health Advisory regarding Crestor® safety, and thereafter required that Crestor®'s label contain new precautionary information and new recommended dose levels for patients at a higher risk for developing

muscle damage, including persons of Asian descent and people with a history of liver or kidney damage.

106. The cumulative effect of these developments was to increase the urgency for AstraZeneca to employ an aggressive marketing campaign to support Crestor®.

## VII. ASTRAZENECA'S FRAUDULENT MARKETING SCHEME

107. At all relevant times, AstraZeneca knew that Crestor® was (and is) being paid or reimbursed by Federal Programs, including Medicaid and Medicare Part D, as well as by the *Qui Tam* States.

108. AstraZeneca knew, or it was reasonably foreseeable, that its promotion of Crestor® would lead to the submission by physicians, pharmacists and government-funded health plans of Crestor® prescriptions that were ineligible for payment by Federal Programs. For example, as recently as December 2009, AstraZeneca sent a memo to each Pharmaceutical Sales Specialist working in Indiana, encouraging them to promote "the preferred status of CRESTOR on the Indiana Medicaid Preferred Drug List." The memo appended promotional material called a "Simvastatin sell sheet with formulary information" that specifically promoted Crestor® over Vytorin® (a combination of ezetimibe and simvastatin) on the basis that Crestor® is covered by Indiana State Medicaid, but Vytorin® is not.

109. When AstraZeneca decided to employ the illegal practices described herein, it knew or should have known that physicians, pharmacists and federally-funded health programs would routinely and necessarily file claims with Federal Programs for reimbursement for Crestor® prescriptions. But for AstraZeneca's illegal promotion, these off-label and misbranded prescriptions for Crestor® would not have been written. As a result, AstraZeneca caused the submission of false claims to Federal Programs for reimbursement of Crestor®. AstraZeneca was the beneficiary of these false claims for reimbursement of Crestor® prescriptions.

### A. ASTRAZENECA TAPS INTO THE LUCRATIVE MARKET FOR STATIN DRUGS, AND WAGES AN IMPROPER PUBLIC CAMPAIGN TO SUCCEED.

110. When Crestor® finally was approved by the FDA in August 2003, it became the seventh statin drug on the market, behind Lipitor® (Pfizer), Zocor® (Merck), Pravachol® (Bristol-Myers Squibb), Mevacor® (Merck), Lescol® (Novartis), and Baycol® (Bayer). Lipitor® was the leading statin in 2003, with $9.2 billion in total sales, followed by Zocor® at $5 billion and Pravachol® at $2.8 billion. Lipitor® continued to lead the market in 2004, with sales of $10.8 billion, followed again by Zocor® at $5.2 billion, and Pravachol® at $2.6 billion.

111. AstraZeneca was eager to tap into the profit potential of a statin market that had been dominated by its competitors, but it had several strikes against it, chief among them: (i) the market penetration of its competitors, (ii) the fact that its competitors had comparatively few adverse side effects compared to well-publicized concerns about Crestor®, and (iii) the fact that one of its chief competitors – Zocor® – soon would be available in a much cheaper generic form.

112. AstraZeneca had been dogged in its effort to gain FDA approval for Crestor®, and it was equally dogged in its public effort to put Crestor® in America's medicine cabinet – so much so that the British medical journal *The Lancet* offered the following criticism in an October 2003 editorial: "AstraZeneca's tactics in marketing its cholesterol-lowering drug, rosuvastatin, raise disturbing questions about how drugs enter clinical practice and what measures exist to protect patients from inadequately investigated medicines." *See The statin wars: why AstraZeneca must retreat*, THE LANCET, Vol. 362, Issue 9393 at p. 1341 (October 25, 2003). The editorial criticized AstraZeneca for relying too much on extrapolation and too little on firm clinical endpoints (as were available for other statins), and for "push[ing] its marketing machine too hard and too fast." *Id.*

113. Indeed, when Dr. Wolfe, Dr. Kessler and others voiced their concerns regarding Crestor®'s toxicity, AstraZeneca responded in swift and misleading fashion. Less than a week after Dr. Graham told Congress of his concerns in November 2004, AstraZeneca ran a direct-to-consumer ("DTC") print advertisement (the "Patient Safety Ad") in the *Washington Post* that stated: "You can be assured that at AstraZeneca, patient safety is our number one priority." It sought to assure readers that Crestor® is "more effective and just as safe" as "the leading medications in its class" and it advised that:

> The scientists at the FDA who are responsible for the approval and ongoing review of CRESTOR have, as recently as last Friday, publicly confirmed that CRESTOR is safe and effective; and that the concerns that have been raised have no medical or scientific basis."

The Patient Safety Ad succeeded in stemming the drop in prescriptions for Crestor®, but when AstraZeneca later submitted it for approval by the FDA, the FDA wasted no time. On December 21, 2004, DDMAC notified AstraZeneca that the Patient Safety Ad "misbrand[ed] Crestor® in violation of the Federal Food, Drug, and Cosmetic Act" because it made "false or misleading safety claims that minimize the risks associated with Crestor®, thereby suggesting that Crestor® is safer than has been demonstrated by substantial evidence or substantial clinical experience." Specifically, DDMAC concluded that the Patient Safety Ad violated the law because:

(i) It minimized the risks associated with the 40 mg dose of Crestor®. DDMAC noted that FDA was "not aware of substantial evidence or substantial clinical experience demonstrating that all doses of Crestor are 'just as safe' as other statins" and that Crestor®'s approved label warned that the 40 mg dose "should be reserved for those patients who have not achieved goal LDL-C at 20 mg. . . ." DDMAC also noted that AstraZeneca had agreed to implement

special distribution measures for the 40 mg dose, as well as three long-term post-marketing clinical trials to further assess the safety of that dose.

(ii) It "misleadingly suggest[ed]" that FDA did not believe Crestor® poses safety concerns. DDMAC noted that there was no support for AstraZeneca's claim that FDA scientists had no concerns, and that recent public statements by the Acting Director of FDA's Center for Drug Evaluation and Research were directly contrary to AstraZeneca's claim.

DDMAC requested that AstraZeneca "immediately cease the dissemination of violative promotional materials for Crestor® such as those described [in the FDA notice letter]."

114. AstraZeneca's conduct in promulgating the Patient Safety Ad in order blunt a wave of bad publicity that resulted from the comments of Drs. Wolfe and Kessler, suggests a callous disregard for the facts regarding Crestor's safety profile, and a preference for maximizing profits over patient safety.

115. Similarly, AstraZeneca sought to blunt the impact of publicly-voiced safety concerns, and to encourage physicians to prescribe Crestor® notwithstanding those concerns, when it ran a DTC ad campaign that included one television commercial and three print advertisements (the "STELLAR Campaign"). The STELLAR Campaign was an outgrowth of the STELLAR trial, which evaluated four statins – Crestor® , Lipitor®, Zocor® and Pravachol®. The STELLAR Campaign made the following four comparative claims in a Dr. Seuss-like rhyme:

(i) "All cholesterol drugs simply aren't the same. When Crestor® performed in a head to head test its lowering effect was clearly the best." (TV)

(ii) "Cholesterol high? Trouble getting it low? Perhaps your answer is right here, below." (Print)

(iii) "Lowering cholesterol isn't a game. It's vital to know not all drugs are the same." (Print)

(iv) "Is your cholesterol treatment doing its share? Are you where you should be? If not, then compare." (Print)

Again, the FDA did not wait long to respond. On March 8, 2005 – fewer than three months after it rejected the Patient Safety Ad – DDMAC notified AstraZeneca that the STELLAR Campaign ads "misbrand[ed] Crestor®" in violation of the Federal Food, Drug, and Cosmetic Act because they made "false or misleading claims regarding the superiority of Crestor®." Specifically, DDMAC concluded that the Patient Safety Ads violated the law because they included a bar graph that presented a "misleading comparison" of Crestor® to its competitor statins in that it "relie[d] solely on data that are not relevant to comparisons of the drugs such as most common dose or starting dose, while ignoring data that do not support the claim of superiority made in the ads." Once again, the FDA requested that AstraZeneca "immediately cease the dissemination of violative promotional materials for Crestor®[.]"

116. AstraZeneca's conduct in promulgating unsubstantiated and misleading comparative claims by way of the STELLAR Campaign was yet another example of the company's preference for profits over patient safety.

117. AstraZeneca's improper DTC advertising efforts alone were not able to capture the market share that AstraZeneca coveted. The long delay in FDA approval had placed AstraZeneca at a disadvantage in the growing market for cholesterol lowering drugs. In addition to the fact that Lipitor® and Zocor® had relatively few reported side effects, they had been approved by the FDA and the statutory compendia for indications for which Crestor® was not approved.

118. More than a year after receiving FDA approval, Crestor® sales still lagged far behind those of the market leaders. In 2004, Crestor® sales were a relatively $908 million, while sales of Lipitor® and Zocor® reached $10 billion and $4 billion, respectively. With generic competition from simvastatin close at hand, AstraZeneca needed more than a misleading public advertising campaign to achieve its financial goals for Crestor®.

### B. ASTRAZENECA ALSO WAGED AN AGGRESSIVE AND ILLEGAL PRIVATE CAMPAIGN OF MISLEADING AND ILLEGAL OFF-LABEL CLAIMS IN ORDER TO EXALT CRESTOR® ABOVE LIPITOR® AND ZOCOR® AND UNDERMINE PUBLIC CONFIDENCE IN GENERIC STATINS.

119. Confronted with lagging sales of a product once viewed to be its financial savior, beginning in 2006, AstraZeneca embarked on an aggressive marketing campaign to grab market share from Lipitor® and Zocor® through a misleading misbranding campaign and – critically – to retain that market share after Zocor® became available as the cheaper, generic simvastatin on June 23, 2006. This campaign included the illegal promotion of off-label uses of Crestor®, the illegal use of comparative marketing tactics (including unsubstantiated superiority claims), and the payment of illegal kickbacks to healthcare professionals to induce them to use Crestor® rather than cheaper generic equivalent (and even safer) drugs. AstraZeneca did these things in furtherance of its Fraudulent Marketing Scheme.

#### 1. AstraZeneca Illegally Promoted Crestor® for Off-Label Uses

120. AstraZeneca knows that it is prohibited under the FDCA from promoting off-label uses of Crestor®. Thus, its "Global Policy" on "Providing Information About our Products" states:

> We must promote only licensed products and only for approved uses in accordance with the approved prescribing information. We must not initiate discussions on 'off-label' uses or unlicensed products in order to promote such use. (emphasis added)

Similarly, AstraZeneca's policy on "Marketing to healthcare professionals" states: "Off-label promotion (the marketing of medicines for uses or for the treatment of patient groups not specified in the prescribing information) is illegal and not permitted by our policies." Although Pharmaceutical Sales Specialists receive annual online compliance training on these issues, that training routinely is countermanded by supervisors, such as when one DSM recently told each PSS in his district to start selling Crestor® as a drug that could prevent heart attacks and strokes, even though such claims would be off-label. Another RSD at the time told a DSM that, if the Sales Specialists were not initiating off-label discussions with doctors about AstraZeneca's ASTEROID trial, then "they are not doing their jobs."

