**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| **UNITED STATES OF AMERICA *ex rel.* LAYNE FOOTE and MARK T. LORDEN, and on behalf of the States of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, WASHINGTON, WISCONSIN, the Commonwealths of MASSACHUSETTS and VIRGINIA, and the DISTRICT OF COLUMBIA,** | **Case No. 10-cv-95 (SLR)** |
| ***Plaintiffs,*** | |
| **v.** | |
| **ASTRAZENECA LP and ASTRAZENECA PHARMACEUTICALS LP,** | |
| ***Defendants.*** | |

**THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

**TABLE OF CONTENTS**

**Page**


I. SUMMARY ....2

II. JURISDICTION AND VENUE ....7

III. PARTIES ....7

A. Plaintiff/Relator Layne Foote ....7

B. Plaintiff/Relator Mark T. Lorden ....9

C. Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP ....10

1. Defendant AstraZeneca Pharmaceuticals LP ....10

2. Defendant AstraZeneca LP ....11

3. Defendants' Collective Liability ....11

D. Federal and State Government Programs – Real Parties in Interest ....12

IV. BACKGROUND: REGULATION OF PRESCRIPTION DRUG MARKETING ....12

A. The FDA Regulatory System ....12

1. The FDA Regulates What Drugs May Be Marketed, and The Uses for Which They May Be Marketed ....12

2. FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements about a Drug's Use ....15

B. The Limited Role of the FDA in Regulating Off-Label Promotion of Drugs ....20

1. The FDA Relies on Information Provided by Drug Manufacturers for New Drug Approvals ....20

2. DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion ....21

C. Drug Payment Under Government Healthcare Programs ....23

1. The Medicaid Program ....23

(a) The Roles of Pharmacy & Therapeutics Committees and Preferred Drug Lists ....24

2. The Medicare Program ....................26

3. Reimbursement Under Other Government Programs ....................30

V. ASTRAZENECA LAUNCHES CRESTOR ....................31

A. Crestor Was Late to an Established Market with Entrenched Market Leaders ....................32

B. Crestor Presented an Ominous Safety Profile ....................34

C. Crestor's Regulatory Approvals Were Narrower than Those of Other Statins ....................37

1. Crestor Received Only Limited FDA Approvals ....................37

2. Crestor Received Only Limited Compendium Endorsements ....................38

D. AstraZeneca Believed that Crestor's Patent Was in Jeopardy ....................39

VI. ASTRAZENECA'S FRAUDULENT MARKETING SCHEME ....................39

VII. ASTRAZENECA MADE FALSE SUPERIORITY STATEMENTS TO MISBRAND CRESTOR ....................45

A. AstraZeneca Used Its STELLAR Trial to Promote Crestor Misleadingly as Being Superior to Other Name Brand Statins ....................45

1. AstraZeneca Made False and Misleading Superiority Statements to Capture Market Share ....................47

2. AstraZeneca Made False and Misleading Comparison Statements to Capture Market Share ....................50

3. AstraZeneca Made False and Misleading Superiority Statements to Induce Government Programs to Prefer and Reimburse for Crestor ....................54

4. AstraZeneca Made False and Misleading Superiority Statements to Health Care Professionals in Order to "Pull Through" Government Program Claims ....................62

B. AstraZeneca Made False and Misleading Superiority Statements that Improperly Targeted Minority Ethnic Populations with High Government Program Utilization Rates ....................63

1. AstraZeneca Funded the ARIES Trial to Illegally Target African-American Patients for Off-Label Sales of Crestor ....................64

2. AstraZeneca Funded the STARSHIP Trial to Illegally Target Hispanic Patients for Off-Label Sales of Crestor ....................................65

3. AstraZeneca Funded the IRIS Trial to Illegally Target South Asian Patients for Off-Label Sales of Crestor..................................................66

4. AstraZeneca Used the ARIES, STARSHIP and IRIS Trials to Falsely Promote Crestor as Superior for Certain Ethnic Populations........67

5. AstraZeneca Made False Superiority Statements Regarding the ARIES, STARSHIP, and IRIS Trials to Government Programs ...............71

C. AstraZeneca Made False and Misleading Superiority Statements to Promote Crestor as Superior to Generic Statins .................................................73

1. AstraZeneca Repeated False and Misleading "Verbatim" Messages Stating that Crestor was Superior to Generic Statins................................78

D. The SATURN Trial Confirmed that AstraZeneca's Superiority Statements Had Been Misleading..........................................................................................82

VIII. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS TO PROMOTE CRESTOR TO REGRESS ATHEROSCLEROSIS ....................................83

A. AstraZeneca Used the ASTEROID Trial to Promote its False and Misleading Message that Crestor Was the Only Statin to Regress Atherosclerosis..........................................................................................85

1. AstraZeneca Made False and Misleading ASTEROID Statements to "Pull Through" Prescriptions for Crestor ............................................87

2. AstraZeneca Targeted Government Programs with Its False and Misleading Message that ASTEROID Showed Crestor was the Only Statin to Regress Atherosclerosis....................................................94

B. AstraZeneca Made False and Misleading Statements About its METEOR Trial to Promote Crestor as the Only Statin to "Halt" or "Stop" the Progression of Atherosclerosis ..............................................................95

1. Sales Specialists Were Instructed to Deliver the Misleading Message that Crestor "Halts" or "Stops" the Progression of Atherosclerosis.........................................................................97

2. AstraZeneca Targeted Government Programs with its False and Misleading Message Based on the METEOR Trial..................................99

IX. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS PROMOTING CRESTOR TO PREVENT HEART ATTACKS AND STROKES .......100

A. AstraZeneca Made False and Misleading Statements That the Negative CORONA Trial Showed Crestor Reduces Heart Attacks and Death ....................101

1. AstraZeneca Targeted Government Programs with False and Misleading Outcomes Statements Based on its Negative CORONA Trial ....................103

B. AstraZeneca Made False and Misleading Statements About its JUPITER Study ....................104

1. The JUPITER Trial and Results Were Flawed and Unreliable ....................105

(a) JUPITER Stacked the Deck with Sick People, But Passed Them Off as "Healthy." ....................105

(b) JUPITER Used Deceptive Relative Benefits to Measure Outcomes ....................106

(c) The JUPITER Reports of Reduced Mortality Were False and Misleading ....................107

(d) Concerns of Bias Stemming From a Patent Held by JUPITER's Principal Investigator ....................108

(e) Concerns Over Early Termination of the JUPITER Trial ....................109

(f) JUPITER Misrepresented Adverse Events, In Particular the Risk of Increased Diabetes Associated with Taking Crestor ....................110

2. AstraZeneca Jumped the Gun in Promoting JUPITER to Physicians for Primary Prevention Based on False and Misleading Statements ....................111

3. When the JUPITER Trial Results Were Announced, AstraZeneca Shifted Its False and Misleading Promotion into High Gear ....................112

4. AstraZeneca Made False and Misleading Statements Concerning JUPITER to Government Programs ....................118

C. AstraZeneca Admitted That its Promotion of Jupiter Trial Data Was False and Misleading ....................119

X. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS TO PROMOTE CRESTOR FOR PREVENTION OF DIABETES, RENAL PROTECTION, REDUCTION OF PROTEINURIA, AND FOR ITS "PLEIOTROPIC" EFFECTS ....................121

A. AstraZeneca Made False and Misleading Statements to Promote Crestor to Prevent or Delay the Onset of Diabetes ....... 121

B. AstraZeneca Made False and Misleading Statements that Crestor Had Renal Protective Effects and also Reduced Proteinuria ....... 124

1. AstraZeneca Made the False and Misleading Statement that Crestor Had Renal Protective Effects and Reduced Proteinuria ....... 124

2. AstraZeneca Directed Sales Specialists to Use "Walking PIRs" to Make the False and Misleading Statement that Crestor Had Beneficial "Pleiotropic" Renal Protective Effects ....... 128

3. AstraZeneca Focused Its False and Misleading Pleiotropic Sales Message on Nephrologists ....... 130

4. AstraZeneca Made False and Misleading Pleiotropic Statements to Promote Crestor to Treat Numerous Off-Label Conditions, Including Alzheimer's Disease and Dementia ....... 131

5. AstraZeneca PLANET I and PLANET II Trials Prove that Statements of Renal Protective Effects and Reduced Proteinuria Were False and Misleading ....... 132

XI. ASTRAZENECA PROVIDED KICKBACKS TO INDUCE OFF-LABEL PRESCRIPTIONS OF CRESTOR ....... 134

A. AstraZeneca Disguised its False and Misleading Promotion of Crestor Through the Payment of Kickbacks ....... 135

1. AstraZeneca Provided Kickbacks to Paid Speakers as Rewards for Prescribing Crestor and for Presenting False and Misleading Programs ....... 135

2. AstraZeneca Provided Kickbacks to Reward Health Care Professionals Who Directed Deceptive, Promotional CME Crestor Courses ....... 142

3. AstraZeneca Used Bogus Advisory Boards to Promote Crestor Illegally and to Manipulate Key Formulary Decision Makers ....... 151

4. AstraZeneca Provided Kickbacks to NCEP ATP III Guideline Authors to Induce Their Support of Crestor's False and Misleading Superiority and Safety Messages ....... 152

B. AstraZeneca's Kickbacks to Health Care Professionals Induced Them to Prescribe Crestor and Cause False Claims to be Submitted and Paid ....... 155

1. AstraZeneca Used "Tutorials" and "Journal Club" Dinners as Pretexts to Induce Prescriptions of Crestor and Cause False Claims to be Submitted ....158

XII. THE FRAUDULENT MARKETING SCHEME CAUSED FALSE CLAIMS TO BE SUBMITTED TO, AND PAID BY, GOVERNMENT PROGRAMS....161

A. AstraZeneca's Off-Label Promotion Caused the Submission of False Claims and Making of Material False Statements to Government Programs....162

1. Submission of False Claims to Medicaid....164

2. Submission of False Claims to Medicare Part D ....166

B. AstraZeneca's Kickbacks Caused the Submission and Payment of False Claims, and the Making of Material False Statements to Government Programs ....168

**COUNT I** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)....170

**COUNT II** (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B) ....170

**COUNT III** (Violation of California False Claims Act)....171

**COUNT IV** (Violation of Colorado Medicaid False Claims Act) ....172

**COUNT V** (Violation of Connecticut False Claims Act for Medical Assistance Programs)....174

**COUNT VI** (Violation of Delaware False Claims and Reporting Act)....175

**COUNT VII** (Violation of District of Columbia False Claims Act) ....176

**COUNT VIII** (Violation of Florida False Claims Act) ....177

**COUNT IX** (Violation of Georgia False Medicaid Claims Act)....179

**COUNT X** (Violation of Hawaii False Claims Act)....180

**COUNT XI** (Violation of Illinois False Claims Act)....181

**COUNT XII** (Violation of Indiana False Claims and Whistleblower Protection Act)....182

**COUNT XIII** (Violation of Iowa False Claims Act)....184

**COUNT XIV** (Violation of Louisiana Medical Assistance Programs Integrity Law) ....185

**COUNT XV** (Violation of Maryland False Health Claims Act) ....................186

**COUNT XVI** (Violation of Massachusetts False Claims Act) ....................187

**COUNT XVII** (Violation of Michigan Medicaid False Claims Act) ....................189

**COUNT XVIII** (Violation of Minnesota False Claims Act) ....................190

**COUNT XIX** (Violation of Montana False Claims Act) ....................192

**COUNT XX** (Violation of Nevada False Claims Act) ....................193

**COUNT XXI** (Violation of New Jersey False Claims Act) ....................194

**COUNT XXII** (Violation of New Mexico Medicaid False Claims Act) ....................195

**COUNT XXIII** (Violation of New York False Claims Act) ....................197

**COUNT XXIV** (Violation of North Carolina False Claims Act) ....................198

**COUNT XXV** (Violation of Oklahoma Medicaid False Claims Act) ....................199

**COUNT XXVI** (Violation of Rhode Island False Claims Act) ....................201

**COUNT XXVII** (Violation of Tennessee Medicaid False Claims Act) ....................202

**COUNT XXVIII** (Violation of Virginia Fraud Against Taxpayers Act) ....................203

**COUNT XXIX** (Violation of Washington Medicaid False Claims Act) ....................205

**COUNT XXX** (Violation of Wisconsin False Claims for Medical Assistance Law) ....................206

**THIRD AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 *ET SEQ*. AND STATE LAW COUNTERPARTS**

This action is brought on behalf of the United States of America and the following states by Layne Foote and Mark T. Lorden (together, "Relators"), by and through their attorneys, against Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP (together, "Defendants," "AstraZeneca," or the "Company") pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, and pursuant to the *qui tam* provisions of the following State statutes: the California False Claims Act, Cal. Gov't Code § 12650 *et seq.* (Deering 2000); the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-304 *et seq.* (2010); the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq.* (2010); the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* (2000); the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* (2000); the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* (2007); the Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); the Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* (2000); the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* (2007); the Iowa False Claims Act, Iowa Code § 685.1 *et seq.* (2010); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.* (2006); the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-601 *et seq.* (LexisNexis 2010); the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* (2007); the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.* (2007); the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.* (2011); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* (1999); the Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-

1 *et seq.* (West 2007); the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.* (2007); the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 *et seq.* (2010); the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et seq.* (2007); the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011); the Washington Medicaid False Claims Act, S. 5978, 62nd Cong. § 201 *et seq.* (2012); and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (2007) ("State *qui tam* statutes" or "*Qui Tam States*").

## I. SUMMARY

1. Beginning with the launch of Crestor (rosuvastatin) in September 2003, AstraZeneca deployed a fraudulent marketing scheme: (i) to promote Crestor as safer and more effective than competitor statins, even though it knew those promotional statements were false and materially misleading; (ii) to promote Crestor for unapproved (*i.e.*, "off-label") uses; (iii) to submit and/or cause to be submitted hundreds of thousands of false claims for reimbursement of Crestor prescriptions by Federal and State health care programs; and (iv) to pay kickbacks to health care professionals to induce them to prescribe Crestor instead of alternate statins.

2. The purpose of this fraudulent marketing scheme was to shore up the Company's balance sheet at a time when it was in trouble financially due to the expirations of three of its major drug patents, and the anticipated loss of revenue that would result. In response, management placed a large bet that Crestor would save the Company, but it faced significant challenges. Crestor was the seventh statin to enter this lucrative market, and it confronted entrenched competitors (led by Lipitor, launched in 1996, and Zocor, launched in 1992) that dominated the market.

3. AstraZeneca had limited time to succeed with its scheme. Competitor statins were facing their own statin patent expiration "cliffs," and they would soon become available generically (Mevacor, 2001; Pravachol, 2006; Zocor, 2006; Lipitor, 2011). That would cause their prices to begin to drop to pennies a day compared to Crestor, which would be priced some twenty to thirty times higher.

4. The lynchpin of AstraZeneca's fraudulent marketing promotion was its "GALAXY Program," a series of 26 clinical studies that compared Crestor to its competitors. GALAXY included several high quality, randomized controlled trials – but those would take years to complete, and many would fail to reach their desired conclusions. So, AstraZeneca's sales and marketing department utilized instead an array of other GALAXY Program trials (commonly called "seeding trials") that were completed more quickly, that generated comparatively weak data, and that were authored by hand-selected key opinion leaders ("KOLs") as investigators, to build support for Crestor.

5. AstraZeneca developed a three-prong strategy to implement its fraudulent marketing scheme. First, it used false and misleading statements about its GALAXY Program trials to promote Crestor as being safer and more effective than other statins. Second, it distorted the GALAXY Program results to promote Crestor first to regress atherosclerosis, and then to "stop" or "halt" the progression of atherosclerosis. Third, it "spun" negative GALAXY Program data into misleading statements that Crestor was effective in reducing morbidity and mortality in "apparently healthy" patients.[1]

6. AstraZeneca implemented its fraudulent marketing scheme through frequent interactions with Government Program directors and their Pharmacy & Therapeutics ("P&T")

---

[1] Morbidity includes the harmful effects other than death that result from cardiovascular disease.

Committees both directly and during advisory boards at posh resorts and luxury hotels, and during promotional continuing medical education ("CME") events and colloquies. The aim of these interactions was to gain "preferred" status for Crestor on Government Program Preferred Drug Lists ("PDLs"), which was a critical component in the success of the Company's strategy.

7. AstraZeneca next carried out its fraudulent marketing scheme through regular "pull through" interactions with health care professionals nationwide during false and misleading sales details, speaker programs, lunch 'n learns, in-services, tutorials, journal clubs, and preceptorships. During these interactions, these health care professionals were provided valuable inducements in order to purchase their brand loyalty. Each positive GALAXY study was misleadingly trumpeted as further evidence of Crestor's superiority over competitor and generic statins.

8. There were speed bumps along the way, including warning letters from the U.S. Food and Drug Administration ("FDA"), notifying AstraZeneca that its promotional tactics were false and misleading. Ultimately, even the Company itself admitted that it had gone too far. On February 4, 2010, AstraZeneca's U.S. President, Richard Fante, sent an e-mail to the entire sales team, admitting:

> Through our own internal reviews, we have identified instances of inappropriate references to JUPITER trial data during interactions with some health care professionals during late 2008 and 2009.

In response, the Company looked for scapegoats to blame, firing numerous Sales Specialists, like Relator Lorden, whose only mistake had been to document in their call notes the fraudulent marketing scheme they had been trained and instructed to implement throughout the country.

9. AstraZeneca's false and misleading promotion of Crestor caused quantifiable harm to the United States and the *Qui Tam* States in the form of dollars they spent to reimburse

Crestor prescriptions that *would not have been written* had the Company provided only accurate and not misleading information to health care professionals, Government Program directors, and P&T Committees.

10. What cannot be as easily quantified, however, is the physical harm caused to the numerous patients who took Crestor as a consequence of AstraZeneca's fraudulent marketing scheme. For example, many patients were prescribed Crestor as a result of the Company's false and misleading statements that it had been proven safer than other statins – *e.g.*, that Crestor *improved* renal function and *reduced* proteinuria (the presence of an abnormal quantity of protein in the urine). These statements were simply false. AstraZeneca's own PLANET I and PLANET II studies confirmed that Crestor (unlike Lipitor) was associated with a significant *decline* in kidney function and had *no impact* on reducing proteinuria.

11. Worse yet, the Company's widespread and false promotion of Crestor to prevent or delay the onset of diabetes put countless non-diabetic patients in serious jeopardy, as the Company's JUPITER trial showed "an increased frequency of . . . reported diabetes was observed with rosuvastatin compared to placebo." In other words, Crestor didn't prevent diabetes, but it might actually *cause* diabetes. Even the FDA took notice, requiring in 2012 that a warning about the risk of diabetes be included in the labels of Crestor. At bottom, the Company's reckless and misleading over-promotion of Crestor has been responsible for statin-induced diabetes in a significant number of patients.

12. AstraZeneca also violated Federal and State laws and regulations when it provided illegal kickbacks to health care professionals to induce them to prescribe Crestor in lieu of cheaper (and even safer) generic equivalents. This misconduct put patients at risk, and it cheated Federal and State health care programs out of millions of dollars.

13. The scheme was a financial success for AstraZeneca. By 2013, Crestor's U.S. sales were over $5.2 billion, much of it from Government Programs. The Company's marketing juggernaut had turned Crestor into the blockbuster it needed by causing myriad false and fraudulent claims for payment and reimbursement of Crestor prescriptions to be paid by Federal and State health care programs.

14. AstraZeneca concealed its fraudulent marketing scheme by making false statements to the FDA, State Medicaid Programs, Medicare Part D Sponsors, and other Government Programs, and by directing employees to conceal evidence.

15. AstraZeneca's conduct had a material effect on the Federal and State Government Programs' decisions to pay for Crestor. Had the Government Programs known that claims for the drug were submitted as the result of AstraZeneca's illegal fraudulent marketing scheme, they would not have made those reimbursements.

16. To make matters worse, at the time AstraZeneca engaged in this illegal conduct, it already was operating under a Corporate Integrity Agreement ("CIA") as part of its 2003 settlement for the drug Zoladex, wherein it pledged to the Government that moving forward it would change its business practices to comply with Federal and State statutes and regulations. AstraZeneca compounded the egregious nature of its misconduct further when it continued its fraudulent marketing scheme for Crestor despite entering into a *second* CIA in April 2010, this time resolving allegations that it had illegally promoted the drug Seroquel.

17. The United States and *Qui Tam* States have suffered substantial harm as a result of AstraZeneca's off-label and misleading promotion and its payment of kickbacks. From 2003 through the second quarter of 2014, Medicaid reimbursements for Crestor totaled at least $1.1 *billion* for some 10 *million* prescriptions. Medicare and other Government Program

reimbursements for Crestor likewise were substantial. In each case, a substantial portion of these reimbursements was made as a result of AstraZeneca's fraudulent marketing scheme. Moreover, AstraZeneca's fraudulent conduct is ongoing.

## II. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

19. This Court has personal jurisdiction over the Defendants because, among other things, the Defendants' United States headquarters are in this District, the Defendants transact business in this District, and the Defendants engaged in wrongdoing in this District.

20. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants' principal place of business in the United States is within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

21. The causes of action alleged herein are timely brought because, among other things, of efforts by the Defendants to conceal from the United States their wrongdoing in connection with the allegations made herein.

## III. PARTIES

### A. PLAINTIFF/RELATOR LAYNE FOOTE

22. Plaintiff/Relator Layne Foote ("Relator Foote") is a resident of Indiana. Relator Foote received a Bachelor of Science degree from the University of Southern Indiana at Evansville in 1995. Relator Foote was employed by AstraZeneca for approximately six years, from July 2003 to October 2009, as a Pharmaceutical Sales Specialist ("PSS" or "Sales Specialist") in the "Great Lakes Region."

23. Relator Foote was initially assigned by AstraZeneca to work in the Louisville (KY) District, which was a part of AstraZeneca's Great Lakes Region. In 2007, Relator Foote

requested and was transferred to AstraZeneca's Evansville, Indiana District, which also was a part of the Great Lakes Region.

24. AstraZeneca hired Relator Foote to promote Crestor within the Louisville District. He was assigned to promote, and he did promote, Crestor during his entire time as an employee of AstraZeneca.

25. Relator Foote held the title of PSS throughout his tenure with AstraZeneca. As such, his primary assigned role was to call on physicians, including primary care doctors, cardiologists, nephrologists, endocrinologists and others, within his assigned district, and to encourage them to prescribe his assigned drugs, including Crestor, for their patients. His secondary responsibility was to call on pharmacies within his assigned district to discourage them from recommending that physicians substitute generic drugs for his assigned, AstraZeneca branded drugs.

26. Relator Foote's compensation package was calculated as base compensation plus a bonus calculated based on progress toward reaching a predetermined goal for monthly sales growth. For example, if Relator Foote reached his goal for monthly sales growth (which usually was in the order of 25-35 percent), he would be paid 100 percent of the bonus for which he was eligible; and if he reached only 75 percent of his goal he would be paid only 75 percent of the bonus for which he was eligible. In addition, AstraZeneca from time to time would run "Special Incentive Plans" or "SIPs" that would pay an additional amount to the PSS responsible for the greatest sales growth in a sales District during a specified period that usually lasted from two to three months. In these ways, AstraZeneca tied Sales Specialist compensation to sales growth, and it incentivized each PSS to increase sales growth irrespective of the fact that it was doing so illegally.

27. Shortly after Relator Foote voiced objection to his District Sales Manager's directive that he promote off-label uses of Crestor to health care professionals, his employment with AstraZeneca was involuntarily terminated. When Relator Foote told his supervisor that he intended to convey his objections to the Human Resources department, his supervisor told him: "I don't know what you think it will accomplish. All you would be doing is talking your way out of a very good severance and get a lot of good people fired."

28. Relator Foote is an original source of the allegations in this Third Amended Complaint, and his allegations are not based upon publicly disclosed information. He voluntarily provided the Federal Government and the *Qui Tam* States with information and documents prior to the filing of his original Complaint in accordance with 31 U.S.C. § 3730(b)(2). Prior to filing his original Complaint, Relator Foote brought the wrongdoing described therein to the attention of AstraZeneca.

**B. PLAINTIFF/RELATOR MARK T. LORDEN**

29. Plaintiff/Relator Mark T. Lorden ("Relator Lorden") is a resident of New Hampshire. Relator Lorden received a Bachelor of Science degree from North Adams State College in North Adams, Massachusetts in 1977. He served in the United States Marine Corps as a Commissioned Officer (First Lieutenant) from 1977 until 1981, when he was honorably discharged.

30. Relator Lorden was employed by AstraZeneca for approximately seven years, from 2003 to February 2010, as a PSS in the Northeast Region/Boston North District.

31. When AstraZeneca hired Relator Lorden in 2003, it assigned him to promote the launch of Crestor following that drug's approval for marketing by the U.S. Food and Drug Administration. Relator Lorden was assigned to promote, and he did promote, Crestor during his entire time as an employee of AstraZeneca. Relator Lorden held the title of PSS throughout his

tenure with AstraZeneca. As such, his primary assigned role was to call on physicians, including primary care doctors, cardiologists, nephrologists, endocrinologists and others, within his assigned district, and to encourage them to prescribe his assigned drugs, including Crestor, for their patients. His secondary responsibility was to call on pharmacies within his assigned district to discourage them from recommending that physicians substitute generic drugs for his assigned, AstraZeneca branded drugs. Relator Lorden's compensation package at AstraZeneca was calculated in the same manner as was Relator Foote's.

32. Relator Lorden's employment with AstraZeneca was involuntarily terminated in February 2010, assertedly as a consequence of his improper promotional activities on behalf of Crestor. In fact, however, Relator Lorden's promotional activities on behalf of Crestor always were done under the direction and supervision of AstraZeneca managers and supervisors, and he was simply made a scapegoat to conceal the Company's illegal scheme.

33. Relator Lorden is an original source of the allegations in this Third Amended Complaint, and his allegations are not based upon publicly disclosed information. He voluntarily provided the Federal Government and the *Qui Tam* States with information and documents prior to the filing of his original Complaint in accordance with 31 U.S.C. § 3730(b)(2). Prior to filing his original Complaint, Relator Lorden brought the wrongdoing described therein to the attention of AstraZeneca.

### C. Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP

#### 1. Defendant AstraZeneca Pharmaceuticals LP

34. Defendant AstraZeneca Pharmaceuticals LP ("AZPLP") is a Delaware limited partnership with its headquarters located at 1800 Concord Pike, Wilmington, Delaware 19850, and it conducts business nationwide.

35. AZPLP's general and limited partners include: (i) AstraZeneca AB, a Swedish corporation with its corporate headquarters in Sweden; (ii) Zeneca Inc., a Delaware corporation with its corporate headquarters in Delaware; (iii) Astra USA, a New York corporation with its principal place of business in Delaware; and (iv) Astra US Holdings Corporation, a Delaware corporation with its corporate headquarters in Delaware.

36. During the relevant time period, AZPLP designed, produced, marketed and promoted prescription medications, including Crestor, nationwide. AZPLP is a subsidiary of AstraZeneca PLC, an English public limited company headquartered in London, England. At all relevant times, AZPLP acted by and through its agents, servants, workers, employees, officers and directors, all acting through the course and scope of their actual and apparent authority, agency, duties or employment.

**2. Defendant AstraZeneca LP**

37. Defendant AstraZeneca LP ("AZLP") is a Delaware limited partnership with its headquarters located at 1800 Concord Pike, Wilmington, Delaware, 19850, and it conducts business nationwide. AZLP's general and limited partners include: (i) Defendant AZPLP; and (ii) KBI Sub Inc., a Delaware corporation with its principal place of business in New Jersey. AZLP is a subsidiary of AstraZeneca PLC.

**3. Defendants' Collective Liability**

38. Defendants are engaged in the development, manufacture, distribution, and sale of Crestor tablets in the United States.

39. At all times material hereto, Defendants employed as many as 15,000 sales personnel and managers located across the United States whose function it was to promote, market or otherwise sell AstraZeneca drugs, including Crestor.

40. As a result of AstraZeneca's actions described herein, the United States and the *Qui Tam* States have suffered and continue to suffer financial harm.

### D. Federal and State Government Programs – Real Parties in Interest

41. The United States and the *Qui Tam* States are real parties in interest that fund, provide and pay for health benefits, including prescription drug benefits. Defendants market, and sell Crestor, the cost of which is paid for, reimbursed or subsidized by multiple government programs, including the Federal Employees Health Benefits program; the Health Insurance Program for the Elderly and Disabled, more commonly referred to as the Medicare Program, 42 U.S.C. § 1395, *et seq*., via Medicare Part C, also known as Medicare+Choice, now known as Medicare Advantage plans; Medicare Part D, the Retiree Drug Subsidy program; Medicare-subsidized employer group waiver plans ("EGWPs"); Railroad Retirement plans; the Indian Health Service; the Medicaid program; the Mail Handler's Health Benefit Plan; the U.S. Secret Service Employees Health Association Health Benefit Plan; the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS," now known as "TRICARE"); the Veteran's Health Administration; and State-funded programs for their employees and indigent citizens (collectively, the "Government Programs").

## IV. BACKGROUND: REGULATION OF PRESCRIPTION DRUG MARKETING

### A. The FDA Regulatory System

#### 1. The FDA Regulates What Drugs May Be Marketed, and The Uses for Which They May Be Marketed

42. Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a), (d). Approval of the drug by the FDA is the final step in a multi-year process of

study and testing. The standards that govern the FDA safety and effectiveness requirements are contained in statutes, regulations, notices, and guidance documents.

43. To determine whether a drug is "safe and effective," the FDA relies on information provided by a drug's manufacturer; it does not conduct any substantial analysis or studies itself. Applications for FDA approval (known as New Drug Applications or "NDAs") must include "full reports of investigations which have been made to show whether or not such drug is safe for use and whether or not such drug is effective in use." 21 U.S.C. § 355(b)(1)(A).

44. The law requires that "adequate and well-controlled investigations" be used to demonstrate a drug's safety and effectiveness. *See* 21 U.S.C. § 355(d)(7). The FDA approves a drug if there are "adequate and well-controlled clinical trials" that demonstrate a drug's safety and effectiveness for its "intended conditions" of use. *See* 21 U.S.C. § 355(d)(5).

45. Clinical trials provide the empirical data upon which the FDA determines a drug's safety and efficacy, and upon which doctors make professional judgments about the relative risks and benefits of a drug and whether it is appropriate to prescribe for their patients.

46. Often, clinical studies sponsored by drug companies are used as marketing tools rather than to develop meaningful scientific data upon which health care professionals can rely. According to Harold Sox, M.D., editor of *Annals of Internal Medicine*, and Drummond Rennie, M.D., deputy editor of the *Journal of the American Medical Association*, the following clinical study characteristics are indicia of marketing masquerading as science: an open-label design, lack of a control group, a very large projected enrollment relative to the importance of the question, a short-term study of a chronic disease, and study of an already approved drug. *See* Harold Sox *et al.*, *Seeding Trial: Just Say "No,"* 149 ANNALS OF INTERNAL MED. 279-280 (2008).

47. A randomized controlled trial ("RCT") is a type of scientific (often medical) experiment in which the people being studied are randomly allocated one of several different treatments under study. RCTs are the "gold standard" of clinical trials; they often are used to test the efficacy of various types of medical intervention, and they may provide reliable information about adverse effects. The terms "RCT" and "randomized trial" are sometimes used synonymously, but the methodologically sound practice is to reserve the "RCT" moniker for only those trials that contain control groups – *i.e.,* trials in which people receiving the study treatment are compared with people receiving no treatment (a placebo-controlled study) or a previously tested treatment (a positive-control study).

48. The statutory requirement that a drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations" has been interpreted to mean a clinical study with (i) clear objectives; (ii) adequate design to permit a valid comparison with a control group; (iii) adequate selection of study subjects; (iv) adequate measures to minimize bias; and (v) well defined and reliable methods of assessing subjects' responses to treatment. *See* 21 C.F.R. § 314.26.

49. After a drug is approved, the FDA continues to exercise control over the product labeling. To ensure or promote safety, the FDA may require a label change to reflect the increased risk of various side effects or interactions, restrict a drug's indications, or, in extreme cases, force a withdrawal from the market. *See* 21 C.F.R. § 201.57(3).

50. The FDA determines the requirements for package inserts or prescribing information that is provided with a prescription medication, which provides information about that drug.

51. The FDA may require that the package insert contain a "black box" warning, which means that medical studies indicate that the drug carries a significant risk of serious or even life-threatening adverse effects.

### 2. FDA Regulations Prohibit Off-Label Marketing and False and Misleading Statements about a Drug's Use

52. The "intended conditions" for use of a drug are listed in the drug's labeling, which is reviewed and approved by the FDA. *See* 21 U.S.C. § 355(d)(1) & (2). Indications for uses that are not listed in a drug's labeling have not been approved by the FDA. *See* 37 Fed. Reg. 16,503 (1972).

53. FDA regulations restrict how drug companies may market and promote approved drugs. *See* 21 U.S.C. §§ 331, 352; 21 C.F.R. § 314.81. Drug labels – including all marketing and promotional materials relating to the drug – may not describe intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. Illegal "misbranding" can result in criminal penalties. *See* 21 U.S.C. § 333.

54. The same general requirements about the promotion of prescription drugs apply to both professional and consumer-oriented marketing. In particular, promotional materials may only make statements that are supported by "substantial" scientific evidence (according to strict scientific procedures), and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional statements and materials. Federal regulations require that the risks as well as the benefits be clearly identified and given appropriate prominence. Promotional materials must be consistent with the FDA-approved product labeling. This restriction pertains to the clinical indications for which the drug has been approved as well as the dosing regimen that is supported by the clinical trials that were undertaken to establish safety and efficacy.

55. A manufacturer wishing to market or otherwise promote an approved drug for uses other than those listed on the approved label, must resubmit the drug for a series of clinical trials similar to those required for the initial FDA approval. *See* Food and Drug Administration Modernization Act of 1997 ("FDMA"), 21 U.S.C. §§ 360aaa(b) & (c); *see also* 21 C.F.R. § 314.54 (outlining the administrative procedure for filing an application for a new indication); 21 U.S.C. §§ 301 *et seq.* A supplemental NDA must be filed. Unless and until an additional indication is approved by the FDA, the unapproved use is considered to be "off-label."

56. "Off-label" refers to the use of an approved drug for any purpose, or in any manner, other than what is described in the drug's labeling. Off-label use includes treating a condition not indicated on the label, treating the indicated condition at a different dose or frequency than specified on the label, or treating a different patient population – *e.g.*, treating a child when the drug is approved to treat adults.

57. Although the FDA is responsible for ensuring that a drug is safe and effective for the specific approved indication, the FDA does not regulate the practice of medicine. Once a drug is approved for a particular use, the FDA does not prohibit physicians from prescribing the drug for uses that are different than those approved by the FDA.

58. When considering off-label prescribing, physicians depend on the patient-specific evidence they have available to them. This includes the particular patient, the severity of his or her problems, the success of prior treatments, and the risks of not treating. Whether contemplating on- or off-label use, physicians also rely on personal experience, recommendations from colleagues and academics, educational seminars, and clinical trials evidence. Much of what physicians rely on is information (or, as the case may be,

misinformation) provided by sales personnel from drug makers, drug company sponsored CME courses and speaker programs, and drug company sponsored clinical trials.