121. AstraZeneca knows that its involvement in promotional activities should be clearly disclosed. Thus, its "Global Policy" states: "Engagements of Healthcare Professionals and Organisations for services must not be disguised promotion." Yet AstraZeneca routinely disguised its role in presentations by paid speakers by surreptitiously "planting" questions about off-label uses with members of the audience.

122. Moreover, AstraZeneca's Global Policy states: "Where the Company is providing support for third party programmes, we must . . . not exert any inappropriate influence over the content of presentations made by any speakers, whether or not the Company has sponsored the event at which the presentation is made." Yet, AstraZeneca routinely prepared visual support (*i.e.,* slides) for use by its paid speakers, including Dr. Jahangir Cyrus, an endocrinologist from Louisville, Kentucky who regularly speaks for AstraZeneca, and it now requires that speakers use only slides that AstraZeneca has approved.

123. In fact, AstraZeneca routinely and intentionally has promoted off-label uses of Crestor® on its own initiative (*i.e.*, not in response to inquiries received from physicians) and using illegal means.

**a. AstraZeneca Disguises its Unlawful Promotion of Crestor® for Off-Label Uses Through its Engagement of Paid Speakers.**

124. AstraZeneca knows that its involvement in promotional activities should be clearly disclosed, and that it should respect the independence of healthcare professionals. Thus, its "Global Policy" on "Providing Information About our Products" states: "Engagements of Healthcare Professionals and Organisations for services must not be disguised promotion."

125. AstraZeneca's "Global Policy" on "Providing Information About our Products" also states: "Where the Company is providing support for third party programmes, we must . . . not exert any inappropriate influence over the content of presentations made by any speakers, whether or not the Company has sponsored the event at which the presentation is made."

126. And AstraZeneca knows that the prohibition on initiating discussion of off-label uses of Crestor® extends to AstraZeneca-sponsored events at which healthcare professionals speak to other healthcare professionals.

127. Notwithstanding its corporate policies, AstraZeneca has intentionally disguised its unlawful off-label promotion of Crestor® through the engagement and payment of kickbacks to healthcare professionals, and by concealing its promotional activities.

128. A key component of AstraZeneca's Fraudulent Marketing Scheme is the use of paid local "experts" to influence other doctors to prescribe Crestor® for their patients, including for off-label uses. This tactic is embedded in AstraZeneca's "Customer Engagement Career Ladder," which evaluates each Pharmaceutical Sales Specialists on, among other things:

> **Influences Others . . .** *Degree to which the PSS persuades and convinces a targeted audience*

- Uses direct influence
- Uses "experts" (e.g. local thought leaders) to effectively influence physicians' prescribing habits.
- Spends time with key influences in advance of a key decision, so as to influence the outcome of that decision (e.g. assists physicians with preparing for P&T committee meetings)
- Develops physicians and healthcare professionals to become speakers-cultivating advocates for AstraZeneca.

129. AstraZeneca, through its Pharmaceutical Sales Specialists, routinely pays "key opinion leaders" – *i.e.* physicians who would influence their peers' medical practices including, but not limited to, prescribing behavior – certain preferred doctors to make presentations to groups of doctors in order to encourage them to prescribe Crestor® for more of their patients, including for off-label uses. The presentations are offered under the guise of providing "fair and balanced" information, but AstraZeneca selects its speakers based on the volume of Crestor® prescriptions they write (*i.e.*, the more they write, the more likely they are to be hired) and AstraZeneca prepares their visual aids (*e.g.*, Powerpoint® slides) describing off-label uses. More alarming, AstraZeneca sales representatives routinely "planted" questions about off-label uses with trusted members of the audience in order to initiate such discussions. These presentations generally are held at three- and four-star restaurants (*e.g.*, "Ruth's Chris Steak House" and "610 Magnolia" in Louisville, Kentucky), and although nominally excluded, guests were permitted to bring a spouse in practice. Speakers were paid as much as $1,500 or more to give these presentations.

130. Dr. Jahangir Cyrus is an endocrinologist in Louisville, Kentucky that AstraZeneca has paid to give presentations designed to encourage other doctors to prescribe Crestor®, including for off-label uses. When Crestor® originally was approved by the FDA, Dr. Cyrus gave 5-6 presentations per year, and was paid approximately $1,500 per presentation; more recently, he speaks about twice per year under contract. AstraZeneca sales representatives

routinely and intentionally "planted" questions with members of the audience in order to initiate presentations by Dr. Cyrus on off-label uses of Crestor®. Other doctors in the Louisville, Kentucky area that AstraZeneca has hired to give these presentations, either in lecture or round table format, include Dr. Connie Anggelis, Dr. Archie Womack and Dr. Kailash Sabharwal. AstraZeneca sales representatives routinely and intentionally "planted" questions with members of the audience at these and other presentations in order to initiate discussions that would promote off-label uses of Crestor®..

**b. AstraZeneca Ilegally Promotes Off-Label Through its Use of the ASTEROID Study As Showing Crestor®'s Ability to Reverse the Progression Atherosclerosis.**

131. AstraZeneca routinely provided its Pharmaceutical Sales Specialists with reprints of research studies and instructed them to provide those studies to the healthcare professionals they called on – particularly when those studies described or supported off-label uses of Crestor® – whether or not the healthcare professionals initiated discussion on the subject. AstraZeneca also encouraged each PSS to compare studies of Crestor®'s efficacy against studies of competitor drugs' efficacy, even though such comparisons are prohibited by the FDA in the absence of two "adequate, well-controlled" studies in which the drugs were compared head-to-head using comparable dosage regimens or a single, large, well-controlled study. Nevertheless, AstraZeneca instructed its personnel to use these techniques in order to persuade healthcare professionals to prescribe Crestor® for off-label uses in lieu of Lipitor® and simvastatin, and in violation of the applicable laws and regulations described above, including 21 C.F.R. 202.1 *et seq*.

132. AstraZeneca's sales representatives regularly provided unapproved, off-label reprints to doctors on their own initiative – *i.e.*, not in response to a pertinent inquiry from the

physician in violation of pertinent regulations. One such off-label promotion was Defendant's use of the ASTEROID study.

133. In its April 5, 2006 issue, the Journal of the American Medical Association ("JAMA") published the results of the AstraZeneca-sponsored ASTEROID trial, which allegedly showed that Crestor® could reverse (not merely slow) the progression of atherosclerosis, which was the leading cause of heart attack and stroke and a condition suffered by 4.5 million Americans. *See* Nissen, Steven E. et al., *Effect of Very High-Intensity Statin Therapy on Regression of Coronary Atherosclerosis: The ASTEROID Trial*, JAMA 2006;295(13):1556-65. But, the study had significant limitations that precluded its use in promoting Crestor®. The most important limitation was that, because the ASTEROID study did not measure outcomes, it thus did not establish a decrease in cardiac events. Dr. James Stein (University of Wisconsin Medical School, Madison, WI), told the internet journal heart*wire* that the ASTEROID trial had important limitations:

> In 2006, the standard of cardiology research is a prospective randomized, placebo-controlled clinical trial. [The ASTEROID] was not controlled by a placebo or by a comparator. So, the magnitude of the benefit that we're seeing is not interpretable. Although we're seeing large reductions in atheroma burden here, we don't know what would have been seen with any of the other drugs on the market or other approaches, such as statins, niacin, or lifestyle changes, in this group of patients.

*See* Michael O'Riordan, *ASTEROID lands with a bang: High-dose rosuvastatin regresses coronary atherosclerosis*, heart*wire*, Mar. 13, 2006, http://www.theheart.org/article/662781.do.

134. Nevertheless, AstraZeneca provided each PSS with approximately 70 reprints of the ASTEROID trial in blue manila envelopes, and instructed each PSS to deliver them to, and discuss them with, as many doctors as possible within his or her assigned territory during a one-month period *whether or not* the doctor initiated a discussion regarding, or requested information

regarding, either the ASTEROID study or Crestor®'s ability to regress atherosclerosis. The purpose of this tactic was to mislead doctors regarding Crestor®'s supposed ability to regress atherosclerosis (a theory that was not supported by AstraZeneca's own follow-on study, METEOR, discussed *infra*), and thereby to encourage them to write off-label prescriptions for Crestor® and cause false and fraudulent claims for such prescriptions to be submitted for reimbursement by the Federal Programs.

135. Despite the fact that the ASTEROID study was not controlled by placebo or a comparator, AstraZeneca's sales representatives followed their instructions and *initiated Crestor® promotions* with physicians and other healthcare professionals, and provided them with supporting written materials (*i.e.*, reprints), in which they affirmatively promoted the ASTEROID study as evidence that Crestor® regresses atherosclerosis – an off-label indication – and on that basis encouraged physicians and other healthcare professionals to prescribe Crestor® for such off-label use and thereby cause false and fraudulent claims for such prescriptions to be submitted for reimbursement by the Federal Programs. When AstraZeneca realized that its sales representatives were recording these illegal, off-label discussions and sales tactics in their physician call notes, the company quickly instructed them (via both email and voicemail) *not* to reference the ASTEROID trial in their call notes. In this way, AstraZeneca sought to cover-up its misconduct.

136. AstraZeneca also sponsored presentations at which its paid speakers *initiated* conversations about the ASTEROID study with other doctors. For example, on August 1, 2006, AstraZeneca sponsored a presentation by Dr. Paul Thompson, a cardiologist from Hartford, Connecticut, to a group of doctors from Louisville, Kentucky, including Drs. Kemparajurs, Cecil, Bhakta, and Donovan. According to notes of that presentation that were prepared by

AstraZeneca's Megan Wade, the primary topic on the agenda was a discussion of the ASTEROID trial and Crestor®'s supposed ability to regress atherosclerosis. In fact, that discussion was prompted by a question that an AstraZeneca sales representative had "planted" with a member of the audience. The purposes of this tactic were to initiate an off-label discussion, mislead doctors regarding Crestor®'s supposed ability to regress atherosclerosis, encourage doctors in attendance to write off-label prescriptions for Crestor®, and thereby cause false and fraudulent claims for such prescriptions to be submitted for reimbursement by the Federal Programs.

137. Indeed, AstraZeneca went out of its way to initiate discussions about the ASTEROID study, and each PSS was instructed to initiate unsolicited and misleading discussions about the ASTEROID study to promote Crestor® to *every* doctor he or she called on (i) as a drug that could slow progression of atherosclerosis (even though it was not approved for that indication until November 2007), and (ii) as the only drug that showed *regression* of atherosclerosis (even though Crestor® has never been approved for that indication).

138. For example, one DSM instructed a sales representative to initiate a discussion with Drs. Stephen Houghland and Phillip Bressoud shortly after the ASTEROID results were published in March 2006, and to affirmatively cite the ASTEROID study as a basis upon which to promote Crestor® for the regression of atherosclerosis. At the time, Dr. Houghland sat on the Pharmacy & Therapeutics ("P&T") Committee for the Passport Health Plan, which is a Medicaid managed health plan, and he also saw patients at the Louisville Veteran's Administration Medical Center. The purpose of the discussion was to persuade Drs. Houghland and Bressoud to prescribe Crestor® for regression of atherosclerosis in their private practices (including for patients at the Louisville VA Medical Center) and to encourage favorable consideration of



133569.00601/35980358v.5

Crestor® to regress atherosclerosis in patients subscribing to the Passport Health Plan. Indeed, AstraZeneca requires its sales representatives to promote Crestor® for inclusion on health plan formularies.