59. Although physicians may prescribe drugs for off-label usage, the law prohibits drug manufacturers from marketing or promoting a drug for a use that the FDA has not approved, or for a patient group that is unapproved. Specifically, a manufacturer illegally "misbrands" a drug if the drug's labeling (which includes all marketing and promotional materials relating to the drug) describes intended uses for the drug that have not been approved by the FDA. 21 U.S.C. §§ 331, 352. The statute, 21 U.S.C. § 331(d), its implementing regulations, and 21 C.F.R. § 202.1(e)(4)(i)(a) in particular, prohibit any advertising that recommends or suggests an off-label use for an approved drug, and the FDA has interpreted "advertising" to include a significant amount of speech that would not typically be considered advertising. *See* Final Guidance on Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997). The FDA "interprets the term 'advertisement' to include information (other than labeling) that originates from the same source as the product and that is intended to supplement or explain the product." *Id*.

60. Any manufacturer speech explaining one of its products is an "advertisement" for the product and is subject to the prohibitions against off-label marketing in 21 C.F.R. § 202.1, as well as the FDA's "fair balance" requirement, described below.

61. FDA regulations provide that an advertisement may not use "literature, quotations, or references for the purpose of recommending or suggesting conditions of drug use that are not approved or permitted in the drug package labeling." 21 C.F.R. § 202.1(e)(6)(xi); *see also* 21 U.S.C. § 331(d) (prohibiting distribution of a drug for non-approved uses); *id*.

§ 331(a) (prohibiting distribution of a misbranded drug); *id.* § 360aaa (permitting dissemination of material on off-label uses only if the manufacturer meets certain stringent requirements).

62. These regulations ban advertisements that are false, lacking in fair balance, or otherwise misleading. Thus, the use of unsubstantiated superiority statements also is prohibited by law. *See* 21 U.S.C. § 352; 21 C.F.R. § 202.1(e)(6).

63. The regulations also prohibit an advertisement that "contains a representation or suggestion that a drug is safer than it has been demonstrated to be by substantial evidence or substantial clinical experience, by selective presentation of information form published articles or other references that report no side effects or minimal side effects with the drug or otherwise selects information from any source in a way that makes a drug appear to be safer than has been demonstrated." 21 C.F.R. § 202.1(e)(6)(iv).

64. The regulations require drug companies to present a "true statement" of information relating to the side effects, contraindications and effectiveness of the drug use. *See* 21 C.F.R. §§ 202.1(e)(5) *et seq.* A company violates this regulation if it presents "false or misleading" information about a drug's side effects or does not "fair[ly] balance" information relating to the safety and efficacy of the drug use against information about its side effects and contraindications. *Id.*

65. FDA regulations broadly describe "labeling" of a drug as including any material accompanying a drug product that is supplied and disseminated by the manufacturer, packer or distributor of the drug. 21 C.F.R. § 202.1(1)(2). The FDA has interpreted oral communications as falling under the umbrella of "labeling."

66. FDA regulations require labeling to be "informative and accurate and neither promotional in tone nor false and misleading in any particular," and to "contain a summary of

the essential scientific information needed for the safe and effective use of the drug," and they prohibit "implied claims or suggestions of drug use if there is inadequate evidence of safety or a lack of substantial evidence of effectiveness." 21 C.F.R. § 201.56.

67. These regulations also lay out the stringent requirements that must be met by the manufacturer before it may disseminate any materials on unapproved or new uses of marketed drugs. This material must be in the form of an unabridged reprint or copy of a published, peer-reviewed article that is considered "scientifically sound" by experts qualified to evaluate the safety or effectiveness of the drug involved. *See* 21 C.F.R. § 99.101(a)(2). The FDA does not consider abstracts of publications to be "scientifically sound." 21 C.F.R. § 99.101(b). Unabridged reprints or copies of articles shall not be disseminated with any information that is promotional in nature. *Id*. § 99.101(b)(2).

68. Furthermore, the manufacturer must not disseminate materials that are "false and misleading," such as those that only present favorable information when unfavorable publications exist, exclude mandatory information about the safety and efficacy of the drug use, or present conclusions that "clearly cannot be supported by the results of the study." 21 C.F.R. § 99.101(a)(4).

69. Off-label information may be disseminated only in response to an unsolicited request from a health care practitioner. In any other circumstance, a manufacturer may disseminate information concerning off-label use only after the manufacturer has submitted an application to the FDA seeking approval of the drug for the off-label use, has provided the materials to the FDA prior to dissemination; and the materials themselves must be submitted in unabridged form and be neither false nor misleading. 21 U.S.C. §§ 360aaa(b) & (c); § 360aaa-1.

70. Companies such as AstraZeneca may not promote their approved drugs through unsubstantiated comparative assertions that exalt their drugs as safer, or more effective, than competitor drugs. Such promotion renders a drug "misbranded" and no longer eligible for reimbursement by Government Programs.

71. In sum, the regulatory regime protects patients and consumers by ensuring that drug companies do not promote drugs for uses other than those found to be safe and effective by an independent, scientific government body – the FDA. Moreover, the prohibition on unsubstantiated comparative statements protects patients and consumers by ensuring that the prescription and use of approved drugs is not based on misleading marketing tactics.

### B. THE LIMITED ROLE OF THE FDA IN REGULATING OFF-LABEL PROMOTION OF DRUGS

#### 1. The FDA Relies on Information Provided by Drug Manufacturers for New Drug Approvals

72. FDA approval of prescription drugs is wholly dependent on the accuracy of information provided by drug manufacturers. *See generally* Wayne A. Ray & Michael Stein, *Reform of Drug Regulation – Beyond an Independent Drug-Safety Board*, 354 NEW ENG. J. MED. 194 (Jan. 12, 2006).

73. FDA approval does not require that a new drug be more effective or safer than other drugs approved to treat the same condition, or that the new drug be cost-effective. A drug need only be shown to be more effective than a placebo in treating a particular condition, without any statistically significant safety findings. Comparative data showing performance as compared to existing drugs is not required; the FDA has no basis for determining that one drug is better than another drug.

74. Because short-term studies are accepted, drug applications often do not contain long-term data on the safety or efficacy of the drug. Approval of a new drug generally contains a

requirement that the manufacturer pursue further long-term studies, but two-thirds of the promised studies never materialize, and the FDA lacks any enforcement authority to require the manufacturer to complete these studies.

75. Many of the effects of newly approved drugs, particularly the long-term effects of taking a medication, could not possibly be known at the time of FDA approval, given the short length of, and relatively few participants in, the clinical trials conducted for approval. *See* Marilynn Marchione, *AP Analysis: How a drug's risks emerge*, USA TODAY (May 23, 2007). There is no requirement that drug companies conduct – or provide results from – post-marketing studies.

76. The FDA often finds itself in a quandary: "Safety and speed are the yin and yang of drug regulation. Patients want immediate access to breakthrough medicines but also want to believe the drugs are safe. These goals can be incompatible." Gardiner Harris, *Potentially Incompatible Goals at F.D.A.*, N.Y. TIMES, A14 (June 11, 2007).

**2. DDMAC's Limited Ability to Regulate Drug Maker Marketing and Promotion**

77. The FDA's Office of Prescription Drug Promotion, formerly the Division of Drug Marketing, Advertising and Communications ("DDMAC") is charged with overseeing the marketing and promotion of approved drugs to ensure that advertisements are not false or misleading, provide a fair balance between the benefits and risks of the drug, and do not include off-label uses. *See* Statement by Janet Woodcock, M.D. (Director Center for Drug Evaluation and Research, FDA) Before the Senate Special Committee on Aging (July 22, 2003).

78. DDMAC's ability to regulate off-label promotion is limited. In 2003, the entire staff consisted of forty members, with twenty-five reviewers responsible for reviewing all drug advertisements and promotional materials.

79. Moreover, materials promoting pharmaceutical products do not have to be pre-approved. FDA review of promotional materials occurs, if at all, only after the materials already have appeared in public. *Id.* Upon finding a violation, DDMAC generally requests, but does not require, the company to stop using the promotional materials. *Id.* Sponsors occasionally are required to correct product misimpressions created by false, misleading, or unbalanced materials. *Id.*

80. Once a drug has been approved, the FDA's statutory authority is limited to requesting label changes, negotiating restrictions on distribution with the manufacturer, and petitioning for the withdrawal of the drug from the marketplace. Title 21 of the Code of Federal Regulations requires that "as soon as there is reasonable evidence of a serious hazard with a drug," the "Warnings" section of the label should be revised to reflect this hazard.

81. FDA's inability to police off-label promotion was confirmed in a July 28, 2008, U.S. Government Accountability Office Report, which found that the FDA took an average of seven (7) months to issue letters in response to off-label promotions. *See* U.S. Government Accountability Office, Publ'n No. GAO-08-035, *Prescription Drugs: FDA's Oversight of the Promotion of Drugs for Off-Label Uses* (July 2008).

82. Among the Report's findings: (i) FDA does not have separate oversight capability sufficient to capture off-label promotion; (ii) FDA is unable to review all promotional submissions because of the volume of materials it receives; instead the FDA must prioritize its reviews in order to attempt to examine those with the greatest potential impact on human health; (iii) FDA is hampered by the lack of a system to track consistently the receipt and review of submitted materials; (iv) FDA conducts limited monitoring and surveillance to identify violations that would not be identified through its review of submitted material – for instance,

discussions between doctors and sales representatives; and (v) during calendar years 2003 through 2007, FDA issued 42 regulatory letters requesting that drug companies stop dissemination of promotional material promoting off-label uses of their pharmaceutical products.

83. AstraZeneca is among the companies cited in the GAO Report – it was cited for Merrum I.V., which had been approved only for treatment of intra-abdominal infections and bacterial meningitis caused by specific pathogens that are not drug-resistant. Despite the limited indication, AstraZeneca was warned that it was improperly marketing Merrum I.V. for treatment of infections caused by particular bacteria and drug-resistant pathogens.

### C. DRUG PAYMENT UNDER GOVERNMENT HEALTHCARE PROGRAMS

84. There is an array of health care programs operated and funded by the United States and the *Qui Tam* States (*i.e.*, the Government Programs) whose purposes are to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries. Several of these Government Programs are described below.

#### 1. The Medicaid Program

85. Medicaid is a public assistance program that pays medical expenses for low-income and disabled individuals and families who otherwise could not afford to pay for their own medical care. Funding for Medicaid is shared between the Federal and State governments; the States (including the District of Columbia) that provided enrollment data for October 2014 reported that more than 68.5 million individuals were enrolled in Medicaid and the Children's Health Insurance Program.

86. Prior to the advent of Medicare Part D in 2006, the Medicaid Program subsidized the purchase of more prescription drugs than any other program in the United States.

87. Although Medicaid is administered on a state-by-state basis, the State Medicaid Programs adhere to Federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the Federal Government will pay for through its funding of State Medicaid Programs. Federal reimbursement for prescription drugs under the Medicaid Program is limited to "covered outpatient drugs." 42 U.S.C. §§ 1396b(I)(10), 1396r-8(k)(2)-(3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." *Id.* § 1396r-8(k)(3).

88. A medically accepted indication, in turn, is a use that is listed in the labeling approved by the FDA, or that is included in one of the drug compendia identified in the Medicaid statute. *Id.* § 1396r-8(k)(6). The three statutorily named compendia are the American Hospital Service Formulary Drug Information ("AHFS"), United States Pharmacopeia-Drug Information or its successor publications ("USP-DI"), and the DRUGDEX Information System ("Drugdex"). *See* 42 U.S.C. § 1396r-8(g)(1)(B)(i). The USP-DI ceased publication in 2007 and has no successor publication recognized by CMS.

**(a) The Roles of Pharmacy & Therapeutics Committees and Preferred Drug Lists**

89. Each State Medicaid Program must establish a P&T Committee comprised of private physicians and pharmacists to inform the development of a formulary and a subset of the "preferred" drugs on the formulary called a PDL. Specifically, the P&T Committees make recommendations to the State Medicaid Programs concerning which drugs should be placed on the formulary and PDL, and the State Medicaid Programs generally base their decisions on the P&T Committees' recommendations.

90. Once a drug is listed on a State Medicaid Program's PDL, it is available to State Medicaid Program patients without prior authorization, and the States receive negotiated

supplemental rebates from the drug company. Conversely, a drug that is not included on the PDL requires prior authorization. In practice, that means that a physician who wants to prescribe a non-preferred drug for a State Medicaid patient must receive prior approval from the State Medicaid Program or the cost of the prescription will not be covered.

91. Thus, PDL status can guarantee a generous market share for included drugs in a competitive class (*e.g.*, statins) and be critical to the drug's financial success.

92. Not surprisingly, therefore, competition among drug companies to obtain PDL status for their drugs is fierce.

93. Inclusion on State Medicaid Program formularies and PDLs was a critical component of AstraZeneca's marketing plan for Crestor.

94. P&T Committees consider a broad array of clinical, economic, and other data provided by drug companies when developing their recommendations for inclusion on their formularies and PDLs. Such data can include FDA files and comments from FDA reviews, published and unpublished data, comparison and clinical study data, and internal clinical and economic analyses conducted by health plans. Drug efficacy, safety, and cost are important considerations in a P&T Committee's assessment process, which also can include information submitted through public testimony. Public testimony generally fits into two categories: clinical experience from health care professionals or Medicaid participants, and scientific information provided by pharmaceutical manufacturers or their representatives.

95. The P&T Committees expect that all information provided to them will be complete and accurate, and that sources of potential bias will be fully disclosed.

96. Once placed on formulary, State Medicaid Programs regularly review classes of drugs to decide which brands to make "preferred" on their PDLs.

97. As described more fully below, during the time period relevant to this Third Amended Complaint, AstraZeneca caused the submission of Crestor claims for reimbursement by State Medicaid Programs notwithstanding its knowledge that those claims were *ineligible* for reimbursement, and therefore false, due to AstraZeneca's (i) knowing and intentional misrepresentations to State P&T Committees in order to gain preferred status for Crestor, and (ii) knowing and intentional promotion of Crestor for uses that were neither approved by the FDA, nor supported by any of the statutorily approved compendia.

**2. The Medicare Program**

98. Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases. The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

99. The first stage of the Medicare program, from May 2004 through December 2005, permitted Medicare beneficiaries to enroll in a Medicare-approved drug discount card program.

100. In addition, low-income beneficiaries, defined as those whose incomes were not more than 135 percent of the poverty line (those with incomes of no more than $12,569 for a single person or $16,862 for a married couple in 2004) qualified for a $600 credit (funded by Medicare) on their drug discount card for 2004, and again for 2005.

101. Starting on January 1, 2006, Part D of the Medicare Program provided optional, subsidized coverage for pharmacy-dispensed outpatient drugs for all Medicare beneficiaries, with low-income individuals receiving the greatest subsidies.

102. A "covered Part D drug" means, *inter alia*, use of a drug for a "medically accepted indication (as defined in paragraph (4))." 42 U.S.C. § 1395w-102(e)(1), and paragraph 4, in turn, refers to the Medicaid definition of medically accepted indication under 42 U.S.C.

§ 1396r8(k)(6) – *i.e.,* including off-label uses are "supported by one or more citations included or approved for inclusion in" one of the three approved compendia. *Id.* § 1395w-102(2)(4); *see* discussion *supra* ¶ 88. Thus, in order to be reimbursable by Medicare Part D, off-label use of a drug must be supported by AHFS, Drugdex, or USP-DI. *Id.*

103. The Centers for Medicare & Medicaid Services ("CMS") is an agency within the U.S. Department of Health & Human Services that is responsible for the administration of several Federal health care programs, including Medicare. CMS contracts with private insurance companies – called "Sponsors" – to provide Part D prescription drug coverage plans to beneficiaries who choose to enroll. As of March 2012, approximately 31 million beneficiaries were enrolled in Part D plans.

104. Sponsors can use a variety of methods to control the cost of providing prescription drug coverage through the Part D Program. They establish formularies (*i.e.,* lists of covered drugs) that give preference to certain drugs over others that treat the same condition. Part D formularies are generally organized into tiers that require different co-payments in order to drive utilization toward less expensive drugs. Drugs in lower tiers typically are the least expensive and have the lowest beneficiary copayment, while drugs in ascending tiers generally are more expensive and have higher beneficiary copayments. For example, a low-cost generic drug on Tier 1 may require only a $5 copayment, a preferred brand-name drug on Tier 2 may require a $40 copayment, a non-preferred brand-name drug on Tier 3 may require a $90 copayment, and specialty drugs on Tier 4 may require co-insurance for 30 percent of the drug's cost.

105. Sponsors also employ utilization management practices, such as prior authorization, quantity limits, and generic substitution, to restrict the use of certain drugs on their

formularies. For example, Sponsors may require a beneficiary to try a less-expensive drug before progressing to a more expensive drug. And Sponsors can negotiate price concessions with drug companies in order to reduce costs for the Sponsors and the beneficiaries.

106. Often, Part D Program Sponsors contract with one or more pharmacy benefit managers ("PBMs") to help them manage their prescription drug benefit programs. PBMs offer a wide variety of services, including managing formularies, processing prescription drug claims, contracting with pharmacies, and negotiating price concessions for particular drugs. PBMs can be compensated for these services in a number of ways, one of which is by retaining a percentage of any price concessions they are able to negotiate.

107. Sponsors are responsible for compliance with Federal requirements and their Part D Program contracts with CMS, even if they have delegated certain responsibilities to a PBM. Sponsors must have contracts with their Part D contractors, including PBMs, to ensure that the contractors comply with all applicable Federal laws and regulations, and with CMS instructions.

108. Sponsors that use formularies for their Part D plans are required by Federal law to maintain P&T Committees. A sponsor that manages its own formulary generally maintains its own P&T Committee (which may involve selecting its members, appointing its chair, and creating policies and procedures to govern Committee action); while other Sponsors contract out certain of these functions to a PBM or to a third party.

109. P&T Committees play the same essential role in the context of Medicare Part D Programs that they do in the context of State Medicaid Programs (*see* discussion *supra* ¶¶ 89-97), and most of their decisions (*e.g.,* which drugs to include on a formulary and PDL) are adopted by the Part D plan.

110. Sponsors must adhere to their P&T Committees' decisions regarding drug utilization management practices. P&T Committees are required by Federal law to determine whether a drug should be included on formulary based *first* on scientific evidence and standards of practice (*i.e.*, whether the drug has therapeutic advantages in terms of safety and efficacy), and *secondarily* on cost considerations.

111. Part D Program Sponsors regularly review each class of drugs on their formularies to determine which drugs should be "on formulary" and/or deemed "preferred" on their PDLs.

112. As with State Medicaid Programs, preferred drugs listed on a Sponsor's PDL are available to Medicare Part D beneficiaries without prior authorization, while non-preferred drugs require prior authorization. In practice, this means that a physician who wants to prescribe a non-preferred drug for a Medicare Part D patient must obtain prior approval from the sponsor, or the cost of the prescription will not be covered.

113. Thus, preferred PDL status on a Part D Program PDL can guarantee a generous market share for drugs in a competitive therapeutic drug class (*e.g.*, statins), and be critical to the drug's financial success. Therefore, competition among drug companies to obtain preferred PDL status for their drugs is fierce.

114. Obtaining preferred PDL status on Part D Program PDLs was a critical component of AstraZeneca's marketing plan for Crestor.

115. As described more fully below, during the time period relevant to this Third Amended Complaint, AstraZeneca caused the submission of claims for reimbursement of Crestor by Medicare Part D Programs notwithstanding its knowledge that those claims were *ineligible* for reimbursement, and therefore false, due to AstraZeneca's (i) knowing and intentional

misrepresentations to Part D Program Sponsors (including their P&T Committees and PBMs) in order to gain preferred status for Crestor, and (ii) knowing and intentional promotion of Crestor for uses that were neither approved by the FDA, nor supported by any of the statutorily approved compendia.

**3. Reimbursement Under Other Government Programs**

116. In addition to Medicaid and Medicare, the Federal Government reimburses a portion of the cost of prescription drugs under several other Government Programs. For example:

- CHAMPUS/TRICARE is a health care program administered by the Department of Defense for individuals and dependents affiliated with the armed forces;
- CHAMPVA is a health care program administered by the Department of Veterans Affairs for families of veterans with 100-percent service-connected disabilities; and
- the Federal Employee Health Benefit Program provides health insurance for Federal employees, retirees, and survivors, and it is administered by the Office of Personnel Management.

117. Coverage of off-label drug use under these programs is similar to the coverage provided by the Medicaid Program. *See, e.g.*, TRICARE Policy Manual 6010.47-M, Chapter 7, Section 7.1 (B) (2) (March 15, 2002); CHAMPVA Policy Manual, Chapter 2, Section 22.1, Art. II (A)(2) (June 6, 2002).

118. Neither the FDA nor any of the statutorily named compendia have recommended Crestor for (i) regressing or reversing atherosclerosis; (ii) stopping or halting atherosclerosis; (iii)

saving lives or reducing death or total mortality; (iv) preventing or delaying the onset of diabetes; or (v) reducing cardiovascular disease outcomes as a result of cholesterol reductions.

119. Claims for Crestor submitted to Government Programs, including Medicare and Medicaid, for (i) regressing or reversing atherosclerosis; (ii) stopping or halting atherosclerosis; (iii) saving lives or reducing death or total mortality; (iv) preventing or delaying the onset of diabetes; or (v) reducing cardiovascular disease outcomes as a result of cholesterol reductions, were ineligible for reimbursement and therefore false during all times relevant to this Third Amended Complaint.

## V. ASTRAZENECA LAUNCHES CRESTOR

120. Between 2000 and 2003 AstraZeneca faced a serious financial crisis. Three of its important drugs (Nolvadex, Zestril, and Prilosec) were about to lose patent protection, and the Company's 2003 Annual Report projected $2.6 billion in lost sales as a result. Crestor was seen as having the potential to capture a portion of the market for cholesterol drugs (which was dominated by Pfizer's Lipitor), and thereby perhaps rescue AstraZeneca financially. *See* Kim Dixon, *Employers Push Back in Prescription War IMOs Discourage Use of Drug Nexium in Favor of Prilosec,* HOUSTON CHRONICLE (June 13, 2003).

121. But success – for both Crestor and the Company itself – hinged on a successful launch in the United States. One sector analyst opined at the time: "If AstraZeneca IS [sic] to keep Crestor sales on track, it needs to make serious headway in the U.S., which accounts for 60% of global statin sales. . . . 'If Crestor doesn't do well in the U.S., AstraZeneca will have huge [sic] problem[.]'" *See* Kerry Capell, *Will This Superdrug Catch a Chill,* BLOOMBERG BUSINESSWEEK (June 27, 2004) (quoting Mike Ratcliffe, U.S. research director at Wood Mackenzie Ltd., Boston).

122. Crestor is a prescription drug and a member of the class of medications known as "statins," which generally are prescribed to lower cholesterol levels by blocking enzymes that are essential to cholesterol production. Statins are among the most widely prescribed medications in the United States.

123. AstraZeneca's corporate financial strategy hinged on the Company's ability to turn Crestor into a so-called "blockbuster" drug that would generate billions in revenue.

124. AstraZeneca launched Crestor on September 16, 2003, and it was a significant gamble, as the Company spent more than $1 billion promoting the drug in only its first year on the market. Sales in 2003 and 2004 were just $129 million and $908 million, respectively.

125. From the start, Crestor's potential for success was limited by four factors: (i) late entry into an established market with entrenched market leaders; (ii) an ominous safety profile, (iii) regulatory approvals that were narrower than those of its established competitors; and (iv) a challenge to the patent for Crestor itself. It was against this backdrop that AstraZeneca developed its fraudulent marketing scheme in order to compete more effectively – albeit illegally – against rival statins.

### A. CRESTOR WAS LATE TO AN ESTABLISHED MARKET WITH ENTRENCHED MARKET LEADERS

126. When Crestor finally was approved by the FDA on August 12, 2003, it was the seventh statin on the market, following Lipitor (Pfizer), Zocor (Merck), Pravachol (Bristol-Myers Squibb), Mevacor (Merck), Lescol (Novartis), and Baycol (Bayer). Its competitors (except for Baycol, which was withdrawn from the market) were entrenched. Lipitor was the leading statin, with $9.2 billion in total sales in 2003, followed by Zocor at $5 billion, and Pravachol at $2.8 billion. Lipitor continued to lead the worldwide market in 2004, with sales of $10.8 billion, followed again by Zocor at $5.2 billion, and Pravachol at $2.6 billion. In contrast,

Crestor's worldwide sales that year were a relatively low $908 million. That trend continued in the years immediately following Crestor's launch. In 2005, for example, Crestor's top three competitors still controlled 91 percent of all statin sales.

127. In an April 15, 2004 S.W.O.T. Analysis,[2] AstraZeneca identified several threats Crestor faced, including its perception as a "me, too" drug, its lack of outcomes data, and the pre-existing saturation of the statin market:

> OPPORTUNITIES
> Perception statin market already saturated.
> Crestor perceived as "me too" drug
> Competitive launches and additional indications from any competitors
> Existing outcome data for Simvastatin and Pravacol
> Pending outcome data from Atorvastatin
> Preemptive strikes from competition re: safety, proteinuria, rhabdomyolysis, 80mg dose
> "Late adopter" physicians hindering 2003 goal and bonus
> **Generous "service funding and support" from competitors**

(emphasis in original)

128. To compound the challenge, AstraZeneca knew that capturing and retaining market share would get considerably more difficult with the passage of time, as earlier statins would become available in generic form long before Crestor, and thus provide Government Programs with substantially cheaper, equally effective alternative statins. That concern was well founded. When Zocor became available in generic form in 2006, its daily cost dropped to pennies per day, while the daily cost of Crestor remained many multiples of that amount – in 2010, some $3.40 per day.

[2] "S.W.O.T." is an acronym for strengths, weaknesses, opportunities, and threats.

### B. CRESTOR PRESENTED AN OMINOUS SAFETY PROFILE

129. Although the FDA had issued an "approvable" letter for Crestor on May 31, 2002, its release was delayed more than a year due to its troubling safety profile, and particularly, concerns over reports of fatal rhabdomyolysis and renal impairment in higher doses.

130. In fact, concerns about Crestor's toxicity led the FDA to limit the manner in which it could be prescribed. The FDA limited the label-approved starting dose to no more than 10 mg except in unusual circumstances, it limited the label-approved use of a 40 mg dose to only unusual circumstances, and it prohibited distribution of an 80 mg dose.

131. Highlighting the safety concern, AstraZeneca agreed to special distribution measures limiting the use of the 40 mg dose, including that it would not stock the 40 mg tablets directly with retail pharmacies, instead requiring pharmacies to go through wholesalers to obtain that dose. Because of the increased potential harm of this dose, pharmaceutical reps were never given 40 mg samples to leave in physician's offices. AstraZeneca had agreed to these measures "to ensure that the 40 mg dose is available only to patients who truly need this dose." According to the FDA, "[t]he special distribution measures were undertaken by AstraZeneca because 'the medical review concluded that the 40 mg dose was only appropriate for 'patients with severe hypercholesterolemia who have not responded adequately to all other forms of therapy.'"

132. These well-publicized actions tended to reinforce public concern about super-statins (since fallout from safety concerns involving Baycol was still fresh in the public mindset), and Crestor in particular.

133. Then, not long after Crestor was introduced to the U.S. market in September 2003, the same safety concerns that had delayed FDA approval resurfaced, and they too were well publicized to physicians and patients.

134. In March 2004, the public interest group Public Citizen petitioned the FDA to order that Crestor be withdrawn from the U.S. market due to safety concerns. Public Citizen presented an analysis that there had been 29 reports of kidney failure or insufficiency among patients given Crestor during the first year after its approval, which was 75 times the rate of kidney failure or insufficiency for all other similar drugs combined. The petition was denied, but in June 2004 – less than a year after approval – the FDA issued a Public Health Advisory that asked doctors to exercise greater caution in prescribing Crestor due to safety concerns.

135. Later that year, in November 2004, Dr. David J. Graham, the FDA's Associate Director for Science and Medicine in the FDA's Office of Drug Safety, testified before a committee of Congress that Crestor was one of five then-currently marketed drugs that should be *withdrawn* from the market due to safety concerns. The same day, Dr. Steven Galson, Director of the FDA's Center for Drug Evaluation and Research was quoted in the *Washington Post* as saying that the FDA "has been very concerned about Crestor since the day it was approved, and we've been watching it very carefully." The impact of those warnings was broadly felt, as J.P. Morgan reported that in the week following the hearing, Crestor's share of new prescriptions among cholesterol lowering drugs dropped 22 percent.

136. Both individually and collectively, these well-publicized reports of Crestor safety concerns had an adverse effect on the drug's competitive profile versus established drugs, and they posed a significant roadblock to AstraZeneca's financial objectives. Thus, AstraZeneca took them quite seriously.

137. Less than a week after Dr. Graham told Congress of his concerns in November 2004, AstraZeneca ran a direct-to-consumer ("DTC") print advertisement (the "Patient Safety Ad") in 30 national newspapers (including the *New York Times*, *Wall Street Journal*, *USA Today*,

and *Los Angeles Times*) and regional newspapers, asserting: "You can be assured that at AstraZeneca, patient safety is our number one priority." It sought to assure readers that Crestor is "more effective and just as safe" as "the leading medications in its class" and it advised that:

> The scientists at the FDA who are responsible for the approval and ongoing review of CRESTOR have, as recently as last Friday, publicly confirmed that CRESTOR is safe and effective; and that the concerns that have been raised have no medical or scientific basis.

The Patient Safety Ad succeeded in stemming the drop in prescriptions for Crestor, but when AstraZeneca later submitted it for approval by the FDA, the FDA promptly notified AstraZeneca on December 21, 2004, that the ad "misbrand[ed] Crestor in violation of the Federal Food, Drug, and Cosmetic Act" because it made "false or misleading safety claims that minimize the risks associated with Crestor, thereby suggesting that Crestor is safer than has been demonstrated by substantial evidence or substantial clinical experience." DDMAC concluded that the Patient Safety Ad violated the law because:

> (i) It minimized the risks associated with the 40 mg dose of Crestor. DDMAC noted that FDA was "not aware of substantial evidence or substantial clinical experience demonstrating that all doses of Crestor are 'just as safe' as other statins" and that Crestor's approved label warned that the 40 mg dose "should be reserved for those patients who have not achieved goal LDL-C at 20 mg. . . ." DDMAC also noted that AstraZeneca had agreed to implement special distribution measures for the 40 mg dose, as well as three long-term post-marketing clinical trials to further assess the safety of that dose.
>
> (ii) It "misleadingly suggest[ed]" that FDA did not believe Crestor poses safety concerns. DDMAC noted that there was no support for AstraZeneca's claim that FDA scientists had no concerns, and that recent public statements by the Acting Director of FDA's Center for Drug Evaluation and Research were directly contrary to AstraZeneca's claim.

DDMAC requested that AstraZeneca "immediately cease the dissemination of violative promotional materials for Crestor such as those described [in the FDA notice letter]."

138. AstraZeneca's conduct in promulgating the Patient Safety Ad in order to blunt a wave of bad publicity concerning Crestor's safety was its not so tacit acknowledgment of the significant challenge such concerns posed to the drug's financial success.

139. Unbeknownst to the FDA, however, and in spite of its ongoing Zoladex CIA obligations, AstraZeneca had been making these same false and misleading Crestor safety statements pervasively since Crestor launched in 2003 – with considerable success – and it continued to make the same fraudulent safety and efficacy statements even well after the FDA's warning letter.

### C. CRESTOR'S REGULATORY APPROVALS WERE NARROWER THAN THOSE OF OTHER STATINS

140. A significant obstacle in AstraZeneca's path toward developing Crestor into a blockbuster was that its chief competitors, Pfizer's Lipitor and Merck's Zocor, were approved by the FDA and supported by the compendia for a wide array of therapeutic uses for which Crestor had not been approved. This afforded Crestor's primary competitors much greater acceptance by health care professionals, and it made them suitable for a much broader array of patients.

#### 1. Crestor Received Only Limited FDA Approvals

141. Initially, the FDA approved Crestor to lower "bad" cholesterol and raise "good" cholesterol in only three contexts:

(i) as an adjunct to diet to reduce elevated total-C, LDL-C, ApoB, non-HDL-C, and TG levels and to increase HDL-C in patients with hypercholesterolemia (heterozygous familial and nonfamilial) and mixed dyslipidemia (Fredrickson Type IIa and IIb);

(ii) as an adjunct to diet for the treatment of patients with elevated serum TG levels (Fredrickson Type IV); and

(iii) to reduce LDL-C, total-C, and ApoB in patients with homozygous familial hypercholesterolemia as an adjunct to other lipid-lowering treatments (*e.g.,* LDL apheresis) or if such treatments are unavailable.

142. Almost five years later, in November 2007, the FDA approved an additional use for Crestor: "as adjunctive therapy to diet to slow the progression of atherosclerosis in adult patients as part of a treatment strategy to lower Total-C and LDL-C to target levels."

143. And in February 2010, based on the so-called JUPITER study, *see* discussion *infra* ¶¶ 349-351, the FDA approved the use of Crestor for "primary prevention of cardiovascular disease" as follows:

> In individuals without clinically evident coronary heart disease but with an increased risk of cardiovascular disease based on age ≥50 years old in men and ≥60 years old in women, hsCRP ≥2 mg/L, and the presence of at least one additional cardiovascular disease risk factor such as hypertension, low HDL-C, smoking, or a family history of premature coronary heart disease, CRESTOR is indicated to:
>
> i. Reduce the risk of stroke
> ii. Reduce the risk of [heart attack]
> iii. Reduce the risk of arterial revascularization procedures[3]

144. Since 2003, Crestor's FDA-approved label has included dosing restrictions – essentially unchanged – due to the risk of potentially fatal muscle damage and kidney problems, warning: "The 40-mg dose of CRESTOR should be reserved for those patients who have not achieved goal LDL-C at 20 mg (see WARNINGS, Myopathy/Rhabdomyolysis)." The label also warns that Crestor may pose heightened or additional risks for persons of Asian descent.

**2. Crestor Received Only Limited Compendium Endorsements**

145. As described *supra* ¶¶ 85-88, Congress adopted a compendia-based system for determining appropriate Medicaid reimbursements for off-label uses of a "covered outpatient drug." *See also* Social Security Act §§ 1927(g)(1)(B)(i) and (k)(6). The statute permits

---

[3] The FDA approved additional uses of Crestor in 2008 and 2009, but they are not relevant to this suit. In October 2008, Crestor was approved as an adjunct to diet for patients with primary dysbetalipoproteinemia (Type III hyperlipoproteinemia), and in October 2009, Crestor was approved for certain pediatric patients with heterozygous familial hypercholesterolemia.

reimbursements for drug uses that "(i) are appropriate, (ii) are medically necessary, and (iii) are not likely to result in adverse medical results."

146. Thus, the only way a prescription for an off-label use can be reimbursed under Medicaid, Medicare, and/or other Federal reimbursement programs is if the particular off-label use was approved by one of the statutorily approved compendia.

147. The leading and most commonly available approved compendium is Drugdex, which does not recommend the off-label use of Crestor for regression of atherosclerosis, and it did not support the off-label use of Crestor for slowing the progression of atherosclerosis before the FDA approved that use in 2008. Nor does it support the use of Crestor for the treatment of (or to delay the onset of) diabetes.