139. Further, in March 2006, AstraZeneca deployed a five-week sales "Blitz" for Crestor® in which the strategy for the first week was entitled "Gold Standard – Regression of Disease." The purpose of this Blitz was to inundate healthcare professionals with *unsolicited* information intended to persuade them to prescribe Crestor® for the regression of atherosclerosis, even though Crestor® had not been approved for that indication. For example, sales representatives in the Louisville district were instructed to provide each physician they called on with candy wrapped in gold foil and to state that, in light of ASTEROID, Crestor® was now the "Gold Standard" in statin therapy because it had been proven to regress atherosclerosis. They also were instructed to distribute Riesen® brand candy to physicians and state that "regression is another 'Riesen®' to prescribe Crestor® over Lipitor® and Zocor®. Upon information and belief, AstraZeneca sales representatives were directed to employ, and did employ, these tactics outside the Louisville region as well.

140. That each PSS was expected to affirmatively promote Crestor® for regression of atherosclerosis without doctor prompting was reinforced by the DSMs, who employed such tactics themselves. For example, on or about September 29, 2009, DSM Hodge accompanied Relator Foote on a sales call to Dr. Michael Kelly in Vincennes, Indiana. During the meeting with Dr. Kelly, (even though Dr. Kelly had not posed any question on the subject) DSM Hodge *initiated* a discussion with Dr. Kelly about the ASTEROID trial, and affirmatively promoted Crestor®'s ability to regress arterial plaque and improve mortality even though such promotion was off-label. DSM Hodge also told Dr. Kelly that, if he were instead to prescribe generic

simvastatin, it "would not do [his] patients any good." DSM Hodge initiated this conversation himself because Relator Foote had stated his objection to employing such a tactic less than an hour before the sales call. In addition to constituting the illegal promotion of an off-label use, DSM Hodge's tactics are troubling because Vincennes, Indiana is an economically depressed area with many senior citizens, and thus it has high percentage of Medicaid and Medicare beneficiaries. As such, this blatantly illegal sales detail had the direct and immediate impact of increasing the submission of off-label prescriptions to government programs.

141. In sum, AstraZeneca knowingly, deliberately, and repeatedly has used the ASTEROID study – which plainly did not satisfy FDA requirements to be considered "adequate and well-controlled" – as a basis upon which to initiate discussions with healthcare professionals designed to encourage them to prescribe Crestor® *off-label* for the regression of atherosclerosis. Initiating these off-label discussions was a clear violation of the applicable laws and regulations.

142. To this day, Crestor® has not received an FDA-approved indication for the regression of atherosclerosis, and Relator Foote is unaware of a pending application for such an indication.

**c. AstraZeneca Used the METEOR Trial to Illegally Promote Crestor®'s Ability to Slow the Progression of Atherosclerosis Before Crestor® Was Approved for that Indication.**

143. A central part of AstraZeneca's strategy was a frontal assault on its very successful primary competitor drugs, Lipitor® and Zocor®. One way in which AstraZeneca hoped to capture and then retain market share from these competitors was to promote Crestor® to slow the progression of atherosclerosis, since neither Lipitor® nor Zocor® had received such an indication.

144. In its March 28, 2007 issue, the Journal of the American Medical Association published AstraZeneca's METEOR trial. *See* Crouse, John R. et al., *Effect of Rosuvastatin on*

*Progression of Carotid Intima-Media Thickness in Low-Risk Individuals With Subclinical Atherosclerosis: The METEOR Trial*, JAMA 2007;297:1344-53. METEOR was a larger version of the ASTEROID trial, with healthier people who had only one risk factor for heart disease. It was more reliable than its predecessor, ASTEROID, because it was randomized, double-blind and placebo-controlled. METEOR's objective was to assess whether statin therapy could slow progression and/or cause regression of atherosclerosis. While METEOR did not show regression of atherosclerosis by Crestor® (as the comparatively unreliable ASTEROID study allegedly had), it did support the notion that Crestor® slows the progression of atherosclerosis.

145. Eager to use METEOR against its competition, immediately upon publication of the METEOR study (*i.e.,* without waiting for FDA approval), and as it had done with the ASTEROID study before it, AstraZeneca directed each PSS in March 2007 to initiate *unsolicited* discussions about METEOR with *every* doctor he or she called on in order to promote Crestor® as a drug uniquely capable of slowing the progression of atherosclerosis. Indeed, each PSS was instructed to disseminate reprints of the METEOR trial in a blue manila envelope to as many doctors as possible during the initial one-month period after METEOR was published *whether or not the doctor initiated a discussion regarding METEOR or Crestor®'s ability to slow progression of atherosclerosis.* This tactic was particularly misleading because three of Crestor®'s competitors – Pravachol®, Mevacor® and Lescol® – already had received indications for slowing the progression of atherosclerosis long before Crestor® entered the marketplace. Thus, as it had with the ASTEROID marketing program, AstraZeneca engaged in a nationwide, illegal promotion of Crestor®.

146. Crestor® did not receive an FDA-approved indication for slowing the progression of atherosclerosis until some eight months later, in November 2007.

147. In sum, AstraZeneca knowingly, deliberately and repeatedly used the METEOR study as a basis upon which to initiate discussions with healthcare professionals designed to encourage them to prescribe Crestor® *off-label* to slow the progression of atherosclerosis even before Crestor® received FDA approval for that indication. Initiating these off-label discussions was a clear and flagrant violation of the applicable laws and regulations.

**d. AstraZeneca Ilegally Promotes Off-Label Through its Promotion of the JUPITER Study As Showing Crestor®'s Ability to Prevent Heart Attacks and Strokes.**

148. In March 2008, AstraZeneca announced that it was halting its ongoing JUPITER trial two years ahead of schedule because it assertedly showed that Crestor® prevents heart attacks and strokes. JUPITER was a placebo-controlled study among persons with healthy LDL levels but high levels of C-Reactive Protein (CRP), a marker for inflammation. ***See*** Ridker, Paul M. *et al.*, ***Rosuvastatin to Prevent Vascular Events in Men and Women with Elevated C-Reactive Protein,*** NEW ENG. J. MED. 2008;359:2195-2207. The study focused only on men over 50 and women over 60, and it did not examine other statin drugs.

149. Again, AstraZeneca immediately (*i.e.,* without waiting for FDA approval or a compendium approved therapeutic use) instructed its sales representatives to promote JUPITER to physicians, healthcare professionals, and decision makers on formulary boards as being able to prevent heart attacks and strokes. For example:

- In mid-2008, PSS Jeff Scott gave a presentation to P&T Committee members for Welborn Health Plans (which offers several Medicare managed care plans), in which he *initiated* a discussion of the JUPITER study and used JUPITER as a basis upon which to *affirmatively promote* Crestor® as being superior to Lipitor® because it could prevent heart attacks and strokes. Mr. Scott used the JUPITER study to encourage Welborn to place Crestor® on its formulary, and he succeeded -- Crestor® was added to Welborn's formulary, and prescriptions for Crestor® increased. Mr. Scott did this with the knowledge and encouragement of his supervisor, DSM Jack Hodge.

- In early 2009, PSS Kelly Epley, with the approval of DSM Jack Hodge, set up a speaker presentation by Dr. Mohit Sheth (a cardiologist) at Pea-Fections Restaurant in Vincennes,

Indiana. The sole purpose of the presentation was to promote off-label uses of Crestor® based on the JUPITER study, and thereby to persuade the physicians, nurse practitioners and pharmacists in attendance to stop switching patients from Crestor® to generic drugs. Ms. Epley directed Dr. Sheth to use his own off-label slides discussing the JUPITER study, and she affirmatively posed questions during the presentation that were intended to expand upon the already off-label discussion. Among the attendees were Dr. Grace Fowler (who has a large Medicare/Medicaid practice) and nurse practitioners Jennifer Belcher (who works with Dr. David Nibel) and Andrea Stephens (who works in the Rohrer Family Clinic). Because the program was not a CME (it was all promotional), Dr. Sheth's presentation was entirely off-label and illegal. When questioned about the program's legality by Relator Foote, Ms. Epley told him that there would be no issue. On information and belief, the program was approved by DSM Hodge.

- On July 15, 2009, DSM Jack Hodge sent an email to each PSS in his region extolling the virtues of the JUPITER study, appending a report on the JUPITER study itself and talking points that stated, among other things: "Significance of the JUPITER study to physicians? Changing how they use statins vs. what statins they use..." This plainly was a reference to using JUPITER to encourage physicians to prescribe Crestor® to lower CRP and reduce the incidence of heart attacks and strokes – an off-label use.

150. Although the FDA's Endocrinologic and Metabolic Drugs Advisory Committee did recently (*i.e.*, in December 2009) recommend a new indication for Crestor® based on the JUPITER study, AstraZeneca's promotion of JUPITER to support such an indication as early as the middle of 2008 plainly was illegal. Pharmaceutical companies may not "jump the gun" and promote unapproved uses simply because they are confident that the FDA one day will "catch up" to them.

151. AstraZeneca's misconduct in illegally promoting Jupiter trial data during interactions with health care professionals recently was confirmed by an internal AstraZeneca message that was disseminated electronically on February 4, 2010 by AstraZeneca's US President, Richard Fante, to the entire AstraZeneca Sales Force. That message stated, among other things:

> Through our own internal reviews, we have identified instances of inappropriate references to Jupiter trial data during interactions with some health care professionals during late 2008 and 2009.

In recognition of the Company's culpability, Mr. Fante notified employees that AstraZeneca would be "taking significant remedial actions, including stronger systemic controls, individual corrective actions and enhanced management accountability for compliance oversight." Moreover, in recognition of the seriousness of its misconduct and the fact that culpability extends to the highest level of the organization, Mr. Fante notified employees that remedial actions would include employee terminations and a reduction in the 2009 annual compensation paid to both managers and senior executives, including Mr. Fante himself.

**e. AstraZeneca Ilegally Uses Medical Liaisons to Promote Off-Label Uses of Crestor®.**

152. Another tactic employed by AstraZeneca to promote Crestor® off-label is to use so-called "Medical Liaisons" to supplement the efforts of a PSS.

153. Medical Liaisons are supposed to talk with physicians only about science-to-science issues, and only when those discussions are initiated by the physician. Their primary role is to engage in non-promotional medical activities, and they are not supposed to engage in product promotion. Thus, a PSS is not permitted to use a Medical Liaison as a conduit through which to initiate and pursue off-label promotional activities with physicians.