### D. AstraZeneca Believed that Crestor's Patent Was in Jeopardy

148. AstraZeneca also was acutely concerned, until at least as early as 2007, that its revenues might be further eroded by the early introduction of generic versions of Crestor itself. The possibility that Crestor might be approved for sale in generic form posed a significant threat to AstraZeneca's projected revenues for the drug, and thus in 2007 the Company filed suit against nine generic drug manufacturers who had proposed to market generic versions of Crestor. Following three years of litigation, AstraZeneca finally prevailed in July 2010, and in March 2013 the Court of Appeals affirmed. But during the three years that the patent lawsuit was pending, Crestor's chance for long-term financial success was uncertain, as the drug faced a potentially mortal threat from generic drug manufacturers.

## VI. ASTRAZENECA'S FRAUDULENT MARKETING SCHEME

149. It was against the foregoing backdrop that AstraZeneca developed and deployed the fraudulent marketing scheme described below, characterized by false and misleading statements, in order to induce physicians to prescribe Crestor for Government Program

beneficiaries, and thereby cause false claims for reimbursement to be submitted to (and paid by) Government Programs.

150. At all times material hereto, the health care professionals to whom AstraZeneca promoted Crestor reasonably relied on scientific information provided by AstraZeneca to inform their clinical decisions and their standards of care.

151. AstraZeneca engaged in a carefully orchestrated and comprehensive program to exploit physicians' trust. Rather than being the product of unbiased scientific inquiry, the scientific information supporting off-label uses of Crestor derived from AstraZeneca's own carefully designed and orchestrated marketing campaign, in which pre-determined, readily marketable "key messages" formed the basis for scientific "evidence" that was distributed.

152. AstraZeneca's Sales Specialists were required to (and did) provide seemingly useful services to busy doctors. Sales Specialists arrived with trinkets, gifts, and reprints of articles from medical journals, as well as the Company's own educational materials summarizing the latest medical research.

153. Since 2004, AstraZeneca's Sales Specialists were required to (and did) provide health care professionals nationwide with AstraZeneca-approved materials to influence the off-label prescribing of Crestor, including "approved" clinical studies, industry supplements, and CME materials. These false and misleading materials were provided to health care professionals at one-on-one details, in-service sessions, speaker programs (both CME and non-CME), advisory boards, conferences, dinners, sporting events, and cultural events.

154. And the Company made sure the news provided to health care professionals was at all times positive. If an AstraZeneca-sponsored trial failed to support the desired hypothesis, as in the case of the AURORA, CORONA, and GISSI-HF negative outcomes trials, and the

negative PLANET I and PLANET II trials (which showed that while Lipitor protected kidney function, Crestor did not and perhaps even hurt kidney function), Sales Specialists were not given reprints to distribute. Instead, they were provided a carefully crafted message that highlighted any positive "spin" that could be used in their physician details, or told to say nothing at all.

155. Such drug company enthusiasm in the face of negative study results is not uncommon. Research funded by industry is far more likely to report conclusions that favor the sponsor's drug, even if the results did not, in fact, support such conclusions. For example, studies that have examined clinical trials involving specific clinical specialties or particular clinical problems have found an association between industry sponsorship and results that favor the drug industry. *See* Bernard Lo & Marilyn J. Field, eds., Institute of Medicine (US), CONFLICT OF INTEREST IN MEDICAL RESEARCH, EDUCATION, AND PRACTICE, INSTITUTE OF MEDICINE at 105 (April 21, 2009) (available at http://www.ncbi.nlm.nih.gov/books/NBK22942/).

156. The specific intent of AstraZeneca's promotion was to influence physicians through false and misleading information to write more prescriptions for Crestor, including for numerous off-label uses.

157. AstraZeneca trained its Crestor Sales Specialists to leverage clinical information concerning uses (including unapproved, off-label uses) when planning each sales call. Sales Specialists were required to pinpoint each study's key findings (including off-label findings), which were then turned into key selling messages. The training for, and pre-call planning of, the fraudulent marketing scheme was thus both elaborate and deliberate. This planning gave Sales Specialists enough time to determine on which points to focus, as well as to prepare for any possible physician objections to the message.

158. Sales Specialists were required to demonstrate to physicians that the Specialists themselves were knowledgeable resources, were familiar with the studies and relevant concepts, and able to speak the physicians' language to answer any questions that might arise.

159. At the conclusion of each sales call, Sales Specialists were required to "close" the sale by asking for the physician's agreement to prescribe Crestor.

160. For example, in February 2009 Regional Sales Director ("RSD") Parker Fretwell sent his "Vision" of a Crestor sales call that would deceptively inform physicians that "[m]ore and more clinical data … clearly differentiates CRESTOR from other statins." Fretwell told Sales Specialists it was his "expectation for each call" that they would "clinically differentiate products … and gain [c]ommitment that [Crestor] is clinically best. . . ." His "expectation" also required that Sales Specialists' sales details "[s]ummarize and [a]sk for a commitment for CRESTOR FIRST…," stating that "CRESTOR is clinically the best product for patients. . . ."

161. Crestor Sales Specialists regularly role-played these false and misleading sales details in front of sales management at district, regional, and national meetings, at which they were trained to hone their details to be aligned with the Company's intended marketing message – *i.e.*, that Crestor was the superior statin.

162. Sales Specialists were evaluated on their ability to utilize their training in the field. In a "Field Coaching Form" dated November 2004, District Sales Manager ("DSM") Stephen Humphrey's comments to Relator Foote stated that a nurse practitioner: "admit[ed] that [Crestor's] LDL efficacy is far above and beyond the other statins. . . . You did a nice job . . . to keep reinforcing the fact that Crestor is better for her patients than the other statins." Likewise, in a July 2009 performance appraisal, DSM Hodge told Relator Foote to "[c]onfirm CRESTOR's

clinical advantage on each call – gain agreement that CRESTOR is significantly a better product than Lipitor/simva[statin].”

163. Until this function was removed from their laptops in 2009, Sales Specialists were supplied with laptop computers to enter “call notes” that described what they did on particular sales calls. Notes from their pre-calling planning and sales calls were included in these call notes. These call notes were regularly uploaded to AstraZeneca’s mainframe computers, and they were thereby available for each AstraZeneca district and regional manager, as well as the Company’s sales and marketing management, who could, and did, track the success of off-label sales calls.

164. In addition, district managers regularly conducted “ride-alongs” with each of their Sales Specialists in order to ensure that they were promoting the false and misleading messages about Crestor, as well as to “coach” them on how to improve those messages.

165. Sales Specialists were expected to deliver to health care professionals “core messages” about Crestor that were created by AstraZeneca’s sales and marketing departments. Sales Specialists were expected to weave AstraZeneca’s “core messages” into their overall product details. To assist with core message delivery, AstraZeneca’s sales and marketing departments prepared “visual aids” and material that Sales Specialists were directed to use and distribute during their sales calls.

166. Sales Specialists were evaluated on their ability to deliver consistently a logical, reasonable call-to-action “close” on every sales call to drive home Crestor prescribing over competing statins.

167. Thus, the false and misleading promotion of Crestor’s safety and superiority was a product of AstraZeneca’s deliberate planning, and it was directly supervised and encouraged by Company management.

168. AstraZeneca's initial efforts to put Crestor in America's medicine cabinet did not go unnoticed. Indeed, they were so brazen that the British medical journal *The Lancet* offered the following criticism in an October 2003 editorial:

> AstraZeneca's tactics in marketing its cholesterol-lowering drug, rosuvastatin, raise disturbing questions about how drugs enter clinical practice and what measures exist to protect patients from inadequately investigated medicines.

*See The statin wars: why AstraZeneca must retreat*, 362 THE LANCET 1341 (October 25, 2003). The editorial criticized AstraZeneca for relying too much on extrapolation and too little on firm clinical endpoints (as were available for other statins), and for "push[ing] its marketing machine too hard and too fast." *Id*.

169. In the face of such industry challenges to Crestor, Company management prepared a detailed set of responses it called "Handling Objections" that Sales Specialists were to learn by rote and repeat in the field to ensure that the carefully rehearsed set of objection responses was given. Despite the lack of adequate head-to-head clinical evidence to support many of these objection responses, the deceptive message Sales Specialists were required to repeat was that Crestor was superior to all other statins. For example, if asked whether AstraZeneca had any morbidity or mortality outcomes data to show that it was effective in primary prevention of cardiovascular disease comparable to that of Lipitor, Sales Specialists were directed to respond using the STELLAR trial (*see* discussion *infra*) to argue that the Company had such data. But the Company knew that STELLAR was *not* an outcomes trial and could not be used to make such a superiority promotion. Indeed, AstraZeneca was admonished by the FDA for this marketing statement in a March 8, 2005 FDA Warning Letter. *See* discussion *infra* ¶ 176.

170. When AstraZeneca deployed its fraudulent marketing scheme, it did so knowing and intending that the health care professionals it induced to prescribe Crestor through false and misleading statements would then cause to be submitted claims for payment by Government Programs, even though it knew those claims were in fact ineligible for payment or reimbursement.

171. But for AstraZeneca's fraudulent marketing scheme, these prescriptions – which were induced by false and misleading statements and kickbacks – would not have been written, and claims for reimbursement of those prescriptions would not have been submitted to or paid by Government Programs.

## VII. ASTRAZENECA MADE FALSE SUPERIORITY STATEMENTS TO MISBRAND CRESTOR

### A. ASTRAZENECA USED ITS STELLAR TRIAL TO PROMOTE CRESTOR MISLEADINGLY AS BEING SUPERIOR TO OTHER NAME BRAND STATINS

172. AstraZeneca sought to blunt the impact of publicly voiced safety concerns, *see* discussion *supra* ¶¶ 129-139, and to encourage physicians to prescribe Crestor in lieu of the competition notwithstanding those concerns, through its aggressive promotion of its STELLAR trial.[4] The STELLAR trial evaluated four statins – Crestor, Lipitor, Zocor and Pravachol, and AstraZeneca's STELLAR Campaign was an outgrowth of that trial.

173. Faced with considerable challenges posed by well-established competitor statins, beginning with the launch in 2003 AstraZeneca made its central sales focus (according to an April 2004 sales plan) to "routinely discuss STELLAR trial and leaving behind the reprint. Continuously make comparisons of Crestor versus Lipitor as far as getting patients to goal."

---

[4] *See* Peter H. Jones, *et al.*, *Comparison of the Efficacy and Safety of Rosuvastatin Versus Atorvastatin, Simvastatin, and Pravastatin Across Doses (STELLAR Trial)*, 92 AM. J. CARDIOLOGY 152 (2003).

174. As part of its STELLAR Campaign, AstraZeneca ran a DTC ad campaign that included one television commercial and three print advertisements that made the following four comparative statements in a Dr. Seuss-like rhyme:

- "All cholesterol drugs simply aren't the same. When Crestor performed in a head to head test its lowering effect was clearly the best." (TV)
- "Cholesterol high? Trouble getting it low? Perhaps your answer is right here, below." (Print)
- "Lowering cholesterol isn't a game. It's vital to know not all drugs are the same." (Print)
- "Is your cholesterol treatment doing its share? Are you where you should be? If not, then compare." (Print)

175. Likewise, Sales Specialists were directed to (and did) use "Crestor Blitzes" to induce health care professionals to prescribe the drug, giving inducements of free Starbucks coffee coupons, smoothies, "How low can you go" limbo sticks, and even "snack blitzes" with the same superiority message – *e.g.*, free gifts of "Crestor" gum (with the pitch that "[a]n extra benefit of Crestor is it's great capacity to increase HDL), Riesen candy (using the tagline "[a]nother 'riesen' to use Crestor is that it is a preferred agent. . ."), Altoid mints ("Crestor is a 'curiously strong' statin"), 100 Grand candy bars ("If you'd like to meet the ATP III goals of LDL,100 mg, use Crestor"), Lifesavers ("Use Crestor to lower LDL and save lives"), and Snickers ("Crestor's efficacy is nothing to snicker at.").

176. These comparative superiority statements were fundamentally false and misleading, and the FDA did not wait long to respond. On March 8, 2005 – fewer than three months after it rejected the Patient Safety Ad (*see* discussion *supra*) – DDMAC notified AstraZeneca that the STELLAR Campaign ads "misbrand[ed] Crestor" in violation of the FDCA because they made "false or misleading claims regarding the superiority of Crestor." Specifically, DDMAC concluded that the STELLAR Campaign ads violated the law because

they included a bar graph that presented a "misleading comparison" of Crestor to its competitor statins in that it "relie[d] solely on data that are not relevant to comparisons of the drugs such as most common dose or starting dose, while ignoring data that do not support the claim of superiority made in the ads." As before, the FDA requested that AstraZeneca "immediately cease the dissemination of violative promotional materials for Crestor[.]"

177. AstraZeneca's conduct in promulgating unsubstantiated and misleading comparative statements by way of the STELLAR campaign is an example of the Company's preference for profits over patient safety.

178. But AstraZeneca's improper DTC advertising efforts were not sufficient to capture the market share the Company desperately coveted. The long delay in FDA approval had placed AstraZeneca at a significant competitive disadvantage in the growing market for cholesterol lowering drugs – particularly where Crestor's primary competitors (Lipitor and Zocor) had well documented outcomes data, relatively few reported side effects, and had been approved by the FDA and the compendia for a broader array of uses.

### 1. AstraZeneca Made False and Misleading Superiority Statements to Capture Market Share

179. Before it will approve a drug for a specific use, the FDA requires that the drug's effectiveness be demonstrated by "adequate and well-controlled clinical investigations." 21 C.F.R. § 314. According to the FDA's 1998 *Guidance to the Industry*, "it has been FDA's position that Congress generally intended to require at least two adequate and well-controlled studies, each convincing on its own, to establish effectiveness." Thus, except in certain circumstances, the FDA generally requires two pivotal, adequate and well-controlled trials to support approval.

180. As a result of the FDA's policy that requires "substantial evidence" to support marketing promotion, companies such as AstraZeneca may not make comparative efficacy statements to physicians by comparing product inserts (*i.e.,* their FDA-approved labels), nor may they make comparative efficacy statements without substantial evidence to support such claims. In addition, due to differences in trial designs, inclusion criteria, and other factors, companies such as AstraZeneca also could not make comparative efficacy statements to health care professionals by comparing non-comparative trials.

181. These legal limitations notwithstanding, AstraZeneca knew that the most effective way to wrest market share from the entrenched competition would be to promote Crestor as being the more effective statin – *i.e.,* a "super-statin" – even though it had no substantial and reliable clinical evidence to support this statement.

182. Thus, a key component of AstraZeneca's fraudulent marketing scheme was the repeated assertion of false and misleading comparisons and unsubstantiated superiority statements. AstraZeneca instructed its Sales Specialists to promote Crestor as being superior to the competition (and particularly Lipitor and Zocor), not simply for their approved uses (which AstraZeneca falsely described as being identical), but also for Crestor's *unapproved* uses. These instructions were conveyed to the Sales Specialists nationwide by RSDs and DSMs, who schooled Sales Specialists on how to use of "powerful" verbiage and verbatim scripts to promote Crestor over the competition, and they were utilized in virtually every sales call.

183. Sales Specialists followed these instructions to great effect, inducing physicians to prescribe Crestor based on false and deceptive statements of superiority, and thereby causing false claims to be submitted to, and paid by, Government Programs.

184. Relator Lorden was trained and instructed by the Company to make this deceptive STELLAR superiority promotion to the health care providers on his call-lists, and he did as he was instructed, including to the following:

- Dr. Christopher Bechara (Lancaster, MA). Dr. Bechara treated beneficiaries participating in the AARP Part D, TRICARE, and Tufts Medicare Complement Government Programs. Based on the aforedescribed false and misleading representations, Dr. Bechara wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Daniel O'Leary (Leominster, MA). Dr. O'Leary treated beneficiaries participating in the AARP Part D Government Program. Based on the aforedescribed false and misleading representations, Dr. O'Leary wrote Crestor prescriptions, which caused false claims to be submitted to this Government Program, which in turn paid at least one false claim.
- Dr. Gary Asher (Lunenburg, MA). Dr. Asher treated beneficiaries participating in the MassHealth and TRICARE Government Programs. Based on the aforedescribed false and misleading representations, Dr. Asher wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

185. Relator Foote also was likewise trained by the Company to make this deceptive STELLAR superiority statement to the health care providers on his call-lists, and he too did as he was instructed. Dr. Rajan Amin (Louisville, KY) is an example of a health care provider to whom (following Company instructions) Relator Foote made false superiority statements using the STELLAR trial. Based on these false and misleading representations, Dr. Amin wrote

Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

### 2. AstraZeneca Made False and Misleading Comparison Statements to Capture Market Share

186. Despite the fact that there were no adequate, well-controlled head-to-head clinical studies supporting comparative statements between Crestor and either Lipitor or Zocor,[5] AstraZeneca trained its Sales Specialists to promote Crestor falsely as being superior to both Lipitor and Zocor, and it developed and distributed promotional materials deceptively supporting those false statements. These materials were prepared and used as part of the fraudulent marketing scheme to convert Lipitor and Zocor use to Crestor, including prescriptions written for unapproved uses, even well after AstraZeneca had receive the FDA Warning Letter on March 8, 2005.

187. The origin of AstraZeneca's false and misleading superiority message was the Company's misleading promotion of the STELLAR trial, *see* discussion *supra* ¶¶ 172-178, and it took root in discussions with health care professionals, which each PSS was instructed to initiate and steer toward a discussion of Crestor's supposed superiority. For example, in November 2003, DSM Cynthia Burell circulated to each PSS in her Louisville district a list of questions sent to her by RSD Lianne Bousquet (Detroit) for the express purpose of "getting into a patient-type detail" discussion with doctors. The questions expressly elicited discussions about unapproved uses of Crestor and, more particularly, about unsubstantiated – and thus false and misleading – contentions that Crestor was superior to Lipitor, Zocor and Pravachol.

---

[5] The SATURN trial, which was published in 2011, showed that Crestor was *not* superior to Lipitor. *See* discussion *infra* ¶¶ 278-282.

188. AstraZeneca's false and misleading superiority message became more urgent as the competition (particularly Lipitor, Zocor and Pravachol) became available in much less expensive generic forms.

189. AstraZeneca trained its Sales Specialists to promote Crestor as being more effective and more easily tolerated than Lipitor, but not to disclose the facts that (i) Lipitor was approved for a broader array of therapeutic uses, and (ii) there was no adequate clinical evidence supporting the argument that Crestor was more easily tolerated.

190. For example, Relator Lorden followed DSM Chris Dufault's instruction to persuade Dr. Malathi Bhat, a family practitioner in Lowell, Massachusetts whose patients overwhelmingly were Medicare and Medicaid beneficiaries, to prescribe Crestor in lieu of Lipitor *regardless of diagnosis*, on the false premise that the drugs' approved uses were interchangeable but that Crestor is more effective and better tolerated for all uses. This false and misleading promotion induced Dr. Bhatt to prescribe Crestor in lieu of Lipitor, and it caused Dr. Bhatt to write at least one prescription for Crestor that was submitted to and paid by a Government Program.

191. DSM Jack Hodge encouraged his Sales Specialists to pursue a similar strategy, albeit in a different region of the country. On February 2, 2009, DSM Hodge sent each PSS in his region a report of an AstraZeneca-sponsored study that, according to Hodge, showed "Crestor is more efficacious and/or better tolerated [than Lipitor]." And on April 29, 2009, he sent an e-mail in which he instructed each PSS in his district to promote Crestor as "significantly a better product than Lipitor" irrespective of the condition for which it was being prescribed, and irrespective of the absence of adequate clinical evidence supporting this statement and the fact that Lipitor had numerous FDA-approved uses not available to Crestor.

192. On July 15, 2009, DSM Hodge sent another e-mail to each PSS in his district, this time citing results of the new JUPITER study, *see* discussion *infra* ¶¶ 349-393, and plainly directing them to promote Crestor as clinically superior to Lipitor, irrespective of patient diagnosis and notwithstanding the fact that JUPITER was not a head-to-head study that demonstrated superiority. Hodge wrote:

> In the field I continue to see some physicians a little reluctant to agree with us that CRESTOR is clinically superior to Lipitor. I often hear that because Lipitor has so much data, so many outcomes studies in so many different patient types, they can't say that CRESTOR is absolutely better. They will tell us that CRESTOR is a good drug, but Lipitor is a good drug too. They'll say that CRESTOR is finally getting some outcomes data, but still does not have nearly the amount of data that Lipitor does. Does this sound familiar?
>
> It's important for us to realize just how much better CRESTOR is than Lipitor. Attached below is a document that really points out how much better CRESTOR is than Lipitor[.]
>
> * * * * *
>
> Has a doctor ever seen a study that demonstrated a 79% reduction in CV events? Even close to a 79% reduction? The answer is NEVER, not until now with CRESTOR!

Hodge's e-mail even attached talking points he prepared that emphasized JUPITER's supposed outcomes data, and that plainly were intended to support this illegal marketing strategy. Although sprinkled with statements regarding the need for visual messages to be approved, the clear import of the e-mail and attached talking points was that each PSS should aggressively market Crestor not simply as an *alternative* to Lipitor, but as clinically *superior* to Lipitor.

193. The following day, July 16, 2009, DSM Hodge circulated and instructed his sales team to "commit . . . to memory" a "wildly successful" verbatim sales dialogue that AstraZeneca was using in Jacksonville, Florida. The dialogue included a blatantly illegal invitation to discuss the unapproved, unsubstantiated and fundamentally misleading suggestion that physicians prescribe Crestor to regress atherosclerosis, *see* discussion *infra* ¶¶ 283-332, stating:

> Crestor does more inside the vessel to help prevent cardiovascular death, heart attacks and strokes.

The dialogue also illegally touted Crestor as the safest statin, stating:

> Not only does Crestor provide superior efficacy compared to Lipitor but it also has been established that Crestor is safer and better tolerated.

Such assertions were prohibited because they were not supported by substantial evidence, and thus were false and misleading. But DSM Hodge promoted – even *required* – them because they successfully induced physicians to prescribe Crestor in lieu of Lipitor, and they likewise caused the submission of false claims for payment by Government Programs.

194. But AstraZeneca's superiority message was even more cynical than that, for the Company instructed its Sales Specialists to promote the notion that *not* using Crestor instead of Lipitor could actually endanger patients.

195. In a September 11, 2009 conference call among the members of AstraZeneca's Evansville sales district, DSM Hodge asked PSS Sean Kirklin to relay a message that he recently had used to persuade a doctor to prescribe Crestor in lieu of simvastatin (*i.e.,* generic Zocor). Kirklin said he told the doctor:

> When you are talking about a drug that will be the difference between prolonging someone's life, saving their life giving them a better quality of life, that's what we are talking about here and I doggon believe <u>it's worth fifty cents a day to give a patient something that's going to save their life</u> and give them a better quality of life and that's what we're talking about. Is a patient's life worth fifty cents a day? (emphasis added)

Later in the same conference call, Kirklin made the outrageous and plainly false statement that using simvastatin was like prescribing water:

> Look, if you really want to save the patients money, why don't you just take them off [generics] and give them water, because a lot of generics are going to do the same exact thing. Are you really wanting to save their life, or are you wanting to help them out? If you really want to help them out, give them Crestor, it's going to make a difference in their life.

DSM Hodge specifically endorsed this sales technique for use in promoting Crestor against both Lipitor and simvastatin, stating "I want to back up one step Sean because I think you are on to something there." Hodge told his sales team:

- "The objective is to have customers prescribe Crestor for all newly diagnosed hyperlipidemic patients . . . and if they're not doing that then they are not doing the right thing for their patients."
- "The physician is allowing the patient to believe that a generic is ok, they are [abdicating] their responsibility to help the patient, what's at stake and why it's so important."

Sales Specialist Myra Wright responded by stating that the sales district had been the most successful when the sales personnel said "look, [Crestor's] the best, it's the most efficacious, it's the most tolerable and now it's the best covered and it doesn't matter who it's for it's the best for everyone."

196. This sales tactic – the use of false and misleading superiority statements – succeeded throughout the country in persuading health care professionals to prescribe Crestor for their patients, including Government Program beneficiaries, thereby causing hundreds of thousands of false claims to be submitted to, and paid by, Government Programs.

**3. AstraZeneca Made False and Misleading Superiority Statements to Induce Government Programs to Prefer and Reimburse for Crestor**

197. From the outset, AstraZeneca's Crestor leadership focused its attention first on gaining access to State Medicaid Program PDLs and later (starting January 1, 2006) on Medicare Part D PDLs in order to grow Crestor sales unimpeded by formulary limitations. To do this, however, AstraZeneca would have to supplant the market leaders, Lipitor and Zocor, on those PDLs.

198. Within months of gaining initial FDA approval for Crestor in August 2003, AstraZeneca had submitted applications to many State Medicaid Programs and later (starting

January 1, 2006) to Medicare Part D Program Sponsors for Crestor to be included on their drug formularies and PDLs. As part of this formulary review process, AstraZeneca presented information concerning Crestor to State Medicaid Programs, Medicare Part D Program Sponsors, and their respective P&T Committees, during both oral meetings (at which AstraZeneca was represented by its own employees or its paid advocates) and in the form of paper submissions.

199. AstraZeneca developed a dedicated "managed care" (also called "managed markets") sales group comprised of some 200 individuals, many of whom had advanced science degrees, whose job it was to call on P&T Committees, including State Medicaid P&T Committee and Medicare Part D P&T Committees. These specialized managed market representatives presented false and misleading studies/abstracts to influence Government Program P&T Committees into adding Crestor as a preferred agent without prior authorization limits.

200. Managed market representatives were specifically trained to initiate the Company's rehearsed message designed to cause the P&T Committee to add Crestor as a preferred agent. Much of the material that they provided to the P&T Committees went beyond Crestor's approved label. For example, they provided AstraZeneca-funded studies of Crestor for uses that had been rejected by the FDA.

201. AstraZeneca's managed markets personnel were trained how to present the Company's carefully hewn message in order to cause Crestor to be placed on Government Program PDLs. For example, the Company trained them through role-playing exercises to promote Crestor based on (i) false and misleading safety statements that had been rejected by the FDA, (ii) false and misleading comparative superiority statements that had been rejected by the FDA, and (iii) false and misleading atherosclerosis regression statements that had been rejected by the FDA.

202. The managed markets representatives did as they were trained and instructed, and they succeeded.

203. Nothing changed even after AstraZeneca received the FDA warning letters concerning the false/misleading safety and comparative superiority campaign, or even after the FDA rejected of the atherosclerosis regression indication. The managed markets' pitch to Government Programs remained the same.

204. Access to these Government Program PDLs was closely monitored so that once Crestor achieved PDL status, Sales Specialists could follow up to ensure Crestor "pull through" with Government Program prescriptions. Indeed, AstraZeneca's team of national account managers closely tracked the Company's success in gaining access to Medicaid Program PDLs and (following January 1, 2006) Medicare PDLs, providing regular reports to the sales force of what it called "wins" – *i.e.,* gaining preferred status on these Government Program PDLs.

205. Success in gaining preferred PDL status, a "win," was announced to Sales Specialists with great fanfare, and the explicit message was that this would give them the opportunity to make significant amounts of money. When one such Government Program PDL "win" with Humana (which was the Sponsor of numerous Government Programs) was announced by National Account Manager Jerry Goodkind in December 2003, DSM Cynthia Burrell was ecstatic. She sent an e-mail to her sales team to get the "bonus check writing machines" going because she was convinced they were going to be "in the money" and that the printers needed to be warmed up so that they could print incentive compensation ("IC") checks. She directed the Sales Specialists in her district to "maximize" sales through Crestor "blitzes" to health care professionals:

> **OH MY GOSH.....THIS IS THE BEST NEWS I HAVE HAD ALL 2003!!!!**
> **Read on and PLEASE maximize this opportunity by closing with this**

> **info & step it out to the employer group level so the docs can readily think of this as they look at a patient's chart!!!**
> . . .
>
> **CRESTOR as preferred Tier 2 with a $5 copay reduction!!!!!!!!!!!**
>
> **They better get the bonus check printing machines warmed up now 'cause we are going to be......**
>
> **IN THE MONEY!$!$!$**
> **MORE in '04!!$!$!$!$**
>
> **The new 2004 IC plan is divided into 3 trimesters for 2004 so let's get your programs, blitzes, etc. planned NOW so we can start back to work on Jan. 2nd with a BANG and get the year started off right! The new plan gives more people more potential to make a LOT more money too!**

(emphasis in original).

206. In addition, AstraZeneca deployed its Sales Specialists on special "Formulary Blitzes" to influence P&T Committee members' decisions, typically bearing gifts. The blitzes included false and misleading safety and superiority message to influence Crestor pull-through and PDL placement, including on Government Program PDLs. One strategy AstraZeneca used to influence pull-through and PDL placement was to host Hawaiian theme parties with health care professionals, including Hawaiian shirts, luau lunches, and surf and boogie boards. AstraZeneca's Formulary Blitz message emphasized ensuring that Crestor "Rides the Crest" with its false superior safety and efficacy statements to remain on the PDLs: "Every time the statin class comes up for review, Crestor Rides the Crest with superior LDL and HDL efficacy." Sales Specialists also used the false safety and superiority message as part of Super Bowl, NCAA, World Series and Kentucky Derby parties, where they deployed the message that "[w]hen doctors and managed care need to pick the best to win (with the best results), [they] are picking CRESTOR to win!" And, Sales Specialists hosted "Happy Birthday, Crestor" parties with health

care professionals to celebrate PDL wins, including gaining access to Government Program PDLs.

207. These blitzes were part of the Company's well-planned efforts to gain access to Government Program PDLs through deception. AstraZeneca's own compliance rules required that "all marketing claims about medicines must be supported by scientific proof. We work to ensure that the claims we make reflect the balance of all the available information." Likewise, AstraZeneca directed that "[w]hen we claim that a medicine is more effective than another one, this must be supported by high quality clinical trials that have demonstrated that superiority." However, these compliance requirements were honored only in the breach, as AstraZeneca used deception and kickbacks to promote Crestor's supposed superiority directly to State Medicaid Programs, Medicare Part D Sponsors, and/or to their respective P&T Committees.

208. The P&T Committees expected that all information provided by AstraZeneca would be complete and accurate, they recommended Crestor for inclusion on PDLs based on the information that was provided, and the State Medicaid Programs and Medicare Part D Sponsors heeded those recommendations. Had they known the information provided by AstraZeneca was materially misleading, Crestor would not have been placed on their formularies, or afforded preferred status on their PDLs.

209. The centerpiece of AstraZeneca's written formulary submissions was a Crestor "dossier" that included a standardized set of clinical and economic evidence presented for consideration during the formulary decision-making process. The dossier included AstraZeneca's detailed explanation of Crestor's safety and efficacy, as well as its overall clinical and economic value relative to alternative therapies, and it was materially misleading.

210. For example, the September 29, 2004 Crestor Formulary Submission Dossier submitted by AstraZeneca to the Montana Medicaid Program (which was identical to the dossiers submitted to Medicare Part D plans and other State Medicaid Programs throughout the United States), made the following misleading statement concerning the STELLAR trial:

> A number of head-to-head studies have compared the efficacy of rosuvastatin with atorvastatin in patients with hypercholesterolemia. In the STELLAR trial that compared rosuvastatin with atorvastatin, simvastatin, and pravastatin across dose ranges in 2,431 patients, rosuvastatin reduced LDL-C significantly more than atorvastatin across the dose response curve. Rosuvastatin 10 mg provided significantly greater decreases in LDL-C than atorvastatin 10 mg (-45.8% vs -36.8, p < 0.001), and numerically greater decreases in LDL-C than atorvastatin 20mg. . . .

211. AstraZeneca's standard Crestor dossier thus highlighted the STELLAR trial in order to induce and deceive both Montana Medicaid as well as Medicare Part D Sponsors and State Medicaid Programs nationwide into believing that Crestor was superior to Lipitor. This was the same statement for which the Company received a March 8, 2005 Notice of Violation from the FDA, declaring that such a statement was "misleading" "because it relies solely on data that are not relevant to comparisons of the drugs such as most common does or starting dose, while ignoring data that do not support the claim of superiority made in the ads." *See* discussion *supra* ¶ 176.

212. Even after AstraZeneca had received the DDMAC Notice of Violation, however, the Company still mobilized teams throughout the United States to promote its superiority message as a reason why Crestor should receive preferred drug status on Medicare Part D and State Medicaid Program PDLs.

213. AstraZeneca targeted P&T Committee members for such promotion in their private practice offices. During these sales calls, AstraZeneca delivered the misleading

STELLAR superiority message in order to persuade the P&T Committee members to add Crestor to Medicare Part D formularies and State Medicaid Program PDLs.

214. AstraZeneca also solicited physicians who treated a high volume of Medicare Part D and/or Medicaid patients to write letters or give presentations to P&T Committees to urge Crestor's addition to formularies and PDLs, again based on the misleading STELLAR superiority promotion. These paid testimonials from local physicians were very influential on P&T Committee decisions.

215. For example, on January 15, 2010, Dr. Antonio Lopez, a preventive cardiologist at Cardiovascular Associates of Idaho who received $86,945 in speaker's fees from AstraZeneca between 2010 and 2013 (2009 figures are not available), gave the Idaho Medicaid Program P&T Committee a false and misleading testimonial concerning the drug's superiority to other statins: "Crestor is the most effective statin for achieving goals of therapy for LDL cholesterol, non-HDL cholesterol, as well as best statin for HDL cholesterol." Based at least in part on his testimonial, the Idaho P&T Committee recommended Crestor remain a preferred statin on the PDL.

216. AstraZeneca deployed an army of its personnel to deliver the misleading STELLAR superiority message directly to Government Program P&T Committees throughout the United States.

217. For example, on January 21, 2004, AstraZeneca dispatched Senior Medical Science Liaison Jennifer Phillips to testify in favor of Crestor before the West Virginia State Medicaid Program P&T Committee. The minutes of the Committee meeting confirm that Phillips' presentation emphasized AstraZeneca's false superiority message based on STELLAR:

> Jenny Phillips, Astra Zeneca: Ms. Phillips said that every thirty-three seconds someone dies from heart disease, and in West Virginia 17 people die every day.

> She wanted to speak about the benefits of Crestor. She stated that statins have been proven the most effective agents to reduce LDL. The Stellar trial compared Crestor with Pravachol, Zocor and Lipitor for efficacy in reducing LDL and other lipid parameters. Crestor was significantly able to reduce LDL compared to Pravachol by 26 percent, Zocor by 12 to 18 percent and compared to Lipitor by 8.2 percent.

Phillips' false and misleading statements concerning Crestor's supposed superiority to Lipitor based on the STELLAR trial were intended to mislead the West Virginia State Medicaid P&T Committee to grant Crestor preferred status, and they succeeded. At the very next P&T Committee meeting (just four months later, on April 24, 2004), with *twelve* AstraZeneca employees in attendance, the Committee voted simultaneously to add Crestor to its formulary and designate it for preferred status on its PDL.

218. Similar circumstances played out before other Government Program P&T Committees and Drug Utilization Review ("DUR") Boards[6] throughout the country. Numerous State Medicaid programs soon added Crestor to their formularies and PDLs. For example, effective December 2003 the Massachusetts Medicaid Program ("MassHealth") announced it was adding Crestor to its formulary, and as a preferred drug the following year. Crestor was added to the Tennessee Medicaid TennCare formulary soon after launch, and it was made a preferred agent on the Preferred Drug List PDL effective October 2005. Crestor was added as a preferred agent to the PDLs in Delaware, Florida, Kentucky, Maryland, Nevada, New York, South Carolina, Texas, Wisconsin, and on numerous other Medicaid PDLs. The State of Iowa reported that Crestor was a preferred agent on its Medicaid program, and that it had paid $699,809.94 in fiscal year 2005 for Crestor, representing 6.41 percent of its total statin payments.