154. The law notwithstanding, AstraZeneca routinely uses Medical Liaisons as an end-run around the prohibition on initiating off-label promotional discussions. AstraZeneca did this by, for example, dispatching Medical Liaisons, including Tom McMullen, Bobby Arelli and others, to accompany salespeople during discussions with particularly reluctant doctors. Although this violated AstraZeneca's own written policy, AstraZeneca perceived it was a way to make its unlawful promotional activities for Crestor® appear lawful. For example, AstraZeneca reasoned (improperly) that the Medical Liaison could accompany a salesperson and initiate a discussion of off-label uses because the discussion would be from one scientist to another. What

AstraZeneca either forgot or ignored was that the discussion still would be an illegal, off-label promotion because it was initiated by a salesperson (not the doctor) in the context of a sales pitch.

155. Tom McMullen is one particular Medical Liaison employed by AstraZeneca who frequently joined sales representatives on sales calls. For example, when Dr. Paul Rogers (who generally prescribed Lipitor®) was reluctant to prescribe Crestor® notwithstanding a sales representative's overtures, DSM Sheila Jackson encouraged and authorized payment for a dinner among Dr. Rogers, Dr. McMullen and the sales representative in order to enable Dr. McMullen to assist in the sales effort by further promoting Crestor®'s allegedly unique (and blatantly off-label) ability to regress atherosclerosis. The dinner was held at "Z's Oyster Bar" in Louisville, Kentucky, and Dr. McMullen used the opportunity to further explain AstraZeneca's belief that the ASTEROID study proved that Crestor® alone could regress atherosclerosis. The dinner was promotional and off-label, and because it was initiated by and included a sales representative, it was illegal.

**f. AstraZeneca Illegally Promotes Crestor® for Off-Label Use By Seeking to Override the Judgment of Doctors.**

156. While drug makers must regularly engage in aggressive business practices in order to increase sales, AstraZeneca has regularly crossed the line in its zealous promotion. For example, AstraZeneca recognizes that there will be instances in which doctors prescribe other statins, including Lipitor® and simvastatin, in lieu of Crestor®. In an effort to override such decisions, AstraZeneca has targeted nurses within doctors' offices and encouraged them to seek to reverse the doctor's decision *irrespective of the condition for which the drug was prescribed.*

157. For example, Pharmaceutical Sales Specialists in the Louisville District encouraged Jan Frager, a nurse and "Lipid Coordinator" at the Medical Center Cardiology office

in Louisville to encourage the doctors in her practice to switch patients from other statins to Crestor® *irrespective of the condition for which the drug had been prescribed.* (Ms. Frager had attended multiple off-label programs that were sponsored by AstraZeneca.) Because Crestor®'s competitors, including Lipitor® and Zocor®/simvastatin have approved indications not shared by Crestor®, AstraZeneca's unsolicited encouragement to Nurse Frager to recommend that her supervising physician substitute Crestor® for its competitors regardless of indication was blatantly a promotion of off-label use.

158. And, Regional Sales Director Parker Fretwell recently used a "blast" voicemail message to encourage each PSS working in the Indianapolis West District to adopt the following sales technique, which had been relayed to him in a voicemail message from a PSS named Michelle:

> I want to turn along a success story. Something we are trying to do to get some extra scripts here between now and the end of the year and get them away from Lipitor®. I had a lunch Wednesday with about four key nurses from the Heartcare Medical Group. They work with four of our big doctors. And I simply asked them based on all the information that you know about Crestor® and the fact that this physician, this physician and this physician already know that Crestor® is a great drug and they do write it as their first choice. When you get a script from your doctor that's a Lipitor® script, could you simply ask him, could we write Crestor® instead? . . . So to the nurses when you get a script from the doctor that is a Lipitor® script, would you simply ask your physician, you know what, can we switch this and write it for Crestor® instead? Because it is a lot easier to get through managed care. That is all I asked, it is a simple thing. They all agreed they would do it. Obviously, there are some cases where we can do that and some cases when we can't but when we can we definitely will.

What is most remarkable about this sales detail, and RSD Fretwell's approval of it, is the candid effort to reverse a doctor's decision to prescribe Lipitor® in lieu of Crestor® *regardless of the indication for which the drug was being prescribed.* Because Lipitor® was approved for indications not shared by Crestor®, this necessarily was another instance of off-label promotion.

**2. AstraZeneca Used Illegal Comparative Marketing Techniques, Including Unsubstantiated Superiority Claims, to Promote Crestor®**

**Over Lipitor® and Generic Simvastatin in Violation of 21 C.F.R. § 202.1**

159. A key component of AstraZeneca's scheme has been the repeated assertion of false and misleading comparisons, and unsubstantiated superiority claims, when comparing Crestor® to other statins. This practice was actively encouraged and endorsed by regional and district sales managers, who encouraged the use of "powerful" verbiage and verbatim scripts.

160. Before it will approve a drug for a specific indication, the FDA requires that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations." 21 C.F.R. § 314. The FDA generally requires two pivotal, adequate and well-controlled trials to support approval, except in certain circumstances. According to the FDA's 1998 *Guidance to the Industry*, "it has been FDA's position that Congress generally intended to require at least two adequate and well-controlled studies, each convincing on its own, to establish effectiveness."

161. As a result of the FDA's clear policy requiring "substantial evidence" to support marketing claims, a drug maker may not make comparative efficacy claims to physicians based on comparing product inserts (a product's approved labeling), nor may a drug maker's promotion to physicians compare two non-comparative trials (due to differences in trial designs, inclusion criteria and other factors).

**a. AstraZeneca Illegally Promotes Crestor® Through Unsubstantiated Comparisons With Lipitor®.**

162. Despite the fact that there were (and still are) no adequate, well-controlled head-to-head clinical studies supporting a comparison of Lipitor® and Crestor®, AstraZeneca developed and distributed promotional materials for its sales representatives claiming that Crestor® was superior to Lipitor®. These materials were prepared and used as part of its Fraudulent Marketing Scheme to convert Lipitor® use to Crestor®, including prescriptions written for off-label uses.

163. From the outset, AstraZeneca encouraged each PSS to initiate off-label discussions with doctors. For example, in November 2003, DSM Cynthia Burell circulated to each PSS in her Louisville district a list of questions sent to her by RSD Lianne Bousquet in Detroit for the express purpose of "getting into a patient-type detail" discussion with doctors. The questions expressly elicited off-label discussions and discussions of unsubstantiated superiority claims vis-à-vis Lipitor®, Zocor® and Pravachol®.

164. AstraZeneca's superiority message became even more urgent in the last two years, when it faced growing competition from new generics for Zocor®, Pravachol®, and soon Lipitor®. For example, on February 2, 2009, DSM Jack Hodge sent to each PSS in his region a report of an AstraZeneca-sponsored study that, according to Hodge, showed "Crestor® is more efficacious and/or better tolerated [than Lipitor®]."

165. And April 29, 2009, DSM Jack Hodge sent an email in which he instructed each PSS within his district to promote Crestor® as "significantly a better product than Lipitor" – apparently irrespective of the condition for which it was being prescribed and irrespective of the fact that Lipitor® had numerous approved indications not available to Crestor®.

166. On July 15, 2009, DSM Hodge sent an email to each PSS in his District in which he cited results of the new JUPITER study, and plainly directed them to promote Crestor® as being clinically superior to Lipitor®, irrespective of patient diagnosis and notwithstanding the fact that JUPITER was not a head-to-head study showing such superiority. Hodge wrote:

> In the field I continue to see some physicians a little reluctant to agree with us that CRESTOR is clinically superior to Lipitor. I often hear that because Lipitor has so much data, so many outcomes studies in so many different patient types, they can't say that CRESTOR is absolutely better. They will tell us that CRESTOR is a good drug, but Lipitor is a good drug too. They'll say that CRESTOR is finally getting some outcomes data, but still does not have nearly the amount of data that Lipitor does. Does this sound familiar?

> It's important for us to realize just how much better CRESTOR is than Lipitor. Attached below is a document that really points out how much better CRESTOR is than Lipitor[.]
>
> * * * * *
>
> Has a doctor ever seen a study that demonstrated a 79% reduction in CV events? Even close to a 79% reduction? The answer is NEVER, not until now with CRESTOR!

Hodge's email even attached talking points he had prepared that emphasized JUPITER's supposed outcomes data, and that plainly were intended to support this illegal marketing strategy. Although sprinkled with statements regarding the need for visual messages to be approved, the clear import of the email and attached talking points was that each PSS should aggressively market Crestor® not simply as an alternative to Lipitor®, but as superior to Lipitor®.

167. And on July 16, 2009, DSM Hodge circulated and instructed his sales team to "commit . . . to memory" a "wildly successful" verbatim sales dialogue that AstraZeneca was using in Jacksonville, Florida. The dialogue included a blatantly illegal invitation to discuss the off-label use of Crestor® for regression of atherosclerosis, stating: "Crestor® does more inside the vessel to help prevent cardiovascular death, heart attacks and strokes." The dialogue also illegally touted Crestor® as the safest statin, stating: "Not only does Crestor® provide superior efficacy compared to Lipitor but it also has been established that Crestor® is safer and better tolerated." Because there is no substantial evidence supporting such a claim, AstraZeneca's promotion using such false and misleading claims illegally misbranded Crestor® in violation of FDA regulations.

168. The message was not just superiority, but that <u>not</u> using Crestor® instead of Lipitor® could endanger patient health. In a September 11, 2009 conference call among the members of AstraZeneca's Evansville Sales District, DSM Hodge asked PSS Sean Kirklin to

relay a message that he recently had used to persuade a doctor to prescribe Crestor® in lieu of generic simvastatin. Kirklin said he told the doctor:

> When you are talking about a drug that will be the difference between prolonging someone's life, saving their life giving them a better quality of life, that's what we are talking about here and I doggon believe it's worth fifty cents a day to give a patient something that's going to save their life and give them a better quality of life and that's what we're talking about. Is a patient's life worth fifty cents a day? (emphasis added)

Later in the same conference call, Kirklin make the absolutely and outrageously unsupported claim that using generic simvastatin was like prescribing water:

> Look, if you really want to save the patients money, why don't you just take them off [generics] and give them water, because a lot of generics are going to do the same exact thing. Are you really wanting to save their life, or are you wanting to help them out? If you really want to help them out, give them Crestor®, it's going to make a difference in their life.

DSM Hodge endorsed this sales technique to the members of his District sales team, stating "I want to back up one step Sean because I think you are on to something there." Hodge went on to tell his sales team:

- "The objective is to have customers prescribe Crestor® for all newly diagnosed hyperlipidemic patients . . . and if they're not doing that then they are not doing the right thing for their patients."
- "The physician is allowing the patient to believe that a generic is ok, they are [abdicating] their responsibility to help the patient, what's at stake and why it's so important."

PSS Myra Wright responded by stating that the sales district had been the most successful when the sales personnel said "look, [Crestor®'s] the best, it's the most efficacious, it's the most tolerable and now it's the best covered and it doesn't matter who it's for it's the best for everyone."

**b. AstraZeneca Illegally Promotes Crestor® Through Unsubstantiated Comparisons With Generic Simvastatin.**

169. Although AstraZeneca always had targeted its branded competitors (*e.g.*, Lipitor® and Zocor®) with illegal comparative marketing techniques, it shifted focus in 2009 to more specifically attack the notion that generic statins presented a viable alternative to Crestor® for some patients. Following a district managers conference in 2009, DSM Hodge instructed each PSS in his district, including Relator Foote, to more aggressively target the generic statins on the basis that they inherently were inferior to Crestor® for all patients.