---

[6] Each state that participates in Government Programs must implement a drug utilization review program to ensure that prescriptions for outpatient drugs are appropriate, medically necessary, and not likely to result in adverse medical consequences. These states establish DUR Boards to establish and implement standards and criteria for their DUR programs.

Within several years AstraZeneca would "win" preferred formulary status for Crestor on 90 percent of Government Program PDLs nationwide.

219. AstraZeneca's scheme to disseminate its false and misleading STELLAR superiority message had succeeded in deceiving Government Programs nationwide to add Crestor as a preferred statin on their formularies.

**4. AstraZeneca Made False and Misleading Superiority Statements to Health Care Professionals in Order to "Pull Through" Government Program Claims**

220. But that was not the end of the fraud, for AstraZeneca then specifically targeted its sales details on physicians who treated Government Program beneficiaries – what AstraZeneca called its "pull-through" effort.

221. For example, in December 2009, AstraZeneca sent a memo to its Sales Specialists working in Indiana, encouraging them to promote "the preferred status of CRESTOR on the Indiana Medicaid Preferred Drug List." (emphasis added) The memo appended promotional material called a "Simvastatin sell sheet with formulary information" that specifically promoted Crestor over Vytorin (a combination of ezetimibe and simvastatin) on the basis that Crestor was covered by Indiana State Medicaid, but Vytorin was not. Sales Specialists in the Northeast were provided a similar set of promotional materials that trumpeted Crestor's formulary status on Massachusetts Medicare Part D and MassHealth plans.

222. This was the same deceptive pull-through scheme using false and misleading superiority campaign that AstraZeneca rolled out to Government Programs nationwide, causing the submission of false Crestor claims to Government Programs.

223. Following Crestor's addition to the MassHealth PDL, Relator Lorden was trained and instructed by the Company to make this false superiority statement to the health care

providers on his call-lists in order to pull through Crestor MassHealth prescriptions, and he did as he was instructed, including to the following:

- Dr. Gabriel Yuil (Lawrence, MA). Based on these false and misleading representations, Dr. Yuil wrote Crestor prescriptions, which caused false claims to be submitted to MassHealth, which in turn paid at least one false claim.
- Dr. Vandan Sahay (Ayer, MA). Based on these false and misleading representations, Dr. Sahay wrote Crestor prescriptions, which caused false claims to be submitted to MassHealth, which in turn paid at least one false claim.
- Dr. Ashok Joshi (Billerica, MA). Dr. Joshi treated beneficiaries participating in the AARP Part D, Fallon Part D, Healthspring Part D, MassHealth, and Network Health Medicaid Government Programs. Based on the aforedescribed false and misleading representations, Dr. Joshi wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Carlos Del Rio (Dracut, MA). Dr. Del Rio treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), and Tufts Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Del Rio wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

### B. ASTRAZENECA MADE FALSE AND MISLEADING SUPERIORITY STATEMENTS THAT IMPROPERLY TARGETED MINORITY ETHNIC POPULATIONS WITH HIGH GOVERNMENT PROGRAM UTILIZATION RATES

224. Crestor is not specifically indicated for use in any particular ethnic population. To the contrary, the only ethnicity-oriented statement on Crestor's FDA-approved label is a suggestion that doctors consider the lowest possible starting dose for Asian populations in light

of studies that have demonstrated a two-fold increase in median exposure to rosuvastatin in that population.

225. Nevertheless, seeing an opportunity to expand its market share, AstraZeneca implemented a strategy to promote Crestor falsely as the most efficacious statin drug for certain ethnic populations with high Government Program utilization rates. As with other superiority statements advanced by AstraZeneca, *see* discussion *supra*, such promotion was fundamentally false and misleading, and it was intended to – and did – induce physicians to prescribe Crestor for unapproved and unproven uses, and in lieu of other therapies that may have been more effective, safer, and less expensive, and it thereby cause false claims for reimbursement to be submitted to, and paid by, Government Programs.

226. In particular, AstraZeneca funded the ARIES, STARSHIP and IRIS trials in order to generate racially-specific data that its Sales Specialists could use to promote Crestor misleadingly as the most efficacious statin for certain ethnic populations. That AstraZeneca intended to use the trials for this improper purpose alone is evident from the way in which the trials were conceived and implemented.

### 1. AstraZeneca Funded the ARIES Trial to Illegally Target African-American Patients for Off-Label Sales of Crestor

227. AstraZeneca's illegal targeting of ethnic minorities began with the ARIES trial, the results of which were presented in 2004, and published on-line in 2005.[7]

228. The ARIES trial was a six-week, randomized, *open label* trial with *no placebo control*, that compared 10 and 20 mg doses of Crestor against non-equivalent 10 mg and 20 mg doses of Lipitor in 774 African-American patients. It was not "adequate and well-controlled"

---

[7] *See* Keith C. Ferdinand, *et al*., *Comparison of Efficacy and Safety of Rosuvastatin Versus Atorvastatin in African-Americans Patients in a Six-Week Trial*, 97 AM. J. CARDIOLOGY 229 (2006).

within the meaning of the applicable statute and regulations, and AstraZeneca knew it could not form the basis of a new FDA-approved use. But AstraZeneca funded the trial anyway because it understood and intended that this rigged trial would be an effective marketing tool to promote Crestor misleadingly as the most efficacious statin for African-American patients. The primary author of the ARIES trial, Keith Ferdinand, is a paid speaker and consultant for AstraZeneca.

229. The results of the ARIES trial were presented on November 10, 2004 at the American Heart Association's Annual Scientific Sessions, and AstraZeneca announced the results in a laudatory press release issued the same day titled:

> CRESTOR™ HELPS MORE AFRICAN AMERICAN PATIENTS WITH HYPERCHOLESTEROLAEMIA ACHIEVE CHOLESTEROL GOALS.

Presaging the manner in which AstraZeneca intended to promote ARIES, the press release quoted Dr. Ferdinand as saying that "ARIES is the first trial to demonstrate superiority in lowering LDL-cholesterol (bad cholesterol) in [African-American patients] using rosuvastatin (CRESTOR) compared to [Lipitor], comparing equal doses of each."

230. Building on the perceived "success" of the ARIES trial, AstraZeneca funded the STARSHIP and IRIS trials, which also were infected with bias and predetermined outcomes.

**2. AstraZeneca Funded the STARSHIP Trial to Illegally Target Hispanic Patients for Off-Label Sales of Crestor**

231. STARSHIP was a six-week, randomized, *open label* trial with *no placebo control*, that compared 10 mg and 20 mg doses of Crestor against non-equivalent 10 mg and 20 mg doses of Lipitor in 696 Hispanic patients.[8]

232. The results of the STARSHIP trial were presented on March 27, 2006 at the annual meeting of the National Hispanic Medical Association, and previously had been

[8] *See* Ramon Lloret, *et al.*, *Comparison of Rosuvastatin Versus Atorvastatin in Hispanic-Americans with Hypercholesterolemia*, 98 AM. J. CARDIOLOGY 768 (2006).

presented at the American College of Cardiology's annual meeting. Presaging the manner in which AstraZeneca intended to improperly promote Crestor to Hispanic patients, a sub-study from STARSHIP that focused on C-reactive protein was presented at the 46th Annual Conference on Cardiovascular Disease Epidemiology and Prevention, also in March 2006.

233. Like the ARIES trial before it, STARSHIP was not "adequate and well-controlled" within the meaning of the applicable statute and regulations, and AstraZeneca knew it could not form the basis of a new FDA-approved use. But, AstraZeneca funded it anyway because it understood and intended that this rigged trial would be an effective marketing tool to misleadingly promote Crestor as the most efficacious statin for Hispanic patients.

### 3. AstraZeneca Funded the IRIS Trial to Illegally Target South Asian Patients for Off-Label Sales of Crestor

234. IRIS was a six-week, *open label* trial with *no placebo control*, that compared 10 mg and 20 mg doses of Crestor against non-equivalent 10 mg and 20 mg doses of Lipitor in 740 South Asian patients.[9]

235. The results of the IRIS trial were presented on June 20, 2006 at a Plenary Session of the XIV International Symposium on Atherosclerosis. Presaging the manner in which AstraZeneca intended to promote Crestor off-label, the written abstract of that presentation announced that 10 mg of Crestor had "lowered LDL-C and non-HDL-C significantly more than [Lipitor] 10 mg in moderate- to high-risk South Asian patients."

236. Like the ARIES and STARSHIP trials, IRIS was not "adequate and well-controlled" within the meaning of the applicable statute and regulations, and AstraZeneca knew it could not form the basis of a new FDA-approved use. But AstraZeneca funded it anyway

---

[9] *See* Prakash C. Deepwania, *et al.*, *Comparison of Rosuvastatin Versus Atorvastatin in South-Asian Patients at Risk of Coronary Heart Disease*, 99 AM. J. CARDIOLOGY 1538 (2007).

because it understood and intended that this rigged trial would be an effective marketing tool to misleadingly promote Crestor as the most efficacious statin for South Asian patients.

#### 4. AstraZeneca Used the ARIES, STARSHIP and IRIS Trials to Falsely Promote Crestor as Superior for Certain Ethnic Populations

237. As the ARIES, STARSHIP and IRIS trials were published, AstraZeneca encouraged its Sales Specialists, through regional conference calls, emails and voicemails from their RSDs, and in-person communications from supervisors, to aggressively exploit the trials to promote Crestor as the most effective (*i.e.,* superior) statin for African-American, Hispanic and South Asian patients regardless of their diagnoses, and despite the fact that the trials themselves were not reliable measures of relative efficacy. The statements were fundamentally misleading.

238. That AstraZeneca intended its Sales Specialists proactively (*i.e.,* without physician prompting) to promote these studies as evidence of Crestor's alleged superiority for special populations was clear from the manner in which the Company distributed the studies and trained the Sales Specialists. The studies were "drop-shipped" to Sales Specialists in the same manner as other materials that they were expected to distribute, reasonably leading Sales Specialists to believe that the trial reprints were approved by the FDA for proactive distribution. To drive the point home, Sales Specialists received training on ARIES, STARSHIP and IRIS at Business Emphasis Meetings, and that training included role-playing exercises and instruction on how they should initiate in their details that the trials should be "best practices" for physicians treating ethnic populations.

239. AstraZeneca was particularly insistent in directing its Sales Specialists to promote ARIES, STARSHIP, and IRIS as evidence of superiority to physicians who saw patients in urban communities with high concentrations of minority populations and high Government Program utilization rates. The Company did this through "pre-call planning" discussions with Sales

Specialists, and by providing them with tools that described target physicians' prescription writing tendencies and payor mixes so that the Sales Specialists could focus their ARIES, STARSHIP and IRIS promotional efforts on physicians who treat African-American, Hispanic and South Asian patients who also are beneficiaries of Government Programs. RSD Ron Iglesias described these physicians and patient populations as "low hanging fruit."

240. AstraZeneca instructed its Sales Specialists to focus these proactive pitches on physicians like Gabriel Yuil, of Lawrence, Massachusetts, who had large minority patient populations, but who were prescribing more Lipitor and simvastatin than Crestor. Relator Lorden followed the Company's direction to promote the ARIES trial aggressively to Dr. Yuil, and the strategy was a success. Upon receiving this pitch, Dr. Yuil – who had a high percentage of African-American Medicare/Medicaid patients – began to prescribe Crestor in greater numbers to his African-American patients *precisely because of the ARIES trial*. Dr. Yuil even showed certain of his patient files to Relator Lorden while specifically telling Lorden that he was prescribing more Crestor for African-American patients based on Lorden's promotion of ARIES. Based on these false and misleading sales details, Dr. Yuil wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which paid at least one false claim.

241. At the direction of his supervisors, Relator Lorden made similarly successful pitches to the Lowell (MA) Community Health Center, which operated a clinic with a significant population of South Asian/Government Program beneficiary patients, and which began to prescribe more Crestor following Relator Lorden's promotion of the IRIS trial. The same occurred following Relator Lorden's Company-directed promotion of the STARSHIP trial to physicians who treated significant low-income populations, including:

- Dr. Krishnamoorthy Rao (Lowell, MA). Dr. Rao treated beneficiaries participating in the AARP Part D, Health Net Part D, MassHealth, Network Health Medicaid (MA), RX America Medicare D, and Silver Script Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Rao wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Chhan Touch (Lowell, MA). Nurse Practitioner Touch treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), Silver Script Part D, and Tufts Part D Government Programs. Based on the aforedescribed false and misleading representations, NP Touch wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Kara Viel, APRN (Dracut, MA). Nurse Practitioner Viel treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), Silver Script Part D, and TRICARE Government Programs. Based on the aforedescribed false and misleading representations, NP Viel wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Hamidreza Danesh (Lowell, MA). Dr. Danesh treated beneficiaries participating in the AARP Part D, Coventry Part D, Health Net Part D, Network Health Medicaid (MA), and Silver Script Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Danesh wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

242. Relator Foote also was trained and instructed to use the STARSHIP trial to proactively promote Crestor as the superior statin for Hispanic patients, and he did so, including for example, to Dr. Juan Polo, a Cuban-born physician in Louisville, Kentucky, who had a predominantly Hispanic patient population. In addition to misleadingly promoting STARSHIP as evidence of Crestor's clinical superiority for Hispanic patients, AstraZeneca induced Dr. Polo to prescribe Crestor by frequently providing lunch for his entire office (approximately eight people) and dinners at local Cuban restaurant "Havana Rumba." The misleading promotion and free lunches induced Dr. Polo to prescribe a high volume of Crestor for his patients, many of whom were Government Program beneficiaries. As a result of these false and misleading representations, Dr. Polo wrote prescriptions for Government Program beneficiaries, and at least one false claim was in turn reimbursed by the Government Program.

243. AstraZeneca's false and misleading promotion of the ARIES, STARSHIP and IRIS trials was a cynical and illegal marketing tactic that was intended to, and did, mislead physicians and patients regarding Crestor's relative efficacy in African-American, Hispanic and South Asian populations.

244. This strategy was false and misleading because the studies were open-label, not placebo-controlled, narrow in focus, and conducted with false comparators. Simply, they were inherently unreliable and their use violated AstraZeneca's espoused compliance policies.

245. AstraZeneca pursued this strategy because it understood that these populations disproportionately were beneficiaries of Government Programs, and that their prescriptions thus were likely to be submitted for reimbursement by Government Programs. AstraZeneca trained and directed its sales personnel to promote these trials misleadingly as evidence that Crestor was more efficacious for these patient populations than its competitors because it knew the resulting

prescriptions would lead to a greater volume of reimbursements by Government Programs, and thus greater revenue for the company.

246. The strategy worked, as the Company's promotion of ARIES, IRIS and STARSHIP as evidence of Crestor's supposed superiority for certain ethnic populations did induce physicians to prescribe Crestor (in lieu of other less expensive, and potentially more effective or safer statins) for their patients, and it did cause them to submit false claims for reimbursement of those prescriptions by Government Programs.

247. As a result of such promotion of ARIES, STARSHIP, and IRIS, the specifically identified physicians and others wrote at least one prescription for Crestor that was paid for by a Government Program upon the submission of a false claim.

**5. AstraZeneca Made False Superiority Statements Regarding the ARIES, STARSHIP, and IRIS Trials to Government Programs**

248. Just as it had with its false and misleading STELLAR campaign, AstraZeneca made false and misleading superiority statements to Medicare Part D plans and State Medicaid Programs, this time asserting that Crestor was superior to Lipitor in the treatment of ethnic minorities.

249. For example, on September 15, 2006, AstraZeneca Senior Clinical Account Manager Mark Henderson, Ph.D. testified before the Virginia State Medicaid Program P&T Committee. The minutes of the Committee meeting indicate Henderson's presentation emphasized AstraZeneca's Crestor false superiority message to Lipitor based on the open label ARIES trial (a study with no placebo control that compared non-equivalent 10 mg and 20 mg doses of Crestor with 10 mg and 20 mg doses of Lipitor):

> The ARIES trial evaluated the efficacy of rosuvastatin (10mg and 20mg) compared to atorvastatin (10mg and 20mg) in the African-American population over a 6-week period. **LDL-C was reduced to a significantly greater extent with rosuvastatin 10mg compared to atorvastatin 10mg**. Rosuvastatin is a

> statin capable of providing significant improvements in the lipid profile in a wide variety of adult patient populations with hypercholesterolemia, with and without hypertriglyceridemia, regardless of race, gender, or age.

(emphasis added)

250. Henderson's statements about the superiority of Crestor compared with Lipitor are similar to the promotion that the Company had been warned about by the FDA in March 2005. The ARIES trial was neither double-blinded nor placebo-controlled, and it was acknowledged internally at AstraZeneca as merely a "promotional" study, meaning it was unable to justify an FDA approval for a new use against atherosclerosis. Based at least in part on Henderson's false representations concerning Crestor's superiority, however, the Committee voted to retain it on the PDL.

251. Likewise, on September 28, 2007, AstraZeneca charged Regional Scientific Manager Kris Norenberg to testify before the Alaska State Medicaid Program P&T Committee. Norenberg's presentation included an apparent reference to its three ethnic minority studies (ARIES, STARSHIP, and IRIS), yet failed altogether to mention that these studies were open-label with no placebo comparator and once more underscored AstraZeneca's Crestor false superiority message:

> We continue to provide head-to-head trials in high-risk populations with other statins, which is strictly LDL lowering and HDL rising. Crestor is the most effective statin monotherapy available on a per milligram basis. We continue to monitor different ethnic populations with studies in Asians, Hispanics and Blacks. Another studies have [sic] demonstrated Crestor's safety in the Japanese population.

252. By stating that Crestor was the "most effective statin monotherapy on a per milligram basis," Norenberg's presentation was not only misleading, it was also in direct contravention of the FDA's Notice of Violation issued more than two years earlier. Based at

least in part on Norenberg's false representations concerning Crestor's superiority, the Committee voted to retain it on the PDL.

### C. AstraZeneca Made False and Misleading Superiority Statements to Promote Crestor as Superior to Generic Statins

253. Although AstraZeneca always had targeted its branded competitors (*e.g.,* Lipitor and Zocor) with illegal comparative marketing techniques, it shifted focus in 2009 to attack more specifically the notion that generic statins presented a viable alternative to Crestor. The Company encouraged its Sales Specialists to promote Crestor falsely as being more effective and safer than simvastatin (*i.e.,* generic Zocor) for all patients, and they did so.

254. In the Northeast, DSM Chris Dufault told his team to "use every advantage" to compete against simvastatin and that if they did not increase market share they would be fired. This message was reinforced by RSD Ron Iglesias, who regularly told Sales Specialists in his region that they were to increase Crestor's market share for first-line use (despite the fact that many managed care plans would not approve Crestor for first-line use) or be fired.

255. To accomplish this objective, DSM Dufault taught Relator Lorden and others that when speaking with physicians they should compare the adverse effects of *higher* doses of simvastatin against those at *lower* doses of Crestor (in order to create a false and misleading impression of relative toxicity), and that they should urge physicians to infer from that misleading comparison that they should prescribe Crestor for all their patients, regardless of diagnosis, because their patients would stop taking simvastatin in order to avoid its adverse effects.

256. And, AstraZeneca's sales personnel were taught to "coach" physicians and other health care professionals on how to prescribe Crestor so that they would evade managed care plan prior authorization requirements that were designed to prefer generic drugs. For example,

DSM Dufault taught Relator Lorden to explain to physicians and other health care professionals that they could avoid formulary restrictions on the use of Crestor by falsely reporting that a patient suffered myalgias (*i.e.,* muscle pain) when using simvastatin, or by submitting Crestor prescriptions on Friday afternoons, when they would receive less scrutiny.

257. Susan Tuscher is a nurse practitioner at the Lowell (Massachusetts) Community Health Center who, at Relator Lorden's suggestion (which had been directed by his supervisor) falsely reported patient myalgias in order to avoid prior authorization requirements imposed by certain formularies, including Government Program formularies, including to MassHealth. In 2012, Ms. Tuscher submitted approximately 36 Crestor claims for Medicare beneficiaries, at least one of which was submitted using, and paid by a Government Program in reliance upon, a false prior authorization.

258. Relator Lorden's next DSM, Chris Czech, accompanied him on multiple sales calls during which he "taught" health care professionals how to avoid step therapy requirements for Crestor that had been imposed by various formularies, including Government Program formularies, in order to prefer generic drugs, including:

- Dr. Mark Bown (Tyngsboro, MA). Dr. Brown treated beneficiaries participating in the Health Net Part D and Tufts Medicare Complement Government Programs. Based on the aforedescribed false and misleading representations, Dr. Bown wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Craig Gustafson (Harvard, MA). Dr. Gustafson treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), TRICARE, and Tufts Part D Government Programs. Based on the aforedescribed false and misleading

representations, Dr. Gustafson wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

- Dr. Malathi Bhat (Lowell, MA). Dr. Bhat treated beneficiaries participating in the AARP Part D, Community Care Rx Part D, Coventry Part D, Health Net Part D, MassHealth, Network Health Medicaid (MA), Silver Script Part D, and Wellcare Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Bhat wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

259. AstraZeneca's false and misleading attack on generics was similar, if more intense, in other parts of the country. For example, following a district managers conference in 2009, DSM Hodge instructed each Sales Specialist in his district, including Relator Foote, to target generic statins more aggressively on the (false) basis that they were inherently inferior to Crestor for all patients.

260. During the same September 11, 2009 conference call discussed *supra*, PSS Jeff Scott bragged that, when he was "selling [Crestor] against generic simvastatin," he was "bringing in the new guidelines that are coming first quarter of next year. . . . We don't know exactly what the new guidelines are going to say, but we know that they are going to be more aggressive on lowering LDL." DSM Hodge called that a "great tactic" and concluded the conference call by telling each Sales Specialist in his district to continue the bogus attack on generic statins:

- "[Doctors] know it's the right thing to do, it's the best thing for patients to put the patient on Crestor and not simvastatin and not Lipitor and not Vytorin and not pravastatin or lovastatin. That's freaking ridiculous so they know it and we need to call them on it."

- "I know we are not going to get warm fuzzies from physicians when we delve in to these discussions, but telling them in a professional way that they are not doing the right thing for patients when they prescribe simvastatin, and I know that's a hornet's nest but we need to get, but that's exactly what we need to do."

261. DSM Hodge reiterated these deliberately deceptive "difficult" messages in an e-mail he sent to his sales team just three days later, on September 14, 2009:

> TEAM, Tactically we have been focusing on our messaging and having strong details, but we've ignored an underlying need to "call physicians out" when we know that they are not doing the right thing for their patients. <u>If physicians are not Rxing CRESTOR for all their newly diagnosed hyperlipidemic patients they are not doing the right thing for their patients! In many instances physicians are allowing patients to believe a generic is OK. This is an abdication of their responsibility to help patients see what's really at stake and why it's so important.</u> When we allow physicians to do this without calling them on it, we are abdicating our responsibility. We've been hesitant to delve into these discussions because it makes us uncomfortable and hits a nerve w/ physicians (causes a reaction). We now realize that this is exactly what we need to have happen. Below you will see powerful verbiage that I've heard from you in your voicemail messages or during field visits. These are examples of you not pulling punches, but instead delving into difficult discussions. We need real, straightforward conversations that call physicians out when they are not doing the right thing for their patients. (emphasis added)

He then identified "Powerful Verbiage" that he explicitly encouraged his Sales Specialists to use when meeting with physicians and other health care professionals, even though the statements were unsubstantiated, false and misleading. Among the more egregious examples:

- "Substitute other medications w/ generics, but not statins! Substituting Crestor with a generic statin is not OK! It's not the best thing for the patient!"
- "You can do more for you [sic] patients."
- "First, let's be very clear that we both agree that the best thing clinically for the patient is to be on CRESTOR instead of Lipitor or simvastatin…"
- "Let's be very clear that the cost difference to the patient that we are talking about is about $10 - $15 dollars (Crestor vs. simva.)…"
- "The reason a patient would want a generic statin instead of CRESTOR is because they don't truly know the importance, the value, that Crestor provides vs. simvastatin. That's where you and I come in doctor…"

- "It's not that patients can't afford Crestor, it's that you're letting them believe a generic is OK. We can't abdicate the responsibility to help them see what's at stake and why it's so important…"

262. This false and misleading attack on generic simvastatin succeeded throughout the country in persuading physicians to prescribe Crestor for Government Program beneficiaries, thereby causing false claims to be submitted to, and paid by, Government Programs.

263. The Company trained and instructed Relator Foote to make this false superiority promotion concerning generic simvastatin, and he did as he was instructed. The health care professionals to whom he made false statements regarding Crestor's superiority to generic simvastatin included Dr. Rashidul Islam of New Salisbury, Indiana. Upon receiving this false and misleading marketing pitch, Dr. Islam suddenly increased his Crestor utilization to more than 80 percent of his total statin scripts. Based on these false and misleading representations, Dr. Islam wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

264. The Company trained and instructed Relator Lorden to make this false superiority promotion concerning generic simvastatin, and he did as he was instructed. The health care professionals to whom he made these false statements regarding Crestor's superiority to generic simvastatin included:

- Angela Kulesza, DNP (Tewksbury, MA). Based on these false and misleading representations, NP Kulesza wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Paul Hart (Sterling, MA). Based on these false and misleading representations, Dr. Hart wrote Crestor prescriptions, which caused false claims to be submitted to Government Program, which in turn paid at least one false claim.

- Dr. Raymond Sauls (Lancaster, MA). Dr. Sauls treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), Silver Script Part D, and Tufts Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Sauls wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

### 1. AstraZeneca Repeated False and Misleading "Verbatim" Messages Stating that Crestor was Superior to Generic Statins

265. AstraZeneca encouraged sales personnel in all regions of the country to share their "success stories" in developing questions for doctors that would elicit discussions about unapproved uses of Crestor. These stories were routinely shared with district and regional sales managers, including RSD Ron Iglesias in New England, who then would cascade them to other managers and Sales Specialists, typically by electronic mail or mass distribution voicemails.

266. On September 21, 2009, DSM Hodge distributed an "ideal dialogue with physicians" to each PSS in his district. He prefaced that dialogue with a repeat of his September 14, 2009 admonition about patient safety:

> If physicians are not [prescribing] CRESTOR for all their newly diagnosed hyperlipidemic patients they are not doing the right thing for their patients! In many instances physicians are allowing patients to believe a generic is OK. This is an abdication of their responsibility to help patients see what's really at stake and why it's so important.

The attached "ideal dialogue" was false and misleading because it promoted Crestor as "the best thing for [patients] clinically" and it asked doctors to "prescribe Crestor instead of Lipitor and instead of simvastatin[.]" DSM Hodge directed his sales team to submit their own ideal dialogues by September 25, 2009.

267. Two days later, on September 23, 2009, DSM Hodge disseminated a voicemail message to each PSS in his district trumpeting as a "best practice" the following sales pitch delivered to a doctor by PSS Wright:

> Look, I can give you the four dollar generic, but I can tell you right now that it is not going to protect you from cardiovascular events like Crestor will, and Crestor is the best choice for your patients.

That "verbatim" was false and misleading because there was no basis upon which to promote Crestor as "the best choice" for all patients.

268. That same day, DSM Hodge disseminated a voicemail message to each PSS in his district trumpeting as a "best practice" the following sales pitch delivered by PSS Alan Florence:

> I was paving the whole atherosclerosis story why Crestor is the only one indicated to slow the progression. Not even generic simvastatin or any of those are indicated for it. In their camp they were like, how do you know generics aren't saving their lives, so we went back and forth sighting the *Heart Protection Study* where you have to use 40 mg to see any time of benefit. So are you writing 40 mg for all your patients on generics? Well, no. Then you are just throwing your money away.

269. Also on September 23, 2009, PSS Errek Suhr submitted his proposed dialogue to DSM Hodge by e-mail. The dialogue, which DSM Hodge praised in an e-mail sent to each PSS in his District on September 24, 2009, argued (falsely) that Crestor should be prescribed "instead of Lipitor or Vytorin for all . . . statin patients that need a branded statin" (apparently regardless of the condition to be treated), and it argued (falsely) that generic alternatives should not be prescribed (again, apparently regardless of the condition to be treated).

270. PSS Juli Michele Nichols-Shelp submitted her proposed dialogue to DSM Hodge on September 25, 2009. It took aim squarely at Lipitor and simvastatin, arguing (falsely) that Crestor is clinically superior to both, and drawing misleading contrasts. Perhaps because of that, DSM Hodge praised the dialogue as "[g]reat work."

271. PSS Alan Florence submitted his proposed dialogue to DSM Hodge on September 25, 2009. The script improperly argued that Crestor had superior outcomes data for preventing cardiovascular events such as stroke, heart attack and sudden death. It also warned doctors that "if you look at this analysis, you are setting your patients up to fail by giving them simvastatin." Perhaps because of its improper reliance on outcomes data, and its unsubstantiated broad-brush attack on simvastatin, DSM Hodge praised the script. PSS Florence's script also made clear that AstraZeneca was targeting Medicare recipients.

272. What each of these "verbatims" has in common is DSM Hodge's endorsement of a sales technique that utilized false and misleading comparative statements to induce physicians to prescribe Crestor in lieu of other therapies, and thereby cause the submission of false claims for reimbursement by Government Programs.

273. Regional Sales Director Parker Fretwell similarly used a "blast" voicemail message to encourage each PSS in the Indianapolis West district to adopt the following sales technique, which one PSS had described in a voicemail as follows:

> I had talked to you about the lunch Alicia and I did on Friday with Dr. Hestor, who is a very hard to access doctor, who has been writing Vytorin for years and slowed down a little bit but still a Vytorin writer and a Lipitor writer and Alicia and I went in there both with guns blazing and asked for all newly diagnosed patients and actually all patients over Lipitor, Simvastatin and Vytorin gave him very compelling news. Evidenced everything and asked for his commitment for all patients new to therapy and gave him many reasons to write Crestor and gave him the access message, everything and left him with about six thirty day vouchers for the 30 days free. It was about 3:00 on Tuesday, and I just got a call from that office and they told me that Dr. Hestor has written six Crestor scripts since the lunch and is requesting more of the 30-day one month vouchers.

What is most notable (and disturbing) about this verbatim sales detail, and RSD Fretwell's enthusiastic approval of it, is the explicit promotion of Crestor over Lipitor, Vytorin and simvastatin *regardless of the indication for which they were being prescribed.* Such promotion was blatantly misleading.

274. On September 29, 2009, during a ride-along, DSM Hodge instructed Relator Foote to read a particular script *verbatim* during his sales calls with physicians. The script stated, among other things, that Crestor is the safest statin, and that it "does more inside the vessel to prevent heart attacks and strokes" than any other drug. Such promotion was false and misleading, and so Relator Foote objected that such promotion was improper. DSM Hodge wrongly told him that the statements were supported by the data, and that Relator Foote was "only hurting [himself]" if he did not follow the script. Less than a month after Relator Foote stated his objection, his employment was terminated.

275. Relator Foote was not the only one troubled by AstraZeneca's false and misleading comparative messaging campaign. When DSM Hodge (accompanied by PSS Jeff Scott) criticized Dr. Chad Perkins of Evansville, Indiana for prescribing simvastatin, Dr. Perkins threw DSM Hodge out of his office and threatened to report his misconduct to AstraZeneca's corporate office.

276. This sales tactic – the use of false and misleading verbatim dialogues – succeeded throughout the country in persuading physicians to prescribe Crestor for their patients, including Government Program beneficiaries, thereby causing false claims to be submitted.

277. The Company trained and instructed Relator Foote to make this false superiority promotion concerning generic simvastatin, and he did as he was instructed. Dr. A. O'tayo Lalude of Louisville, Kentucky is one of the health care professionals to whom he made false statements regarding Crestor's superiority to generic simvastatin, and the promotion caused Dr. Lalude to increase his utilization of Crestor substantially. Based on these false and misleading representations, Dr. Lalude wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

### D. THE SATURN TRIAL CONFIRMED THAT ASTRAZENECA'S SUPERIORITY STATEMENTS HAD BEEN MISLEADING

278. AstraZeneca was vitally concerned that Crestor's market position ($5.7 billion in sales in 2010) would be eroded by the introduction of generic – and thus lower cost – Lipitor (atorvastatin) in November 2011. Thus, the Company needed a vehicle (other than the inherently unreliable STELLAR trial) by which to persuade physicians – and payors, including Government Programs – that Crestor was clinically superior to the other statins. That is how the SATURN trial was conceived, and it is why the SATURN trial was timed to precede only shortly the introduction of generic Lipitor.

279. The SATURN trial compared the effect of Crestor 40 mg and Lipitor 80 mg on plaque[10] build-up in the arteries of patients with heart disease.[11] AstraZeneca had hoped it would show statistically significant clinical superiority of Crestor over Lipitor.

280. But the results were disappointing. Although SATURN showed that Crestor 40 mg resulted in a greater reduction in plaque buildup than Lipitor 40 mg, the results were not statistically significant. That Crestor achieved a secondary endpoint – change from baseline as measured by volume – was a hollow victory, as the drug's failure to achieve its primary endpoint threatened Crestor's favorable treatment on formulary lists. According to a Sanford Bernstein investor note by analyst Tim Anderson, the disappointing results meant that "payers could push back even harder against usage of the drug downstream of Lipitor generics." Anderson added that the imaging method used in SATURN was a "reasonable, but imperfect proxy" for heart attack risk.

---

[10] Plaque in atherosclerosis is the raised accumulation of lipids, cellular debris, smooth muscle cells, collagen, and/or calcium in the intima of artery walls.

[11] *See* Stephen J. Nicholls, *et al.*, *Effect of Two Intensive Statin Regimens on Progression of Coronary Disease (SATURN)*, 365 NEW ENG. J. MED. 2078 (2011).

281. Navid Malik, an analyst with Matrix Corporate Capital, told Bloomberg News: "A lot of people were hoping [SATURN] would differentiate [Crestor and Lipitor]. I don't think it will now." But the implications were more far-reaching than that, as Malik explained in an investor note that SATURN's failure to reach statistical significance "calls into question the rationale for use of the 40mg dose altogether[.]" The outcome "potentially muddies the water on the data previously seen in the Jupiter study" which compared Crestor to a placebo and resulted in a label change.

282. SATURN had been the first adequate and well-controlled clinical trial to compare Crestor and Lipitor head-to-head, and its results confirmed that the superiority statements AstraZeneca had been making since 2004 (which were based on inferior studies) had been materially misleading.

## VIII. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS TO PROMOTE CRESTOR TO REGRESS ATHEROSCLEROSIS

283. AstraZeneca knows that the FDCA prohibits the promotion of therapeutic uses that have not been approved by the FDA. Thus, its "Global Policy" on "Providing Information About our Products" states:

> We must promote only licensed products and only for approved uses in accordance with the approved prescribing information. <u>We must not initiate discussions on 'off-label' uses or unlicensed products in order to promote such use</u>. (emphasis added)

Similarly, AstraZeneca's policy on "Marketing to health care professionals" states:

> Off-label promotion (the marketing of medicines for uses or for the treatment of patient groups not specified in the prescribing information) is illegal and not permitted by our policies.

284. Although each PSS receives annual on-line compliance training on these issues, that training routinely is countermanded by supervisors, such as when one District Sales Manager told each PSS in his district to start selling Crestor as a drug that could prevent heart

attacks and strokes, even though such promotion was not approved by the FDA. As such, it was routine, if not brazen, for AstraZeneca DSMs to tell Sales Specialists to ignore compliance training directed at the avoidance of off-label promotion.