170. During the same September 11, 2009 conference call discussed *supra*, PSS Jeff Scott bragged that when he was "selling against generic simvastatin" he was "bringing in the new guidelines that are coming first quarter of next year. . . . We don't know exactly what the new guidelines are going to say, but we know that they are going to be more aggressive on lowering LDL." DSM Hodge called that a "great tactic" and concluded the conference call by telling his sales team:

- "[Doctors] know it's the right thing to do, it's the best thing for patients to put the patient on Crestor® and not simvastatin and not Lipitor® and not Vytorin® and not prevastatin or lovastatin. That's freaking ridiculous so they know it and we need to call them on it."
- "I know we are not going to get warm fuzzies from physicians when we delve in to these discussions, but telling them in a professional way that they are not doing the right thing for patients when they prescribe simvastatin, and I know that's a hornet's nest but we need to get, but that's exactly what we need to do."

171. DSM Hodge reiterated these messages in an email he sent to his sales team just three days later, on September 14, 2009:

> TEAM, Tactically we have been focusing on our messaging and having strong details, but we've ignored an underlying need to "call physicians out" when we know that they are not doing the right thing for their patients. <u>If physicians are not Rxing CRESTOR for all their newly diagnosed hyperlipidemic patients they are not doing the right thing for their patients! In many instances physicians are allowing patients to believe a generic is OK. This is an abdication of their responsibility to help patients see what's really at stake and why it's so important.</u> When we allow physicians to do this without calling them on it, we are abdicating our responsibility. We've been hesitant to delve into these discussions because it

> makes us uncomfortable and hits a nerve w/ physicians (causes a reaction). We now realize that this is exactly what we need to have happen. Below you will see powerful verbiage that I've heard from you in your voicemail messages or during field visits. These are examples of you not pulling punches, but instead delving into difficult discussions. We need real, straightforward conversations that call physicians out when they are not doing the right thing for their patients. (emphasis added)

As indicated, DSM Hodge then identified "Powerful Verbiage" that he explicitly encouraged his Sales Specialists to use when meeting with physicians. Among the more egregious examples:

- "Substitute other medications w/ generics, but not statins! Substituting Crestor® with a generic statin is not OK! It's not the best thing for the patient!"
- "You can do more for you [sic] patients."
- "First, let's be very clear that we both agree that the best thing clinically for the patient is to be on CRESTOR instead of Lipitor or simvastatin…"
- "Let's be very clear that the cost difference to the patient that we are talking about is about $10 - $15 dollars (Crestor® vs. simva.)…"
- "The reason a patient would want a generic statin instead of CRESTOR is because they don't truly know the importance, the value, that Crestor® provides vs. simvastatin. That's where you and I come in doctor…"
- "It's not that patients *can't* afford Crestor®, it's that you're letting them believe a generic is OK. We can't abdicate the responsibility to help them see what's at stake and why it's so important…"

### c. AstraZeneca Illegally Promotes Crestor® Through Verbatim Dialogues that Repeat Unsubstantiated Comparative Claims.

172. On September 21, 2009, DSM Hodge distributed an "ideal dialogue with physicians" to each PSS in his district. He prefaced that dialogue with a repeat of his September 14, 2009 admonition about patient safety:

> If physicians are not [prescribing] CRESTOR for all their newly diagnosed hyperlipidemic patients they are not doing the right thing for their patients! In many instances physicians are allowing patients to believe a generic is OK. This is an abdication of their responsibility to help patients see what's really at stake and why it's so important.

The attached "ideal dialogue" promoted Crestor® as "the best thing for [patients] clinically" and it asked doctors to "prescribe Crestor® instead of Lipitor® and instead of simvastatin[.]" DSM Hodge directed his sales people to submit their own ideal dialogues by September 25, 2009.

173. Two days later, on September 23, 2009, DSM Hodge disseminated a voicemail message to each PSS in his district trumpeting as a "best practice" the following sales pitch delivered to a doctor by PSS Wright:

> "Look, I can give you the four dollar generic, but I can tell you right now that it is not going to protect you from cardiovascular events like Crestor® will, and Crestor® is the best choice for your patients."

174. That same day, DSM Hodge disseminated a voicemail message to each PSS in his district trumpeting as a "best practice" the following sales pitch delivered by PSS Alan Florence:

> "I was paving the whole atherosclerosis story why Crestor® is the only one indicated to slow the progression. Not even generic simvastatin or any of those are indicated for it. In their camp they were like, how do you know generics aren't saving their lives, so we went back and forth sighting the *Heart Protection Study* where you have to use 40 mg to see any time of benefit. So are you writing 40 mg for all your patients on generics? Well, no. Then you are just throwing your money away.

175. Also on September 23, 2009, PSS Errek Suhr submitted his proposed dialogue to DSM Hodge by email. The dialogue, which DSM Hodge praised in an email sent to each PSS in his District on September 24, 2009, argued that Crestor® should be prescribed "instead of Lipitor or Vytorin for all . . . statin patients that need a branded statin" (apparently regardless of the condition to be treated), and it argued that generic alternatives should not be prescribed (again, apparently regardless of the condition to be treated).

176. PSS Juli Michele Nichols-Shelp submitted her proposed dialogue to DSM Hodge on September 25, 2009. It took aim squarely at Lipitor® and simvastatin, arguing that Crestor® is clinically superior to both, and drawing misleading contrasts. Perhaps because of that, DSM Hodge praised the dialogue as "[g]reat work."

177. PSS Alan Florence submitted his proposed dialogue to DSM Hodge on September 25, 2009. The script improperly, and illegally, argued that Crestor® had superior outcomes data for preventing cardiovascular events such as stroke, heart attack and sudden death. It also warned doctors that "if you look at this analysis, you are setting your patients up to fail by giving them simvastatin." Perhaps because of its improper reliance on outcomes data, and its unsubstantiated broad-brush attack on generic simvastatin, DSM Hodge praised the script. PSS Florence's script also makes clear that AstraZeneca was targeting Medicare recipients.

178. Regional Sales Director Parker Fretwell recently used a "blast" voicemail message encouraging each PSS in the Indianapolis West District to adopt the following sales technique, which one PSS had described in a voicemail as follows:

> I had talked to you about the lunch Alicia and I did on Friday with Dr. Hestor, who is a very hard to access doctor, who has been writing Vytorin for years and slowed down a little bit but still a Vytorin writer and a Lipitor writer and Alicia and I went in there both with guns blazing and asked for all newly diagnosed patients and actually all patients over Lipitor, Simvastatin and Vytorin gave him very compelling news. Evidenced everything and asked for his commitment for all patients new to therapy and gave him many reasons to write Crestor® and gave him the access message, everything and left him with about six thirty day vouchers for the 30 days free. It was about 3:00 on Tuesday, and I just got a call from that office and they told me that Dr. Hestor has written six Crestor® scripts since the lunch and is requesting more of the 30 day one month vouchers.

What is most notable (and disturbing) about this sales detail, and RSD Fretwell's enthusiastic approval of it, is the explicit promotion of Crestor® over Lipitor®, Vytorin® and simvastatin *regardless of the indication for which they were being prescribed.*

179. On September 29, 2009, during a ride-along, DSM Hodge instructed Relator Foote to read *verbatim* a particular script during his sales calls with doctors. The script stated, among other things, that Crestor® is the safest statin, and that it does more inside the vessel to prevent heart attacks and strokes than any other drug. When Relator Foote objected that such

promotion was improper, DSM Hodge told him that the statements were supported by the data and that Relator Foote was "only hurting [himself]" if he did not follow the script. Less than a month after Relator Foote stated his objection, AstraZeneca terminated his employment.

180. Relator Foote was not the only one troubled by AstraZeneca's new (or at least newly-focused) messaging campaign. When DSM Hodge (accompanied by PSS Jeff Scott) recently criticized Dr. Chad Perkins of Evansville, Indiana for prescribing simvastatin, Dr. Perkins threw DSM Hodge out of his office and threatened to report his misconduct to AstraZeneca's corporate office.

### 3. AstraZeneca Illegally Provided Kickbacks to Physicians in Order to Influence Them to Prescribe Crestor® for Their Patients.

181. AstraZeneca knows that it is not permitted to pay doctors in order to encourage them to prescribe Crestor® over other drugs. Thus, AstraZeneca's corporate policy on "Marketing to healthcare professionals" states:

> In the US, we only provide [to doctors] items that are educational and will benefit patient care such as medical textbooks. We do not provide diagnostic equipment, reminder items or gifts that provide personal benefits.
>
> We don't give gifts anywhere in the world in exchange for prescribing a medicine.
>
> * * * * *
>
> We will not pay any healthcare professional for prescriptions for any of our medicines.

182. Nevertheless, the notion that AstraZeneca sales personnel could, should and did "buy" doctors' loyalty to the Crestor® brand was (and is) pervasive. As described more below, AstraZeneca did so under the guise of a policy that stated:

> We do pay certain healthcare professionals to undertake a variety of services for AstraZeneca. These include:
>
> - Speaking at, chairing or moderating scientific or educational meetings

- Providing consultancy services and advice
- Running training for our sales representatives and other employees to help them understand the impact that diseases such as asthma and diabetes have on patients' lives.

* * * * *

> Any food provided is secondary to the purpose of the meeting and is of modest value. It is only provided to people attending the meeting in a professional capacity.

AstraZeneca routinely, and intentionally, violated the substance and spirit of this policy.

183. As discussed, *supra*, AstraZeneca routinely paid preferred speakers thousands of dollars to promote off-label uses of Crestor® in lecture-style presentations to other doctors. In so doing, AstraZeneca also implicitly compensated the doctors who attended those presentations – many of whom routinely attended the same presentation multiple times – with lavish dinners that their spouses were permitted to attend free of charge. AstraZeneca's goal in doing so was to influence the doctors who attended these presentations to prescribe Crestor®, including for the off-label uses discussed at those presentations.

**a. AstraZeneca's Illegal Use of Tutorials and Journal Club Dinners**

184. AstraZeneca knew that it could not directly pay doctors to induce them to prescribe Crestor® or receive a sales pitch, and the doctors knew this as well. Nevertheless, several doctors would not meet with an AstraZeneca sales representative unless they were "wined and dined" in the process. Accordingly, AstraZeneca utilized "tutorials" and "Journal Clubs" to create an appearance that the compensation it provided to doctors was earned income.

185. As used by AstraZeneca, a tutorial was a 15-20 minute presentation by the doctor to the Pharmaceutical Sales Representative, generally on an AstraZeneca study selected by the PSS because it supported an off-label use of Crestor®. Although the PSS already was fully

familiar with the subject of the tutorial, the doctor typically was paid $150 or more for his time. For example, DSM Steven Humphry authorized payment to Dr. Jeffrey Hilb for just such a tutorial in June 2005.