285. Thus, Sales Specialists routinely initiated discussions with physicians about unapproved uses of Crestor, and they were encouraged always to "leave something behind." Typically, and with the knowledge and approval of their managers, PSSs would leave behind reprints of studies that touted an unproven, and therefore unapproved, use of Crestor in order to induce prescriptions (and Government Program payments). Sometimes these reprints were provided by the Company, and other times the Sales Specialists were directed to download these materials themselves from the internet.

286. Similarly, AstraZeneca directed its Sales Specialists to schedule lunch meetings with key physician groups during weeks when the Company planned to present positive Crestor results at meetings of organizations such as the American Heart Association (*e.g.,* in connection with presentation of the JUPITER results in November 2008). The purpose of scheduling lunches in this manner was to be sure that high decile physicians were aware of the new results as soon as possible, even though the discussions (which were initiated by the Sales Specialists) necessarily were off-label, and routinely misleading.

287. The objective of these policies and practices was to create a culture in which the Sales Specialists would mislead physicians through aggressive promotion of unproven and unapproved uses of Crestor, which in turn would induce those physicians to prescribe Crestor in lieu of other therapies and cause the submission of false claims to Government Programs.

### A. AstraZeneca Used the ASTEROID Trial to Promote its False and Misleading Message that Crestor Was the Only Statin to Regress Atherosclerosis

288. The "holy grail" among statin makers has been to be the first to prove the ability to regress (*i.e.*, reverse) heart disease. The ASTEROID trial was AstraZeneca's attempt to collect that prize.

289. In its April 5, 2006 issue, the Journal of the American Medical Association published results of the AstraZeneca-sponsored ASTEROID trial, which the Company asserted was evidence that Crestor could reverse the progression of atherosclerosis, then the leading cause of heart attack and stroke and a condition suffered by 4.5 million Americans.[12]

290. Even though ASTEROID lacked a placebo or active comparator, and despite the fact that its only purpose was to serve as a promotional seeding trial (*i.e.*, it was not designed to satisfy FDA requirements for a label change, but only to assist in marketing), AstraZeneca used the ASTEROID trial results to attempt to differentiate Crestor from other statins based on its supposed ability to regress atherosclerosis.

291. AstraZeneca knew that the absence of a control group meant no meaningful conclusions could be drawn from the ASTEROID trial. Even AstraZeneca's own Crestor training materials told Sales Specials that "[t]o draw meaningful conclusions regarding the efficacy and safety of a study drug, the study *must include a control population* . . . ." (emphasis added) This is because a control group allows "the clinical and statistical analysis to uncover whether there are differences among the treatment groups and to determine which differences are real."

---

[12] *See* Steven E. Nissen, *et al.*, *Effect of Very High-Intensity Statin Therapy on Regression of Coronary Atherosclerosis: The ASTEROID Trial*, 295 J. AM. MED. ASS'N 1556 (2006).

292. As soon as the ASTEROID results were announced, however, AstraZeneca's sales and marketing machine hyped ASTEROID as a "major" clinical study, and the Company marketed its regression message to health care professionals throughout the United States. In press releases at the time, the Company maintained ASTEROID proved that Crestor was the "first statin monotherapy to achieve regression of coronary atherosclerosis" and "clearly differentiate rosuvastatin from other treatment options." *See* Press Release, AstraZeneca (via PRNewswire), *First Statin Monotherapy to Achieve Regression of Coronary Atherosclerosis by Angiography in a Major Clinical Study* (March 31, 2006) (on file with counsel).

293. The motivation for such a false message was clear: AstraZeneca knew that the best way to steal market share from more established statins was to deceive physicians into believing that Crestor could achieve results that other statins could not.

294. Despite a lack of FDA approval, or substantial clinical evidence, AstraZeneca used ASTEROID to promote Crestor's supposed ability to regress – or reverse – the progression of atherosclerosis.

295. But ASTEROID had significant limitations that rendered such promotion materially misleading:

- First, ASTEROID did not measure outcomes, and thus it did not establish a decrease in cardiac events.
- Second, to the extent ASTEROID showed regression at all, it showed it only at the 40 mg dose – the use of which the FDA had restricted due to safety concerns. *See* discussion *supra*.
- Third, ASTEROID was not placebo-controlled, and it did not utilize a comparator.

As Dr. James Stein of the University of Wisconsin Medical School explained to the internet journal heart*wire*:

> In 2006, the standard of cardiology research is a prospective randomized, placebo-controlled clinical trial. [ASTEROID] was not controlled by a placebo or by a comparator. So, the magnitude of the benefit that we're seeing is not interpretable. Although we're seeing large reductions in atheroma burden here, we don't know what would have been seen with any of the other drugs on the market or other approaches, such as statins, niacin, or lifestyle changes, in this group of patients.

*See* Michael O'Riordan, *ASTEROID lands with a bang: High-dose rosuvastatin regresses coronary atherosclerosis*, MEDSCAPE, March 13, 2006.

296. Thus, ASTEROID did not provide reliable evidence of Crestor's supposed ability to regress atherosclerosis.

**1. AstraZeneca Made False and Misleading ASTEROID Statements to "Pull Through" Prescriptions for Crestor**

297. Nevertheless, even before ASTEROID had been published, AstraZeneca instructed its Sales Specialists to "create buzz" and off-label discussions about the study – and about regression in particular – by promoting its upcoming publication to health care practitioners on their call lists.

298. And, when ASTEROID finally was published, AstraZeneca provided each PSS with stacks of reprints of the study in blue manila envelopes, and it instructed each PSS to deliver those reprints to, and discuss them with, as many physicians as possible *whether or not* the physician initiated a discussion regarding, or requested information regarding, either ASTEROID or Crestor's supposed ability to regress atherosclerosis.

299. AstraZeneca sales personnel followed their instructions, and initiated Crestor promotions with health care professionals, providing reprints and then affirmatively promoting ASTEROID as evidence that Crestor was the only statin that regresses atherosclerosis. That

promotion was not only false and misleading, it induced prescriptions of Crestor that otherwise would not have been written, and it caused false claims for payment of Crestor to be submitted to, and paid by, Government Programs.

300. The Company trained and instructed Relator Foote to make this deceptive regression contention using reprints of ASTEROID, and he did as he was instructed. Dr. Phillip Feitelson of Louisville, Kentucky is one of the health care professionals to whom he made false statements regarding Crestor's supposed regression of atherosclerosis, using the ASTEROID trial. Based on these false and misleading representations, Dr. Feitelson wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

301. DSMs were aware of this false and misleading promotional activity as it occurred, and they incited it throughout the nation. When AstraZeneca senior management realized that its sales personnel were recording these prohibited encounters and sales tactics in their physician call notes, the Company immediately instructed them (via both e-mail and voicemail) *not* to reference ASTEROID in their recorded call notes, and to *delete* any such references that they had recorded in the past, because the Company *knew* such notes were evidence of wrongdoing. In this way, AstraZeneca sought to cover up its misconduct.

302. AstraZeneca sponsored presentations at which (by the Company's design) its paid speakers initiated conversations about ASTEROID, and Crestor's supposed ability to regress atherosclerosis, with other physicians.

303. For example, on August 1, 2006, AstraZeneca sponsored a presentation by Dr. Paul Thompson, the Connecticut cardiologist, to a group of doctors from Louisville, Kentucky, including Drs. Kemparajurs, Cecil, Bhakta, and Donovan. According to notes of that

presentation that were prepared by AstraZeneca's Megan Wade, the primary topics on the agenda were ASTEROID and Crestor's supposed ability to regress atherosclerosis. That discussion deliberately was prompted by a question that AstraZeneca's own sales personnel had "planted" with a member of the audience in order to initiate a discussion about this unproven and unapproved use in order to mislead those in attendance and thereby induce them to prescribe Crestor to regress atherosclerosis and, ultimately, cause false claims for reimbursement to be submitted to, and paid by, Government Programs. This and similar programs achieved that objective.

304. AstraZeneca used every trick in the book to promote its regression message. The Company employed Bobby S. Arelli, M.D. as a Medical Science Liaison who was assigned to supplement the Sales Specialists' off-label efforts where necessary to overcome physician resistance. When Louisville cardiologist Michael J. Springer, M.D. (Med Center Cardiology) resisted the regression pitch delivered by Relator Foote, the Company arranged for Dr. Springer to have dinner with Arelli at "Z's Oyster Bar" in Louisville so that Arelli could proactively promote the regression pitch to him directly.

305. AstraZeneca regularly sponsored speaker programs and CMEs at which its paid presenters openly touted the role of Crestor in supposedly regressing atherosclerosis. One such program was conducted according to slides prepared by AstraZeneca in March 2009, and made available for physicians who attended. According to the approved speaker slide program AstraZeneca provided to speakers to use throughout the country, AstraZeneca made the false and misleading statement that "[]rosuvastatin is the only statin to show regression of coronary atherosclerosis in a major clinical study [ASTEROID]." In one slide, for example, AstraZeneca not only made misleading statements based on ASTEROID, it also made misleading regression

superiority statements in a deceptive comparison of the ASTEROID trial to several other competitor studies, REVERSAL, ACTIVATE and CAMELOT:




306. AstraZeneca went out of its way to initiate discussions about ASTEROID and Crestor's supposed unique ability to regress atherosclerosis. Each PSS was instructed to (and did) initiate unsolicited and misleading discussions about ASTEROID with *every* doctor he or she called on, and specifically promote Crestor as (i) the only drug that could regress atherosclerosis, and (ii) a drug that could slow the progression of atherosclerosis (even though it was not approved for that use until November 2007).

307. The Company trained and instructed Relator Foote to make this deceptive regression promotion using ASTEROID, and he did as he was instructed. Dr. Connie Anggelis of Louisville, Kentucky is one of the health care professionals to whom he made false statements regarding Crestor's superior regression of atherosclerosis, using the ASTEROID trial. Based on

these false and misleading representations, Dr. Anggelis wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

308. The Company trained and instructed Relator Lorden to make this deceptive regression statement using ASTEROID, and he did as he was instructed. The health care professionals to whom he made these false statements regarding Crestor's superior regression of atherosclerosis, using the ASTEROID trial, included:

- Dr. Elias Nabbout (Tewksbury, MA). Based on these false and misleading representations, Dr. Nabbout wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Christopher Bechara (Lancaster, MA). Dr. Bechara treated beneficiaries participating in the AARP Part D, TRICARE, and Tufts Medicare Complement Government Programs. Based on the aforedescribed false and misleading representations, Dr. Bechara wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Daniel O'Leary (Leominster, MA). Dr. O'Leary treated beneficiaries participating in the AARP Part D Government Program. Based on the aforedescribed false and misleading representations, Dr. O'Leary wrote Crestor prescriptions, which caused false claims to be submitted to this Government Program, which in turn paid at least one false claim.

309. In fact, within a month after ASTEROID was released, DSM Chris Dufault instructed Sales Specialists in New England to promote regression as a selling point for Crestor *because if they did not grow market share they all would lose their jobs.*

310. Further, in March 2006, AstraZeneca deployed a five-week sales "Blitz" for Crestor in which the strategy for the first week was entitled "Gold Standard – Regression of Disease." The purpose of this Blitz was to inundate health care professionals with *unsolicited* information intended to persuade them to prescribe Crestor for the regression of atherosclerosis, even though such use was neither approved nor supported by the science.

311. The Company trained and instructed Relator Foote to employ this deceptive regression Blitz, and he did as he was instructed. Dr. Jack Allen of Louisville, Kentucky is one of the health care professionals to whom he used this sales Blitz campaign to promote Crestor's superior ability to regress atherosclerosis. Based on these false and misleading representations, Dr. Allen wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

312. The roll out of the Blitz was both comprehensive and impressively shameless. Sales personnel in the Louisville district were instructed to provide each physician they called on with candy wrapped in gold foil and to state (falsely) that, in light of ASTEROID, Crestor was now the "Gold Standard" in statin therapy because it had been proven to regress atherosclerosis. They also were instructed to distribute "Riesen" brand candies to physicians and state that "regression is another 'Riesen' to prescribe Crestor over Lipitor and Zocor. These statements were false and misleading, but they were intended to – and did – induce physicians to prescribe Crestor for regression, and thereby cause false claims for payment to be submitted to Government Programs.

313. That each PSS was expected to promote Crestor affirmatively for regression without being prompted by a physician was reinforced by their DSMs, who employed such tactics themselves. For example, on or about September 29, 2009, DSM Hodge accompanied

Relator Foote on a sales call to Dr. Michael Kelly in Vincennes, Indiana. During the meeting with Dr. Kelly, and even though Dr. Kelly had not posed any question on the subject, DSM Hodge initiated a discussion with him about ASTEROID, and he falsely promoted Crestor's ability to regress arterial plaque and improve mortality in Dr. Kelly's patients. He also told Dr. Kelly –falsely – that, if he were to prescribe generic simvastatin instead of Crestor, it "would not do [his] patients any good." DSM Hodge initiated this conversation himself because Relator Foote had objected to the tactic less than an hour before the sales call. This particular sales call is significant because Vincennes, Indiana is an economically depressed area with many senior citizens, and thus it has high percentage of Medicaid and Medicare beneficiaries. Thus, this blatantly illegal sales detail had the direct and immediate impact of increasing the submission of false claims for reimbursement by Government Programs. Based on these false and misleading representations, Dr. Kelly wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

314. In sum, AstraZeneca knowingly, deliberately, and repeatedly promoted ASTEROID – which did not satisfy FDA requirements to be considered "adequate and well-controlled" – as a basis upon which to initiate discussions with health care professionals about Crestor's supposed ability to regress atherosclerosis. The objectives of these tactics were to mislead physicians about Crestor's efficacy, to thereby induce them to prescribe Crestor in lieu of other less-expensive (and likely safer) alternatives, and to cause false claims for reimbursement to be submitted to, and paid by, Government Programs. The objectives were achieved.

### 2. AstraZeneca Targeted Government Programs with Its False and Misleading Message that ASTEROID Showed Crestor was the Only Statin to Regress Atherosclerosis

315. AstraZeneca repeated its false and misleading regression message to Medicare Part D Sponsors and State Medicaid Programs nationwide.

316. For example, on September 15, 2006, AstraZeneca sent RSM Kris Norenberg to appear before the Alaska State Medicaid Program P&T Committee and urge that Crestor remain on the Program's PDL. His presentation emphasized AstraZeneca's false message that, based on ASTEROID, Crestor is the only statin that regresses atherosclerosis:

> We have a number of trials in a number of high-risk populations where we compare ourselves to other statins. Our LDL lowering is superior to the other statins. The second phase is testing the hypothesis that the best changes in LDL and HDL will translate into the best changes in atherosclerosis based on imaging. The ASTEROID trial was a study looking at regression of atherosclerosis. We have demonstrated significant reductions across all of our end points and we are the only statin monotherapy to do that. Atorvastatin and pravastatin have shown reductions in one of their end points, but we have shown regression in all three.

Norenberg's statements concerning ASTEROID were false and misleading, and they were intended and did induce the Alaska State Medicaid Program P&T Committee to believe that Crestor was "the only statin" able to regress atherosclerosis. Based at least in part on Norenberg's false and misleading statements to the Committee, Crestor was voted to be included on the PDL.

317. Key to the success of its false and misleading ASTEROID regression message was AstraZeneca's direct marketing of that message to Medicare Part D and State Medicaid Program P&T committee members (*i.e.,* not simply through formal presentations to the Committees themselves).

318. Shortly after the ASTEROID results were published, Relator Foote was instructed by his DSM to initiate a discussion regarding ASTEROID and Crestor's supposed ability to

regress atherosclerosis with Drs. Stephen Houghland and Phillip Bressoud. Both these physicians work for the University of Louisville Hospital and see a high number of Medicaid and Medicare patients through their practice. At the time, Dr. Houghland sat on the P&T Committee for the Passport Health Plan, which is a Medicaid managed health plan, and he also saw patients at the Louisville Veteran's Administration Medical Center. The purpose of the discussion was to persuade Drs. Houghland and Bressoud not simply to prescribe Crestor for regression of atherosclerosis in their private practices (including for Government Program beneficiaries and patients at the Louisville VA Medical Center), which they did, but also to induce them to encourage favorable consideration of Crestor to regress atherosclerosis in patients subscribing to the Passport Health Plan. Indeed, AstraZeneca required its sales personnel to promote Crestor for inclusion on health plan formularies wherever possible.

319. As a result of such promotion, Drs. Houghland and Bressoud each wrote at least one prescription for Crestor that was paid for by a Government Program upon the submission of a false claim.

### B. AstraZeneca Made False and Misleading Statements About its METEOR Trial to Promote Crestor as the Only Statin to "Halt" or "Stop" the Progression of Atherosclerosis

320. AstraZeneca also used its METEOR study to promote Crestor misleadingly as the only statin proven to "halt" or "stop" atherosclerosis.[13]

321. METEOR was a larger version of ASTEROID, and it studied the impact of a 40 mg dose of Crestor in patients at varying levels of risk for cardiovascular disease. Although both METEOR and ASTEROID studied the limited-use 40 mg dose, METEOR was the more reliable trial because it was randomized, double-blind, and placebo-controlled.

---

[13] *See* John R. Crouse, *et al.*, *Effect of Rosuvastatin on Progression of Carotid Intima-Media Thickness in Low-Risk Individuals with Subclinical Atherosclerosis: The METEOR Trial*, 297 J. Am. Med. Ass'n 1344 (2007).

322. METEOR's objective was to assess whether statin therapy could slow progression and/or cause regression of atherosclerosis. While METEOR did *not* show that Crestor regresses atherosclerosis (as the comparatively unreliable ASTEROID allegedly had), it did support the notion that Crestor slows the progression of atherosclerosis. But, this was not the message AstraZeneca had intended because Crestor's competitors had long had the same indication.

323. Eager nonetheless to use METEOR against its competition, immediately upon its publication (*i.e.,* without waiting for FDA approval), and as it had done with ASTEROID, AstraZeneca directed each PSS in March 2007 to initiate *unsolicited* discussions about METEOR with *every* physician he or she called on in order to promote Crestor as a drug uniquely capable of *halting* or *stopping* the progression of atherosclerosis.

324. And although METEOR had *failed* to substantiate the Company's regression promotion, and instead concluded that Crestor "did not induce disease regression," AstraZeneca nevertheless promoted METEOR as *supporting* the regression hypothesis through a word-smithed promotion and instead asserted it "halted" or "stopped" the progression of atherosclerosis.

325. After the FDA had rejected the regression indication and given Crestor only limited approval for "slowing the progression of atherosclerosis," AstraZeneca promoted that Crestor "slowed" or "halted" the progression of atherosclerosis. For example, the slide deck that the Company's paid physician speakers were required to (and did) use throughout the United States emphasized that Crestor was the "[f]irst statin" with clinical evidence "to show [it] *halts* the progression of atherosclerosis in low risk patients . . . " (emphasis added).

326. And AstraZeneca touted METEOR as showing that for patients with more risk factors and greater baseline carotid intima-media thickness, "the CRESTOR-treated group

exhibited a **greater trend toward regression[.]”** *See* Press Release, AstraZeneca (via PRNewswire), *New Analysis of the Meteor Study Demonstrate the Positive Effects of CRESTOR(TM) on Atherosclerosis in Patients with two or More Risk Factors* (Nov. 7, 2007) (on file with counsel) (emphasis added).

**1. Sales Specialists Were Instructed to Deliver the Misleading Message that Crestor “Halts” or “Stops” the Progression of Atherosclerosis**

327. Each Sales Specialist was instructed to disseminate reprints of the METEOR trial in a blue manila envelope to as many doctors as possible during the initial one-month period after METEOR was published *whether or not the doctor initiated a discussion regarding METEOR or Crestor’s ability to slow progression of atherosclerosis*. This tactic was particularly misleading because three of Crestor’s competitors – Pravachol, Mevacor and Lescol – had already received FDA approvals for slowing the progression of atherosclerosis long before Crestor entered the marketplace. Each PSS then was required to follow up with physicians to tout METEOR as supporting the false and misleading message.

328. Further, AstraZeneca trained its sales personnel to follow distribution of the METEOR reprints with questions intended to elicit discussions with physicians about how Crestor (unlike Lipitor and Zocor) would “halt” or “slow” the progression of atherosclerosis. In this context, AstraZeneca encouraged sales personnel to (misleadingly) tell physicians that they should prescribe Crestor instead of Lipitor and Zocor because only Crestor would actually help their patients.

329. For example, DSM Chris Dufault encouraged Relator Lorden to promote METEOR *sua sponte*, and before Crestor’s label had been amended, as evidence that Crestor *halts* the progression of atherosclerosis. Relator Lorden followed this instruction in his details to Dr. Malathi Bhat, a family practitioner in Lowell, Massachusetts whose patients generally are



133569.00601/36435098v.3

Medicare and Medicaid beneficiaries, and this succeeded in persuading her to prescribe Crestor, instead of Lipitor, for many of these patients. As a result, Dr. Bhat wrote Crestor prescriptions, which caused at least one false claim to be submitted to (and paid for by) a Government Program.

330. In sum, AstraZeneca knowingly, deliberately and repeatedly used the METEOR trial as a basis upon which to initiate materially misleading discussions with health care professionals in order to induce them to prescribe Crestor. This occurred nationwide.

331. The Company trained and instructed Relator Foote to make this deceptive assertion, based on METEOR, that Crestor "halts" the progression of atherosclerosis, and he did as he was instructed. Dr. James Bosler of Louisville, Kentucky is one of the health care professionals to whom he made these false statements regarding Crestor's allegedly superior ability to halt the progression of atherosclerosis. Based on these false and misleading representations, Dr. Bosler wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

332. The Company trained and instructed Relator Lorden to make this deceptive statement based on METEOR that Crestor "halts" the progression of atherosclerosis, and he did as he was instructed. The health care professionals to whom he made these false statements included:

- Dr. Hiep Nguyen (Lowell, MA). Dr. Nguyen treated beneficiaries participating in the AARP Part D, MassHealth, and Network Health Medicaid (MA) Government Programs. Based on the aforedescribed false and misleading representations, Dr. Nguyen wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

- Dr. Hung Lo (Lowell, MA). Based on these false and misleading representations, Dr. Lo wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Carol Savage (Harvard, MA). Dr. Savage treated beneficiaries participating in the Health Net Part D, Humana Part D, and Tufts Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Savage wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.

### 2. AstraZeneca Targeted Government Programs with its False and Misleading Message Based on the METEOR Trial

333. AstraZeneca specifically focused its false and misleading promotional message for METEOR on Medicare Part D Plans and State Medicaid Programs.

334. For example, on February 20, 2008, AstraZeneca directed Jamie Hurst, an AstraZeneca RSM, to appear before the Washington State Medicaid Program P&T Committee. Dr. Hurst's presentation to the P&T Committee emphasized AstraZeneca's false message concerning METEOR:

> My name is Jamie Hurst. I'm the regional scientific manager with AstraZeneca. It was mentioned this morning Rosuvastatin or Crestor received an indication to slow the progression of arthrosclerosis. **And this indication is unique among the class of statins because it is not restricted to either a particular vascular bed or to the disease state.** The indication was based primarily off of the Meteor trial, which is a double blind, randomized, placebo control trial investigating the effects of 40 mg of Rosuvastatin on the progression of carotid arthrosclerosis. Based on the primary endpoint, Rosuvastatin slowed the progression of arthrosclerosis relative to the placebo group.

(emphasis added).

335. This message was false and misleading in several respects. First, Hurst neglected to advise the P&T Committee that the 40 mg dose METEOR relied upon had been restricted by

the FDA. *See* discussion *supra*. Second, Hurst did not disclose that METEOR had failed to reach its regression endpoint, and again made false superiority statements. Third, Hurst did not disclose that, although there were no serious cardiovascular events in the METEOR placebo group, patients in the treatment (Crestor) group suffered eight serious cardiovascular events, including heart attack and angina. Instead, in addition to making false superiority statements, Hurst misled the Committee into believing that METEOR proved that Crestor was "unique" and that "tolerability of Rosuvastatin was very good over the course of the trial" with the 40 mg dose having a similar safety profile to the placebo. Based at least in part on this false and misleading testimony by AstraZeneca's own designee, the Committee voted to add Crestor to the Washington formulary, and it recommended that Crestor be considered preferred on the PDL.

## IX. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS PROMOTING CRESTOR TO PREVENT HEART ATTACKS AND STROKES

336. In the context of pharmaceutical research, "outcomes" data describe the result, or consequence, of utilizing a particular medical therapy. It is a way to measure the value of a particular therapy based not on abstractions, but on tangible health results for patients. Outcomes data play an increasingly important role in informed decision-making by physicians, patients, and payors such as Government Programs.

337. As early as 2004, there were outcomes data that demonstrated Crestor's chief competitors – Zocor and Lipitor – worked to reduce heart disease. But there were no hard outcomes data that demonstrated Crestor's efficacy. This put Crestor at a competitive disadvantage, and it led AstraZeneca to "spin" its clinical trials as somehow suggesting superiority over competing statins.

338. It was not uncommon for health care professionals to object to prescribing Crestor due to its lack of morbidity and mortality outcomes data. Accordingly, AstraZeneca instructed

its Sales Specialists to tell health care professionals *falsely* that STELLAR was an outcomes trial (it was not, it merely examined lipid profiles and inflammatory markers), and to also tell them that forthcoming GALAXY Program trials (*e.g.*, CORONA and JUPITER) would provide *additional* supportive outcomes data.

339. When AstraZeneca did finally obtain some outcomes data for Crestor following the negative AURORA trial in 2007, the negative CORONA trial in 2007, and the JUPITER trial in 2008, it manipulated that data into false and misleading promotional primary care messages that induced prescriptions and false claims.

### A. AstraZeneca Made False and Misleading Statements That the Negative CORONA Trial Showed Crestor Reduces Heart Attacks and Death

340. AstraZeneca had intended its CORONA trial to prove once and for all that it had positive outcomes data for Crestor.[14]

341. CORONA was a prospective trial of Crestor in the treatment of heart failure. The mean patient age was 73, and the study was limited to older patients with moderate to severe systolic heart failure of ischemic origin who had already received extensive treatment with drugs for cardiovascular disease.

342. CORONA's objective was to determine whether Crestor 10 mg (*i.e.*, a "real world" dose, in contrast to the FDA-restricted 40 mg dose used in other trials) would have a significant effect on cardiovascular outcomes, as measured by the primary endpoint composite of cardiovascular (CV) death, non-fatal heart attacks (MIs), and non-fatal strokes.

343. To AstraZeneca's dismay, although patients in the CORONA treatment group did experience expected reductions in LDL cholesterol and C-reactive protein (CRP) and a

[14] *See* John Kjekshus, *et al.*, *Rosuvastatin in Older Patients with Systolic Heart Failure (CORONA)*, 358 New. Eng. J. Med. 1301 (2007).

significant reduction in the number of hospitalizations due to cardiovascular causes and heart failure, the 10 mg Crestor regimen had *no significant effect* on the composite endpoint. In other words, patients in the treatment group did not have better health outcomes than patients in the placebo group.

344. CORONA not only failed to reach its primary endpoint, it also failed to demonstrate a difference between Crestor and placebo with respect to three of four pre-specified secondary endpoints, including death from any cardiovascular cause, all-cause death, and any coronary event.

345. Undeterred by the fact that CORONA did not have positive outcomes data, the Company trained and instructed the Sales Specialists instead to make the very opposite promotion. The Company trained and instructed Relator Lorden to make this deceptive statement – that CORONA had generated positive outcomes data (based solely on a reduction in the number of certain hospitalizations), and he did as he was instructed. The health care professionals to whom he made these false statements included:

- Dr. Francis Marino (Methuen, MA). Based on these false and misleading representations, Dr. Marino wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. James Waters (Chelmsford, MA). Based on these false and misleading representations, Dr. Waters wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Robert Babineau (Fitchburg, MA). Dr. Babineau treated beneficiaries participating in the MassHealth, Network Health Medicaid (MA), and Tufts Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr.

Babineau wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

### 1. AstraZeneca Targeted Government Programs with False and Misleading Outcomes Statements Based on its Negative CORONA Trial

346. On January 17, 2008, AstraZeneca RSM Mandy Hosford testified to the Idaho State Medicaid Program P&T Committee concerning the results of AstraZeneca's failed CORONA trial. She did not advise the Committee that CORONA had failed to demonstrate efficacy in reducing mortality, telling the Committee instead:

> At AstraZeneca, we recently wrapped up [the CORONA] study in patients with symptomatic heart failure of ischemic etiology and recognized that we also significantly reduce their entrance to the hospital for cardiovascular or heart failure causes . . . .

This was materially misleading because AstraZeneca *knew* that the CORONA results were more significant (adversely so) than that, but withheld that information from the Committee and instead promoted a deceptively positive message.

347. Likewise, Hosford made false statements to the P&T Committee concerning Crestor's superiority compared to all other statins. She used the Company's core selling message to misrepresent to the Committee that using Crestor could "redefine success" in preventing cardiovascular disease:

> So we are now the only marketed statin that can basically redefine success to both the physician and the patient in preventing cardiovascular disease by saying that we're not only treating your numbers, but we're treating that build-up of plaque in the vasculature that is a very, very significant risk factor for cardiovascular events.

Beyond just touting CORONA, Hosford told the P&T Committee about positive results in its ethnic minority studies discussed *supra* (*i.e.*, ARIES, STARSHIP, and IRIS), but she did not disclose that those studies were open label and had no placebo comparators. Instead, she misleadingly stated: "We have outcomes data on the way in populations that obviously have not

yet been studied in the statin bibliography of research." Based in part on Hosford's misleading statements concerning CORONA, the Committee voted not to change Crestor from its preferred status on the PDL.

348. On June 26, 2008, RSM Hosford made similar false statements concerning Crestor's supposed ability to reduce mortality to the Nevada State Medicaid Program P&T Committee. The Committee minutes of Hosford's presentation reveal she asserted that AstraZeneca's failed CORONA trial nonetheless provided evidence that (like Lipitor) Crestor could reduce heart failure hospitalizations. Despite admitting that CORONA had failed to reach its primary endpoint of proving efficacy in reducing mortality, Hosford went on to spin the negative results as nonetheless supporting evidence of Crestor's ability to reduce heart failure hospitalizations. Of course, fewer hospitalizations is a subjective measure at the discretion of a physician and hardly rigorous enough to conclude Crestor reduces cardiovascular events. Based in part on Hosford's misleading statements concerning CORONA, the Committee voted not to change Crestor from its preferred status on the PDL.

### B. AstraZeneca Made False and Misleading Statements About its JUPITER Study

349. Eager to move past the negative CORONA trial, AstraZeneca moved quickly to begin touting its JUPITER trial instead.[15]

350. The results of the JUPITER clinical trial were first published on-line on November 9, 2008, apparently opening the door to the use of statins in persons without elevated levels of LDL-C, but with elevated levels of high-sensitivity CRP (hs-CRP).

---

[15] *See* Paul M. Ridker, *et al.*, *Rosuvastatin to Prevent Vascular Events in Men and Women with Elevated C-Reactive Protein*. 359 New. Eng. J. Med. 2195 (2008).

351. The study, presented at the American Heart Association convention in New Orleans, purportedly found that the risk of heart attack was more than cut in half for "apparently healthy" people who took statins. The principal JUPITER investigator, Dr. Paul M. Ridker (Brigham and Women's Hospital, Boston), told attendees that expanding statin use could prevent about 250,000 heart attacks, strokes, vascular procedures or cardiac deaths over five years.

**1. The JUPITER Trial and Results Were Flawed and Unreliable**

**(a) JUPITER Stacked the Deck with Sick People, But Passed Them Off as "Healthy."**

352. Previous studies of statins had found that people at high risk for a heart attack or stroke would benefit from using a statin, but healthy people would not. *See*, *e.g.*, John D. Abramson *et al.*, *Are lipid-lowering guidelines evidence-based*? 369 LANCET 168 (2007).

353. AstraZeneca sponsored the JUPITER trial in an effort to show physicians that Crestor would prevent heart attacks and strokes in all their patients – *i.e.,* not simply those shown to be at high risk, as well as in patients who were shown to have high levels of C-Reactive Protein ("CRP").

354. JUPITER was a placebo-controlled study among men over 50 and women over 60, and AstraZeneca repeatedly told the scientific and medical communities that it studied only "apparently healthy men and women" – an implicit suggestion that the benefits it demonstrated could be applied to an extremely broad array of presumably healthy patients.

355. But this was not true. The JUPITER patients selected to participate in the trial *already* were at a higher than normal risk for cardiovascular disease due to their high levels of CRP. And although AstraZeneca asserted the study participants had healthy LDL-C levels, the LDL-C cutoff for JUPITER participation was 130 mg/dL, which many experts would consider to be higher than optimal levels. Moreover, the baseline median body mass index of the study

population was 28.3 (compared to a normal measure of 18.5-24.9), indicating that most of the patients studied in JUPITER were overweight or obese – another marker for cardiovascular disease risk. Moreover, at the *outset* of the study period, 41 percent of those studied were reported to suffer from "metabolic syndrome" – a combination of medical disorders that, taken together, is a marker for increased risk of cardiovascular disease.

356. In other words, right of the gate, JUPITER would have limited utility in guiding the care of patients who were not at risk for cardiovascular disease, but AstraZeneca intentionally obscured and misrepresented those facts in its promotional dialogues in order to encourage the much broader use of Crestor.

**(b) JUPITER Used Deceptive Relative Benefits to Measure Outcomes**

357. The JUPITER results measured relative risk reduction, as opposed to absolute risk reduction, and this misled physicians and patients.

358. JUPITER did this by only measuring relative risk reduction – *i.e.,* dividing the number of designated events (heart attacks, strokes, and deaths from cardiovascular disease) for the Crestor group by the events for the placebo group: 83 vs. 157. This investigators reported this as meaning that the Crestor group had roughly half (53 percent) the chance of experiencing an event as did the placebo group. On its face, the number was impressive, deceptively so.

359. Trumpeting Crestor's "relative benefit" as shown by JUPITER was misleading because the JUPITER data actually showed that the "absolute benefit" or real-life benefit a person could expect from Crestor treatment was quite different. JUPITER followed nearly 18,000 people in treatment for almost two years. In absolute numbers 83 of 8,901 (0.9 percent) patients in the Crestor group experienced a serious event, while 157 of 8,901 (1.8 percent) of patients in the placebo group experienced a serious event. Thus, JUPITER showed an absolute

event reduction of less than 1 percent – a tiny fraction of AstraZeneca's 53 percent relative benefit contention. In other words, 120 patients had to be treated with Crestor for 1.9 years to prevent one heart attack, stroke, and death from cardiovascular disease – hardly as impressive as the relative benefit assertion AstraZeneca made concerning JUPITER.

#### (c) The JUPITER Reports of Reduced Mortality Were False and Misleading

360. The JUPITER investigators reported cardiovascular-related deaths as 0.45 percent among those in the Crestor group, versus 0.85 percent among patients in the placebo group. AstraZeneca hyped this as proving that Crestor could cut heart disease deaths in half. But what AstraZeneca did not report is that deaths from other causes were *27 percent higher* in the Crestor group, resulting in only a marginal statistical difference in overall death rates. Perhaps more unsettling, JUPITER failed to report the causes for any of the 186 non-cardiac-related deaths.