186. In the Louisville, Kentucky area, a group of doctors proposed an "end-run" around the rule that prohibited AstraZeneca from simply buying them lavish dinners in order to induce loyalty to Crestor®. The doctors proposed, and AstraZeneca agreed to pay for, monthly "Journal Club" dinners at exclusive restaurants during which doctors discussed AstraZeneca's Galaxy trials (*e.g.* Asteroid, Meteor & Jupiter) and openly discussed off-label use of Crestor®. The pretext for allowing AstraZeneca to pay for the meal was that each time a doctor who had been paid for a tutorial would then discuss the subject of that tutorial at dinner. In this manner, AstraZeneca accomplished two objectives: it initiated and promoted an off-label use of Crestor®, and it traded lavish dinners for brand loyalty with doctors who would not meet with AstraZeneca otherwise. Among the doctors who participated in the tutorials and Journal Clubs were Drs. Jeffrey Hilb, James Bosler, Archie Womack, Max Irick, and Philip Feitelson. Illustrating that the journal clubs "worked" to increase off-label sales of Crestor®, the volume of Crestor® off-label prescriptions would generally increase following a Journal Club dinner.

187. AstraZeneca also sought to disguise its illegal payment of kickbacks to doctors through the use of "preceptorships." In a preceptorship, an AstraZeneca PSS would pay a "high volume" doctor (*i.e.,* a doctor who wrote a high number of statin prescriptions), typically $250 to permit the PSS to follow the doctor during patient examinations for an entire day. In theory, the purpose of a preceptorship was to provide the PSS with insight into how the doctor decides which statin drug to prescribe. In practice, since the PSS rarely stayed with the doctor for the entire day, it was a thinly-veiled means of funneling unearned cash to doctors who AstraZeneca

expected would reciprocate by writing more prescriptions for Crestor®, including for off-label uses.

188. Preceptorships were part of each PSS' accountability. Each PSS was expected to participate in three preceptorships per year with high volume doctors not generally susceptible to AstraZeneca's other marketing practices.

189. One doctor that AstraZeneca recently sought to influence through a preceptorship is Dr. Kevin Lusk of Ferdinand, Indiana. Dr. Lusk sees patients in an economically depressed community, and he did not write many prescriptions for Crestor®. AstraZeneca wanted to induce Dr. Lusk to prescribe Crestor®, including for off-label uses, for more of his patients. Because Dr. Lusk would not accept free samples of Crestor® to distribute, AstraZeneca paid him $250 to do a preceptorship with an AstraZeneca sales representative in early 2009. Although AstraZeneca paid for a full-day preceptorship, the sales representative followed company practice and expectations and did not stay the entire day. Following this preceptorship, Dr. Lusk began to write a greater number of prescriptions for Crestor®, including for Medicaid and Medicare patients. Other doctors who were paid by AstraZeneca through the preceptorship program include Drs. Arun Umat and Shanker Chanderamani of Bluegrass Cardiology in Louisville.

190. The notion that Pharmaceutical Sales Specialists were expected to induce doctors through lavish dinners and paid tutorials and preceptorships repeatedly was confirmed at the supervisory level. District Sales Managers had to authorize funding for each tutorial, preceptorship, Journal Club or other dinner event, and they routinely did so. DSM Jack Hodge underscored the importance of such funding to the marketing process when he stated during a District sales team conference call on September 11, 2009: "I'm trying to give you guys the

tools, you know, the money. We will spend money like the government cause we are out of budget, but I'm trying to give you guys the authority to go out [and] do as many lunches as you can."

## VIII. ASTRAZENECA KNEW THE LEGAL RISKS RELATED TO OFF-LABEL AND OTHER ILLEGAL PROMOTION OF CRESTOR®.

191. At all times relevant to this Complaint, AstraZeneca knew that it was prohibited from (i) initiating any promotion of Crestor® for an off-label use, (ii) promoting Crestor® through illegal comparative marketing techniques, including unsubstantiated superiority claims, and (iii) paying kickbacks to doctors in exchange for their decisions to prescribe Crestor® for their patients.

192. Defendants have been aware of the FDA regulations regarding off-label promotion of pharmaceuticals since at least June 4, 2003, when they entered into a Corporate Integrity Agreement with the Office of the Inspector General of the U. S. Department of Health and Human Services in order to settle allegations of improper sales and marketing practices related to the drug Zoladex® (the "Zoladex CIA"). Defendants recently were reminded of those regulations when they agreed (in November 2009) to enter into a settlement with the United States arising out of allegations that they had engaged in the improper off-label promotion of the drug Seroquel®. This knowledge notwithstanding, defendants routinely and intentionally have ignored and violated the regulations against off-label promotion with respect to Crestor®, as described herein.

## IX. ASTRAZENECA'S PROMOTION OF CRESTOR® CAUSED THE ILLEGAL SUBMISSION OF OFF-LABEL CLAIMS TO FEDERAL PROGRAMS AND THE QUI TAM STATES.

193. AstraZeneca's Fraudulent Marketing Scheme served its intended purpose, as it induced doctors to write prescriptions for Crestor® in lieu of other statins, including for off-label

use, by beneficiaries of the various Federal Programs described herein which, in turn, led the Federal Programs to provide reimbursements that were not properly authorized.

194. At least in part as a result of AstraZeneca's illegal sales and marketing practices, Crestor® has been heavily used for the treatment of Medicaid, Medicare Part D and other Federal Healthcare Program participants. For Medicaid alone, reimbursements for Crestor® during the years 2003 through 2008 amounted to almost $1 billion, and a significant, but as yet unknown, percentage of these reimbursements were for off-label uses.

**COUNT I**
**(Violation of False Claims Act, 31 U.S.C. § 3729, *et seq.*)**

195. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

196. This is a civil action brought by Relator Foote, on behalf of the United States of America against Defendants under the False Claims Act, 31 U.S.C. §§ 3729(a)(1) and (2).

197. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, and may still be presenting or causing to be presented, to CMS, or other Federal Programs, false or fraudulent claims for payment, in violation of, *inter alia*, 31 U.S.C. § 3729(a)(1).

198. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made, caused, or caused to be used, and may still be using or causing to be used, false or fraudulent records and/or statements to get false or fraudulent claims paid in violation of, *inter alia*, 31 U.S.C. § 3729(a)(2).

199. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information which supported claims to CMS, and Federal Programs, with actual knowledge

of the falsity of the information that supported these claims, caused, and may still be causing, the use of false or fraudulent materials or information to support claims paid by the government.

200. The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for Crestor® prescribed to patients enrolled in Federal Programs.

201. As a result of Defendants' actions as set forth above in this complaint, the United States of America has been, and may continue to be, severely damaged.

**COUNT II**
**(Violation of False Claims Act, 31 U.S.C. § 3730)**

202. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

203. From July 2003 until October 2009, Relator Foote was employed by AstraZeneca as a Pharmaceutical Sales Specialist. In this position, Relator Foote reported to Jack Hodge, who was AstraZeneca's District Sales Manager and Relator Foote's immediate supervisor.

204. On September 29, 2009, Relator Foote objected to AstraZeneca's illegal instruction, through DSM Hodge, that he read a particular Crestor® promotional script *verbatim* during sales calls with doctors. Relator Foote informed AstraZeneca that the instruction was unlawful, and that he would refuse to deliver the script because it included illegal promotional statements, as described more fully above. AstraZeneca responded to Relator Foote's objection by telling him, through DSM Hodge, that he was "only hurting [himself]" if he did not follow the promotional script *verbatim*. Still, Relator Foote refused to comply with the unlawful instruction.

205. Relator Foote's refusal to comply with AstraZeneca's illegal, off-label directive was protected conduct under the federal False Claims Act, and his refusal to comply was done in furtherance of this action. AstraZeneca knew of Relator Foote's protected activity because it was conveyed to AstraZeneca, contemporaneously, through supervisory employee DSM Hodge.

206. Less than a month after Relator Foote engaged in protected activity by refusing to comply with AstraZeneca's unlawful directive to engage in illegal promotional activity, AstraZeneca retaliated against him for such protected activity by terminating his employment. AstraZeneca then sought to conceal its misconduct, including both the unlawful retaliatory termination of Relator Foote's employment and the Fraudulent Marketing Scheme, by offering Relator Foote a severance package in exchange for his silence.

207. AstraZeneca's retaliatory acts proximately caused Relator Foote personal hardships, including economic losses, that are compensable by an award of statutory damages.

**COUNT III**
**(Violation of California False Claims Act)**

208. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

209. This is a civil action brought by Relator Foote on behalf of the State of California against Defendants under the California False Claims Act, CAL. CODE § 12652(c).

210. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of California or its political subdivisions false or fraudulent claims for payment, in violation of CAL. CODE § 12651(a)(1).

211. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of CAL. CODE § 12651(a)(2).

212. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of CAL. CODE § 1265 1 (a)(7).

213. The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

214. As a result of Defendants' actions as set forth above, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT IV
## (Violation of Connecticut False Claims Act)

215. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

216. This is a civil action brought by Relator Foote on behalf of the State of Connecticut against Defendants under the Connecticut False Claims Act, 2009 Conn. Pub. Acts No. 09-5.

217. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of 2009 Conn. Pub. Acts No. 09-5 § 2(a)(1).

218. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Pub. Acts No. 09-5 § 2(a)(2).

219. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Pub. Acts No. 09-5 § 2(a)(1).

220. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-

related management services for recipients of state and state subdivision funded health insurance programs.

221. As a result of Defendants' actions as set forth above, the State of Connecticut, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT V**
**(Violation of Delaware False Claims and Report Act)**

222. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

223. This is a civil action brought on behalf of Relator Foote on behalf of the Government of the State of Delaware against Defendants under the State of Delaware's False Claims and Reporting Act, DEL. CODE ANN. tit. 6, § 1203(b).

224. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, directly or indirectly, to an officer or employee of the Government of the State of Delaware false or fraudulent claims for payment or approval, in violation of DEL. CODE ANN. tit. 6, §1201 (a)( 1 ).

225. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, directly or indirectly, false records or statements to get false or fraudulent claims paid or approved, in violation of DEL. CODE ANN. tit. 6, §1201(a)(2).

226. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the Government of Delaware, in violation of DEL. CODE ANN. tit. 6, § 1201(a)(7).

227. The Government of the State of Delaware, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of healthcare programs funded by the Government of the State of Delaware.

228. As a result of Defendants' actions, the Government of the State of Delaware has been, and may continue to be, severely damaged.

**COUNT VI**
**(Violation of District of Columbia False Claims Act)**

229. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

230. This is a civil action brought by Relator Foote, in the name of the District of Columbia against Defendants under the District of Columbia False Claims Act, D.C. CODE ANN. § 2-308.15(a).

231. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, a false or fraudulent claim for payment or approval, in violation of D.C. CODE ANN. § 2-308.14(a)(1).

232. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly used or caused to be used, and may continue to use or cause to be used, false records and/or statements to get false claims paid or approved by the District, in violation of D.C. CODE ANN. § 2-308.14(a)(2).

233. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or used, or caused to be made or used, and may still be making or using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, in violation of D.C. CODE ANN. § 2-308.14(a)(7).

234. The District of Columbia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

235. As a result of Defendants' actions, as set forth above, the District of Columbia has been, and continues to be, severely damaged.