361. Moreover, the JUPITER trial reported benefits prematurely, and it contradicted numerous other rosuvastatin trials (*e.g.,* CORONA) conducted to evaluate Crestor for primary-prevention or for high-risk patients taking the statin for considerably more years. Those other studies had failed to find a notable benefit in taking Crestor to reduce cardiovascular events, deaths or all-cause mortality. For example, in the three-year CORONA trial on heart failure patients, Crestor was found to reduce LDL-cholesterol and CRP levels, but the investigators failed to find that Crestor had a benefit in reducing cardiovascular deaths, heart attacks or strokes. *See* discussion *supra* ¶¶ 340-344. The JUPITER investigators did not reconcile the quite different CORONA results.

362. Regarding the cardiovascular events reported by JUPITER, these too were misleadingly presented. The researchers included hospitalizations and procedures, which are

subjective measures determined at the discretion of a physician, and thus they complicate any effort to interpret the results as supporting reductions in cardiovascular events. A more objective measure, in contrast, would have been to use the total numbers of fatal heart attacks and strokes in each group, but the unreported JUPITER data showed there was *no difference* in this measure between the study arms (*i.e.,* there was a total of only 12 deaths in each arm of the trial). Likewise, the incidence of clinically-diagnosed non-fatal heart attacks and strokes after 1.9 years also were exceedingly low – 0.7 percent of participants in the Crestor arm, compared with 1.4 percent in the control arm. Thus, JUPITER's numbers were too underpowered to extrapolate them to a credible reduction in mortality, nor would they support AstraZeneca's rosy contentions about Crestor generally.

363. Even taking into account *all* the reported cardiovascular events, procedures and hospitalizations experienced by the study participants, JUPITER showed that you would have to treat 120 people for 1.9 years in order to prevent a single event. *See* Mark A. Hlatky, M.D. (Stanford University School of Medicine), Editorial, *Expanding the Orbit of Primary Prevention – Moving beyond JUPITER*, 359 NEW. ENG. J. MED. 2280 (2008). According to Dr. Hlatky, "absolute differences in risk are more clinically important than relative reductions in risk in deciding whether to recommend drug therapy, since the absolute benefits of treatment must be large enough to justify the associated risks and costs."

**(d) Concerns of Bias Stemming From a Patent Held by JUPITER's Principal Investigator**

364. There is well-documented potential for bias in a trial sponsored by the same drug company that hopes to use the trial results as a basis upon which to expand the use of its drug. *See, e.g.*, Kirby Lee, *et al.*, *Publication of Clinical Trials Supporting Successful New Drug Applications: A Literature Analysis*, 5 PLOS MED. e191 (2008).

365. In this context, JUPITER was hopelessly infected with the potential for bias. At least 11 of the 15 JUPITER investigators reported to have close financial ties to AstraZeneca. AstraZeneca was clearly closely involved with JUPITER. Indeed, the lead investigator – Paul Ridker – made a point of thanking the Company for its generosity: "With thanks to the clinical development teams worldwide at AstraZeneca for their considerable efforts in data collection, site monitoring, and overall study coordination."

366. Perhaps more significantly, though, there were serious questions whether Ridker himself was inherently biased because he and his institution owned the patent on the CRP test used in JUPITER – meaning that they stood to receive handsome licensing fees from its use in the JUPITER trial itself, and by physicians if their recommendations were to become the standard of care.

**(e) Concerns Over Early Termination of the JUPITER Trial**

367. There were serious concerns over the early termination of the JUPITER trial.

368. In March 2008, AstraZeneca announced that it was halting JUPITER two years ahead of schedule because it assertedly showed that Crestor prevents heart attacks and strokes.

369. AstraZeneca touted this as great news, but a review in the Journal of the American Medical Association has warned:

> [Randomized Controlled Trials] stopped early for benefit are becoming more common, often fail to adequately report relevant information about the decision to stop early, and show implausibly large treatment effects, particularly when the number of events is small. These findings suggest clinicians should view the results of such trials with skepticism.

Victor M. Montori, *et al.*, *Randomized Trials Stopped Early for Benefit: A Systematic Review*, 294 J. AM. MED. ASS'N 2203 (2005).

370. Stopping a major clinical trial halfway through is significant, as it invalidates any credible statistical analysis of the benefits and effectiveness of a treatment, and makes safety and longer-term risks impossible to evaluate.

371. A recent study of cancer trials led by Dr. Giovanni Tafuri, M.D., with the Italian Medicines Agency in Rome, reported that the number of clinical trials being stopped early, just as they start to show a benefit, has increased dramatically over recent years. "This suggests a commercial component in stopping trials prematurely," according to co-author, Giovanni Apolone, M.D., head of the Laboratory of Translational and Outcome Research at the Mario Negri Institute for Pharmacological Research in Milan. Ending studies early risks overestimating the treatment's effects, and too many are being stopped early without strong evidence of superior benefits, these authors concluded. It leaves insufficient data to make a credible statistical analysis of a drug's effectiveness. "If a trial is evaluating the long-term efficacy of a treatment," Drs. Tafuri and Apolone wrote, "short-term benefits, no matter how significant statistically, may not justify early stopping. Data on disease recurrence and progression, drug resistance, metastasis, or adverse events, all factors that weight heavily in the benefit/risk balance, could easily be missed."

### (f) JUPITER Misrepresented Adverse Events, In Particular the Risk of Increased Diabetes Associated with Taking Crestor

372. The JUPITER authors wrote that the "reported serious adverse events were similar in the rosuvastatin and placebo groups." That was misleading. Even discounting the fact that one in four study participants had already stopped taking their study pills for some reason, it is difficult to understand how an inert placebo could cause nearly the same side effects and at the same rate as an active chemical (in this case, Crestor). Perhaps more importantly, though, data at the time JUPITER was halted prematurely suggest that problems might have been developing

among those in the Crestor arm. For example, those in the Crestor arm were reporting slightly more muscular weakness and pain, kidney and liver disorders, and *elevated* lab values (*e.g.*, creatinine, alanine aminotransferase, and hematuria that are indications of possible kidney and liver damage). Although these differences were not yet statistically significant, the decision to halt the trial prematurely masked what was occurring within the study population.

373. And, JUPITER did report one statistically significant adverse effect within the Crestor arm: a 25 percent higher number of newly diagnosed cases of diabetes in patients taking Crestor (270 cases versus 216 cases, 3.0 percent versus 2.4 percent of participants, respectively). That is, the higher number of study participants who developed diabetes may cancel out the fewer number who had a nonfatal cardiovascular event. There were also small, but significant elevated levels of glycated hemoglobin in the Crestor group, although the authors downplayed the diabetes risk, stating that "the incidence of newly diagnosed diabetes and worsening glycemic control have been reported in previous trials of pravastatin, simvastatin, and atorvastatin," too.

**2. AstraZeneca Jumped the Gun in Promoting JUPITER to Physicians for Primary Prevention Based on False and Misleading Statements**

374. Notwithstanding JUPITER's numerous and profound limitations, AstraZeneca used the study to embark on an aggressive scheme to endorse Crestor misleadingly as able to prevent heart attacks and strokes in all patients – *i.e.*, primary prevention. This was fundamentally misleading. *See, e.g.*, Michel de Lorgeril *et al.*, *Cholesterol Lowering, Cardiovascular Diseases, and the Rosuvastatin-JUPITER Controversy*, 170 ARCH. INTERN. MED. 1032 (2010) (concluding that the JUPITER results did not support the use of statin treatment for primary prevention of cardiovascular disease).

375. Worse yet, months *before* the JUPITER results had been publicly announced in November 2008, and without waiting for FDA approval or a compendium endorsement, AstraZeneca coached its Sales Specialists to begin promoting JUPITER to health care professionals and decision makers on Government Program formulary boards as being able to prevent heart attacks and strokes generally (*i.e.,* not just in high-risk patients), and as demonstrating the value of using CRP as a diagnostic tool that would justify prescribing Crestor to patients who did not otherwise present as high-risk.

376. AstraZeneca had already drilled its Sales Specialists to promote Crestor for this broad array of patients, and they did so *despite* JUPITER's flaws – *e.g.,* knowledge that the JUPITER study population was not "apparently healthy," and knowledge that in absolute (not relative) terms, there was no significant difference in the overall rate of serious diseases between JUPITER's Crestor and placebo groups.

377. This occurred in all parts of the country, it was fundamentally false and misleading, and it induced physicians to prescribe Crestor for Government Program beneficiaries, thereby causing the submission of false claims for reimbursement by Government Programs.

378. In the Northeast, for example, AstraZeneca taught each PSS to pose leading questions to health care professionals (*e.g.,* "How are you using CRP in your practice?") that invariably would invite discussions of the JUPITER study and reliance on CRP levels as a basis upon which to prescribe Crestor to an otherwise borderline patient. DSM Chris Czech dictated his team to share these "CRP success stories" on district sales calls.

**3. When the JUPITER Trial Results Were Announced, AstraZeneca Shifted Its False and Misleading Promotion into High Gear**

379. When the JUPITER results were publicly presented for the first time on November 9, 2008 at the American Heart Association's ("AHA") Annual Scientific Sessions, AstraZeneca formally shifted its Crestor Sales Specialists into high gear. The following Monday, AstraZeneca conducted region-wide telephone conferences among the Sales Specialists and managers in each of its three national regions. The calls were conducted by area sales directors, and they lasted approximately two hours each.

380. During those conference calls, Sales Specialists around the country were told that they soon would receive sealed envelopes containing the JUPITER study results. The first set of envelopes they received would be purple, and they were instructed to deliver those envelopes to high statin writing physicians (so-called "high decile" prescribers), *whether or not the physicians made any inquiry about JUPITER*. The second set of envelopes they received would be gold, and Sales Specialists were instructed to deliver those envelopes to physicians who had questions about JUPITER, or who Sales Specialists thought might be interested. And, Sales Specialists were directed to meet with their "key targets" (*i.e.*, high decile prescribers) immediately after the AHA presentation in order to take advantage of the new JUPITER data.

381. When Sales Specialists received the two sets of envelopes containing the JUPITER study, as they had been ordered to do, they did deliver them to physicians in accordance with the directives they had been given (*i.e.*, focusing first on those physicians who wrote the highest number of statin prescriptions), *regardless of whether the physician had made any pertinent inquiry*.

382. Frequently, and as AstraZeneca had envisioned, the physicians opened the envelopes in the presence of Sales Specialists and extensive promotional discussions about the

JUPITER study ensued – even though the JUPITER results were not so glowing as advertised and it was not then the basis of any FDA approval or compendium endorsement.

383. AstraZeneca coached its Sales Specialists to follow up dissemination of the JUPITER study envelopes by initiating false and misleading details regarding the JUPITER study during their next visits with those physicians. These follow up discussions were called "Next Call Objectives" or "NCOs", and in this case Sales Specialists were directed to include among their NCOs leading questions about how health care professionals used CRP levels in their practices – plainly initiating false and misleading promotional discussions about JUPITER.

384. Ironically, it was Relator Lorden's decision to truthfully record this practice in the call notes he recorded in November 2008 in AstraZeneca's electronic database (monitored by his supervisors) that AstraZeneca later used as a pretext *more than a year later* to terminate his employment involuntarily.

385. But, this pretextual firing was not an honest effort to cull out those who the Company had concluded were engaged in fraudulent conduct. Rather, it was part of AstraZeneca's efforts to conceal its flagrant fraudulent activity. Indeed, in an effort to prevent Sales Specialists from leaving behind a record of their off-label promotional activities, AstraZeneca had already modified its electronic call activity database in June 2009 to prevent any narrative text entry, permitting Sales Specialists to select only pre-approved phrases to describe their call details, with the express intention that these phrases not be fully comprehensive of their activities.

386. AstraZeneca's illegal and misleading promotion of JUPITER as a basis upon which physicians should prescribe Crestor for unproven uses continued undiminished well into

2010 and after. Here is a slide from its 2009 speaker slide deck AstraZeneca's paid physicians to summarize nationwide using the deceptive JUPITER primary prevention message:




387. JUPITER became the clinical evidence AstraZeneca had long sought to distinguish Crestor from the other statins. Supplied with stacks of JUPITER reprints, Sales Specialists were deployed throughout the United States to deliver the false and misleading JUPITER primary care outcomes message. For example:

(i) In early 2009, PSS Kelly Epley, with the approval of DSM Jack Hodge, set up a speaker presentation by Dr. Mohit Sheth (a cardiologist from Henderson, Kentucky) at Pea-Fections Restaurant in Vincennes, Indiana. The presentation was a reward for Dr. Sheth's Crestor prescribing (he wrote some 214 Crestor Medicare prescriptions in 2012 alone) and it was intended to promote unapproved and unproven uses of Crestor



133569.00601/36435098v.3

based on JUPITER, and thereby to persuade the physicians, nurse practitioners and pharmacists in attendance to stop switching patients from Crestor to generic drugs. Ms. Epley directed Dr. Sheth to use his own unapproved slides discussing JUPITER, and she affirmatively posed questions during the presentation that were intended to expand upon the discussion of unapproved and unproven uses. Attendees included Dr. Grace Fowler (a D.O. from Vincennes, Indiana who has a large Medicare/Medicaid practice) and nurse practitioners Jennifer Belcher (who worked with Dr. David Nibel) and Andrea Stephens (who worked in the Rohrer Family Clinic). Because the program was not a CME (it was all promotional), Dr. Sheth's presentation was illegal. However, when questioned about the program's legality by Relator Foote, Ms. Epley told him that there would be no issue. As intended, Dr. Fowler's Crestor prescriptions increased dramatically after this event. Based on these false and misleading representations, Dr. Fowler wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

(ii) On July 15, 2009, DSM Jack Hodge sent an e-mail to each Sales Specialist in his region extolling the virtues of JUPITER, appending a report on JUPITER and talking points that stated, among other things: "Significance of the JUPITER study to physicians? Changing how they use statins vs. what statins they use. . . ." This plainly was a reference to using JUPITER to encourage physicians to prescribe Crestor to lower CRP and reduce the incidence of heart attacks and strokes – an unapproved and unproven use.

388. The Company trained and instructed Relator Foote to make these deceptive morbidity and mortality promotions using JUPITER, and he did as he was instructed. The health care professionals to whom he made these statements included:

- Dr. Connie Anggelis (Louisville, KY). Based on these false and misleading representations, Dr. Anggelis wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Larry Fineman (Louisville, KY). Based on these false and misleading representations, Dr. Fineman wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

389. The Company trained and instructed Relator Lorden to make these deceptive morbidity and mortality statements using JUPITER, and he did as he was instructed. The health care professionals to whom he made these statements included:

- Dr. Rajaa Nahra (Lowell, MA). Dr. Nahra treated beneficiaries participating in the AARP Part D, Health Net Part D, MassHealth, Network Health Medicaid (MA), and Silver Script Part D Government Programs. Based on the aforedescribed false and misleading representations, Dr. Nahra wrote Crestor prescriptions, which caused false claims to be submitted to these Government Programs, which in turn paid at least one false claim.
- Dr. Dean Morrell (Leominster, MA). Dr. Morrel treated beneficiaries participating in the Network Health Medicaid (MA) Government Program. Based on the aforedescribed false and misleading representations, Dr. Morrell wrote Crestor prescriptions, which caused false claims to be submitted to this Government Program, which in turn paid at least one false claim.

- Dr. Jack Chang (Lowell, MA). Based on these false and misleading representations, Dr. Chang wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

390. AstraZeneca's widespread and intentional promotion of JUPITER based on false and misleading information violated the law, and it caused physicians to prescribe Crestor, and submit many thousands of false claims for reimbursement that ultimately were paid by Government Programs.

**4. AstraZeneca Made False and Misleading Statements Concerning JUPITER to Government Programs**

391. The false and misleading JUPITER mortality primary prevention message became the main attraction in AstraZeneca's presentations to Medicare Part D Sponsors and to State Medicaid Programs around the United States.

392. For instance, on January 16, 2009, AstraZeneca RSM Mandy Hosford made deceptive and misleading statements concerning the JUPITER trial to the Idaho State Medicaid Program P&T Committee, stating that JUPITER had proven Crestor was unique among statins. She told the Committee:

> [W]e saw a 48% relative risk reduction in stroke in these patients, as well as 47% reduction in the need for arterial revascularization or entering the hospital for a case of unstable angina. Total mortality was reduced by 20%. This was also statistically significant, and this was the first time in a primary prevention study.

This emphasis on relative risk reduction was inherently misleading because absolute event reduction was less than 1 percent. *See* discussion *supra* ¶¶ 357-359. She also told the Committee that "we see substantial cardiovascular event risk reduction." However, this statement was inherently misleading, in no small part because it included hospitalizations and other procedures. What Hosford did not tell the Committee was that the total numbers of fatal heart attacks and strokes, for example, *were no different* between the study arms (a total of only

12 deaths in each arm of the trial). *See* discussion *supra* ¶¶ 360-363. Based in part on Hosford's misleading statements concerning JUPITER, the Committee voted not to change Crestor from its preferred status on the PDL.

393. The same misleading JUPITER message was delivered to Medicare Part D Sponsors. In mid-2008, for example (and well before the JUPITER results had been announced), PSS Jeff Scott gave a presentation to P&T Committee members for Welborn Health Plans (which offers several Medicare managed care plans), in which he used JUPITER as a basis upon which to promote Crestor as being superior to Lipitor because it could prevent heart attacks and strokes generally. Mr. Scott used JUPITER to encourage Welborn to place Crestor on its formulary, and he succeeded – Crestor was added to Welborn's formulary, and prescriptions for Crestor increased substantially including at least one Government Program claim.

### C. ASTRAZENECA ADMITTED THAT ITS PROMOTION OF JUPITER TRIAL DATA WAS FALSE AND MISLEADING

394. On the eve of its Seroquel settlement and Corporate Integrity Agreement with the Government in April 2010, AstraZeneca undertook efforts to create the appearance it was cleaning up its compliance with the law. On February 4, 2010, AstraZeneca's US President, Richard Fante, sent an e-mail to all Sales Specialists stating, among other things:

> Through our own internal reviews, we have identified instances of inappropriate references to Jupiter trial data during interactions with some health care professionals during late 2008 and 2009.

395. In recognition of the Company's culpability, Mr. Fante notified employees that AstraZeneca would be "taking significant remedial actions, including stronger systemic controls, individual corrective actions and enhanced management accountability for compliance oversight." And in recognition of the seriousness of its misconduct and the fact that culpability extended to the highest level of the organization, Mr. Fante notified employees that remedial

actions would include employee terminations and a reduction in the 2009 annual compensation paid to both managers and senior executives, including Mr. Fante himself.

396. One of the employees AstraZeneca terminated pursuant to Mr. Fante's message was Relator Lorden, who was terminated for *truthfully* documenting JUPITER-related promotional activities that *his supervisors directed*. *See* discussion *supra*. In terminating the employment of Relator Lorden (and others), who did only what his supervisors told and authorized him to do, AstraZeneca sought to cover up its management's complicity in – indeed, its direction of – the false and illegal promotion of the JUPITER trial. The notion that Relator Lorden and others similarly situated were mere rogues in promoting JUPITER in the way that they had, acting without any guidance or direction by management, is thus simply absurd.

397. Not long after US President Fante acknowledged the impropriety in AstraZeneca's promotion of JUPITER, on March 10, 2010, the Company convened a "Town Hall" teleconference for sales personnel in each of its three regions. The Town Hall was moderated by Vice President of Sales Mike Tilton, who told the Sales Specialists that from that day forward, AstraZeneca would "do things differently" and "win the right way" (emphasizing the latter phrase on at least four separate occasions). Vice President Tilton specifically told sales personnel that they *no longer* would be permitted to talk outside a drug's FDA-approved label. Of course, coming on the heels of President Fante's February 4, 2010 e-mail, the termination of Relator Lorden and others, and the other conduct described in this Third Amended Complaint, Tilton's presentation was a not so tacit admission that AstraZeneca had knowingly and improperly engaged in illegal promotional activities.

## X. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS TO PROMOTE CRESTOR FOR PREVENTION OF DIABETES, RENAL PROTECTION, REDUCTION OF PROTEINURIA, AND FOR ITS "PLEIOTROPIC" EFFECTS

### A. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS TO PROMOTE CRESTOR TO PREVENT OR DELAY THE ONSET OF DIABETES

398. Diabetes is a significant cardiovascular risk factor, conferring a three time absolute adjusted risk of cardiovascular disease death. The American Diabetes Association standards of care for diabetes state that statin therapy should be initiated in individuals with diabetes and other cardiovascular risk factors with a target LDL cholesterol of <100 mg/dl.

399. Shortly after Crestor launched in 2003, AstraZeneca's management initiated a cynical, false, and misleading promotion of Crestor as being the superior statin not simply to lower cholesterol, but also to prevent or delay the onset of diabetes, and it enlisted the Sales Specialists to implement the strategy.

400. Sales Specialists were trained and instructed by their DSMs to counsel physicians (including general practitioners, cardiologists, and endocrinologists) that they should prescribe Crestor for their *pre-diabetic* patients because the drug's "cardioprotective" properties could prevent or delay the onset of diabetes, even though there was no credible scientific support for that statement.

401. For example, Relator Foote was instructed by his DSM to promote Crestor to endocrinologist Jahangir Cyrus (who saw both diabetic and pre-diabetic patients) and internists Archie Womack and Jeffrey Hilb in exactly this fashion. Relator Foote did as he was instructed, and each of these Louisville, Kentucky physicians began to write greater numbers of Crestor prescriptions following this false and misleading promotion. As a result of such promotion, each of these physicians wrote at least one prescription for Crestor that was paid for by a Government Program upon the submission of a false claim.

402. However, by at least as early as 2008 (when the JUPITER trial results were announced), it was clear that there were serious problems with AstraZeneca's statement to physicians that Crestor could be used to prevent or delay the onset of diabetes. Although not discussed at length by the JUPITER investigators in their published report, the JUPITER trial *failed* to reach its intended endpoint to determine whether Crestor could prevent diabetes, and it instead showed that Crestor actually *caused* some patients to *develop* diabetes. *See* discussion *supra*.

403. Even AstraZeneca admitted in 2010 in its presentation to the FDA Advisory Committee:

> One of the secondary efficacy objectives of the JUPITER trial was to investigate whether rosuvastatin reduced the incidence of diabetes. . . . After the initiation of the JUPITER study, several statin studies reported results that did not support the hypothesis of a preventative effect of statins on development of diabetes and raised the possible association of statin treatment with reported diabetes. In JUPITER, an increased frequency of investigator reported diabetes was observed with rosuvastatin compared to placebo. . . .

404. Against this backdrop, the Company's promotion of JUPITER as evidence that Crestor was the ideal statin to prevent or delay the onset of diabetes was highly misleading and extremely dangerous.

405. Yet the Company did not correct the false and misleading message it had been pushing out to the medical community. Instead, AstraZeneca (through its DSMs) instructed Sales Specialists that they should *not* proactively discuss the true facts with physicians, and that if this issue were raised by a physician, that they should describe the JUPITER numbers regarding diabetes as a mere "statistical anomaly" that should not cause any concern.

406. The adverse consequences of AstraZeneca's over-promotion of Crestor to prevent or delay the onset of diabetes were neither hypothetical, nor academic. In 2012, the FDA

approved a new label for Crestor that warned of the risk of diabetes in patients taking the drug (*e.g.*, one in 167 patients taking a 20 mg dose).

407. Eric J. Topol, a cardiologist at Scripps Clinic, warned in a 2012 editorial published in the *New York Times* about the "unequivocal" evidence showing that statin use caused some patients to develop diabetes:

> When all the data available from multiple studies was pooled in 2010 for more than 91,000 patients randomly assigned to be treated with a statin or a sugar pill (placebo), the risk of developing diabetes with any statin was one in every 255 patients treated. . . . *The cause and effect was unequivocal because the multiple large trials of the more potent statins had a consistent excess of diabetes.*
>
> . . . The numbers increase to one in 167 for patients taking 20 milligrams of Crestor, and up to one in 125 for intensive statin treatments involving drug strategies to markedly lower cholesterol levels. . . .
>
> More than 20 million Americans take statins. That would equate to 100,000 new statin-induced diabetics. Not a good thing for the public health and certainly not good for the individual affected with a new serious chronic illness.
>
> If there were a major suppression of heart attacks or strokes or deaths, that might be justified. But in patients who have never had heart disease and are taking statins to lower their risk (so-called primary prevention), the reduction of heart attacks and other major events is only 2 per 100. And we don't know who the 2 per 100 patients are who benefit or the one per 200 who will get diabetes! Moreover, the margin of benefit to risk is quite narrow.
>
> The announcement, medication label change and health advisory by the F.D.A. were long overdue, and have brought this important public health issue to light. The information that we have does not support that this is a "small" problem unless one considers more than 100,000 new diabetics insignificant. *The problem of statin-induced diabetes cannot be underplayed while the country is being overdosed.*

Eric Topol, *The Diabetes Dilemma for Statin Users*, N.Y. TIMES (March 5, 2012) (emphasis added).

408. The Company's selling of Crestor to prevent diabetes was not only unfounded, it was dangerous to thousands of Americans. While the diabetes risk may have been acceptable for

a patient who already had heart disease or a stroke, it would have been unacceptable for many patients who never had heart disease or been diagnoses as a diabetic. AstraZeneca's unfounded promotion that Crestor could *prevent* or *delay the onset* of diabetes in these patients was false and misleading. And the evidence is such that many patients likely contracted diabetes as a result of the Company's deceptive over-promotion.

### B. ASTRAZENECA MADE FALSE AND MISLEADING STATEMENTS THAT CRESTOR HAD RENAL PROTECTIVE EFFECTS AND ALSO REDUCED PROTEINURIA

#### 1. AstraZeneca Made the False and Misleading Statement that Crestor Had Renal Protective Effects and Reduced Proteinuria

409. From the time of Crestor's launch in 2003, there had been serious questions about whether the drug would damage the kidneys. AstraZeneca responded that Crestor was "well tolerated" and had little effect on kidney function. For example, here is a slide from a 2003 AstraZeneca speaker slide deck stating that Crestor was "well tolerated from a renal standpoint":



133569.00601/36435098v.3




410. When challenged by Public Citizen concerning Crestor's safety, AstraZeneca pushed back, and told the FDA:

> The safety and tolerability of CRESTOR have been assessed using data from the largest pre-approval clinical trial program for any statin approved to date. . . . Proteinuria was seen in <1.0% of patients receiving CRESTOR 5, 10, or 20 mg and in those patients receiving placebo, atorvastatin 10 to 80 mg, simvastatin 10, 40, and 80 mg, or pravastatin 10 mg, proteinuria were transient in many cases, reversible, and not associated with long-term detrimental effects on renal function. Importantly, renal function, . . . did not deteriorate in patients receiving long-term (=96 weeks) CRESTOR therapy at any dose, irrespective of age, sex, hypertensive or diabetic status, level of renal function at baseline. . . .

*See* Letter from Catherine M. Bonuccelli, MD, Vice President, External Scientific Affairs, AstraZeneca, to Hon. Tommy Thompson, Secretary, U.S. Department of Health & Human

Services re: FDA Docket No. 2004-0113 (July 20, 2004), Enclosure at 18-20 (on file with the FDA).[16]

411. However, AstraZeneca doubled-down and promoted that Crestor was actually renal *protective*. In this 2004 speaker program slide, based on unreported "data on file," the Company stated that more than two-thirds (68 percent) of patients with dipstick-positive proteinuria prior to initiation of treatment with rosuvastatin *experienced a decrease in proteinuria levels following long-term Crestor treatment*. Unstated in the slide, however, was that this conclusion was based on only 53 patients who had dipstick-positive proteinuria prior to treatment:

[16] The sources for AstraZeneca's claim were papers by Shepherd and Brewer. *See* H. Bryan Brewer, *Benefit-risk assessment of rosuvastatin 10 to 40 milligrams*, 92 AM. J. CARDIO. 23 (2003); James Shepherd, *et al*., *Safety of rosuvastatin*, 94 AM J. CARDIO. 882 (2004).




412. And in a 2004 speaker slide deck, the Company went further and asserted that Crestor actually "tended to improve" renal function:




### 2. AstraZeneca Directed Sales Specialists to Use "Walking PIRs" to Make the False and Misleading Statement that Crestor Had Beneficial "Pleiotropic" Renal Protective Effects

413. As part of its false and misleading promotion, AstraZeneca required Sales Specialists to promote the notion that Crestor had beneficial "pleiotropic" benefits in reducing proteinuria[17] and improving kidney function (*i.e.*, the false statement that "rosuvastatin is not harmful to the kidney and might be renal protective").

414. In pharmacology, the term "pleiotropic" refers to the tendency of a drug to have multiple actions in addition to its main or intended action. This is not the same as a side effect, for pleiotropic effects of medicines generally are beneficial. For example, originally, aspirin's

---

[17] Proteinuria is the presence of an abnormal quantity of protein in the urine, which may indicate kidney damage. The most common cause of proteinuria is diabetes.

main or intended action was as a pain reliever, but it was later found to have pleiotropic cardiovascular effects – *e.g.,* lowering the risk of heart attack. Some believe that statins have pleiotropic effects, and AstraZeneca promoted that belief.

415. AstraZeneca Sales Specialists were trained to (and they did) use illegal "Walking PIRs" to make the false and misleading statement that Crestor has pleiotropic effects in reducing proteinuria and improving kidney function.

416. Normally, when a physician asked a question that would elicit off–label information, Sales Specialists were supposed to submit a "Physician Information Request" or "PIR" to the Company's Medical Affairs department, which is then permitted to respond directly to the physician by letter or fax. But AstraZeneca considered that process too cumbersome.

417. When Crestor launched, there were so many physician requests for information that AstraZeneca issued each Sales Specialist a "Walking PIR," which was basically a glossy sales aid with different types of off-label information not normally available for sales calls. The Company instructed Sales Specialists that they could use these "Walking PIRs" to bypass the normal PIR process, and share the off-label information directly with physicians. This was manifestly improper.

418. Most troubling was that the "Walking PIRs" routinely were used to address physician safety concerns with Crestor, and contained information regarding the renal concerns that arose with Crestor.

419. By instructing and enabling Sales Specialists to bypass the normal PIR process, AstraZeneca also enabled the Sales Specialists to promote pleiotropic benefits of Crestor that were outside of its approved and intended use. This approach was especially dangerous because

the use of "Walking PIRs" removed AstraZeneca's ability to track (via normal PIRs) the most commonly asked off-label questions for a new product that was already under great scrutiny.

### 3. AstraZeneca Focused Its False and Misleading Pleiotropic Sales Message on Nephrologists

420. Nephrology is the study of kidney function and the treatment of kidney problems (*e.g.,* dialysis and kidney transplantation). Sales Specialists throughout the United States were assigned to promote Crestor directly to numerous nephrologists, even though Crestor did not have any nephrology-specific approved indication.

421. Nephrologists Drs. David H. Goldstein and Robert E. Lee of Nephrology Associates, and internist/nephrologist Dr. Chaisak Pengvanich, all of Louisville, Kentucky, were among the physicians who Relator Foote detailed, at the direction of his supervisor, using Walking PIRs as described above.

422. The manner in which AstraZeneca promoted Crestor to nephrologists was fundamentally false and misleading.

423. The Walking PIR that Sales Specialists were instructed to provide to nephrologists nationwide contained data from clinical trials that allegedly showed a statin class effect for improving renal function. It contained graphs showing how a patient's baseline GFR (Glomerular filtration rate – a measure of kidney function) improved after treatment with a statin.[18] It included a graph showing what the Company asserted was "improved creatinine clearance" (another measure of kidney function) using Crestor.[19] And it included data showing that statins can help reduce C-reactive protein ("CRP") – the point being that Sales Specialists

[18] GFR estimates how much blood passes through the tiny filters in the kidneys, called glomeruli, each minute.

[19] Creatinine is a breakdown product of creatine, which is an important part of muscle. The creatinine clearance test compares the level of creatinine in urine with the level of creatinine in the blood.

should use the Walking PIRs to promote Crestor to treat diabetic retinopathy *despite* the lack of evidence to support such a statement.[20]

424. The physicians to whom these false and misleading pleiotropic sales messages were delivered included Drs. Goldstein, Lee, and Pengvanich. In each instance, these physicians increased their utilization of Crestor upon receiving this false and misleading sales message. Based on these false and misleading representations, each physician wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

#### 4. AstraZeneca Made False and Misleading Pleiotropic Statements to Promote Crestor to Treat Numerous Off-Label Conditions, Including Alzheimer's Disease and Dementia

425. Dr. James K. Liao was a very popular national speaker for AstraZeneca, often talking about the supposed pleiotropic benefits of Crestor during his Company-sponsored presentations and "Q&A" sessions at physician educational programs. Indeed, Liao's annual honorarium cap was set at an extraordinary $300,000 – an amount he reached in less than six months. Not only was Liao used heavily as a speaker, his pleiotropic message was regularly used in sales details through dissemination of journal reprints.

426. Nor was the Liao message limited to physicians who attended his programs. Sales representatives who attended Liao's presentations and heard his Company-endorsed message about Crestor's supposed off-label effects were instructed to (and they did) relay that information on to physicians who did not attend the programs themselves.

427. In addition, Relator Foote's DSM, Cindy Burrell, instructed the Sales Specialists in her district to dispel mounting safety concerns by reference to a Liao journal reprint, which

[20] CRP is a protein found in the blood, and its levels rise in response to inflammation. Elevated levels of CRP can be markers for diabetic retinopathy, a leading cause of blindness in adults with diabetes.

she circulated, that boasted of the benefits of statins to treat ischemic stroke, endothelial function, and dementia. Among the off-label and deceptive statements made by that Liao article – which Sales Specialists were instructed to (and did) repeat, were contentions about the pleiotropic benefits of Crestor to protect against the effects of Alzheimer's disease and lower the risk of depression:

- "Recent epidemiological reports suggest that statins might be protective for Alzheimer's disease, and for other types of dementia."
- "Individuals with current statin use may have a lower risk of developing depression."

*See* James Liao, *et al.*, *Pleiotropic Effects Of Statins*, 45 ANN. REV. PHARM. TOX. 89 (2005).

428. This was another (successful) effort by AstraZeneca to seize market share *not* on the basis of proven science, but on the basis of a false *suggestion* of efficacy.

### 5. AstraZeneca PLANET I and PLANET II Trials Prove that Statements of Renal Protective Effects and Reduced Proteinuria Were False and Misleading

429. Eventually, AstraZeneca's own PLANET trials demonstrated that the Company's promotion of Crestor to improve renal function and reduce proteinuria had been false and misleading.

430. On July 5, 2010, researchers announced the results of AstraZeneca's PLANET I and PLANET II trials, which the Company had hoped would support its long-promoted assertion that Crestor was superior to Lipitor in reducing proteinuria and in improving overall renal function, for all patients.

431. But the PLANET studies did *not* support those contentions, confirming that the renal protective statements had been false and misleading from the start. In fact, the PLANET trials proved just the opposite of what AstraZeneca had been promoting. In addition to showing

that high-dose *Lipitor* significantly reduced proteinuria and did not affect renal function, they showed that *Crestor* was associated with a significant *decline* in renal function and had *no effect* on reducing proteinuria.

432. Until the PLANET results were announced in 2010, AstraZeneca had convinced the medical community that most of the lipid effects they saw with statins were class effects – *i.e.,* not unique to any particular statin. But, per lead investigator Dick de Zeeuw, the PLANET results "sort of dismember[] the class effect" for the parameters studied, which showed that Lipitor and Crestor exerted quite different effects on proteinuria and renal function. *See* Daniel M. Keller, *PLANET I and II: Atorvastatin beats rosuvastatin for protecting kidneys in diabetic and nondiabetic patients*, MEDSCAPE (July 5, 2010) (on file with counsel). And taking the two PLANET trials together, Dr. David Harris (University of Sydney, Australia) said:

> It's a very important study because it has dispelled the idea about class effects of statins and has shown that two drugs [Crestor and Lipitor] that we thought were extremely similar have very different effects and, clinically, very significant effects on kidney disease. . . . It certainly would point any practicing nephrologist toward using atorvastatin rather than the other drug in this situation.