**COUNT VII**
**(Violation of Florida False Claims Act)**

236. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

237. This is a civil action brought by Relator Foote on behalf of the State of Florida against Defendants under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

238. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

239. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

240. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082 (2)( g).

241. The State of Florida and its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

242. As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT VIII
## (Violation of Georgia Medicaid False Claims Act)

243. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

244. This is a civil action brought by Relator Foote, in the name of the State of Georgia, against Defendants pursuant to the State of Georgia Medicaid Fraud False Claims Act, GA. CODE ANN. § 49-4-168 (2007), *et seq.*

245. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Georgia Medicaid program, in violation of GA. CODE ANN. § 49-4-168 (2007).

246. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of GA. CODE ANN. § 49-4-168 (2007).

247. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of GA. CODE ANN. § 49-4-168 (2007).

248. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of GA. CODE ANN. § 49-4-168 (2007).

249. The State of Georgia or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

250. As a result of Defendants' actions, as set forth above, the State of Georgia or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT IX**
**(Violation of Hawaii False Claims Act)**

251. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

252. This is a civil action brought by Relator Foote on behalf of the State of Hawaii and its political subdivisions against Defendants under the State of Hawaii's False Claims Act - False Claims to the State, HAW. REV. STAT. § 661-25.

253. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to

officers or employees of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of HAW. REV. STAT. § 61-21(a)(l).

254. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(2).

255. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of HAW. REV. STAT. § 661-21(a)(7).

256. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

257. As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT X**
**(Violation of Indiana False Claims and Whistleblower Protection Act)**

258. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

259. This is a civil action brought by Relator Foote on behalf of the State of Indiana against Defendants under the State of Indiana False Claims and Whistleblower Protection Act, IND. CODE ANN. § 5-11-5.5-4(a).

260. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(l).

261. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(2).

262. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, in violation of IND. CODE ANN. § 5-11-5.5-2(b)(6).

263. The State of Indiana, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

264. As a result of Defendants' actions, as set forth above, the State of Indiana has been, and may continue to be, severely damaged.

**COUNT XI**
**(Violation of Illinois Whistleblower Reward and Protection Act)**

265. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

266. This is a civil action brought by Relator Foote on behalf of the State of Illinois against Defendants under the State of Illinois Whistleblower Reward and Protection Act, 740 ILL, COMP. STAT. ANN. 175/4(b).

267. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Illinois or a member of the Illinois National Guard a false or fraudulent claim for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(I).

268. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(2).

269. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(7).

270. The State of Illinois, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

271. As a result of Defendants' actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

**COUNT XII**
**(Violation of Louisiana Medical Assistance Programs Integrity Law)**

272. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

273. This is a civil action brought by Plaintiff, Relator, on behalf of the State of Louisiana's medical assistance programs against Defendants under the State of Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. § 46:439.1.

274. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of LA. REV. STAT. § 46:438.3(A).

275. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of LA. REV. STAT. § 46:438.3(B).

276. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of LA. REV. STAT, § 46:438.3 (D).

277. The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

278. As a result of Defendants' actions, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT XIII**
**(Violation of Massachusetts False Claims Act)**

279. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

280. This is a civil action brought by Relator Foote on behalf of the Commonwealth of Massachusetts against Defendants under the Massachusetts False Claims Act, MASS. LAWS ANN. ch. 12, § 5C(2).

281. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MASS. LAWS ANN, ch. 12, § 5B(1).

282. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts or its political subdivisions in violation of MASS. LAWS ANN. ch. 12, § 5B(2).

283. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or one of its political subdivisions, in violation of MASS. LAWS ANN. ch. 12, § 5B(8).

284. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

285. As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**
**(Violation of Michigan Medicaid False Claims Act)**

286. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

287. This is a civil action brought by Relator Foote in the name of the State of Michigan against Defendants under the State of Michigan Medicaid False Claims Act, MICH. COMP. LAWS SERV. § 400.610a(l).

288. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, a false statement or false representation of a material fact in an application for Medicaid benefits, in violation of MICH. COMP. LAWS. SERV. § 400.603(1).

289. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit, in violation of MICH. COMP. LAWS. SERV. § 400.603(2).

290. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants are not entitled or in an amount greater than

that to which Defendants are entitled, in violation of MICH. COMP. LAWS. SERV. § 400.603(3).

291. Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly presented or made or caused to be presented or made, and may still be presenting or causing to be presented a false claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, in violation of MICH. COMP. LAWS. SERV. § 400.607(1).

292. The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

293. As a result of Defendants' actions, as set forth above, the State of Michigan or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XV**
**(Violation of Montana False Claims Act)**

294. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

295. This is a civil action brought by Relator Foote on behalf of the State of Montana against Defendants under the State of Montana False Claims Act, MONT. CODE ANN. § 17-8-406( 1).

296. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of MONT. CODE ANN. § 17-8-403( l)(a).

297. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

298. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana or one of its political subdivisions, in violation of MONT. CODE ANN. § 17-8-403( l)(g).

299. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

300. As a result of Defendants' actions, as set forth above, the State of Montana or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVI**
**(Violation of New Hampshire Medicaid False Claims Act)**

301. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

302. This is a civil action brought by Relator Foote on behalf of the State of New Hampshire against Defendants under the State of New Hampshire Medicaid False Claims Act, N.H. REV. STAT. ANN. § 167:61-cII.(a).

303. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(a).

304. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a fake claim paid or approved, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(b).

305. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Hampshire or one of its political subdivisions, in violation of N.H. REV. STAT. ANN. § 167:61-bI.(e).

306. The State of New Hampshire, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

307. As a result of Defendants' actions, the State of New Hampshire or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVII**
**(Violation of New Jersey False Claims Act)**

308. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

309. This is a civil action brought by Relator Foote, in the name of the State of New Jersey, against Defendants pursuant to the State of New Jersey Fraud False Claims Act, N.J. STAT. ANN. § 265 (2007), *et seq.*

310. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

311. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of N.J. STAT. ANN. § 265 (2007).

312. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or

quantity than is due or when no benefit or payment is authorized, in violation of N.J. STAT. ANN. § 265 (2007).

313. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of N.J. STAT. ANN. § 265 (2007).

314. The State of New Jersey or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

315. As a result of Defendants' actions, as set forth above, the State of New Jersey or its political subdivisions has been, and may continue to be, severely damaged.

## COUNT XVIII
## (Violation of New Mexico Medicaid False Claims Act)

316. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

317. This is a civil action brought by Relator Foote on behalf of the State of New Mexico against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

318. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4A.

319. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may be continuing to present or causing to be presented a claim for payment under the Medicaid program that is not authorized or is not eligible for benefit under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4B.

320. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved, in violation of N.M. STAT. ANN. § 27-14-4C.

321. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, in violation of N.M. STAT. ANN. § 27-14-4E.

322. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-

related management services for recipients of health insurance programs funded by the state or its political subdivisions.

323. As a result of Defendants' actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**
**(Violation of New York False Claims Act)**

324. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

325. This is a civil action brought by Relator Foote on behalf of the State of New York against Defendants under the State of New York False Claims Act, N.Y. CLS St. Fin. § 190.2.

326. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.Y. CLS St. Fin. § 189(a).

327. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false claim paid or approved, in violation of N.Y. CLS St. Fin. § 189(b).

328. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of New York or one of its political subdivisions, in violation of N.Y.CLS St. Fin. § 189(g).

329. The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

330. As a result of Defendants' actions, as set forth above, the State of New York or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**
**(Violation of Nevada Submission of False Claims to State or Local Government Act)**

331. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

332. This is a civil action brought by Relator Foote on behalf of the State of Nevada against Defendants under the State of Nevada Submission of False Claims to State or Local Government Act, NEV. REV. STAT. ANN. § 357.080(1)

333. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of NEV. REV. STAT. ANN. § 357.040( l)(a).

334. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements to obtain payment or approval for false claims in violation of NEV. REV. STAT. ANN. § 357.040(1)(b).

335. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or one of its political subdivisions, in violation of NEV. REV. STAT. ANN. § 357.040(1)(g).

336. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

337. As a result of Defendants' actions, as set forth above, the State of Nevada or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXI**
**(Violation of Nevada North Carolina False Claims Act)**

338. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

339. This is a civil action brought by Relator Foote on behalf of the State of North Carolina against Defendants under the North Carolina False Claims Act, N.C. GEN. STAT. § 1-605.

340. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of N.C. GEN. STAT. § 1-607(a)(1).

341. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the State of North Carolina or its political subdivisions in violation of N.C. GEN. STAT. § 1-607(a)(2).

342. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina or one of its political subdivisions, in violation of N.C. GEN. STAT. § 1-607(a)(7).

343. The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

344. As a result of Defendants' actions, as set forth above, the State of North Carolina or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXII**
**(Violation of Oklahoma Medicaid False Claims Act)**

345. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

346. This is a civil action brought by Relator Foote, in the name of the State of Oklahoma, against Defendants pursuant to the State of Oklahoma Medicaid Fraud False Claims Act, OKLA. STAT. tit. 63, § 5053 (2007), *et seq.*

347. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Oklahoma Medicaid program, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

348. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

349. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

350. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or

recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of OKLA. STAT. tit. 63, § 5053 (2007).

351. The State of Oklahoma or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

352. As a result of Defendants' actions, as set forth above, the State of Oklahoma or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXIII**
**(Violation of Rhode Island False Claims Act)**

353. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

354. This is a civil action brought by Relator Foote, in the name of the State of Georgia, against Defendants pursuant to the State of Rhode Island Fraud False Claims Act, R.I. GEN. LAWS § 9-1.1-1 (2008), *et seq.*

355. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for any benefit or payment under the Rhode Island Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

356. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a

false statement or representation of material fact for use in determining rights to a benefit or payment, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

357. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally concealed or failed to disclose, and may still be concealing or failing to disclose, an event with an intent fraudulently to secure the benefit or payment cither in a greater amount or quantity than is due or when no benefit or payment is authorized, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

358. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly offered or paid, and may still be offering or paying, remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for purchasing, ordering or arranging for, or recommending purchasing or ordering of, a good, supply or service for which payment was made, in whole or in part, under the Medicaid program, in violation of R.I. GEN. LAWS § 9-1.1-1 (2008).

359. The State of Rhode Island or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

360. As a result of Defendants' actions, as set forth above, the State of Rhode Island or its political subdivisions has been, and may continue to be, severely damaged.

**COUNT XXIV**
**(Violation of Tennessee Medicaid False Claims Act)**

361. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

362. This is a civil action brought by Relator Foote in the name of the State of Tennessee against Defendants under the Tennessee Medicaid False Claims Act, TENN. CODE ANN. § 71-5-183(a).

363. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee a claim for payment under the Medicaid program knowing it was false or fraudulent, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

364. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

365. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, relative to the Medicaid program, with knowledge that such records or statements were false, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

366. The State of Tennessee, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

367. As a result of Defendants' actions, as set forth above, the State of Tennessee has been, and may continue to be, severely damaged.