*Id*.

433. AstraZeneca was not zealous in correcting the misimpressions that had been caused by its routine falsehoods. Even though the results were available at least by March 2010, the PLANET I study was not published until nearly five years later, on February 3, 2015.[21] And the results of PLANET II (Prospective Evaluation of Proteinuria and Renal Function in Non-diabetic Patients With Progressive Renal Disease) apparently still have not been published.

---

[21] *See* Dick deZeeuw, *et al.*, *Renal effects of atorvastatin in patients with diabetes who have progressive renal disease (PLANET I): a randomized clinical trial,* The Lancet (Feb. 3 2015), available at http://www.thelancet.com (last retrieved on Feb. 18, 2015).

434. This should not be surprising, for as quick as AstraZeneca has been to promote news that it considered to be positive, it has been correspondingly slow to inform physicians about news that was negative. Indeed, Sales Specialists were *forbidden* to discuss proactively any information that was negative, thereby undercutting any hope that their promotion of Crestor might reflect a fair and balanced view of the science.

## XI. ASTRAZENECA PROVIDED KICKBACKS TO INDUCE OFF-LABEL PRESCRIPTIONS OF CRESTOR

435. AstraZeneca knows that its involvement in promotional activities should be clearly disclosed, and that it should respect the independence of health care professionals. Thus, its "Global Policy" on "Providing Information About our Products" states: "Engagements of Healthcare Professionals and Organisations for services must not be disguised promotion."

436. AstraZeneca's "Global Policy" on "Providing Information About our Products" also states: "Where the Company is providing support for third party programmes, we must . . . not exert any inappropriate influence over the content of presentations made by any speakers, whether or not the Company has sponsored the event at which the presentation is made."

437. And AstraZeneca knows that the prohibition on initiating discussion of unapproved uses of Crestor extends to Company-sponsored events at which health care professionals speak to other health care professionals.

438. Notwithstanding the clear dictates of its corporate policies, in reality AstraZeneca intentionally disguised the true nature of its promotional activities in order to mislead physicians into believing that they were receiving objective scientific information, rather than a self-interested promotional pitch, and it thereby induced them to prescribe Crestor for unapproved and unproven uses, and cause false claims for reimbursement to be submitted to Government Programs.

## A. AstraZeneca Disguised its False and Misleading Promotion of Crestor Through the Payment of Kickbacks

### 1. AstraZeneca Provided Kickbacks to Paid Speakers as Rewards for Prescribing Crestor and for Presenting False and Misleading Programs

439. Promotional speaker programs funded and conducted by pharmaceutical companies are highly regulated by the FDA. Promotional educational presentations must be "on-label" – *i.e.,* presenting only information about FDA-approved uses contained in the product's package insert. Promotional talks must also contain "fair balance" – *i.e.,* a discussion of the risks and benefits of the drug, including adverse effects, precautions, and warnings. Above all, promotional programs must be truthful and not misleading. Among other things, all presentation slides, whether provided by the pharmaceutical company or developed by the speaker, should be designed to meet these requirements. There is a narrow exception to the "on-label" rule: speakers at promotional programs may answer questions about unapproved drug uses so long as the questions posed by the audience are unsolicited. Speakers should clearly advise the audience that the answer is outside the scope of approved labeling and that they are speaking from independent medical judgment. Questions should be answered briefly, to avoid unnecessary off-label discussion, and then the discussion should be guided back to the originally planned, on-label presentation.

440. AstraZeneca's speaker programs were, by design, intended to breach these clear rules. Instead, AstraZeneca's fraudulent marketing scheme used paid local and/or national "key opinion leaders" ("KOLs"), physicians who would influence other physicians to prescribe Crestor, including for unapproved and unproven uses. This tactic was embedded in AstraZeneca's "Customer Engagement Career Ladder," which evaluated each Pharmaceutical Sales Specialists on, among other things:

**Influences Others . . .** Degree to which the PSS persuades and convinces a targeted audience

- Uses direct influence
- Uses "experts" (e.g., local thought leaders) to effectively influence physicians' prescribing habits.
- Spends time with key influences in advance of a key decision, so as to influence the outcome of that decision (e.g., assists physicians with preparing for P&T committee meetings)
- Develops physicians and health care professionals to become speakers-cultivating advocates for AstraZeneca.

These KOLs were part of AstraZeneca's vast Crestor National Educators Network ("CNEN"), some 1200 trained speakers AstraZeneca used to advocate for Crestor. AstraZeneca selected speakers based on the volume of Crestor prescriptions they wrote (*i.e.*, the more they wrote, the more likely they were to be hired), and the expectation (generally based on experience) that they would speak favorably about Crestor and promote it for unapproved and unproven uses.

441. National KOL speakers were trained in the AstraZeneca false and misleading superior safety and efficacy message at numerous symposia (with some 100 attendees at each symposium) held at posh hotels and resorts throughout the United States, including:

- May 10, 2002, Disney's Grand Floridian Resort & Spa, Orlando, Florida
- September 20, 2002, Portofino Bay Hotel, Orlando, Florida
- September 27, 2002, Renaissance Hollywood Hotel, Los Angeles, California
- August 8, 2003, Philadelphia Marriott Hotel, Philadelphia, Pennsylvania
- August 15, 2003, Sheraton Chicago Hotel, Chicago, Illinois
- September 12, 2003, Argent Hotel, San Francisco, California

Local KOL speakers were trained via on-line seminars in the misleading superior safety and efficacy message. Among those conducting the KOL speaker training both in person and via the on-line courses were Tony Zook, Senior Vice President of Commercial Operations; Paul Rogers, Crestor Commercial Brand Leader; and James W. Blasetto, M.D., Crestor Executive Director for Strategic Development.

442. Beginning at least as early as 2003, AstraZeneca set up thousands of CNEN speaker programs for health care professionals throughout the United States, and it used these programs to promulgate false and misleading Crestor promotions that flouted both its own and FDA rules. AstraZeneca selected these CNEN speakers based, if not entirely, at least in part on the recommendations of its Sales Specialists, who were instructed to recommend speaking assignments as inducements and rewards for physicians who were thought to have the potential to write high numbers of prescriptions for Crestor. In many instances, the CNEN speakers were chosen because they were high decile prescribers of statin drugs (and thus their choice was a reward for prescribing Crestor or an inducement to prescribe more Crestor). The CNEN speaker monies were thus an improper effort to induce and/or reward Crestor product allegiance and improve the relationships between the speakers and AstraZeneca.

443. The CNEN programs were rife with illegal conduct. AstraZeneca routinely paid preferred CNEN speakers thousands of dollars to promote unapproved and unproven uses of Crestor in lecture-style presentations to other physicians.

444. These CNEN presentations generally were held at three- and four-star restaurants throughout the United States (*e.g.,* Ruth's Chris Steak House and 610 Magnolia in Louisville, Kentucky, Stonehedge Inn in Tyngsboro, Massachusetts, and Café Escadrille in Burlington, Massachusetts). Although nominally excluded, guests were permitted to bring a spouse in

practice. And although meal costs were supposed to be capped at $100 per person in order to comply with regulatory requirements, the speaker programs routinely exceeded that amount, and Sales Specialists routinely fabricated names of additional attendees in order to reduce the per capita expenditures for record-keeping purposes. CNEN speakers were paid some $1,500 (more for national KOLs) to give these presentations.

445. Although any statements by its CNEN speakers were governed by the FDA laws and regulations governing promotional speech, AstraZeneca deliberately ignored the fact that its speakers illegally and routinely advocated for unapproved and unproven uses, often using their own unapproved and visual aids and data. More alarming, AstraZeneca sales personnel across the country routinely "planted" questions about unapproved and unproven uses with trusted members of the audience in order to instigate such discussions under the guise of legitimacy.

446. Dr. Jahangir Cyrus is an endocrinologist in Louisville, Kentucky who AstraZeneca paid to give CNEN presentations designed to encourage other physicians to prescribe Crestor, including for unapproved and unproven uses. When Crestor originally was approved by the FDA, Dr. Cyrus gave five to six presentations per year, and he was paid approximately $1,500 per presentation. AstraZeneca Sales Specialists routinely and intentionally "planted" questions with members of the audience in order to initiate presentations by Dr. Cyrus on unapproved and unproven uses of Crestor. In exchange for his services, Dr. Cyrus between 2010 and 2013 received $17,129 and in return rewarded AstraZeneca by writing Crestor, including in 2012 alone 409 prescriptions, some 280 of which were for Medicare Part D patients. As a result of the payment of kickbacks to Dr. Cyrus, at least one false claim was submitted to, and paid by, a Government Program.

447. Other physicians in the Louisville, Kentucky area who AstraZeneca has hired to give similar presentations, either in lecture or round table format, include Dr. Connie Anggelis, Dr. Archie Womack and Dr. Kailash Sabharwal. AstraZeneca Sales Specialists routinely and intentionally "planted" questions with members of the audience at these and other presentations in order to initiate discussions that would promote unapproved and unproven uses of Crestor.

448. As a result of these payments to provide false and misleading presentations, Dr. Anggelis wrote at least one prescription that caused a false claim to be submitted to, and paid by, a Government Program (including some 96 Crestor prescriptions for Medicare patients in 2012 alone).

449. As a result of these payments to provide false and misleading presentations, Dr. Womack wrote at least one prescription that caused a false claim to be submitted to, and paid by, a Government Program (including some 81 Crestor prescriptions for Medicare patients in 2012 alone).

450. As a result of these payments to provide false and misleading presentations, Dr. Sabharwal wrote at least one prescription that caused a false claim to be submitted to a Government Program.

451. Dr. Paul Thompson is Director of the Preventive Cardiology Program at Hartford Hospital in Hartford, Connecticut. AstraZeneca paid Dr. Thompson to give promotional talks about unapproved and unproven uses of Crestor to other doctors in the Fall of 2008, and thereafter regarding his research into unproven dosing regimens and Crestor's supposed – but never substantiated – ability to regress atherosclerosis. Although AstraZeneca Sales Specialists attended these talks and were aware that the subject matter was not approved, they did not intervene, or even address the fact that Dr. Thompson went into unapproved territory, because

AstraZeneca knew *and intended* that his talks would promote unapproved and unproven uses. AstraZeneca paid Dr. Thompson to give these presentations because it expected that he would persuade other physicians to prescribe Crestor for unapproved and unproven uses, and thereby increase AstraZeneca's share of the statin market and cause false claims for reimbursement to be submitted to Government Programs. In exchange for his services, Dr. Thompson between 2010 and 2013 received $35,495 and in return rewarded AstraZeneca by writing Crestor, including in 2012 alone at least 65 Crestor prescriptions, some 60 of which were for Medicare Part D patients, causing at least one false claim to be submitted to, and paid by, a Government Program.

452. AstraZeneca sales personnel further promoted Dr. Thompson's unapproved and unproven dosing presentations by presenting his results *sua sponte* to physicians they called upon, often providing them with copies of the study that they had downloaded from the internet.[22] Stuart Pease was among the Sales Specialists who routinely engaged in this practice, and he successfully employed it to persuade physicians such as Daniel J. O'Leary, of Leominster (MA) Medical Associates, to prescribe Crestor to more of his patients, many of whom were Medicare and Medicaid beneficiaries, causing at least one false claim to be submitted to, and paid by, a Government Program.

453. Dr. Brian Swirsky is a cardiologist affiliated with the Yale-New Haven Hospital. AstraZeneca paid Dr. Swirsky to give unapproved and unproven promotional talks to other physicians, including one at the Café Escadrille in Burlington, Massachusetts in the Spring of 2009. During this and other paid talks, Dr. Swirsky actively promoted Crestor's ability to regress atherosclerosis, as well as the JUPITER study's mortality data and evidence that CRP

---

[22] *See* Paul D. Thompson, *et al.*, *Efficacy of Rosuvastatin (5 mg and 10 mg) Twice a Week in Patients Intolerant to Daily Statins*, 101 Am. J. Cardiology 1747 (2008).

could be a useful diagnostic tool, as evidence of Crestor's alleged superiority to other statins. Dr. Swirsky made these statements without being prompted by any questions on the subject. And although multiple AstraZeneca sales personnel attended these talks and were aware that the subject matter was unapproved and unproven, they did not intervene or address the circumstance in their post-program evaluations because AstraZeneca knew *and intended* that the talks would venture into that territory. AstraZeneca paid Dr. Swirsky to give these presentations because it expected that he would persuade other physicians to prescribe Crestor for unapproved and unproven uses, and thereby increase AstraZeneca's share of the statin market and cause false claims for reimbursement to be submitted to Government Programs. In exchange for his services, Dr. Swirsky in 2010 received $34,250 and in return rewarded AstraZeneca by writing Crestor, including in 2012 alone at least 53 Crestor prescriptions, some 52 of which were for Medicare Part D patients, causing at least one false claim to be submitted to, and paid by, a Government Program.

454. Dr. Terri Jerkins is an endocrinologist from Nashville, Tennessee who AstraZeneca paid to give unapproved and unproven promotional talks for Crestor. For example, Dr. Jerkins gave such a talk on March 11, 2004, during which she engaged in extensive unapproved and unproven clinical comparisons of Crestor to other statins and actively promoted Crestor, sua sponte, as a substitute for Lipitor and Zocor regardless of the patient's diagnosed condition. She was a particularly vocal advocate during this presentation for the use of Crestor by diabetic and pre-diabetic patients. She had given a similar paid presentation on October 16, 2003. In exchange for her services, Dr. Jerkins in 2010 received $18,029 and in return rewarded AstraZeneca by writing Crestor (data prior to 2010 is not available), including in 2012 alone wrote at least 299 Crestor prescriptions, some 249 of which were for Medicare Part D patients,

causing at least one false claim to be submitted to, and paid by, a Government Program. In addition, Alan Florence of the Southern Indiana territory recorded the Dr. Jerkins program and with DSM Hodge's approval made multiple copies that he gave to each sales representative so they could distribute them to physicians in their territory.

455. At AstraZeneca, paying well-respected KOL doctors to promote unapproved and unproven uses of Crestor as described *supra*, was fundamentally misleading and deceptive, but it also was common and broadly-accepted because the primary focus at AstraZeneca was on growing market share at all costs. Managers were aware of this practice, they condoned it, and they encouraged it. Sales personnel knew that if they succeeded in growing market share, the Company generally would not scrutinize their methods. Conversely, sales personnel knew that if they did not succeed in growing market share, they would lose their jobs. Indeed, although many Sales Specialists whose employment was terminated for failure to meet sales goals, no Sales Specialists who were terminated for promoting unapproved and unproven uses of Crestor (although such promotion was common) – until AstraZeneca used that pretext to terminate Relator Lorden's (as well as hundreds of other sales representatives') employment in February 2010.

456. AstraZeneca reinforced the message that Sales Specialists would lose their jobs if they did not grow market share when Vice President Joe Canning met with 18 to 20 Northeast Sales Specialists in Boston in 2007, telling them to increase market share or be fired. Canning made no effort to limit the promotion of Crestor to its FDA-approved uses; instead, he told those in attendance: "Lipitor is continuing to grow market share, and that should be <u>our</u> business."

### 2. AstraZeneca Provided Kickbacks to Reward Health Care Professionals Who Directed Deceptive, Promotional CME Crestor Courses

457. Another key source of drug information for doctors is CME courses, usually medical lectures featuring nationally recognized health care professionals. Required to maintain medical licenses and to stay current with new developments to give patients the best medical care, many CME courses provide expert syntheses of clinical trial information.

458. The percentage of CMEs that are commercially funded increased significantly from forty-eight percent in 1998 to fifty-eight percent in 2002. Currently, sixty percent of CMEs have direct commercial sponsorship; indirect sponsorship (*e.g.*, via non-profits funded by company money) accounts for a large portion of the remainder. Total industry contributions for continuing medical education are estimated to be seventy percent or higher and total in the hundreds of millions of dollars.

459. Survey data from the Accreditation Council for Continuing Medical Education ("ACCME") show that by 2007 industry funding of accredited CME event has increased dramatically to 60 percent of all seminar funding, raising the concern that such events are biased in favor of the drug company sponsor. *See generally* Ronald M. Cervero, *The Relationship between Commercial Support and Bias* in *Continuing Medical Education Activities: A Review of the Literature* 2 (June 2008), available at http://www.accme.org/sites/default/files/null/aae6ecc3-ae64-40c0-99c6-4c4c0c3b23ec_uploaddocument.pdf (last retrieved on Mar. 4, 2015).

460. While the majority of physicians do not believe the CME activities are biased by commercial support, there is substantial evidence that CME activities are biased toward the industry sponsor. And, while most physicians believe that they are capable of making clinical decisions that are in the best interests of the patient without being influenced by commercial interests, research shows that there are many ways that independent judgment can be influenced

in unconscious ways, and thus physicians may not be aware of how industry support of a CME activity may influence their clinical decisions. *Id.* at 9.

461. The content of CME programs is intended to be independent of drug companies. According to ACCME standards and FDA guidance, independent educational grants cannot be tied to the purchase, sale, prescription, or recommendation of the company's products. *See* Standards for Commercial Support: Standards to Ensure Independence in CME Activities (ACCME, Adopted April 2004, Approved Sept 2004); U.S. Department of Health and Human Services, Food and Drug Administration, *Guidance for Industry: Industry-Supported Scientific and Educational Activities*, 62 Fed. Reg. 232 (Dec. 3, 1997).

462. Responsibility for and control over the selection of content, faculty, educational methods, materials, and venue belong *solely* to the CME provider in accordance with their guidelines.

463. According to AstraZeneca's own Global Policy on Ethical Interactions: "In no circumstances may the engagement of an External Stakeholder or Patient be used as a means to gain access or to disguise Promotional Activities, or create an appearance of doing so." *See* AstraZeneca, Global Policy on Ethical Interactions, Policy No. 10.3. This Policy was observed only in the breach.

464. AstraZeneca set up its off-label Crestor CME promotional programs through various medical education vendors including: (i) Dowden Health Media ("Dowden" d/b/a Convergent Health Solutions), 110 Summit Avenue, Montvale, NJ 07645; (ii) Galen Publishing, LLC ("Galen"), an HMG Company, P.O. Box 340, Somerville, NJ 08876; (iii) Medical Communications Media, Inc. ("MCM Education"), 54 Friends Lane, Suite 125 Newtown, Pennsylvania 18940; and (iv) Partners in Healthcare Education, LLC, 8607 Southlake Circle, Ft

Myers, Florida 33908. In exchange for their services, these medical education vendors received "unrestricted educational grants" from AstraZeneca. AstraZeneca funded the entire cost of the programs, it selected the speakers, and it exercised complete control over the subject matter. Many of the seminars were provided free-of-charge to the participants, and in some instances paid the participants an honorarium for attending.

465. The medical education vendors' mass CME mailings were designed to (and did) solicit many from the same pool of payor decision makers that AstraZeneca had targeted for its managed markets advisory boards and colloquies (*see* discussion *infra* ¶¶ 468-483), and the mailings were designed to (and did) appeal to numerous other doctors and pharmacists as well, nearly all of whom treated Government Program beneficiaries. Many of the seminars were conducted as audio conferences and webinars, and were thus viewed as free CME events throughout the United States by thousands of health care professionals. Since attendees applied for CME credit, AstraZeneca and/or its medical education vendors had records of the attendees and their addresses so that its Sales Specialists and managed markets personnel could (and did) follow-up with efforts to ensure success with Crestor pull-through activities.

466. Educational materials concerning Crestor and its off-label uses were distributed in advance of the CMEs. AstraZeneca controlled the content of the materials, including any PowerPoint slides used (copies of which were distributed in the workbooks as well as on the internet). After the seminar program, a CME "monograph" was frequently sent to all participants purporting to incorporate the seminar discussions, but in actuality it had been carefully refined by AstraZeneca to ensure the Crestor marketing message would feature prominently.

467. The supposedly independent CME seminars, workbooks, slides and monographs contained the same Crestor false and misleading safety and comparative superiority statements that were rejected by the FDA, the same off-label and false superiority statements of Crestor's disease risk reduction outcomes, and the same off-label promotion of Crestor for regression of atherosclerosis and (after rejection of that indication by the FDA) for halting or stopping the progression of atherosclerosis. Among the illegal, promotional CMEs AstraZeneca sponsored were:

- A free on-line lipid information program (released in 2002) with a disease awareness campaign available on a large, multi-component educational activity called APOLLO (http://www.apollolipids.org), which included on-line offerings, live meetings, webcasts, newsletters, and slide sets. The APOLLO campaign included a "Steering Committee" made up of 20 national KOLs (Drs. Christie Ballantyne, Bryan Brewer, Michael Clearfield, Michael Davidson, Prakash Deepwania, Antonio Gotto, Robert Guthrie, Alan Hirsch, Donald Hunninghake, Robert Illingworth, Pamela Kushner, Alexandra Jane Lansky, Peter Libby, McRae Linton, Carol Mason, James McKenney, Lori Mosca, Thomas Pearson, Jorge Plutzsky, Paul Thompson), a calendar of upcoming CMEs, a list of on-line CME events, speaker slides (including rosuvastatin slides to be used by local physicians), Medline abstracts, and quarterly Apollo Chronicles (complete with articles about use of Crestor ghost-authored for its Steering Committee members). AstraZeneca sponsored Apollolipids.org with an unrestricted educational grant, and it controlled the content of the program. Apollolipids.org and its CME content included the false and misleading Crestor superiority message, and it was offered as a free inducement to over 100,000 health care professionals throughout the United States.

- A free on-line CME titled "Advances in the Management of Dyslipidemia in Diabetic Patients," (released in 2003) sponsored by AstraZeneca and facilitated by Johns Hopkins. AstraZeneca sponsored the CME with an unrestricted educational grant, and it controlled the content of the program. The CME included a promotional review of off-label posters discussing the false and misleading Crestor superiority message, and it was offered as a free inducement to thousands of physicians throughout the United States.
- A free on-line CME Audio Conference Workbook (released on September 25, 2006) that asserted Crestor was superior to Lipitor and other statins. These materials were false and misleading and in direct violation of the FDA's March 8, 2005 Warning Letter. AstraZeneca sponsored the CME through an unrestricted educational grant, and it controlled the content of the program. The CME was promotional in nature, and it was offered as a free inducement to thousands of physicians throughout the United States.
- A free on-line CME Audio Conference Workbook (released on September 2006) titled "Rosuvastatin [Crestor] Development Program." This CME made precisely the same false and misleading Crestor safety statements that had been expressly rejected by the FDA, including that: "rosuvastatin appears as safe, or safer, than existing statins." AstraZeneca sponsored the CME through an unrestricted educational grant, and it controlled the content of the program. The CME was promotional in nature, and it was offered as a free inducement to thousands of physicians throughout the United States.
- A free on-line CME Program titled "Monograph for Managed Care Medical Directors, Pharmacy Directors, Physicians and Pharmacists" (released on February 1, 2007 and available for CME credit through February 28, 2009) that cited AstraZeneca's ASTEROID study and concluded that Crestor "can actually reverse atherosclerotic

disease." AstraZeneca sponsored the CME through an unrestricted educational grant, and it controlled the content of the program. The CME was promotional in nature, and it was offered as a free inducement to thousands of physicians throughout the United States

- A free on-line CME Program titled "Dyslipidemia in Managed Care: How an Effective Treatment Approach Can Improve Return on Investment." This on-line monograph (released on February 1, 2007 and available for CME credit through August 22, 2007) offered free CLE credit for managed care medical directors, pharmacy directors, physicians and pharmacists. AstraZeneca sponsored the through an unrestricted educational grant to MCM Education, and it controlled the content of the program. The CME was promotional in nature, and it included the false and misleading STELLAR superiority message concerning Crestor, and was offered as a free CME inducement to thousands of physicians throughout the United States.
- A free on-line CME Program titled "Coronary artery disease 2008: Can we identify and treat risk factors earlier and more aggressively?" This program (released on August 1, 2008 and available through July 31, 2009) was sponsored through an "unrestricted educational grant" from AstraZeneca, and it was "facilitated" by Partners in Healthcare Education, LLC with content "developed by" Dowden. But, AstraZeneca actually controlled the content of the program. The CME included the false and misleading STELLAR superiority message concerning Crestor, and it was offered as a free CME inducement to thousands of physicians throughout the United States.
- A free on-line CME Program titled "Effective Management of Dyslipidemia in Minority Populations – Applying Current Data to Practice" (released in May 2009) led by one of AstraZeneca's paid speakers, Dr. Keith C. Ferdinand. Dr. Ferdinand was a highly sought

after and influential speaker, and a regular recipient of AstraZeneca speaking, research and consulting monies; for example, he received at least $163,020 for his services between 2010 and 2013. In the program – which remains available on-line today – Dr. Ferdinand initiated a promotional discussion of JUPITER and the use of CRP levels as a predictive risk factor, and he and his co-presenters encouraged attendees and on-line readers to rely upon JUPITER and its CRP-related data to prescribe Crestor off-label. AstraZeneca sponsored the CME through an unrestricted educational grant, and it controlled the content of the program. The CME was promotional, and it was offered free of charge to thousands of physicians throughout the United States.

468. AstraZeneca's managed markets personnel also disseminated the promotional monograph reprints to key decision makers at payors (including to Government Programs) as part of the Company's nationwide promotion to P&T Committees.

469. AstraZeneca also implemented a special form of CME for payor medical directors it called "colloquies." Far from being just general educational discussions relevant to these health care professionals, these colloquies were actually Company-funded and -controlled Crestor advertisements that AstraZeneca had arranged to influence key decision makers in order promote Crestor's addition as a preferred agent on PDLs. The AstraZeneca-chosen speakers at the colloquies made the same false safety, superiority, and off label message, aiming to win preferred formulary status.

470. Colloquy attendees were payor medical directors, including from numerous Government Programs. The colloquies were organized and implemented for AstraZeneca by MediMedia Managed Care, 780 Township Line Road, Yardley, PA 19067 ("MediMedia"), a managed care medical marketing company, but they were funded and controlled by AstraZeneca.

Medical directors were thus a captive audience brainwashed with the Company's Crestor superiority and safety promotional message.

471. The initial Crestor colloquy was held on May 16-18, 2002 at the Lowe's Ventana Canyon Resort in Tucson. It provided $1,500 for every medical director attendee as well as payment of all expenses including airfare, meals, and limo services.

472. After the colloquy, AstraZeneca also funded, again through MediMedia, two written supplements to *Managed Care Magazine,* summarizing the colloquy content. Again, AstraZeneca made sure the print versions included its false statements of Crestor's superiority.

473. These AstraZeneca-sponsored false and misleading promotional materials, posing as objective educational supplements, were mailed to thousands of physicians and other health care ·professionals (*i.e.,* to all subscribers of *Managed Care Magazine*), and were offered as free CME credit. *Managed Care Magazine* bills itself as the "leading voice in managed care" with 60,000 total subscribers, including managed care executives and other health care program decision makers at Government Programs. Again, the colloquy materials were promotional advertisements for Crestor.

474. A second Crestor colloquy was held on May 1-3, 2003, at the Park Hyatt Hotel in Chicago. Again, AstraZeneca corrupted the substance of the colloquy with the same false safety, superiority and off-label Crestor promotional spin.

475. And again, the colloquies were followed by AstraZeneca-controlled free CME supplements to *Managed Care Magazine*, each containing AstraZeneca hyped versions of the false and misleading colloquy.

476. AstraZeneca has controlled the topics, content and choice of speakers of these purportedly independent CMEs and turned them into off-label, promotional seminars aimed at

influencing key Government Program decision makers and prescribing physicians to prescribe Crestor.

477. These false and misleading promotional CMEs were offered as free inducements to thousands of physicians throughout the United States, and they caused at least one false Crestor claim to be submitted to, and paid for, by a Government Program.

### 3. AstraZeneca Used Bogus Advisory Boards to Promote Crestor Illegally and to Manipulate Key Formulary Decision Makers

478. As part of its strategy to obtain favorable Crestor formulary placement using false safety and superiority statements, off-label promotion, and financial inducement, AstraZeneca convened numerous Crestor managed care "advisory boards" with payor formulary decision makers (including from Government Programs) as attendees.

479. These advisory boards were designed to appear to be vehicles to share scientific information among AstraZeneca and health care professionals from health plans. In practice, however, they were thinly-veiled (and illegal) marketing events intended to promote Crestor for off-label uses, compensate doctors and formulary decision makers for their loyalty to Crestor, and persuade others to support Crestor as a preferred formulary agent.

480. AstraZeneca again retained MediMedia to conduct these bogus advisory boards.

481. The advisory boards' purported aim was to be payor "focus groups." At least one purpose in convening the advisory boards was as a vehicle to promote Crestor's false safety and superiority statements, its false and misleading regression message, its false and misleading outcomes data/studies, and/or to provide illegal financial inducements to attendees to promote and recommend Crestor as a preferred formulary agent.

482. These Crestor advisory boards were routinely held at high-end hotels or resorts throughout the United States. AstraZeneca paid all expenses, including food, travel, and lodging

for each of the invited attendees. Each medical director attendee received an honorarium of up to $1,500 and expenses.

483. Under AstraZeneca's direction, MediMedia recruited the key medical director decision makers from payors throughout the country, including from Government Programs.

484. The clear and intended goal of the advisory boards was to induce these decision makers to add Crestor as a preferred agent on their plans' formularies.

**4. AstraZeneca Provided Kickbacks to NCEP ATP III Guideline Authors to Induce Their Support of Crestor's False and Misleading Superiority and Safety Messages**

485. A key part of AstraZeneca's scheme for off-label promotion of Crestor was the development and use of clinical practice guidelines ("Guidelines"). The Guidelines — summaries of "expert" opinions, which are often used to identify standards of care — are an important source of drug information for physicians. Guidelines are typically formulated by panels of experts under the auspices of medical professional societies, non-profit organizations, or quasi-governmental organizations.

486. Guideline panel experts, however, often have economic ties to the drug industry via research grants or speaker fees. These financial relationships with pharmaceutical companies "may create conflicts of interest and a risk of undue influence on judgment both for entities that sponsor the development of clinical practice guidelines and for the individuals who participate in their development." *See* COMM. ON CONFLICT OF INTEREST IN MED. RESEARCH, EDUC. AND PRACTICE, BD. ON HEALTH SCI. POLICY, INST. OF MED. OF THE NAT'L ACADEMIES, *Conflict of Interest in Medical Research, Education, and Practice* at 183 (Bernard Lo, *et al.* eds., National Academies Press April 21, 2009).

487. Consensus groups that require industry funding for the development of practice guidelines propose topics that will attract industry funding (*e.g.*, a guideline on how to use a

product but not whether it should be used). Among the topics proposed to potential funders, drug companies may favor topics and questions for which the evidence is most likely to support conclusions favorable to that particular company's products.

488. The lack of transparency of conflict of interest policies in Guidelines "limits the ability of guideline readers to consider financial relationships and conflicts of interest as part of their assessment of the credibility of a set of guidelines." *Id.* at 205.

489. Financial ties between the experts who formulate Guidelines and the drug companies whose drugs are being considered are not unusual. Indeed, one study concluded that 59 percent of the experts participating in Guidelines creation have such financial ties. *See* Niteesh K. Choudhry, *et al., Relationships between authors of clinical practice guidelines and the pharmaceutical industry.* 287 J. AM. MED. ASS'N 612–17 (2002).

490. Use of Guidelines became a central part of AstraZeneca's marketing message for Crestor. Sales Specialists were directed to use the recommendations of the National Cholesterol Education Program to support use of Crestor. *See* NATIONAL HEART, LUNG, AND BLOOD INST., NATIONAL INST. OF HEALTH, *Third Report of the Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults* ("NCEP ATP III"), NIH Publication No. 02-5215 (September 2002).

491. On September 13, 2006, for example, DSM Gary Eggers e-mailed his team:

> The key to overcoming the outcomes obstacle is to know the NCEP Interim guidelines like the back of your hand. . . . 20 years of statin data all point to the undeniable fact that lower is better. How you get there is as important as where you end up. High efficacy (best in class) w/ low mg dosing a. . . is the better path and only Crestor can go there.

The NCEP ATP III Guidelines became a central part in AstraZeneca's superiority and safety message.

492. Even though there had been no conflicts of interest disclosed in the NCEP Guidelines, one week after they were published – as conflicts started to appear in the press – the National Institutes of Health ("NIH") published the complete list of conflicts on its website: eight of the nine authors had financial ties to statin makers, including seven of the nine who had ties to AstraZeneca.

493. AstraZeneca's ties to the NCEP ATP III authors were particularly troubling. For example, one of the authors of the NCEP ATP III update, H. Brian Brewer, M.D., a full-time NIH employee in charge of overseeing the formulation of the cholesterol guidelines, had received $114,000 in consulting fees from statin makers between 2001 and 2003 in addition to his full-time salary, including significant revenues from AstraZeneca.

494. The line between whether Brewer was a government research scientist or a cheerleader for AstraZeneca had become especially blurred. Not only did he appear in 2003 at the FDA Advisory Board hearing on approving Crestor, Brewer was also the editor of the proceedings of an AstraZeneca-sponsored symposium, and the author of an August 2003 article that was published (with AstraZeneca sponsorship) by the American Journal of Cardiology as a special supplement just in time for the Crestor launch.[23] The supplement cited the misleading STELLAR superiority and safety statements discussed *supra*, and although it noted that Brewer was an NIH employee, it said nothing of his ties to AstraZeneca.

495. Sales Specialists were instructed to, and they did, disseminate reprints of the Brewer supplement to health care providers nationally, along with a misleading message that the

[23] *See* H. Brian Brewer, *Benefit-risk assessment of Rosuvastatin 10 to 40 milligrams,* 21 AM. J. CARDIO. 92 (2003). The American Journal of Cardiology has a monthly circulation of approximately 38,000 health care professionals who would have received a reprint of the AstraZeneca-funded Brewer supplement.

lead NCEP ATP III author (and an NIH employee) had endorsed Crestor as the best statin: "Compared with these other statins, the benefit/risk profile of [Crestor] . . . is very favorable."

### B. AstraZeneca's Kickbacks to Health Care Professionals Induced Them to Prescribe Crestor and Cause False Claims to be Submitted and Paid

496. AstraZeneca knows that it is not permitted to pay doctors to encourage them to prescribe Crestor over other drugs. Thus, AstraZeneca's corporate policy on "Marketing to health care professionals" states:

> In the US, we only provide [to doctors] items that are educational and will benefit patient care such as medical textbooks. We do not provide diagnostic equipment, reminder items or gifts that provide personal benefits.
>
> We don't give gifts anywhere in the world in exchange for prescribing a medicine.
>
> * * * *
>
> We will not pay any health care professional for prescriptions for any of our medicines.