**COUNT XXV**
**(Violation of Texas Human Resources Code, Medicaid Fraud Prevention Chapter)**

368. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

369. This is a civil action brought by Relator Foote in the name of the State of Texas against Defendants under the State of Texas Human Resources Code, Medicaid Fraud Prevention Chapter, TEX. HUM. RES. CODE § 36.101(a).

370. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact on an application for a contract, benefit or payment under a Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(1).

371. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made or caused to be made, and may still be making or causing to be made, a false statement or misrepresentation of material fact that is intended to be used, and has been used, to determine a person's eligibility for a benefit or payment under the Medicaid program, in violation of TEX. HUM. RES. CODE § 36.002(2).

372. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program in violation of TEX. HUM. RES. CODE § 36.002(4)(B).

373. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made a claim under the Medicaid program for a service or product that was inappropriate, in violation of TEX. HUM. RES. CODE § 36.002(7)(C),

374. The State of Texas, its political subdivisions or the Department, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

375. As a result of Defendants' actions, as set forth above, the State of Texas, its political subdivisions or the Department has been, and may continue to be, severely damaged.

## COUNT XXVI
## (Violation of Virginia Fraud Against Taxpayers Act)

376. Relator Foote incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

377. This is a civil action brought by Relator Foote on behalf of the Commonwealth of Virginia against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, VA. CODE ANN. § 8.01-216.5, *et seq.*

378. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth, a false or fraudulent claim for payment or approval, in violation of VA. CODE ANN. § 8.01-216.3(A)(l).

379. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(2).

380. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth, in violation of VA. CODE ANN. § 8.01-216.3(A)(7).

381. The Commonwealth of Virginia, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

382. As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia, its political subdivisions or the Department has been, and may continue to be, severely damaged.

**COUNT XXVII**
**(Violation of Wisconsin False Claims for Medical Assistance Act)**

383. Relator Foote incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

384. This is a civil action brought by Relator Foote on behalf of the State of Wisconsin against Defendant under the State of Wisconsin False Claims for Medical Assistance, WIS. STAT. § 20.931 (2007), *et seq.*;

385. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the state, a false or fraudulent claim for medical assistance, in violation of WIS. STAT. § 20.931(2)(a) (2007).

386. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain approval or payment of a false claim for medical assistance, in violation of WIS. STAT. § 20.931(2)(b).

387. The State of Wisconsin, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

388. As a result of Defendant' actions, as set forth above, the State of Wisconsin, its political subdivisions or the Department has been, and may continue to be, severely damaged.

**WHEREFORE,** Relator Foote pray for judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729, *et seq.*; CAL. CODE § 12650, *et seq.*, 2009 Conn. Pub. Acts No. 09-5, *et seq.*, DEL. CODE ANN. tit. 6, § 1201, *et seq.*, D.C. CODE ANN. § 2-308.13, *et seq.*, FLA. STAT. ANN. § 68.081, *et seq.*, GA. CODE ANN. § 49-4-168, *et seq.*, HAW. REV. STAT. § 661-21, *et seq.*, IND. CODE ANN. § 5-11-5.5, *et seq.*, 740 ILL. COMP. STAT. ANN. § 1751, *et seq.*, LA. REV. STAT. § 437.1, *et seq.*, MASS. LAWS ANN. Ch. 12, §5A, *et seq.*, MICH. COMP. LAWS SERV. § 400.601, *et seq.*, MONT. CODE ANN. § 17-8-401, *et seq.*, N.H. REV. STAT. ANN. § 167:61-b, *et seq.*, N.J. STAT ANN. § 265, *et seq.*, N.M. STAT. ANN. § 27-14-1, *et seq.*, N.Y. CLS ST. FIN. § 187, *et seq.*, NEV. REV. STAT. ANN. § 357.010, *et seq.*, N.C. GEN. STAT. § 1-605, *et. seq.,* OKLA. STAT. tit. 63, § 5053, *et seq.*, R.I. GEN. LAWS § 9-1,1-1, *et seq.*, TENN. CODE ANN. § 71-5-181, *et seq.*, TEX. HUM. RES. CODE § 36.001, *et seq.*, VA. CODE ANN. § 8.01-216.1, *et seq.,* and WIS. STAT. § 20.931 (2007), *et seq.*

B. That judgment be entered in Relator Foote's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That Relator Foote be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), CAL. CODE § 12652(g), 2009 Conn. Pub. Acts No. 09-5 § 5 (e), DEL. CODE ANN. tit. 6, § 1205, D.C. CODE ANN. § 2-308.15(f), FLA. STAT. ANN.

§ 68.085, GA. CODE ANN. § 49-4-168, HAW. REV. STAT. § 661-27, IND. CODE ANN. § 5-11-5.5-6(a), 740 ILL. COMP. STAT. ANN. 175/4(d), LA. REV. STAT. § 439.4, MASS. GEN. LAWS ch. 12, § 5F, MICH. COMP. LAWS SERV. § 400.610a(9), MONT. CODE ANN. § 17-8-410, N.H. REV. STAT. ANN. § 167:61-e, N.J. STAT ANN. § 265, N.M. STAT. ANN. § 27-14-9, N.Y. CLS St. Fin. § 190.6., NEV. REV. STAT. ANN. § 357.220, N.C. GEN. STAT. § 1-607(a), OKLA. STAT. tit. 63, § 5053, R.I. GEN. LAWS § 9-1,1-1, TENN. CODE ANN. § 71-5-183, TEX. HUM. RES. CODE § 36.110, VA. CODE ANN. § 8.01-216.7, and WIS. STAT. § 20.931, including without limitation (i) reinstatement of employment with no diminution of seniority, (ii) double back-pay for the period since his unlawful retaliatory termination, (iii) interest on such back-pay, and (iv) special damages, including reasonable attorneys' fees and litigation costs.

D. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in CAL. CODE § 12651(a), plus a civil penalty of no more than ten thousand dollars ($10,000) per claim as provided by CAL. CODE § 12651(a), to the extent such multiplied penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the Government of the State of Connecticut multiplied as provided for in 2009 Conn. Pub. Acts No. 09-5 § 2(b), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Pub. Acts No. 09-5 § 2(b), to

the extent such multiplied penalties shall fairly compensate the Government of the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the Government of the State of Delaware multiplied as provided for in DEL. CODE ANN. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five- hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the State of Delaware False Claims and Reporting Act, as provided by DEL. CODE ANN. tit. 6, § 1201(a), to the extent such multiplied penalties shall fairly compensate the Government of the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. CODE ANN. § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. CODE ANN. § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in FLA. STAT. ANN. § 68.082, plus a civil penalty of not less than five thousand dollars

($5,000) or more than ten thousand dollars ($10,000) as provided by FLA. STAT. ANN. § 68.082, to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in GA. CODE ANN. § 49-4-168, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent of the proceeds per claim as provided by GA. CODE ANN. § 49-4-168.2, to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in HAW. REV. STAT. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by HAW. REV. STAT. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in IND. CODE ANN. § 5-11-5.5-2, plus a civil penalty of at least five thousand dollars ($5,000) as provided by IND. CODE ANN. § 5-11-5.5-2, to the extent such multiplied penalties shall fairly

compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 ILL. COMP. STAT, ANN. 175/3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000), and the costs of this civil action brought to recover such damages and penalty, as provided by 740 ILL. COMP. STAT. ANN. 175/3(a), to the extent such multiplied penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in LA. REV. STAT § 438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by LA. REV. STAT § 438.6(B)(I), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by LA. REV. STAT § 438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by LA. REV. STAT. § 438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by

Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MASS. LAWS ANN. ch. 12, 65B, multiplied as provided for in MASS. LAWS ANN. ch. 12, § 5B, plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to MASS. LAWS ANN, ch. 12, 5B, to the extent such multiplied penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS SERV. §§ 400.603-400.606, 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MONT. CODE ANN. § 17-8-403(2), multiplied as provided for in MONT. CODE ANN.

§ 17-8-403(2), plus a civil penalty of up to ten thousand dollars ($10,000) for each false claim, pursuant to MONT. CODE ANN. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of New Hampshire or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.H. REV. STAT. ANN. § 167:6111, multiplied as provided for in N.H. REV. STAT. ANN. § 167:61II, plus a civil penalty of two thousand dollars ($2,000) for each false claim, pursuant to REV. STAT. ANN. § 167:61II, to the extent such multiplied penalties shall fairly compensate the State of New Hampshire or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. STAT. ANN. § 265, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by N.J. STAT. ANN. § 265, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. STAT. ANN. § 27-14-4, multiplied as provided for in N.M. STAT. ANN. § 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after fill discovery;

T. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. CLS St. Fin. § 189.1., multiplied as provided for in N.Y. CLS St. Fin. § 189.1., plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. CLS St. Fin. § 189.l., to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in NEV. REV. STAT. ANN. 357.040, multiplied as provided for in NEV. REV. STAT. ANN. § 357.040(1), plus a civil penalty of not less than two thousand dollars ($2,000) or more than ten thousand dollars ($10,000) for each act, pursuant to NEV. REV. STAT. ANN. § 357.040, to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the

various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. GEN. STAT. § 1-605, multiplied as provided for in N.C. GEN. STAT. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. GEN. STAT. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in OKLA. STAT. tit. 63, § 5053, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by OKLA. STAT. tit. 63, § 5053.4, to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X. That judgment be entered in Relator Foote's favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. GEN. LAWS § 9-1,1-1, plus a civil penalty of not less than fifteen (15) percent or more than twenty five (25) percent per claim as provided by R.I. GEN.

LAWS § 9-1,1-4, to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TENN. CODE ANN. § 71-5-182, multiplied as provided for in TENN. CODE ANN. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) pursuant to TENN. CODE ANN. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relator Foote's favor and against Defendants for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in TEX. HUM. RES. CODE § 36.052(a)(l), multiplied as provided for in TEX. HUM. RES. CODE § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to TEX. HUM. RES. CODE § 36.052(a)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act committed that resulted in injury to an elderly or disabled person, and of not less than one thousand dollars

($1,000) or more than ten thousand dollars ($10,000) for each unlawful act committed that did not result in injury to an elderly or disabled person, pursuant to TEX. HUM. RES. CODE § 36.052(a)(3)(A) and (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA. That judgment be entered in Plaintiff's favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in VA. CODE ANN. § 8.01-216.3(A), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by VA. CODE ANN. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB. That judgment be entered in Plaintiffs' favor and against Defendant in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in WIS. STAT. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by WIS. STAT. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

CC. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

DD. That judgment be granted for Relator Foote against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator Foote in the prosecution of this suit; and

EE. That Relator Foote be granted such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Relator Foote demands a trial by jury of all issues so triable.

Dated: February 5, 2010

BLANK ROME LLP

By: ______________________
David A. Dorey (DE I.D. No. 5283)
Steven L. Caponi (DE I.D. No. 3484)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: 302-425-6400
Facsimile: 302-425-6464

and

W. Scott Simmer
Alan M. Freeman
BLANK ROME LLP
600 New Hampshire Ave., NW
Washington DC 20037
Telephone: 202-772-5800
Facsimile: 202-572-8412

*Counsel for Plaintiff/Relator*

Dated: February 5, 2010