497. However, AstraZeneca also knew that physicians could be successfully persuaded through incentive payments to change their prescribing behavior. Indeed, a paper recently published on-line by researchers at the Rady School of Management at the University of California at San Diego and the University of Washington School of Public Health concluded – on the strength of data from twelve drug companies (including AstraZeneca), more than 330,000 physicians (*i.e.*, over half of all physicians licensed in the United States), and nearly one billion prescriptions – that "when a drug company pays a doctor he is more likely to prescribe that company's drug." *See* Joseph Engelberg, *et al.*, *Financial Conflicts of Interest in Medicine* (Jan. 26, 2014), available at SSRN 2297094 (on file with counsel). Thus, even though most health care professionals "strive to provide [their patients] with the best possible medical care, there is empirical evidence that various types of financial and economic incentives [] play a major role in

how medical providers practice medicine." Niam Yaraghi, Ctr. for Tech. Innovation at BROOKINGS, *A Sustainable Business Model for Health Information Exchange Platforms: The Solution to Interoperability in Healthcare IT* 4 (January 30, 2015) (on file with counsel) (citing Engelberg, *et al.*, *supra*).

498. Accordingly, driven by profit motive above all else, the notion that AstraZeneca sales personnel could, should and did "buy" doctors' loyalty to the Crestor brand was pervasive. As described below, the Company did so under the guise of a policy that stated:

> We do pay certain health care professionals to undertake a variety of services for AstraZeneca. These include:
>
> - Speaking at, chairing or moderating scientific or educational meetings
> - Providing consultancy services and advice
> - Running training for our sales representatives and other employees to help them understand the impact that diseases such as asthma and diabetes have on patients' lives.
>
> * * * * *
>
> Any food provided is secondary to the purpose of the meeting and is of modest value. It is only provided to people attending the meeting in a professional capacity.

AstraZeneca routinely and intentionally violated both the substance and spirit of this policy.

499. As discussed *supra*, AstraZeneca also entertained the physicians who attended these presentations – many of whom routinely attended the same presentation multiple times – with lavish dinners that their spouses were permitted to attend free of charge. The Company's goal in doing so was to influence the physicians who attended these presentations to prescribe Crestor or to reward their past prescribing, including for the off-label uses discussed at those presentations.

500. The Company trained and instructed Relator Lorden to entertain health care professionals with lavish dinners in order to buy their support for Crestor, and he did as he was instructed. The health care professionals he entertained in this fashion included:

- Dr. Malathi Bhat (Lowell, MA). Based on these inducements, Dr. Bhat wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. Carlos Del Rio (Dracut, MA). Based on these inducements, Dr. Del Rio wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.
- Dr. David Getz (Clinton, MA). Based on these inducements, Dr. Getz wrote Crestor prescriptions, which caused false claims to be submitted to Government Programs, which in turn paid at least one false claim.

501. And AstraZeneca was not bashful about offering a *quid pro quo* to physicians who prescribed Crestor as their first-line statin. Indeed, the list of "best practices" distributed within the New England region specifically encouraged Sales Specialists to ask physicians the following questions:

> Is Crestor your first choice statin for advanced dyslipidemia therapy? What do you need from me (information, studies, food, pens, pt. education) to make Crestor your first choice?
>
> Dr., if I do x,y,z, you will make Crestor your first choice?

502. The foregoing caused false claims for Crestor to be submitted to, and paid by, Government Programs.

### 1. AstraZeneca Used "Tutorials" and "Journal Club" Dinners as Pretexts to Induce Prescriptions of Crestor and Cause False Claims to be Submitted

503. AstraZeneca knew that it could not directly pay health care professionals to induce them to prescribe Crestor or receive a sales pitch, and the physicians knew this as well. Nevertheless, many physicians would not meet with an AstraZeneca sales specialist unless they were "wined and dined" in the process. Accordingly, AstraZeneca utilized "tutorials" and "journal clubs" to create an appearance that the compensation it provided to prescribing physicians was earned income. These events were not educational, but rather were about relationship building and influencing the physicians' prescribing behavior. AstraZeneca's Sales Specialists understood that they would be "graded" on the success of their tutorials in prompting physicians to write more prescriptions for Crestor, including for off-label uses.

504. As used by AstraZeneca, a tutorial was a 15-20 minute presentation by the doctor to one or more Sales Specialists, generally on an AstraZeneca study selected by the PSS because it supported an unapproved use of the drug. Although the PSS already was fully familiar with the subject of the tutorial, the physician typically was paid $150 or more for his or her time. For example, DSM Steven Humphry authorized payment to Dr. Jeffrey Hilb of Louisville, Kentucky for just such a tutorial in June 2005. Dr. Seth Bilazarian of Haverhill, Massachusetts also benefited from this program. Based on these false and misleading representations, Dr. Hilb and Dr. Bilazarian wrote Crestor prescriptions, which caused false claims to be submitted for their Government Program beneficiaries, and the Government Programs in turn paid at least one false claim for each physician's beneficiaries.

505. In other instances, AstraZeneca paid for monthly "journal club" dinners at exclusive restaurants during which they discussed AstraZeneca's GALAXY trials (*e.g*,. STELLAR, ASTEROID, METEOR, and JUPITER) and openly discussed unapproved and

unproven uses of Crestor. The pretext for AstraZeneca's payment for the meals was that each time a physician who had been paid for a tutorial would then discuss the subject of that tutorial at the dinner. In this manner, AstraZeneca accomplished two objectives: it initiated and promoted an unapproved and unproven use of Crestor, and it traded lavish dinners for brand loyalty with physicians who would not meet with the Company otherwise. Among the physicians who participated in the tutorials and journal clubs were Drs. Jeffrey Hilb, James Bosler, Archie Womack, Max Irick, and Philip Feitelson. Illustrating that the journal clubs "worked" to increase sales of Crestor for unapproved and unproven uses, the volume of such prescriptions written by these physicians generally increased following a journal club dinner, including at least one prescription for each physician's Government Program beneficiaries.

506. AstraZeneca also sought to disguise its illegal payment of kickbacks to physicians through the use of "preceptorships." In a preceptorship, an AstraZeneca PSS would pay a "high volume" physician (*i.e.,* one who wrote a high number of statin prescriptions), typically $250 or $300 to permit the PSS to follow him or her during patient examinations for a half–day, or as much as $1,500 for an entire day. In theory, the purpose of a preceptorship was to provide the PSS with insight into how the physician decided which statin to prescribe. In practice, since the PSS generally did not learn anything new and rarely stayed with the physician for the entire day, it was a thinly-veiled means of funneling unearned cash to physicians who the Company expected would reciprocate by writing more prescriptions for Crestor, including for unapproved and unproven uses for Government Program beneficiaries.

507. Preceptorships were part of each sales specialist's accountability. In some areas of the country, each PSS was expected to participate in at least three preceptorships per year with high volume physicians not generally susceptible to AstraZeneca's other marketing practices.

The Sales Specialists understood that they would be "graded" on the success of their preceptorships in inducing physicians to write more prescriptions for Crestor, including for off-label uses.

508. The preceptorships succeeded in expanding Crestor's market share. One physician who AstraZeneca sought to influence through a preceptorship is Dr. Kevin Lusk of Ferdinand, Indiana. Dr. Lusk sees patients in an economically depressed community, and he did not write many prescriptions for Crestor. AstraZeneca wanted to induce him to prescribe Crestor, including for unapproved and unproven uses, for more of his patients. Because Dr. Lusk would not accept free samples of Crestor to distribute, AstraZeneca instead paid him $250 to do a preceptorship with a sales specialist in early 2009. Although AstraZeneca paid for a full-day preceptorship, the sales specialist followed Company practice and expectations and did not stay the entire day. Following this preceptorship, Dr. Lusk began to write a greater number of prescriptions for Crestor, including at least one prescription for Government Program patients, demonstrating that the preceptorship induced him to prescribe Crestor. Other physicians include Drs. Arun Umat and Shanker Chanderamani of Bluegrass Cardiology in Louisville who were paid by AstraZeneca through the preceptorship program, and who similarly wrote at least one Crestor prescription per physician for Government Program beneficiaries.

509. Another physician who AstraZeneca sought to influence through a paid preceptorship is Dr. Donald Levine, an endocrinologist in Leominster, Massachusetts. Prior to the preceptorship, Dr. Levine had not been prescribing what AstraZeneca considered to be "enough" Crestor, but had been prescribing Vytorin instead. This was a red flag for AstraZeneca, which paid Dr. Levine between $250 and $300 for a half-day preceptorship with Relator Lorden. Eventually, due to the inducement, Dr. Levine began prescribing what

AstraZeneca considered to be "enough" Crestor, including at least one prescription for a Government Program beneficiary.

510. The notion that Sales Specialists were expected to induce physicians through lavish dinners, journal clubs, paid tutorials and preceptorships repeatedly was confirmed at the supervisory level. District Sales Managers had to authorize funding for each tutorial, preceptorship, journal club or other dinner event, and they routinely did so. DSM Jack Hodge underscored the importance of such funding to the marketing program when he stated during a district sales team conference call on September 11, 2009: "I'm trying to give you guys the tools, you know, the money. We will spend money like the government cause we are out of budget, but I'm trying to give you guys the authority to go out [and] do as many lunches as you can."

511. In sum, AstraZeneca used tutorials, journal clubs, and preceptorships as a way to gain an audience with otherwise reluctant physicians in order to induce them to prescribe Crestor, in lieu of other statin therapies, for unapproved and unproven uses based on false and misleading information. The strategy worked, and it caused the submission of false claims for reimbursement of Crestor prescriptions to be submitted to, and paid by, Government Programs

## XII. THE FRAUDULENT MARKETING SCHEME CAUSED FALSE CLAIMS TO BE SUBMITTED TO, AND PAID BY, GOVERNMENT PROGRAMS

512. At all times relevant to this Third Amended Complaint, AstraZeneca knew that it was prohibited from (i) initiating any promotion of Crestor for an unapproved and unproven use, (ii) promoting Crestor through false and misleading comparative marketing techniques, including unsubstantiated superiority statements, and (iii) paying kickbacks to doctors in exchange for their decisions to prescribe Crestor for their patients.

513. AstraZeneca's false and misleading promotional schemes served their intended purpose by causing health care professionals to prescribe Crestor for non-approved and non-medically accepted uses, which in turn caused the submission and payment of false claims for reimbursement, resulting in hundreds of millions of dollars in improper payments by Government Programs and the *Qui Tam* States.

514. Due in no small part to AstraZeneca's illegal conduct, Crestor has been heavily used for non-medically accepted uses by Medicaid, Medicare Part D, and other Government Program participants and beneficiaries. Thus, AstraZeneca's illegal conduct has caused Government Programs and *Qui Tam* States to pay hundreds of millions of dollars that they should not have paid, unjustly enriching AstraZeneca.

### A. ASTRAZENECA'S OFF-LABEL PROMOTION CAUSED THE SUBMISSION OF FALSE CLAIMS AND MAKING OF MATERIAL FALSE STATEMENTS TO GOVERNMENT PROGRAMS

515. In order for a drug to be eligible for reimbursement by Medicare Part D, it must be approved by the FDA and used for a "medically accepted indication." 42 U.S.C. § 1395w-102(d)(1) & (e)(4)(A)(ii); *see also* discussion *supra*. A medically accepted indication is defined as any use that is FDA-approved or supported by one or more citations included or approved for inclusion in one of the specified drug compendia. *See* discussion *supra*. Specific coverage policies and decisions are generally made by program sponsors, who contract with CMS to provide such coverage and are responsible for making coverage determinations in accordance with statutes and regulations.

516. In order for a drug to be eligible for reimbursement under the Medicaid Program, the drug's manufacturer must first enter into a rebate agreement with the U.S. Department of Health and Human Services. Once a manufacturer has entered into a drug rebate agreement, a state generally is required to cover that manufacturers' outpatient drugs that are covered under

the state plan unless "the prescribed use is not for a medically accepted indication." 42 U.S.C. § 1396r-8(d)(1)(B)(i); *see* discussion *supra*.

517. Other Government Programs adhere to similar rules in determining a drug's eligibility for reimbursement and generally require that, in order to be covered, a drug must be prescribed for an FDA-approved use or a use supported in one or more drug compendia.

518. AstraZeneca promoted Crestor falsely and misleadingly for uses that were neither approved by the FDA nor supported by any of the compendia, and thus those uses were ineligible for reimbursement by Government Programs, including Medicare and Medicaid.

519. As a result of AstraZeneca's false and misleading promotion of Crestor for uses that were neither approved by the FDA nor supported by any of the compendia, health care professionals prescribed Crestor for such uses.

520. As a result of these prescriptions, pharmacies filled prescriptions for Crestor and submitted false claims to Government Programs for payment of those prescriptions. *See* discussion *infra* ¶¶ 525-541.

521. Because these Crestor prescriptions were ineligible for reimbursement by Government Programs, these claims for reimbursement were false within the meaning the Federal False Claims Act and State analogues.

522. AstraZeneca's false and misleading off-label promotion of Crestor therefore caused the submission of claims that were false, and not eligible for reimbursement, to Government Programs.

523. AstraZeneca engaged in this false and misleading off-label promotion knowingly, and with the intent to cause the submission of false claims to Government Programs.

524. As a consequence of AstraZeneca's false and misleading off-label promotion of Crestor, Government Programs paid reimbursements for these false claims, and as a result have incurred, and continue to incur, significant damages.

525. By causing these false claims that it knew were ineligible for reimbursement to be submitted to, and paid by, Government Programs, AstraZeneca knowingly and intentionally made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described *supra*, ¶¶ 149-171.

**1. Submission of False Claims to Medicaid**

526. The pharmacies where AstraZeneca's drugs, including Crestor, are filled agree to provide pharmaceuticals to the patients served by the *Qui Tam* States' Medicaid Programs, and the *Qui Tam* States in turn reimburse these pharmacies for the cost of these drugs, including Crestor, plus a fixed dispensing fee meant to provide the dispenser with a profit for providing services to Medicaid patients.

527. The pharmacies submit their Medicaid claims for reimbursement by "batching them" daily, and submitting them electronically to the *Qui Tam* States. These claims include the claims for off-label prescriptions for Crestor, as well as claims tainted by illegal kickbacks. In instances in which claims were for off-label prescriptions or tainted by illegal kickbacks, the pharmacies made false representations and false claims concerning Medicaid reimbursement directly to the *Qui Tam* States on a daily basis.

528. As part of each electronic claim, the pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that (as Medicaid providers) they are in compliance with all applicable Federal and state laws.

529. The pharmacies are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

530. The Federal Government provides matching funds and ensures that the states comply with minimum standards in the administration of the program. The Federal share of states' Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on each individual state's per capita income compared to the national average. Among the *Qui Tam* States, the FMAP is at least 50 percent, and in some instances, as high as 77 percent. For example, for FY2009, the Federal share in Delaware was 50 percent; the Federal share in Iowa was 62.62 percent.[24]

531. Through the FMAP process, State Medicaid administrators obtain the Federal Government's share of the pharmacies' reimbursements by submitting a quarterly Form 64 to CMS. For this reason, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the Federal Government within the meaning of the FCA.

532. The Federal Government pays Medicaid claims through a continuing line of credit certified by the Secretary of the Treasury in favor of the state payee. 42 C.F.R. § 430.30(d)(3), (4). The Federal Government authorizes the state payee "to draw Federal funds as needed to pay the Federal share of disbursements." 42 C.F.R. § 430.30(d)(3). The state can draw down on those funds only to pay the Medicaid claims of health care professionals. 42 C.F.R. § 430.30(d).

533. The funds made available to the state thus remain Federal funds, in a Federal Reserve account, until they are drawn by the state and used to pay the institutions or pharmacies' claims.

534. The Federal Government also "approves" within the meaning of the FCA the claims submitted and paid through the Medicaid Program. When a state presents its Form 64

---

[24] *See* OFFICE OF THE ASSISTANT SEC'Y FOR PLANNING AND EVALUATION, U.S. DEP'T OF HEALTH & HUMAN SERVS., *Federal Medical Assistance Percentages or Federal Financial Participation in State Assistance Expenditures FMAP*, *available at* http://aspe.hhs.gov /health/fmap.htm (last retrieved June 23, 2013).

(*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports. Based on the information in the reports, CMS determines and approves whether the claims that the state paid with Federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

535. Because the Form 64 constitutes the United States' means for approving and paying the amount of Federal funds expended by the state, these reports overstated the amount of Federal funds to which the state was entitled by the amount fraudulently paid as a result of off-label prescriptions for the AstraZeneca drugs, as well as claims tainted by illegal kickbacks. They were, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

536. The claims for reimbursement submitted to the *Qui Tam* States by the physicians' offices and pharmacies, which in turn caused the *Qui Tam* States to submit claims for reimbursement to the Federal Government pursuant to FMAP, constituted false claims as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

**2. Submission of False Claims to Medicare Part D**

537. The pharmacies where the AstraZeneca drugs, including Crestor, are filled agree to provide pharmaceuticals to Medicare Part D Plans ("PDPs") for Medicare patients that they serve, and the PDPs in turn reimburse these pharmacies for the cost of these drugs, including Crestor, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicare patients. PDPs (or MA-PDPs) are administered under contract with CMS

by private entities such as Blue Cross Blue Shield plans, large commercial insurers such as Humana, and pharmacy benefit managers.

538. Every time a beneficiary fills a prescription covered under Part D, PDPs must submit a summary called the prescription drug event, or PDE record. The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit. CMS uses the PDE record to calculate reimbursement to PDPs for the cost of Crestor, plus an amount meant to provide the PDPs with a profit for administering the PDP.

539. CMS reimbursement to PDPs pursuant to the PDE overstated the amount of Federal funds to which PDPs were entitled by the amount fraudulently paid as a result of off-label prescriptions for the AstraZeneca drugs, as well as claims tainted by illegal kickbacks. They were, therefore, false records or statements caused to be made or used to get false claims paid and approved by the United States.

540. The claims for reimbursement submitted to PDPs by the pharmacies, which in turn caused the PDPs to submit claims for reimbursement to the Federal Government, constituted false claims as a result of the claims for reimbursement for off-label prescriptions and claims tainted by illegal kickbacks.

541. AstraZeneca's false and misleading off-label promotional schemes served their intended purpose by causing health care professionals to write off-label prescriptions for Crestor for non-medically accepted uses, which in turn caused the submission of false claims for reimbursement to be submitted, resulting in hundreds of millions of dollars in improper payments by Government Programs and the *Qui Tam* States.

542. Due to AstraZeneca's illegal conduct, Crestor has been heavily used for non-medically accepted uses by Medicaid, Medicare Part D, and other Government Program

participants and beneficiaries. Thus, AstraZeneca's illegal conduct has caused Government Programs and *Qui Tam* States to pay hundreds of millions of dollars that they should not have paid, unjustly enriching AstraZeneca.

### B. AstraZeneca's Kickbacks Caused the Submission and Payment of False Claims, and the Making of Material False Statements to Government Programs

543. AstraZeneca provided health care professionals and medical education contractors with remuneration related to promotional speaker programs, advisory boards, tutorials, preceptorships, professorships, and CME programs, all in return for or to induce purchasing, ordering, arranging for or recommending purchasing or ordering of goods or items for which payment was made by Government Programs, in violation of the Federal Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), and state analogues. *See* discussion *supra* ¶¶ 439-483.

544. These kickbacks caused health care professionals to prescribe, or recommend that other health care professionals prescribe, Crestor.

545. These actions caused pharmacies to submit claims for reimbursement for AstraZeneca's drugs to Government Programs, including Medicare and Medicaid. *See* discussion *supra* ¶¶ 511-541.

546. Government Programs, including Medicare and Medicaid, do not cover claims for drugs when a kickback is involved in the underlying transaction — including claims that were submitted for payment of a drug as a result of a kickback given to a health care professional to prescribe that drug. Where a kickback is involved in the underlying transaction, any claim submitted to a Government Program is false within the meaning of the Federal False Claims Act and State analogues.

547. In order to enroll in and bill Medicare, providers must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

548. Similarly, any provider who submits claims to Medicaid must sign a provider agreement with each Medicaid Program to which it submits claims. The Iowa Provider Agreement, for example, requires that in order to be eligible to receive payment under the Iowa Medicaid Program, providers must certify that they will:

> [c]omply with all applicable Federal and State laws, administrative rules and written policies of the Iowa Medicaid Program, including but not limited to Title XIX of the Social Security Act (as amended), the Code of Federal Regulations, [and] the Federal anti-kickback statute….

Iowa Medicaid Provider Agreement General Terms § 1.4. The Agreement further requires that:

> [a]ll such goods and/or services [paid for by the Iowa Medicaid Program] must have been rendered by Provider in accordance with Federal and State law and the State policies and procedures set forth in the Iowa Medicaid Provider Manual. Financial obligations of the State of Iowa are contingent upon funds for that purpose being appropriated.

*Id.* § 2.1.

549. Claims for Crestor that were submitted to Government Programs and were tainted, in part or in whole, by kickbacks provided by AstraZeneca were, therefore, false within the meaning of the Federal False Claims Act and State analogues.

550. AstraZeneca's payment of kickbacks caused the submission to Government Programs of claims for reimbursement that were false, and not eligible for reimbursement, and it caused the payment of those claims by Government Programs.

551. AstraZeneca's payment and offers of payment of kickbacks were made knowingly and with the intent to cause false claims to be submitted to Government Programs.

552. Government Programs paid reimbursements for those false claims, and as a result have incurred, and continue to incur, significant damages due to AstraZeneca's illegal payment of kickbacks.

553. By causing these claims that it knew were ineligible for reimbursement to be submitted to, and paid by, Government Programs, AstraZeneca made, used, or caused to be made or used, false records or statements material to false or fraudulent claims. *See* discussion *supra* ¶¶ 511-541.

**<u>COUNT I</u>**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A)[25]**

554. Relators incorporate by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

555. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A).

556. As a result of Defendants' actions alleged herein, the United States has been, and may continue to be, severely damaged.

**<u>COUNT II</u>**
**(Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)[26]**

557. Relators incorporate by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

---

[25] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

[26] To the extent wrongdoing occurred after May 20, 2009, this Third Amended Complaint should be deemed to include violations of the Federal False Claims Act's recent amendments.

558. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B).

559. The United States, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Crestor prescribed to patients enrolled in Government Programs.

560. As a result of Defendants' actions alleged herein, the United States has been, and may continue to be, severely damaged.

## COUNT III
## (Violation of California False Claims Act)

561. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

562. This is a civil action brought by Relators on behalf of the State of California against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

563. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

564. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made

or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

565. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

566. The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

567. As a result of Defendants' actions as set forth above, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

**COUNT IV**
**(Violation of Colorado Medicaid False Claims Act)**

568. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

569. This is a civil action brought by Relators, on behalf of the State of Colorado, against Defendants under the Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-306(2).

570. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

571. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

572. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

573. The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

574. As a result of Defendants' actions, as set forth above, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT V
**(Violation of Connecticut False Claims Act for Medical Assistance Programs)**

575. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

576. This is a civil action brought by Relators on behalf of the State of Connecticut against Defendants under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat § 17b-301d.

577. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 17b-301b(1).

578. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Gen. Stat. § 17b-301b(2).

579. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Gen. Stat. § 17b-301b(7).

580. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

581. As a result of Defendants' actions as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VI**
**(Violation of Delaware False Claims and Reporting Act)**

582. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

583. This is a civil action brought by Relators on behalf of the Government of the State of Delaware against Defendants under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

584. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201 (a)( 1 ).

585. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

586. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

587. The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health care programs funded by the State of Delaware.

588. As a result of Defendants' actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VII**
**(Violation of District of Columbia False Claims Act)**

589. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

590. This is a civil action brought by Relators, on behalf of the District of Columbia, against Defendants under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

591. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

592. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

593. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

594. The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

595. As a result of Defendants' actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VIII**
**(Violation of Florida False Claims Act)**

596. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

597. This is a civil action brought by Relators, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. § 68.083(2).

598. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

599. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

600. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

601. The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

602. As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT IX**
**(Violation of Georgia False Medicaid Claims Act)**

603. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

604. This is a civil action brought by Relators, on behalf of the State of Georgia, against Defendants pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

605. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid Program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

606. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid Program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

607. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

608. The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

609. As a result of Defendants' actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

**COUNT X**
**(Violation of Hawaii False Claims Act)**

610. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

611. This is a civil action brought by Relators, on behalf of the State of Hawaii, against Defendants under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

612. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

613. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

614. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

615. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

616. As a result of Defendants' actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XI**
**(Violation of Illinois False Claims Act)**

617. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

618. This is a civil action brought by Relators, on behalf of the State of Illinois, against Defendants under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

619. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

620. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

621. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

622. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

623. As a result of Defendants' actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XII**
**(Violation of Indiana False Claims and Whistleblower Protection Act)**

624. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

625. This is a civil action brought by Relators, on behalf of the State of Indiana, against Defendants under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

626. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

627. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

628. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

629. The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of those claims

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

630. As a result of Defendants' actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**
**(Violation of Iowa False Claims Act)**

631. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

632. This is a civil action brought by Relators, on behalf of the State of Iowa, against Defendants under the Iowa False Claims Act, Iowa Code § 685.3(2)(a).

633. Defendants, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

634. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

635. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to the State of Iowa, or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

636. The State of Iowa, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

637. As a result of Defendants' actions, as set forth above, the State of Iowa and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**
**(Violation of Louisiana Medical Assistance Programs Integrity Law)**

638. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

639. This is a civil action brought by Relators, on behalf of the State of Louisiana's medical assistance programs, against Defendants under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

640. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

641. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

642. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

643. The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Defendants, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendants' claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

644. As a result of Defendants' actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT XV**
**(Violation of Maryland False Health Claims Act)**

645. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

646. This is a civil action brought by Relators, on behalf of the State of Maryland, against Defendants under the Maryland False Health Claims Act of 2010, Md. Code Ann., Health-Gen. § 2-604.

647. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

648. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

649. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still me making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

650. The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

651. As a result of Defendants' actions, as set forth above, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVI**
**(Violation of Massachusetts False Claims Act)**

652. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

653. This is a civil action brought by Relators, on behalf of the Commonwealth of Massachusetts, against Defendants under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

654. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

655. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

656. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

657. The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs

and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

658. As a result of Defendants' actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVII**
**(Violation of Michigan Medicaid False Claims Act)**

659. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

660. This is a civil action brought by Relators, on behalf of the State of Michigan, against Defendants under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

661. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

662. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

663. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendants has applied for or is receiving a benefit with intent to obtain a benefit to which Defendants were not entitled or in an amount greater than that to which Defendants were entitled, in violation of Mich. Comp. Laws § 400.603(3).

664. Defendants, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

665. The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

666. As a result of Defendants' actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVIII**
**(Violation of Minnesota False Claims Act)**

667. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

668. This is a civil action brought by Relators, on behalf of the State of Minnesota, against Defendants under the Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

669. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Minnesota, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

670. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

671. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

672. The State of Minnesota, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State and State subdivision funded health insurance programs.

673. As a result of Defendants' actions, as set forth above, the State of Minnesota and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**
**(Violation of Montana False Claims Act)**

674. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

675. This is a civil action brought by Relators, on behalf of the State of Montana against, Defendants under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

676. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

677. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

678. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

679. The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

680. As a result of Defendants' actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XX**
**(Violation of Nevada False Claims Act)**

681. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

682. This is a civil action brought by Relators, on behalf of the State of Nevada, against Defendants under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

683. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

684. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

685. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

686. The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

687. As a result of Defendants' actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXI**
**(Violation of New Jersey False Claims Act)**

688. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

689. This is a civil action brought by Relators, on behalf of the State of New Jersey, against Defendants pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

690. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any

contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

691. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

692. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

693. The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

694. As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXII**
**(Violation of New Mexico Medicaid False Claims Act)**

695. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

696. This is a civil action brought by Relators on behalf of the State of New Mexico against Defendants under the State of New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

697. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4A.

698. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may be continuing to present or causing to be presented a claim for payment under the Medicaid program that is not authorized or is not eligible for benefit under the Medicaid program, in violation of N.M. STAT. ANN. § 27-14-4B.

699. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved, in violation of N.M. STAT. ANN. § 27-14-4C.

700. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of New Mexico or one of its political subdivisions, in violation of N.M. STAT. ANN. § 27-14-4E.

701. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

702. As a result of Defendants' actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIII**
**(Violation of New York False Claims Act)**

703. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

704. This is a civil action brought by Relators, on behalf of the State of New York, against Defendants under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

705. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

706. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

707. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

708. The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

709. As a result of Defendants' actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIV**
**(Violation of North Carolina False Claims Act)**

710. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

711. This is a civil action brought by Relators, on behalf of the State of North Carolina, against Defendants under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

712. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing

to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

713. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

714. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

715. The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the State or its political subdivisions.

716. As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXV**
**(Violation of Oklahoma Medicaid False Claims Act)**

717. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

718. This is a civil action brought by Relators, on behalf of the State of Oklahoma, against Defendants pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

719. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

720. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

721. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

722. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

723. As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVI**
**(Violation of Rhode Island False Claims Act)**

724. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

725. This is a civil action brought by Relators, on behalf of the State of Rhode Island, against Defendants pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

726. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

727. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

728. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing

to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

729. The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

730. As a result of Defendants' actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**
**(Violation of Tennessee Medicaid False Claims Act)**

731. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

732. This is a civil action brought by Relators, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

733. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid Program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

734. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing

to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid Program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

735. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid Program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

736. The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid Program.

737. As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVIII**
**(Violation of Virginia Fraud Against Taxpayers Act)**

738. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

739. This is a civil action brought by Relators, on behalf of the Commonwealth of Virginia, against Defendants under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

740. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information,

knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

741. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

742. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

743. The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

744. As a result of Defendants' actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIX**
**(Violation of Washington Medicaid False Claims Act)**

745. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

746. This is a civil action brought by Relators, on behalf of the State of Wisconsin, against Defendants under the Washington Medicaid False Claims Act, S. 5978, 2nd Cong. § 205.

747. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of S. 5978, 2nd Cong. § 202(1)(a).

748. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of S. 5978, 2nd Cong. § 202(1)(b).

749. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay

or transmit money to the State of Washington, or its political subdivisions, in violation of S. 5978, 2nd Cong. § 202(1)(g).

750. The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

751. As a result of Defendants' actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXX**
**(Violation of Wisconsin False Claims for Medical Assistance Law)**

752. Relators incorporate herein by reference the preceding paragraphs of this Third Amended Complaint as though fully set forth herein.

753. This is a civil action brought by Relators, on behalf of the State of Wisconsin, against Defendants under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(5)(a).

754. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

755. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing

to be made or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

756. The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of State funded health insurance programs.

757. As a result of Defendants' actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

**WHEREFORE,** Relators pray for judgment against Defendants as follows:

A. That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*; Cal. Gov't Code § 12650 *et seq.*; Colo. Rev. Stat. § 25.5-4-304 *et seq.*; Conn. Gen. Stat. § 17b-301a *et seq.*; Del. Code Ann. tit. 6, § 1201 *et seq.*; D.C. Code § 2-308.13 *et seq.*; Fla. Stat. § 68.081 *et seq.*; Ga. Code Ann. § 49-4-168 *et seq.*; Haw. Rev. Stat. § 661-21 *et seq.*; 740 Ill. Comp. Stat. § 175/1 *et seq.*; Ind. Code § 5-11-5.5 *et seq.*; Iowa Code § 685.1 *et seq.*; La. Rev. Stat. Ann. § 46:437.1 *et seq.*; Md. Code Ann., Health-Gen. § 2-601 *et seq.*; Mass. Gen. Laws ch. 12, § 5A *et seq.*; Mich. Comp. Laws § 400.601 *et seq.*; Minn. Stat. § 15C.01 *et seq.*; Mont. Code Ann. § 17-8-401 *et seq.*; Nev. Rev. Stat. § 357.010 *et seq.*; N.J. Stat. Ann. § 2A:32C-1 *et seq.*; N.M. Stat. Ann. § 27-14-1 *et seq.*; N.Y. State Fin. Law § 187 *et seq.*; N.C. Gen. Stat. § 1-605 *et seq.*; Okla. Stat. tit. 63, § 5053 *et seq.*; R.I. Gen. Laws § 9-1.1-1 *et seq.*; Tenn. Code Ann. § 71-5-181 *et seq.*; Va. Code Ann. § 8.01-216.1 *et seq.*; S. 5978, 2nd Cong. § 201 *et seq.*; and Wis. Stat. § 20.931 *et seq*.

B. That judgment be entered against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty

of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than five thousand dollars ($5,000) per claim or more than ten thousand dollars ($10,000) per claim as provided by Cal. Gov't Code § 12651(a), to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

E. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen.

Stat. § 17b-301b(b)(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 17b-301b(b)(1), to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

F. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Delaware False Claims and Reporting Act, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

G. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-308.14(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-308.14(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

H. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each false claim as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

I. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

J. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

L. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

M. That judgment be entered in Relators' favor and against Defendants in the amount of damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

N. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for

in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no more than ten thousand dollars ($10,000) per violation or an amount equal to three times the value of the illegal remuneration, whichever is greater, as provided for by La. Rev. Stat. Ann. § 46:438.6(B)(1), plus up to ten thousand dollars ($10,000) for each false or fraudulent claim, misrepresentation, illegal remuneration, or other prohibited act, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(a), plus payment of interest on the amount of the civil fines imposed pursuant to Subsection B of § 438.6 at the maximum legal rate provided by La. Civil Code Art. 2924 from the date the damage occurred to the date of repayment, as provided by La. Rev. Stat. Ann. § 46:438.6(C)(l)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

O. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) for each false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

P. That judgment be entered in Relators' favor and against Defendants for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil

penalty of not less than five thousand dollars ($5,000) dollars and not more than ten thousand dollars ($10,000), plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendants' actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch 12. § 5B, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Q. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendants' unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relators, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

R. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Minnesota or its political subdivisions for the value of payments or benefits provided as a result of Defendants' unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of Defendants' unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000)

per claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relators, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

S. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) for each act, pursuant to Nev. Rev. Stat. § 357.040(1), to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

U. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as

provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than and not more than the civil penalties allowed under the Federal False Claims Act (31 U.S.C. § 3729 *et seq.*) for each false or fraudulent claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

V. That judgment be entered in Relators' favor and against Defendants for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.M. Stat. Ann. § 27-14-4, multiplied as provided for in N.M. Stat. Ann. § 27-14-4, to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

W. That judgment be entered in Relators' favor and against Defendants for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

X. That judgment be entered in Relators' favor and against Defendants for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Y. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

Z. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per claim as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes

undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

AA. That judgment be entered in Relators' favor and against Defendants for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) pursuant to Tenn. Code Ann. § 71-5-182(a)(l), to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

BB. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

CC. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in S. 5978, 62nd Cong. § 202(1), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per claim as provided by S. 5978, 62nd Cong. § 202(1), to the extent such penalties shall fairly compensate

the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

DD. That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Wisconsin or its political subdivisions multiplied as provided for in Wis. Stat. § 20.931(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) as provided by Wis. Stat. § 20.931(2), to the extent such multiplied penalties shall fairly compensate the State of Wisconsin or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

EE. That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

FF. That judgment be granted for Relators against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit; and

GG. That Relators be granted such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Relators demand a trial by jury of all issues so triable.

BLANK ROME LLP

By: */s/ David A Dorey*
David A. Dorey (DE I.D. No. 5283)
Steven L. Caponi (DE I.D. No. 3484)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone: 302-425-6400

Facsimile: 302-425-6464

Dated: March 5, 2015 *Counsel for Plaintiff/Relator*

Of Counsel:

Alan M. Freeman
BLANK ROME LLP
600 New Hampshire Avenue, NW
Suite 1200
Washington D.C. 20037

W. Scott Simmer
SIMMER LAW GROUP PLLC
600 New Hampshire Avenue, NW
Suite 10-A
Washington, D.C. 20037